**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| COMMONWEALTH LAND TITLE INS. CO.,<br>Plaintiff,<br>v.<br>IDC PROPERTIES, INC.,<br>Defendant and Third Party Plaintiff,<br>v.<br>TIMOTHY MORE and EDWARDS ANGELL PALMER & DODGE LLP,<br>Third Party Defendants. | Case No. 01-400T |

**MOTION FOR SUMMARY JUDGMENT OF THIRD PARTY DEFENDANTS**
**EDWARDS ANGELL PALMER & DODGE LLP AND TIMOTHY MORE**

Pursuant to Fed. R. Civ. P. 56(c) and Local Rule Cv 56, third party defendants Edwards Angell Palmer & Dodge LLP, formerly Edwards & Angell ("Edwards & Angell"), and Timothy More ("More") hereby move for summary judgment on all claims of the Third Party Complaint of third party plaintiff IDC Properties, Inc. ("IDC'). As is more fully explained in the supporting Memorandum of Law and the Statement of Undisputed Facts, both filed herewith, the claims of the Third Party Complaint are deficient for two reasons.

First, under the applicable Rhode Island statute of limitations, legal malpractice actions must be commenced within three years of the incident that gave rise to the action. Here, IDC waited ***almost five years*** after learning of a possible legal malpractice claim against Edwards & Angell and Mr. More to file its Third Party Complaint. As the Court recognized at the May 9, 2007 status conference, all four counts of IDC's Third Party Complaint simply allege a legal

malpractice claim under different guises, and there is no genuine dispute as to any material fact. IDC's claims against Edwards & Angell and Mr. More are therefore all time-barred under ample and dispositive Rhode Island case law.

Second, even if Count I of the Third Party Complaint, styled as an "indemnification" claim, were not a time-barred legal malpractice claim, summary judgment must be granted because IDC cannot establish two necessary elements for indemnification: (1) that it could be liable to the plaintiff Commonwealth Land Title Ins. Co. ("Commonwealth"); and (2) that it has incurred or could incur damages payable to Commonwealth.

**WHEREFORE,** for the aforementioned reasons and for those reasons stated in the third party defendants' accompanying Memorandum of Law, filed herewith, as supported by the third party defendants' Statement of Undisputed Material Facts, also filed herewith, Edwards & Angell and Mr. More move for an order:

1. Entering summary judgment for third party defendants Edwards Angell Palmer & Dodge LLP and Timothy More; and

2. Granting such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

EDWARDS ANGELL PALMER & DODGE LLP
and TIMOTHY MORE

By their attorneys,

/s/ Deming E. Sherman
Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)

Harold Hestnes (admitted *pro hac vice*)
John G. Fabiano (admitted pro *hac vice*)
Benjamin M. Stern (admitted *pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
(617) 526-5000 (fax)

Dated: May 21, 2007

CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of May, 2007, a copy of the within Motion was sent by electronic means (ECF) to the following counsel of record:

Steven E. Snow, Esq.
ses@psh.com

Robert K. Taylor, Esq.
rkt@psh.com

Stephen F. Gordon, Esq.
sgordon@gordonhaley.com

Peter J. Haley, Esq.
haley@gordonhaley.com

W. Mark Russo, Esq.
mrusso@frlawri.com

Christopher M. Mulhearn, Esq.
cmulhearn@frlawri.com

and mailed to the following counsel of record:

Harold Hestnes, Esq.
John G. Fabiano, Esq.
Benjamin M. Stern, Esq.
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109

/s/ Deming E. Sherman
Deming E. Sherman

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| COMMONWEALTH LAND TITLE INS. CO., Plaintiff, v. IDC PROPERTIES, INC., Defendant and Third Party Plaintiff, v. TIMOTHY MORE and EDWARDS ANGELL PALMER & DODGE LLP, Third Party Defendants. | Case No. 01-400-T |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF THIRD PARTY DEFENDANTS EDWARDS ANGELL PALMER & DODGE LLP AND TIMOTHY MORE**

**INTRODUCTION**

Summary judgment must be granted in favor of Edwards Angell Palmer & Dodge LLP, formerly Edwards & Angell LLP ("Edwards & Angell") and Timothy More ("More") (collectively, the "Third Party Defendants") for two reasons.

First, under the applicable Rhode Island statute of limitations, legal malpractice actions must be commenced within three years of the incident that gave rise to the action. Here, the third party plaintiff, IDC Properties, Inc. ("IDC"), waited ***almost five years*** after learning of a possible legal malpractice claim against Edwards & Angell and Mr. More to file its Third Party Complaint. As the Court recognized at the May 9, 2007 status conference, all four counts of IDC's Third Party Complaint simply allege a legal malpractice claim under different guises, and

there is no genuine dispute as to any material fact. IDC's claims against the Third Party Defendants are therefore all time-barred under ample and dispositive Rhode Island case law.

Second, even if Count I, styled as an "indemnification" claim, were not a time-barred legal malpractice claim, summary judgment must be granted because IDC cannot establish two necessary elements for indemnification: (1) that it could be liable to the plaintiff Commonwealth Land Title Ins. Co. ("Commonwealth"); and (2) that it has incurred or could incur damages payable to Commonwealth.

## SUMMARY OF MATERIAL UNDISPUTED FACTS[1]

In or around 1992, IDC acquired title to several parcels at Goat Island South in Newport, Rhode Island. (SUF ¶ 2; Third Party Complaint at ¶ 4 (Docket No. 33).)

In or around December 1997, IDC requested that its attorney, Mr. More, then a partner at Edwards & Angell, obtain title insurance on the North Unit of Goat Island South (the "North Unit"). (SUF ¶¶ 4-5; Third Party Complaint at ¶ 10.) In late 1997 and early 1998, Mr. More communicated with Michael Mellion at Commonwealth about issuing title insurance to IDC. (SUF ¶¶ 6-7.) Commonwealth subsequently issued a $7 million title insurance policy to IDC dated January 13, 1998. (SUF ¶ 8; Third Party Complaint at ¶ 10.). The policy purported to insure the North Unit and the rights to construct improvements. (SUF ¶ 8.)

In late 1998, IDC requested that Mr. More obtain increased title insurance coverage on the North Unit and add other Goat Island South units to the policy. (SUF ¶ 9; Third Party Complaint at ¶ 11.) Mr. More again contacted Mr. Mellion. (SUF ¶¶ 10-11.) As a result, Commonwealth increased its coverage to $12 million and added other units at Goat Island South to the policy. (SUF ¶ 12.)

---

[1] Pursuant to Local Rule Cv 56, the Third Party Defendants have separately filed a Statement of Undisputed Facts. All references to "SUF" in this memorandum refer to that document.

On or about May 29, 1999, three condominium associations at Goat Island South commenced an action against IDC in Rhode Island Superior Court challenging certain amendments to the Goat Island South Condominium Declaration and alleging that IDC had improperly extended its development rights. (SUF ¶ 13.) Neither Edwards & Angell nor Mr. More represented IDC in connection with that litigation. (SUF ¶ 14.)

On August 24, 2001, Commonwealth filed this declaratory judgment action against IDC, seeking a declaration that it did not have to provide coverage under the two title insurance policies it had issued to IDC for the North Unit. (SUF ¶14; Complaint (Docket No. 1).) Commonwealth contended that, because Mr. More and IDC had known of the intention of the three condominium associations to file the Superior Court action (and Mr. More had been involved in the drafting of a tolling agreement), and because neither Mr. More nor IDC disclosed that information to Commonwealth before it issued its policies in January 1998 and February 1999, Commonwealth was not obligated to provide insurance coverage. (SUF ¶ 16; Complaint at ¶¶ 5-6, 11-12.)

IDC filed an Answer and Counterclaims on September 28, 2001, asserting that Commonwealth was obligated to provide insurance coverage. (SUF ¶ 17; Answer and Counterclaims (Docket No. 4).) Despite IDC's full knowledge that Commonwealth based its claim that the insurance coverage could be avoided upon the actions of Mr. More (then an Edwards & Angell partner), IDC made no effort to join, implead, or otherwise assert claims against Mr. More and Edwards & Angell at that time. (SUF ¶ 17; Answer and Counterclaims.)

Nearly five years after Commonwealth filed its Complaint (and four and one-half years after IDC filed its Answer and Counterclaims), on March 27, 2006, IDC filed its Third Party Complaint against Edwards & Angell and Mr. More, alleging that Edwards & Angell and Mr. More failed to exercise reasonable care and diligence in obtaining title insurance for IDC from

Commonwealth in 1998 and 1999.[2] (SUF ¶¶ 18-21; Third Party Complaint at ¶¶ 9-33.) Neither Edwards & Angell, nor Mr. More have represented IDC in this action. (SUF ¶ 15.)

**ARGUMENT**

## I. THE THREE-YEAR STATUTE OF LIMITATIONS FOR LEGAL MALPRACTICE ACTIONS BARS ALL OF IDC'S CLAIMS.

### A. The Applicable Statute of Limitations Bars IDC's Legal Malpractice Claim.

The General Laws of Rhode Island state:

> [A]n action for legal malpractice shall be commenced *within three (3) years of the occurrence of the incident which gave rise to the action*; provided, however, that:
>
> …
>
> In respect to those injuries due to acts of legal malpractice *which could not in the exercise of reasonable diligence* be discoverable at the time of the occurrence of the incident which gave rise to the action, suit shall be commenced within three (3) years of the time that the act or acts of legal malpractice should, *in the exercise of reasonable diligence*, have been discovered.

R.I. Gen. Laws § 9-1-14.3 (2005) (emphasis added); *see also Guay v. Dolan*, 685 A.2d 269, 272 (R.I. 1996) (district court required to apply three-year statute of limitations on legal malpractice claims).

### B. IDC's Claims, Which Were Filed More Than Three Years After the Alleged Incidents Occurred, Are Time-Barred.

The "incidents" allegedly giving rise to IDC's legal malpractice claim occurred in connection with the issuance of the two Commonwealth insurance policies. (SUF ¶¶ 19-21; Third Party Complaint at ¶¶ 10-12.) By definition, they could not have happened later than February 1999, when Mr. More obtained, on IDC's behalf, the second title insurance policy on the North Unit. (SUF ¶ 12; Third Party Complaint at ¶ 11.) IDC does not allege any later

[2] IDC filed a motion for leave to serve the Third Party Complaint on October 31, 2005. (Motion for Leave to Serve Third Party Complaint (Docket No. 22).). After hearing argument on the motion, the Court orally allowed it on March 14, 2006. IDC filed the Third Party Complaint on March 27, 2006.

incidents or conduct giving rise to its legal malpractice claim. (SUF ¶16; Third Party Complaint.)

Unless IDC can demonstrate the applicability of the "reasonable diligence/discovery" exception contained in the three-year statute of limitations, its legal malpractice claim is time-barred. *See, e.g.*, *Harvey v. Snow*, 281 F. Supp.2d 376, 377 (D. R.I. 2003) (Lagueux, J.) (granting motion for summary judgment where suit alleging legal malpractice was instituted after expiration of the three-year statute of limitations); *Rocchio v. Moretti*, 694 A.2d 704, 704-05 (R.I. 1997) (affirming grant of summary judgment where suit was filed after expiration of three-year statute of limitations on legal malpractice claims); *Penn-Dutch Kitchens v. Grady*, 651 A.2d 731, 733 (R.I. 1994) (legal malpractice claim barred by three-year statute of limitations where alleged conduct occurred over three years prior to assertion of claim).

### C. IDC Cannot Demonstrate the Applicability of the "Reasonable Diligence/Discovery" Exception.

IDC bears the burden of proving that, under R.I. Gen. Laws § 9-1-14.3, it "could not in the exercise of reasonable diligence" have discovered the alleged "acts of legal malpractice" within the applicable three-year statute of limitations. *See Feddersen v. Garvey*, 427 F.3d 108, 112 (1st Cir. 2005) (construing "discovery rule" under New Hampshire statute of limitations for legal malpractice actions, which is substantively identical to the Rhode Island statute). IDC cannot meet this burden.

Commonwealth filed its declaratory judgment action on August 24, 2001 against IDC, alleging that, while IDC was seeking to obtain title insurance from it in 1998 and 1999, Mr. More and IDC were aware of plans by three condominium associations to file legal challenges to IDC's development rights and that Mr. More had negotiated a tolling agreement prior to Commonwealth's issuance of the policy. (Complaint at ¶ 11 & p. 9.) Commonwealth further alleged that neither IDC, nor Mr. More, informed it of the potential legal challenge by the

condominium associations or the existence of the tolling agreement when it issued its 1998 and 1999 policies. (SUF ¶¶ 19-21; Third Party Complaint at ¶ 12.) These allegations, in large part, form the basis of the Third Party Complaint. (*Compare* Complaint at ¶¶ 4-6, 11-12, *with* Third Party Complaint at ¶¶ 10-14.)

Commonwealth's Complaint should have reasonably put IDC on notice of the conduct underlying its legal malpractice claim against Edwards & Angell and Mr. More. *See Harvey*, 281 F. Supp.2d at 382 (the question of whether the injury was "still illusory" irrelevant for purposes of determining when statute of limitations begins to run); *Rocchio*, 694 A.2d at 706 (discovery rule not applicable where earlier litigation should have alerted party of alleged negligence of counsel prior to expiration of three-year statute of limitations); *see also Canavan v. Lovett, Schefrin and Harnett*, 862 A.2d 778, 783-84 (R.I. 2004) ("Under the discovery rule, '[i]t is not necessary for the plaintiff to fully appreciate the potential liability, or even be convinced of an injury; the objective standard requires only that the plaintiff be aware of the facts that would place a reasonable person on notice that a potential claim exists'.") (citation omitted).

At the May 9, 2007 status conference, IDC articulated (for the first time) its theory that the accrual period for its legal malpractice statute of limitations begins to run only when (or if) IDC is "injured" by a final determination that Commonwealth does not have to provide coverage under the title insurance policies. IDC claims that *Rosen Constr. Ventures, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, 364 F.3d 399 (1st Cir. 2004) supports its argument. In fact, *Rosen* ***contradicts*** IDC's claim. In *Rosen*, the First Circuit held that a client suffers injury from legal malpractice when it "expends additional legal fees to ameliorate the harm caused by [his original attorney's] error." *Rosen*, 364 F.3d at 405 (citing cases). Because IDC began to pay attorneys' fees by at least September 28, 2001, when it filed its Answer and Counterclaims (SUF ¶ 17; Answer and Counterclaims at p. 7), there can be no serious dispute that it has already

suffered an "injury" within the meaning of *Rosen*. Furthermore, *Rosen* emphasizes that the "critical inquiry" is when IDC "knew, or reasonably should have known" of the alleged malpractice. *See Rosen*, 364 F.3d at 405. In this instance, IDC "knew or reasonably should have known" it had a potential legal malpractice claim against Edwards & Angell and Mr. More at the time it answered Commonwealth's Complaint. Yet, IDC waited ***about five years*** to bring a legal malpractice claim against Edwards & Angell and Mr. More.[3]

**D. The Three-Year Statute of Limitations Bars All of IDC's Claims.**

IDC cannot avoid the legal malpractice three-year statute of limitations simply by calling its legal malpractice claim something else. This Court and the Rhode Island Supreme Court already have determined that the statute of limitations for legal malpractice applies to all other claims based on the same set of factual allegations. *See Harvey*, 281 F. Supp.2d at 377 (granting summary judgment because the plaintiffs' legal malpractice, negligence, and breach of contract claims all arose from the same set of factual allegations and were therefore all time-barred under the legal malpractice three-year limitations); *Penn-Dutch Kitchens*, 651 A.2d at 733 (holding that negligence and breach of contract claims brought nearly four years after attorney's alleged acts or omissions barred by three-year statute of limitations applicable to legal malpractice actions and ordering trial court to enter summary judgment accordingly).

Like Rhode Island, Massachusetts also has a three-year statute of limitations for legal malpractice actions. *See* Mass. Gen. Laws ch. 260, § 4. As in *Harvey*, the District of Massachusetts has applied Massachusetts' three-year statute of limitations to breach of contact and breach of fiduciary duty claims where, as here, the claims "all clearly relate to the legal representation . . . and they cannot properly be characterized otherwise." *Hodas v. Sherburne,*

[3] IDC's legal malpractice claim is time-barred regardless of whether the Court concludes that the filing of the Motion for Leave to Serve the Third Party Complaint (on October 31, 2005), or the filing of the Third Party Complaint itself (on March 27, 2006), is the relevant "end date" for statute of limitations purposes, as both are more than three years after Commonwealth filed the Complaint.

*Powers & Needham, P.C.*, 938 F. Supp. 58, 59 (D. Mass. 1996); *see also Naisuler v. Bradley*, No. 954308, 1999 WL 1324270, *2 (Mass. Super. Feb. 23, 1999) (holding that breach of contract claim against attorney was subject to three-year statute of limitations for malpractice actions because factual allegations were similar to legal malpractice claim).[4]

The alleged factual basis of IDC's legal malpractice claim is that Edwards & Angell and Mr. More acted as IDC's counsel in procuring title insurance for IDC's property in 1998 and 1999 and that they failed to exercise reasonable care and diligence in providing their services. (SUF ¶ 19, 20(d); Third Party Complaint at ¶¶ 30-33). As the Court recognized at the May 9, 2007 status conference, IDC's "other" claims (breach of contract, breach of fiduciary duty, and "indemnification" claims) all have the same factual basis:

- IDC's "indemnity" claim (Count I) alleges that "[i]f the court determines that IDC is not entitled to coverage under the Policy because of the conduct of More and Edwards & Angell in procuring the Policy, IDC is entitled to be indemnified and held harmless by More and Edwards & Angell by reason of their wrongful conduct." (SUF ¶ 20(a); Third Party Complaint at ¶ 17.)

- IDC's breach of fiduciary duty claim (Count II) is based on IDC's purported reliance on the Third Party Defendants to procure title insurance on IDC's behalf. (SUF ¶ 20(b); Third Party Complaint at ¶¶ 20-23.)

- IDC's breach of contract claim (Count III) is also based on the Third Party Defendants' role in procuring title insurance for IDC's property in 1998 and 1999 and their failure to "make all appropriate disclosures and take all necessary steps" necessary to the issuance of valid title insurance. (SUF ¶ 20(c); Third Party Complaint at ¶¶ 25-28.)

Accordingly, those claims also are all time-barred.

---

[4] Decisions from other jurisdictions with specific statutes of limitations for legal malpractice actions are consistent with Rhode Island and Massachusetts authority. *See generally* 2 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice, § 22.8 (2005). For example, the California Code of Civil Procedure has a one-year limitations period for any "action against an attorney for a wrongful act or omission … arising in the performance of professional services." Cal. Civ. Proc. Code § 340.6 (2006). California courts have held that this section applies to breach of fiduciary duty actions arising from the same facts as a legal malpractice action. *See, e.g., Quintilliani v. Mannerino*, 62 Cal.App.4th 54, 67 (Cal. App. 4th 1998) ("Since the fiduciary obligations arose solely from these attorney-client relationships … the statute of limitations for legal malpractice is applicable."); *Pompilio v. Kosmo, Cho & Brown*, 39 Cal.App.4th 1324, 1329 (Cal. App. 2d 1995) ("[Plaintiffs] have alleged a cause of action entitled 'Breach of Fiduciary Duty.' Nevertheless, the allegations of this cause of action concern [defendant's] acts and omissions while representing the [plaintiffs] and sounds in legal malpractice.").

**II. EVEN IF IDC'S "INDEMNIFICATION" CLAIM WERE NOT A TIME-BARRED LEGAL MALPRACTICE CLAIM, THE THIRD PARTY DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT.**

At the May 9, 2007 status conference, IDC claimed, for the first time, that its "indemnity" claim is equitable in nature. For an equitable indemnification claim to survive, the party seeking indemnification must establish, among other things, that: (1) it is exposed to liability; and (2) it will have to pay damages as a result. *See, e.g., R.I. Depositors Econ. Prot. Corp. v. Hayes*, 64 F.3d 22, 25 (1st Cir. 1995) (applying Rhode Island law) (*citing* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 51 (5th ed. 1984); *Muldowney v. Weatherking Prods., Inc.*, 509 A.2d 441, 443 (R.I. 1986) ("The concept of indemnity is based upon the theory that one who has been exposed to liability solely as the result of a wrongful act of another should be able to recover from that party."). IDC cannot prove either of these required elements.

First, in this declaratory judgment action, IDC cannot be held liable to Commonwealth. Commonwealth seeks only a declaration that IDC is excluded from coverage under the title insurance policies and that Commonwealth therefore does not have to pay IDC the policy amount. (SUF ¶ 16; Complaint at pp. 8-9.) IDC's counterclaim seeks only a declaration that it is entitled to coverage and that it should be paid the policy amount. (SUF ¶ 17; Answer and Counterclaim at p. 7.) Neither outcome would subject IDC to liability. Therefore, IDC cannot bring an indemnification claim, equitable or otherwise, against the Third Party Defendants. *See Muldowney*, 509 A.2d, at 443-44 ("[T]he party seeking indemnity *must be liable to a third party*.") (emphasis added); *see also R.I. Depositors Econ. Prot. Corp.*, 64 F.3d at 25 ("The purpose of an indemnity action is to require the party primarily liable to hold harmless the party secondarily liable.").

Furthermore, even if there were a determination of IDC's "liability" to Commonwealth, there is no possibility that IDC will have to pay Commonwealth damages in this action. IDC's claim for "indemnification" therefore fails on this basis as well. *See A&B Constr. v. Atlas Roofing & Skylight Co.*, 867 F. Supp. 100, 113 (D. R.I. 1994) (holding that indemnity claim does not arise until one party has been compelled by reason of some legal obligation to pay damages incurred); *Muldowney*, 509 A.2d at 443 (stating that a necessary condition for an equitable indemnification claim is that "as between the prospective indemnitee and indemnitor, the obligation ought to be discharged by the indemnitor.").

**CONCLUSION**

For the reasons set forth above, the Third Party Defendants respectfully move for summary judgment on the Third Party Complaint.

Respectfully submitted,

EDWARDS ANGELL PALMER &
DODGE LLP and TIMOTHY MORE

By their attorneys,

/s/ Deming E. Sherman
Deming E. Sherman (#1138)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)

Harold Hestnes (admitted *pro hac vice*)
John G. Fabiano (admitted *pro hac vice*)
Benjamin M. Stern (admitted *pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
(617) 526-5000 (fax)

Dated: May 21, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of May, 2007, a copy of the within Memorandum was sent by electronic means (ECF) to the following counsel of record:

Steven E. Snow, Esq.
ses@psh.com

Robert K. Taylor, Esq.
rkt@psh.com

Stephen F. Gordon, Esq.
sgordon@gordonhaley.com

Peter J. Haley, Esq.
haley@gordonhaley.com

W. Mark Russo, Esq.
mrusso@frlawri.com

Christopher M. Mulhearn, Esq.
cmulhearn@frlawri.com

and mailed to the following counsel of record:

Harold Hestnes, Esq.
John G. Fabiano, Esq.
Benjamin M. Stern, Esq.
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109

/s/ Deming E. Sherman
Deming E. Sherman

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| COMMONWEALTH LAND TITLE INSURANCE COMPANY | : |
| | : |
| VS. | : C.A. NO. 01-400 T (RWL) |
| | : |
| IDC PROPERTIES, INC. | : |

DEPOSITION OF THOMAS ROOS, a Defendant in the above-entitled cause, taken on behalf of the Plaintiff, before Barbara Warner, Notary Public in and for the State of Rhode Island, at the offices of Partridge, Snow & Hahn, 180 South Main St., Providence, RI, on September 26, 2002, at 1:00 P.M.

PRESENT:

FOR THE PLAINTIFF........... PARTRIDGE, SNOW & HAHN, LLP
BY: ROBERT K. TAYLOR, ESQUIRE

FOR THE DEFENDANT........... BLISH & CAVANAGH
BY: THOMAS E. ROMANO, ESQUIRE

FOR THE DEFENDANT........... BLISH & CAVANAGH
BY: WILLIAM R. LANDRY, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
401-946-5500

INDEX


| WITNESS | PAGE |
|---|---|
| THOMAS ROOS | |
| EXAMINATION BY MR. TAYLOR.......... | 3 |


EXHIBITS


| NO. | DESCRIPTION (PLAINTIFF'S) | PAGE |
|---|---|---|
| 1. | COMPLAINT.......................... | 17 |
| 2. | 9-18-98 FAX........................ | 36 |
| 3. | 10-9-97 MEMO....................... | 49 |
| 4. | 12-15-97 MEMO...................... | 62 |
| 5. | 12-3-98 LETTER..................... | 64 |
| 6. | 11-12-97 MEETING................... | 67 |
| 7. | 11-30-97 LETTER.................... | 70 |
| 8. | 12-10-97 LETTER.................... | 73 |
| 9. | 8-23-99 LETTER..................... | 75 |




(DEPOSITION COMMENCED AT 1:30 P.M.)
THOMAS ROOS
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Would you state your name and spell your last name for the record.
THE WITNESS: Thomas Roos, R-O-O-S.
EXAMINATION BY MR. TAYLOR
Q. Good afternoon, Mr. Roos, my name is Robert Taylor. I represent the plaintiff in this case, Commonwealth Land Title Insurance Company. Before we start, I want to go over two or three ground rules for a deposition to make sure we are clear on them. The first rule is that because this discussion is taking place with a court reporter and is being transcribed on the record, it is very important you and I try not to interrupt each other and that we give each other the courtesy as much as possible of allowing each other to finish our sentence and that will give the court reporter the opportunity to transcribe the record as clearly and accurately as possible. Will you agree with me we try to do our best not to step on each other's toes?



A. Yes.
Q. Secondly, if at any time you do not understand my question, you do not hear it clearly, or for any reason you want it rephrased or reasked again so you are sure you understand, please let me know. Will you do that?
A. Yes.
Q. If at any time you want to take a break, I will be happy to accommodate you, all right?
A. Thank you.
Q. Mr. Roos, could you please give me your address?
A. 525 South Flagler Drive, West Palm Beach, Florida.
Q. Do you have an address in Rhode Island?
A. Yes, my office, which is Number 2 Goat Island, Newport, Rhode Island.
Q. And do you currently have a residence in Rhode Island?
A. Right now, no.
Q. Please give me a little bit of background history starting with your education at the undergraduate level?



A. I graduated from Boden College with a degree in Economics, minor in Physics.
Q. What year was that?
A. 1985. And that's it.
Q. After you graduated from Boden College, did you take a job?
A. I worked for Banker's Trust Company in New York City for approximately eight months. After that, I joined the U.S. Navy and I was with them for four years.
Q. What did you do while you were at Banker's Trust?
A. Financial analyst.
Q. Any particular industry?
A. I was in their training program.
Q. Where did you serve in the Navy?
A. Pensacola, Florida; Corpus Christi, Texas; Beeville Texas; Washington, D.C.; San Diego, California.
Q. At what rank did you enter the Navy?
A. After boot camp officer training, I was an Nsonce (phonetic).
Q. And did you receive any promotions while you were in the Navy?
A. It would be -- I became a lieutenant, junior

Page 6

grade and I was in the reserves, inactive reserves, where ultimately I was discharged as a lieutenant.
Q. Did you receive an honorable discharge?
A. Yes.
Q. Are you still serving in the reserves?
A. No.
Q. Were you discharged in 1990?
A. Active duty, I believe I was discharged in '91, I believe, '91 or '92.
Q. After you left the Navy, what did you do next?
A. I worked for Island Development Corporation. I was manager of their property on Goat Island.
Q. How long did you work for Island Development Company as their manager of property on Goat Island?
A. I believe until about 1994.
Q. Then what happened?
A. Then I purchased the business assets.
Q. Meaning you purchased the assets of Island Development Corporation?
A. Yes.
Q. What did those assets consist of?
A. Nominally all of the real estate on Goat

Page 7

Island.
Q. Nominally?
A. Yes, nominally.
Q. How were you introduced to Island Development Corporation?
A. I was a shareholder, as well as other members of my family were shareholders.
Q. What portion of the shares of Island Development Corporation did you and your family members own in 1994?
A. 65 percent, roughly.
Q. Who were the other shareholders of Island Development Corporation in 1994?
A. There was a family related group, last name was Neville, and other relatives of the same with different last names.
Q. Other relatives of the Nevilles'?
A. Yes.
Q. Is the Neville family related to your family in some way?
A. No.
Q. Did the Neville family own 35 percent of Island Development Corporation in 1994?
A. I would say about that much.

Page 8

Q. Would you describe Island Development Corporation as a family business?
A. I would say partial family, partial not family. It wasn't strictly a family business.
Q. Were members of the Neville family actively engaged in the day-to-day management of Island Development Corporation?
A. No.
Q. What other members of your family were actively engaged in the day-to-day operations of Island Development Corporation in 1994?
A. None of them.
Q. As the manager of the Goat Island property in 1994, did you report to anybody?
A. Board of Directors.
Q. Who sat on the Board of Directors in 1994?
A. Myself, Tom Rogers, Jr., I believe David Stockweather or Frank Neville, one or the other. I am not sure which one was on the Board at that time. Howard Cashner, Jack Hopkins, I don't remember the 6th person. There was one other Board member.
Q. Is Tom Rogers, Jr. a relative yours?
A. Yes.

Page 9

Q. What is his relationship to you?
A. My grandfather.
Q. Dave Stockweather, is he related?
A. No.
Q. I assume Frank Neville is not related to you?
A. No.
Q. Howard Cashner, is he related to you?
A. No.
Q. Jack Hopkins?
A. No.
Q. Was the 6th member of the Board related to you?
A. No.
Q. Did the Board of Directors of Island Development Corporation meet periodically in 1994?
A. Yes, we did.
Q. How often did they meet?
A. As needed, maybe once every three months. I am just guessing.
Q. Would you report to the Board on the status of Goat Island at those meetings?
A. Yes.
Q. Would you report to individual Board members from time to time outside of the formal Board meetings about the status of Goat Island?

time that it is apparently written?
A. I don't know. I know I have seen this before.
Q. Would you please look at the bottom paragraph in the first page of this letter, which refers to a meeting on March 22, 1994, and after you had a chance to review that paragraph, the letter, tell me whether or not you recall that meeting?
(WITNESS PERUSES DOCUMENT)
A. No, I don't recall that particular meeting.
Q. What is Globe Manufacturing Company?
A. A manufacturing company, it was a corporation that had earlier owned the assets of Island Development Corporation.
Q. Is Globe Manufacturing Company a subsidiary of Island Development Corporation?
A. No.
Q. What was the ownership structure of the assets of the Island Development Corporation?
A. At that time, the same shareholders owned both.
Q. The shareholders of Island Development Corporation also owned Globe Manufacturing; is that right?



A. Right, but they were certain corporations at that point in time. No, I'm sorry. In 1992, Globe Manufacturing owned all assets of Goat Island. In 1992, Island Development Corporation was formed and the assets of Goat Island were transferred to the new corporation with the same ownership structure as had existed at Globe Manufacturing in 1992. Globe Manufacturing had a restructuring of its ownership in 1992, so at one time in 1992 both corporations had the same ownership structure. However, the shareholder structure changed from Globe Manufacturing after 1992.
Q. But in 1992, Globe Manufacturing actually owned the assets on Goat Island?
A. Yes.
Q. So when you purchased the assets on Goat Island in 1994, did you purchase them from Globe Manufacturing?
A. No, Island Development Corporation.
Q. Had Globe Manufacturing transferred the assets of IDC in 1992 to 1994?
A. In 1992 they had.
Q. The second paragraph of this letter starts off by



saying, "In mid March 1994, Tom Roos advised that he desired to extend the time period in which the development rights provided for in the declaration of Goat Island South, a waterfront condominium (the Master Declaration) could be exercised," and it continues on from there. My question is, do you remember advising anyone from Adler Pollock in March of 1994 that you wanted to extend the time period within which you could exercise the development rights?
A. Yes.
Q. Who did you talk with at Adler Pollock?
A. Stan Kanter. There might have been other people, too.
Q. What do you remember about the substance of that conversation?
A. Originally I needed them to teach me. Since they were the drafters of the declaration, I needed them to teach me the provisions of the declaration, explain them to me in a way that I could understand them. And counsel advised me as to the significant issues that I needed to be concerned with if I was going to be purchasing the assets. We discussed the issue of -- in



their explanations, they described the issues which would have been of concern, which is the expiration of the development rights. And they -- I had asked them what would be necessary to extend the development rights, what process would be required, what was the best strategy. And they developed the process by which was necessary to extend those development rights.
Q. Did they prepare anything for you in writing about the process that would be necessary?
MR. ROMANO: They being who?
MR. TAYLOR: They being Adler Pollock.
A. I can't think of anything specifically, but I imagine they probably would have written something.
Q. Some sort of written memorandum?
A. Probably. Their staff had organized the meeting, established the agenda, established the way the votes were to be taken and procedures or whatever was necessary there, the notices. That was all done through the staff of Adler Pollock & Sheehan.
Q. Would you have retained copies of anything that

Page 42

deposition and to Attachment A, just behind A.
A. Okay.
Q. This purports to be a December 4, 1997 letter from Timothy More to Michael Mellion from Commonwealth Company; have you seen this document before?
A. No. I don't remember if I have seen it.
Q. Were you aware in December of 1997 that Mr. More was contacting Commonwealth Land Title Insurance Company to ask them to quote on title insurance for the North Development Unit, including the development rights?
A. I knew that he was shopping for additional title insurance on the property. I didn't know who he was talking to.
Q. Did you direct him to shop for additional title insurance?
A. Yes.
Q. Why was that?
A. We were planning to construct some buildings on the property and wanted to secure the value of the additional improvements we were going to be making.
Q. Prior to the time that Commonwealth issued

Page 43

insurance to IDC, did IDC have any title insurance on the development rights on Goat Island?
A. I know we had title insurance on something, I don't know what it covered. I know it covered the development rights, I didn't understand title insurance.
Q. What additional buildings were you planning on building in late 1997 that prompted you to feel you needed title insurance?
A. We were planning the construction of the Newport Regatta Club. I don't know if we were in the process or started construction. I don't know if we were starting construction or completed construction. We were in the process or planning the process.
Q. Was the Newport Regatta Club built on the North Development Unit?
A. Yes.
Q. Did Mr. More report to you at all on his conversations with whatever title insurer he was contacting in late 1997?
A. I think we had some discussions, I don't remember what discussions. I don't remember any

Page 44

contact or discussions at all.
Q. How did Mr. More arrive at the $5 million worth of insurance that is mentioned in this letter?
A. I think he asked me, what type of additional improvements are we going to put on the property. I don't know if I knew a number, but I came up with a number of $5 million for additional improvements on the property. I can cover for those.
Q. Did Mr. More advise you that any title insurer was reluctant to offer title insurance on the development rights for the North Development Unit?
A. I don't remember any particular specifics like that. I just remember what the price would be, we were talking to other people. That is all I remember. I don't remember much more than that.
Q. Did Mr. More ever tell you that Chicago Title was unwilling to issue an insurance policy on the development rights for the North Development Unit in late 1997?
A. I don't remember that. Who wrote the first $ten million policy, some company on Chicago?

Page 45

Q. My understanding in '94 is there was a policy issued by Chicago.
A. I didn't know that. So you are representing Commonwealth?
Q. Yes.
A. Okay.
Q. Did you personally have any contact with Commonwealth Insurance Company in 1997 or 1998?
A. I remember at one point I had met one of the title people. Through what context, I don't know. I don't remember if I met them in '94 or '98. I don't think it was part of any -- I don't know if it was a negotiation. I remember I did meet one gentleman representing one of the title companies. I don't think it was a meeting. It may have been a meeting, but I don't think so.
Q. Do you remember anything you talked about?
A. It could have been in a closing. I know I met one of the guys that was from a title company that was doing a policy for us. I can't remember his name or who he represented and in what context. I don't know if I met him at his office or at a closing.
Q. Did Mr. More ever indicate to you that he was

a different policy. I am not sure if they were in the first policy or not.

Q. This letter says that IDC would like to increase the amount of its title insurance policy from $7 million to $12 million and to add South Development and Development Unit Number 1?

A. That would suggest they were covered and maybe I realized that they weren't covered, so I wanted them to be covered.

Q. What had happened with the Newport Regatta Club between 1997 and 1998 that in your mind necessitated increasing the title insurance from $7 million to $12 million?

A. I think that was around construction time. I don't know if we had completed construction. Plus the land value was increasing, too.

Q. So those were your reasons for wanting to increase insurance?

A. Property land values were increasing in value and we were putting improvements on the property. I don't know, I believe there are only two title insurance policies. Had the second title insurance policy already been obtained before this point or after, I don't know. I believe



there are only two. So if I was, if I had asked him if I wanted a title insurance policy in 1997 because of the addition of buildings and increasing land values or whatever, if we didn't have a policy by '98, I think the reasons are exactly the same.

Q. Has there been any development on the South Development Unit on Goat Island?

A. There are no development rights attached to that property.

Q. Has there been any development?

A. Any construction, no.

Q. What about development Unit Number 1, has there been any construction there?

A. No.

Q. Did you have any plans for construction on those two units in late 1998?

A. I didn't have any specific plans, but I certainly had intentions and still have intentions of constructing improvements on this property.

MR. TAYLOR: Mark this as Exhibit 6, please.

(EXHIBIT 6 MARKED FOR IDENTIFICATION)



Q. Showing you what has been marked as Exhibit 6 to your deposition, which is a document headed America Condominium Association, Inc. November 12, 1997, my question is if you remember seeing this document before?

(WITNESS PERUSES DOCUMENT)

A. I don't particularly remember this document, but I remember back somewhere I may have seen it. I am reasonably familiar with it.

Q. In the upper right-hand corner of the first page of the document there is a handwritten notation, is that your handwriting?

A. Yes, that would be mine.

Q. What does it say there on the upper right-hand corner of the first page?

A. File condo issues.

Q. Did you have a file in your office in 1997 that was labeled condo issues?

A. Yes. I have lots of files on lots of things.

Q. Do you still have a file today called condo issues?

A. I have files that contain condominium issues, yes, but the names change constantly.

Q. The first sentence of this document on the first



page indicates that there may have been a meeting with you and the America Condominium Association on November 13, 1997; do you recall whether or not a meeting occurred on or about that date?

A. No. That makes -- we had endless meetings over the years. That very well could be. I don't think this would have been a meeting with the Condominium Association, maybe it was one or two or three representatives.

Q. Drawing your attention to Number 1 on the first page, it says, "Give us your position in writing on our challenge to each of the amendments to the declaration you have enacted. Our attorney has told you and your lawyers in no uncertain terms what you did was illegal; effectively rendering them null and void." Do you see where I am?

A. Yes.

Q. Looking at this, do you recall that at least some of the residents of the America Condominium Association were challenging the validity of the extension of the development rights as of this point in time?

A. Yes. You can probably create a time line that would suggest that we were discussing these

Page 74

concerned with they felt needed to be filed before potential statute of limitations expired for them. So going for a negotiated resolution of the disputes, that we would toll their complaints or toll their rights until we had an opportunity to explore a resolution.
Q. One of the claims that was being tolled was the extension of the development rights was expired; is that right?
A. I believe we tolled everything.
Q. And that included the --
A. I don't believe that was one of the issues which required tolling because A, the statute of limitations had already run. And they were concerned about the ten-year statute of limitations, and I don't know what specific issues that ten-year statute of limitations applied to.
Q. Do you know whether or not the title insurance company that issued the title policy to IDC in January of 1998 was ever told about the tolling agreement?
A. I have no idea what communications went on between them.

Page 75

Q. Was there any mediation between IDC and the unit owners?
A. Yes.
Q. What happened?
A. They walked away from it.
Q. Were there mediation hearings held?
A. They are nonbinding mediations.
Q. So there were meetings?
A. Or arbitration, arbitration, mediation, which settled it.
MR. TAYLOR: Mark this as Exhibit 9, please.
(EXHIBIT 9 MARKED FOR IDENTIFICATION)
Q. I am showing you what has been marked as Exhibit 9 to your deposition, which is an August 2, 1999 letter from Timothy More to you. My first question is have you seen this document before?
A. I don't remember specifically reading the document. I seem to be familiar with its content.
Q. Do you recall seeing this document?
A. I don't recall specifically reading this document, but the content is familiar.
Q. Why were you asking Mr. More's opinion on whether

Page 76

the voting control of IDC Properties, Inc. over the Goat Island South Condominium Association violates the Condominium Act or any other law?
A. Probably the issue the other side was complaining about. Just asking advice of my counsel.
Q. You don't remember this was a request you made in connection with some specific event?
A. No, I don't remember this being related to any specific event.
Q. Was Mr. More still representing you?
A. I pay the bill. Should I tell him that? I guess he would be representing me.
Q. That bill is for services that were rendered to you --
A. I don't think I am allowed to talk about that.
Q. Let me finish the question. The question is whether that bill was for services rendered within the last six months?
A. Yes. I just paid a bill within the last couple of weeks.
Q. Are you still represented by Edwards & Angell?
A. Yes.

Page 77

Q. When did Mr. More leave Edwards & Angell?
A. I have no idea.
Q. Has he ever told you why he left?
A. No.
Q. Has anyone else told you why he left?
A. No.
Q. Has IDC ever asked Commonwealth to provide it with a defense if the lawsuit was brought by the Condominium Association?
A. I believe I had been told that the companies have been notified of the lawsuit, title companies we conferred with, and that is about all. They were put on notice. Possibly they have been asked to help participate with the defense, at least review the defense, but I don't know if that would be Commonwealth or Chicago or who or in what capacities.
Q. You say possibly, my question is do you know whether or not Commonwealth has been asked?
A. I don't know whether they have or not.
Q. And IDC has been represented by Blish & Cavanagh in that litigation; is that right?
A. Yes.
Q. And was it IDC's desire to continue to have Blish

# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

COMMONWEALTH LAND TITLE INSURANCE COMPANY,
Plaintiff

VS. C.A. NO. 01-400T(RWL)

IDC PROPERTIES, INC.,
Defendant

* * * * * * * * * * * * * * * * *

DEPOSITION OF TIMOTHY T. MORE, ESQUIRE, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Partridge, Snow & Hahn, 180 South Main Street, Providence, Rhode Island, on December 20, 2002, at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF........ PARTRIDGE, SNOW & HAHN
BY: Robert K. Taylor, Esquire

FOR THE DEFENDANT........ BLISH & CAVANAGH
BY: William R. Landry, Esquire

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

Island project, Tom Roos was desirous of extending his development rights and wanted to make other amendments to the condominium documents. In reviewing the documents, and in particular some recent amendments which had been prepared by Adler, Pollock & Sheehan and, namely, by Stan Kanter, I concluded that in order to amend the master condominium, at least with respect to extending the development rights, that there needed to be a unanimous consent of the unit owners. In looking at, at least one of the amendments, it appeared as if the amendment had been signed by less than all of the unit owners. So I wrote Stan and said had he considered this issue, and he replied back, which is the letter attached to the Complaint. In working on the amendments that Tom Roos wanted, I spent a lot of time thinking about what was required, the various legal issues that were involved, which were quite complex, and came to the conclusion that a unanimous consent of the master unit owners would be sufficient on a prima facie basis to extend the development rights. As you are aware, there are a number of sub-condominiums and sub-master units --



not sub-master units but master units within the Goat Island condominium. A couple of them are simply land units, and some of them have actually been turned into sub-condominiums such as Capella and America. I forget what the other ones are. My conclusion was that with respect to those units which had been turned into condominiums themselves, we would need to get the vote of that condominium with respect to the land unit that it represented. In the case of the units that Tom Roos still owned, we would need only his vote. My recollection is that there was a meeting at which the requisite number of votes from each of the condominiums such as Capella and America were present along with Tom Roos, and that at this meeting the necessary vote was taken to approve the amendment to the condominium declaration extending the development rights. So in the Complaint where it states on Page 6, "The Fourth Amendment was not passed with unanimous consent of all the unit owners," I believe that is a misstatement of my understanding of the facts, and, in fact, an incorrect statement. The question would be -- could be, when you look at



the term unit owners, whether you mean every single unit owner within the whole project or whether you mean the master unit owners. It was my opinion at the time that under the Condominium Act and under the Goat Island Master Declaration what was required was the unanimous consent of the master unit owners, and that neither of those, neither the law nor the declaration required a consent of every single condominium unit owner within each of the sub-condominiums, and that conclusion is reflected in the memorandum attached as Exhibit B to the Complaint dated November 17, 1997. So, anyway, that was the nature of my own kind of response to Stan Kanter's letter and the issues that I raised with him.

MR. TAYLOR: Since we started talking about these letters, let's just go ahead and mark this as Exhibit 2 to your deposition.

(PLAINTIFF'S EXHIBIT 2 MARKED FOR IDENTIFICATION)

Q. Can you identify Exhibit 2?
A. Exhibit 2 is a letter from me to Stan Kanter dated December 2, 1994.
Q. Did you write this letter?
A. Yes.



Q. And did you send it to Mr. Kanter on or about December 2, 1994?
A. To the best of my knowledge, yes.
Q. Before we talk about this letter itself, can you give me the background of how you first came to know Tom Roos?
A. Tom Roos came into the office through my partner Chip Rogers.
Q. When did you first meet Tom Roos?
A. Sometime in late 1994.
Q. And was late 1994 the first time that you personally provided any services to Mr. Roos or to IDC?
A. Yes.
Q. What was the reason that you were introduced to Mr. Roos in late 1994?
A. I was introduced because Tom wanted to use Edwards & Angell, and my expertise -- one of my expertise is condominium law.
Q. Had Edwards & Angell been representing Mr. Roos prior to late 1994?
A. I don't know.
Q. How about IDC, do you know if E & A represented IDC prior to late 1994?

# EXHIBIT 3

**In The Matter Of:**

*Commonwealth Land Title Insurance Company v. IDC Properties, Inc.*

---

*Michael B. Mellion, Esq.*

*January 9, 2003*

---

*Reporting Associates*
*10 Dorrance Street*
*Westminster Square Building Suite 617*
*Providence, RI 02903*
*(401) 351-1660*

*Original File IDCLFO.V1, 56 Pages*
*Min-U-Script® File ID: 3239546416*

**Word Index included with this Min-U-Script®**

Page 21

Q: You recognize that as a copy of the letter you got from Tim More back in December of 1997?
A: Yes.
Q: Do you recognize the handwritten markings on the exhibit?
A: Yes, I do.
Q: Whose are those?
A: They're mine.
Q: Okay. Could you tell me, what is that? A sailboat at the top?
A: Ha-ha-ha. Well, I suppose it became a sailboat. I don't know what it started out to be, but it turned into a sailboat.
Q: And do you recall what the significance of 12/12 in '97 might be?
A: No, as a matter of fact, I don't.
Q: How about the other entries below that?
A: That's the dollar K. That's a dollar a thousand premium. Exam. I may have been discussing approximate premium cost and what else we charged for. And that's, that's probably why I would have written a note like that is my guess.
Q: And would you also have circled the words "regarding the development rights" in the

Page 22

letter itself?
A: Yes. I'm sure I circled that.
Q: Do you recall when you made these entries in relation to when you received the letter?
A: I don't actually recall, but my guess is that I called him in response to his letter and spoke on the telephone with him. That would be, that's probably the significance of 12/12 is probably when I spoke with him. But, again, that's just a guess.
Q: Do you have a present recollection of actually having had a conversation with Mr. More regarding the substance of this letter?
A: Actually, I don't have a present recollection of the conversation, no.
Q: But you do recall that one most likely occurred?
A: Oh, sure. I'm sure we discussed it.
Q: So I take it you don't have a present recollection of what you said in that conversation or what Mr. More said?
A: I can only assume it was a routine conversation because I think I would have remembered anything that he would have told me about this that would have been out of the

Page 23

ordinary.
Q: Was a request to provide five million dollars in title insurance on development rights something that you would have regarded as out of the ordinary back in December of 1997?
A: Well, I think the letter is requiring or requesting five million on the North Development Unit, meaning it's a unit.
Q: Had Commonwealth been involved in issuing title insurance with respect to the Goat Island condominiums before 1997?
A: I'm not sure. I don't think we insured anything in that area that he was talking about. It's possible we insured some units, residential condominiums that are also on the Island.
Q: Okay. Do you have a present recollection of whether that happened or not?
A: The residential units?
Q: Yes.
A: I don't have a present recollection, but my guess is we probably insured a few of them.
Q: Okay. Did you become aware as a result of your communications with Mr. More that another title insurance company had insured title to

Page 24

the North Development Unit?
A: You know, I don't remember. Whether in that conversation he mentioned that, I don't recall that.
Q: Did you become aware at some point that Chicago Title Insurance Company had issued a title policy with respect to the North Development Unit?
MR. SNOW: I'd object. At any point up until today?
MR. LANDRY: Yes.
A: I think I was aware that Chicago had issued some policies out there. Exactly on what units they were, I don't really remember. But —
Q: Okay. So you can't remember now what you learned from Mr. More about Chicago Title Insurance coverage?
MR. SNOW: Objection to the form of the question.
A: Well, if you're asking whether they had previously insured any units down there or any of that land, no, I don't have a present recollection about when or whether he showed me a policy or told me that they had also

Page 41

Q: If you ever looked at your file to determine that.
A: I'd have to look at my file to determine whether I had notes about conversations with him.
Q: Did you ever do that?
A: 'Cause that's where it would be.
Q: Have you ever done that up until today?
A: I have not done that in preparation for this, no.
Q: You haven't done it at anytime since this litigation has been pending?
A: I'm sure I've looked through the file. I don't recall. I don't recall that there are notes of conversations in there. I'll have to look again to be able to tell you accurately whether there are or not.
Q: Have you ever looked to see whether there are any notes reflecting your observations as you performed the research that you've described with respect to this particular risk?
A: I remember making some notations on this memo. It's possible I kept some notes on a legal pad of what I did, but I don't recall that independently.

Page 42

Q: Was there any communication between you and your home office or regional counsel with respect to this particular risk? And I'm talking now about the five million dollar policy issued in or about January of 1998.
A: I don't recall any.
Q: Do you recall discussing the issue with anyone else in your office?
A: I don't recall discussing it with anyone else.
Q: So you would have made the call on this entirely yourself?
A: My recollection is that I made the call myself, yes.
Q: Now, at some point do you recall Mr. More approximately a year later applying for an increase in this title policy to twelve million dollars, as well as the addition of certain other master units in the Goat Island South condominium?
A: I remember he asked me to issue an endorsement to the policy increasing the amount, yes.
Q: And do you recall discussing that issue with him?
A: My recollections about our conversations were very brief, in that he wanted me to increase

Page 43

it, which is why I had to go out and run the title. And he seemed to be in a hurry to get it.
Q: And what, if anything, did you do in response to that request?
A: My recollection is we ran the title for him, and there was nothing on the record that we found that seemed to make a big change, so we issued it.
Q: Do you recall any part of the substance of the discussions you had with Mr. More before Commonwealth agreed to increase that coverage to twelve million and to add the other units?
A: The substance of the conversations was that they were in a hurry, essentially. How fast could I do it, as I recall.
Q: Did you ask him why they were in a hurry?
A: No. Frequently people are very demanding. They want things now.
Q: Especially in December? There are a lot of real estate transactions —
A: At the end of the year.
Q: — that close before the end of the year?
A: That's a fact.
Q: Did you conduct any independent research

Page 44

before agreeing to increase the coverage limits to twelve million dollars? Other than the titles.
A: Other than the title.
Q: That you described.
A: Not that I remember.
Q: Do you recall seeking any authority from regional counsel or anyone else at the home office, if you will?
MR. SNOW: Regarding the endorsement?
MR. LANDRY: Yes.
A: No, not regarding the endorsement.
Q: Or discussing the issue with anyone in your Rhode Island office?
A: There really were no issues to discuss. It was just running the title for it. There was nothing in the record.
Q: Now, have you ever had a conversation with Jeff Meyer at Chicago Title Insurance Company regarding the Goat Island condominiums?
A: Yes, I have.
Q: Okay. And how long have you known Mr. Meyer?
A: Oh, I've known him prior to his joining Chicago. So it was probably sometime in the

# EXHIBIT 4

UNITED STATES DISTRICT
DISTRICT OF RHODE ISLAND

COMMONWEALTH LAND TITLE INSURANCE COMPANY,
Plaintiff,
VS. C.A. NO. 01-400T
IDC PROPERTIES, INC.,
Defendant and Third Party Plaintiff,
VS.
TIMOTHY MORE, And
EDWARDS ANGELL PALMER DODGE, LLP,
Third Party Defendants.

DEPOSITION OF TIMOTHY MORE AND 30(b)6 DEPOSITION FOR EDWARDS ANGELL PALMER & DODGE, LLP, in the above-entitled cause, taken on behalf of the Defendant and Third Party Plaintiff, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of Ferrucci Russo, PC, 55 Pine Street, Providence, Rhode Island, on September 7, 2006, at 10:00 a.m.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RI 02915
(401) 437-3366



APPEARANCES:

For the Plaintiff:
PARTRIDGE SNOW & HAHN, LLP
BY: ROBERT K. TAYLOR, ESQUIRE
180 South Main Street
Providence, RI 02903

For the Defendant and Third Party Plaintiff:
GORDON HALEY, LLP
BY: PETER J. HALEY, ESQUIRE
101 Federal Street
Boston, MA 02110

For the Third Party Defendants:
WILMER CUTLER PICKERING HALE and DORR, LLP
BY: HAROLD HESTNES, ESQUIRE
60 State Street
Boston, MA 02109



INDEX


| WITNESS | PAGE |
|---|---|
| TIMOTHY MORE | |
| Examination by Mr. Haley | 6 |
| Examination by Mr. Taylor | 61 |


EXHIBITS

DEFENDANT AND THIRD PARTY PLAINTIFF


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition of Edwards Angell Palmer Dodge, LLP, 3 pp | 6 |
| 2 | Notice of Deposition of Timothy More, 2 pp | 6 |
| 3 | Correspondence dated 12/4/97 to Michael Mellion from Timothy More, With Enclosure, 3 p | 16 |
| 4 | Memo dated 12/15/97 to Tim Moore From Jeff Meyer, 1 p | 18 |
| 5 | Correspondence dated 12/10/97 to Timothy More with Tolling Agreement, 4 pp | 26 |
| 6 | Tolling Agreement, 5 pp | 29 |
| 7 | Correspondence dated 1/7/98 to Mary Beth Furia from Timothy More with Enclosure, 6 pp | |
| 8 | Correspondence dated 12/5/94 to Timothy More from Stanley Kanter, 3 pp | 31 |
| 9 | Correspondence dated 12/2/94 to Stanley Kanter from Timothy More, 2 pp | 31 |
| 10 | Memorandum dated 9/28/01 to William Landry from Timothy More, 2 pp | 37 |
| 11 | Privileged and Confidential Memorandum To William Landry and Thomas Roos from Timothy More, 1 p | 38 |




EXHIBITS (CONTINUED)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 12 | Correspondence dated 8/23/99 to Thomas Roos from Timothy More, 3 pp | 40 |
| 13 | Correspondence dated 11/3/99 to Thomas Roos from Timothy More, 4 pp | 43 |
| 14 | Correspondence dated 4/14/99 to Timothy More from Michael Mellion, 1 p | 47 |
| 15 | Document entitled Endorsement, 2 pp | 47 |
| 16 | Fax Cover Sheet dated 12/3/98 and Correspondence dated 12/3/98 to Michael Mellion from Timothy More, 2 pp | 49 |
| 17 | Correspondence dated 2/2/99 to Michael Mellion from Timothy More, 1 p | 49 |
| 18 | Copy of Folder Cover No. 34545.0001 and Correspondence dated 2/6/98, 3/8/99 and 3/15/99 to Thomas Roos from Timothy More, 10 pp | 51 |
| 19 | Copies of Invoices dated 12/2/04, 1/5/05, 2/2/05, 4/4/05, 13 pp | 54 |
| 20 | Third Party Complaint and Demand For Trial By Jury, 7 pp | 56 |
| 21 | Answer of Edwards Angell Palmer & Dodge, LLP and Timothy More, 8 pp | 56 |
| 22 | Rhode Island Supreme Court citation America Condominium Association v. IDC, Inc., et al., dated 4/8/05, 9 pp | 59 |


PLAINTIFF'S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 23 | Faxed correspondence dated 3/3/99, 4/5/97, Settlement Agreement, 1997 Tax Bill, 10 pp | 69 |




COPY

the extent of the conversation. Subsequently, I had a conversation with him regarding how much insurance he wanted, and ultimately, I had a conversation with him telling him that the title insurance would be issued.
**Q. And other than that, did Mr. Roos provide you with any specific instruction or directions with respect to how the title insurance would be acquired?**
A. No, because he wasn't sure that he would be able to get it. He was somewhat surprised at the fact that he could get it.
**Q. And how do you know that?**
A. Just in the nature of the conversation.
**Q. And what about the conversation led you to believe he was surprised he could get it?**
A. Because it was -- his inquiry was more along the lines of, you know, "Gee, could I get title insurance?" I said, "I believe you should be able to get title insurance." So he didn't call up saying, "I want to get title insurance because I know I can get title insurance."
**Q. And do you recall him using the words, "Gee, can I get title insurance," or is that your --**



A. That's my language 10 years after the conversation.
**Q. And do you have any notes or memoranda or anything else which would evidence those conversations?**
A. I have no notes or memorandums on any matter relating to this transaction other than a few letters which Mr. Hestnes has provided to me.
**Q. And had you procured title insurance for your clients before in the course of your practice?**
A. Yes.
MR. HESTNES: Any clients?
MR. HALEY: Any clients.
A. Yes.
**Q. And how frequently had you done that?**
A. Oh, maybe three or four times a year.
**Q. And is it something you considered yourself experienced in?**
A. Yes.
**Q. And with respect to procuring title insurance, what was it that you understood your obligations as the attorney looking for title insurance to be?**
A. The client asked for title insurance. My objective is to obtain title insurance.
**Q. And with respect to the relationship between you**



**and the title insurance company, how does that process work? Was there a written application?**
A. No. I mean, I sent a letter to --
MR. HESTNES: Is this just in general or applied to any of the transactions here now?
MR. HALEY: Just in general.
A. In general, there is no application form.
**Q. And other than making the phone call, is there anything else required of you in making the application for title insurance?**
A. No.
**Q. And with respect to the information required by the title insurance company, what is your understanding of what your obligations are with respect to providing them with information concerning the property?**
MR. TAYLOR: Objection to the form, time frame.
A. The title policies -- in some situations, title companies issue commitment letters, and sometimes they don't issue commitment letters. They just issue the policy. If the commitment is issued, then the commitment normally has certain requirements that the title company wants to see



satisfied before they'll issue a policy. It may be providing corporation documents. It may be providing a corporate vote. It may be providing evidence of some discharges, you know, whatever the commitment requires. In this case, in the case of the policy issued by Commonwealth, there was no commitment letters, I recall.
(PAUSE)
(OFF THE RECORD)
(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 3 MARKED FOR IDENTIFICATION)
**Q. Mr. More, I show you a copy of what's been marked Exhibit 3 which is a letter from you to Michael Mellion; is that correct?**
A. Yes.
**Q. And is that how the request for title insurance was initiated, in this instance?**
A. I am not sure whether I made a phone call first, and this was a follow-up letter or whether the letter came first. My guess is that I had a phone call with Michael first.
**Q. And --**
A. Because that would be my normal procedure.
**Q. And do you recall what the substance of that phone**

call was?
A. Substance of the phone call was that IDC was looking for title insurance on the North Development Unit.
**Q. And attached to the letter is a memorandum dated November 17, 1997, that was prepared by you?**
A. Yes.
**Q. And did you have any conversations with Mr. Mellion concerning the memorandum?**
A. Yes.
**Q. What conversations were those?**
A. Well, we went over the issues that were involved, that are identified in this memorandum, and I don't know whether it was in that conversation or in another conversation that would have been reasonably contemporaneous with this letter, and with the request for title insurance, that I also applied to Chicago Title for title insurance, and that Chicago was, you know, having concerns about issuing title insurance on the North Development Unit.
**Q. And did Chicago ultimately decline to issue title insurance?**
A. Yes.



**Q. And what was your understanding of why they declined to issue title insurance?**
A. The reasons are set forth in the letter from Jeff Meyer to me.
MR. HALEY: If we can mark that as --
MR. HESTNES: Have you marked the --
MR. HALEY: We did mark the memorandum as part of Exhibit 3, and we'll mark the Meyer memorandum as Exhibit 4.
(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 4 MARKED FOR IDENTIFICATION)
**Q. Mr. More, I show you what's been marked as Exhibit 4. Is that the memorandum -- the response from Jeff Meyer that you referred to?**
A. Yes.
**Q. And did Jeff Meyer also express to you a concern that he was aware that the condominium association was contemplating suit against IDC Properties?**
A. It is so stated in this memo to me.
**Q. And what conversations did you have with Mr. Meyer about the memo?**
A. I had a number of conversations with Jeff over some period of time, and I don't know whether it was two weeks or three weeks or what the time



frame was, but over the issues that he notes in his memo to me.
**Q. And did you tell Mr. Mellion that Chicago Title had declined to provide title insurance coverage?**
A. At some point, prior to the end of 1997, I did.
**Q. And was that in a phone conversation?**
A. Yes.
**Q. And do you have any notes or memoranda of that conversation or anything else which evidenced the conversation?**
A. I don't have any, but -- I don't have any of my files. They could exist, but I don't have them.
**Q. And why did you tell Mr. Mellion that?**
A. I told him that for two reasons; one is that it meant that I would need to get the insurance from Commonwealth because I wasn't going to be getting it from Chicago; and I told him that because it was part and parcel of the whole, you know, issue for getting title insurance. It was part and parcel of kind of the whole set of facts that surrounded, you know, IDC's desire to get title insurance. But I think from Tom Roos's point of view, he was at some point -- maybe it had already started, I don't know -- building on the North



Development Unit, and so he was looking for title insurance because he was going to make an investment on the property, and he had already made an investment on the property, and certainly the disputes with the America's Cup and Capella Condominium Unit owners was an ongoing situation.
**Q. And did you ever show Mr. Mellion a copy of the document marked as Exhibit 4 or provide a copy of that to him?**
A. I do not believe I did.
**Q. And what was Mr. Mellion's response to you when you told him that Chicago Title had declined to provide coverage?**
A. I do not recall.
**Q. And you said that -- in your response to the prior question, that one of the issues involved in the application for title insurance was the dispute with the condominium association. And is that something that Mr. Mellion was informed of, to your knowledge?**
A. I believe that he was, by me.
**Q. And other than by you, are you aware of any other information that was provided to Mr. Mellion concerning the dispute?**

Page 49

(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBITS 16 AND 17 MARKED FOR IDENTIFICATION)
Q. Mr. More, I show you what's been marked Exhibits 16 and 17. Exhibit 16 is a facsimile cover sheet and a letter dated December 3, 1998, to Mr. Mellion. Is that your signature on the letter?
A. Yes.
Q. Is this a letter that you sent to Mr. Mellion requesting the increase of the title insurance?
A. Yes.
Q. And did you have any conversation with Mr. Roos or anyone else from IDC Properties at the time regarding this increase?
A. Yes.
Q. What conversations were those?
A. Tom Roos called me to ask if I could get an increase in the amount of title insurance.
Q. And other than Mr. Roos asking to increase the amount of the title insurance, did you have any other conversations with Mr. Roos regarding the title insurance?
A. I presume I told him that I was successful in getting the title insurance at some point in time.

Page 50

Q. Other than that, do you recall any other conversations you had with him concerning the title insurance at this time?
A. No.
Q. And directing your attention to Exhibit 17, which is a letter dated February 2, 1999, addressed to Mr. Mellion, is that your signature?
A. Yes.
Q. Is this a letter that you sent to Mr. Mellion?
A. Yes.
Q. And did you have any discussions with Mr. Mellion regarding the declarations to Goat Island and Amendments 1 through 8 or Amendment 9 after sending this letter?
A. I don't recall.
Q. And do you know if prior to sending this letter, Mr. Mellion had copies of the declaration or the Amendments 1 through 9?
A. I don't know.
Q. Those amendments would be recorded and would be available in the registry, to your knowledge, would they not?
A. Yes.
Q. And do you recall anything else about the increase

Page 51

in the title insurance policy, any other conversations that you had with Mr. Mellion at this time?
A. No.
Q. You did not have any further conversations with Chicago Title at the time you sought to increase the level of title insurance?
A. No.
Q. Other than Chicago Title or Commonwealth Title, did you ever make application to or have discussions with any other title insurance company regarding title insurance on the property?
A. No.
MR. HALEY: 18.
(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 18 MARKED FOR IDENTIFICATION)
Q. Mr. More, I show you a document which has been marked as Exhibit 18, the front page of which is a folder cover. Do you recognize that as a folder maintained by you at Edwards & Angell?
A. No.
Q. Do you recognize the folder cover at all?
A. I don't recognize it.
Q. And do you know what the initials MSA stand for

Page 52

after which follows your name and Providence, Rhode Island?
A. Yes.
Q. What does that stand for?
A. Matter Supervising Attorney.
Q. And was that an acronym used by Edwards & Angell while you were there?
A. Yes.
Q. And with respect to the Number 34545.0001, do you recognize that number at all?
A. No.
Q. And did Edwards & Angell have a practice of maintaining numbers for their client files?
A. I have no knowledge one way or another on that.
Q. Directing your attention to the second page of the document, it has the words Title Insurance; is that your handwriting?
A. It looks like my handwriting.
Q. And then there's a letter to Mr. Roos dated February 6, 1998; is that your signature?
A. Yes.
MR. HESTNES: Off the record.
(OFF THE RECORD)
Q. If you turn to the document dated March 8, 1999 --

# EXHIBIT 5

E & A

# EDWARDS & ANGELL, LLP FAX COVER SHEET

Date: December 3, 1998

**This transmission is being sent FROM:**

Timothy T. More Zip 25C Ext. 539
EDWARDS & ANGELL, LLP
One BankBoston Plaza
Providence, Rhode Island 02903
Main Number: (401) 274-9200
Fax Numbers: (401) 276-6611 or (401) 276-6625

**PLEASE DELIVER TO:**

Name: Michael Mellion Telecopy Number: 233-0099

Firm: Commonwealth Land Title Direct Number:

Name: Tom Roos Telecopy Number: 848-5513 press #9

Firm: IDC Direct Number: 849-6683

Number of pages being sent including cover: 2

Message:

**CONFIDENTIALITY NOTE**

This facsimile contains privileged and confidential information intended only for the use of the individual or entity named above. *If the reader of this facsimile is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited.* If you have received this facsimile in error, please notify us immediately by telephone (call collect) and return the original facsimile to us at the above address via the U.S. Postal Service. We will reimburse you for postage. Thank you.

If you do not receive all pages, please call our TELECOPY OPERATOR AT (401) 276-6678 immediately.

Sent on ______ at ______ A.M. ______ P.M.

By: ______

258

PLAINTIFF'S EXHIBIT 16 - More 9/7/06 Quiltine

DEFENDANT'S EXHIBIT 20

#642

# EDWARDS & ANGELL, LLP

COUNSELLORS AT LAW
since 1894
Timothy T. More
Direct Dial. (401) 276-6339
Email: tmore@ealaw.com

ONE BANKBOSTON PLAZA
PROVIDENCE, RI 02903-2499
(401) 274-9200
FAX (401) 276-6611

December 3, 1998

Michael Mellion, Esq.
Commonwealth Land Title Insurance Company
7 Thurber Boulevard
Smithfield, RI 02917

RE: **Goat Island**

Dear Michael:

IDC would like to increase the amount of its title insurance policy from $7,000,000 to $12,000,000 and to add the South Development Unit (a/k/a the Independent Unit) and Development Unit #1 (a/k/a the West Unit).

North South
Individual Unit

Very truly yours,

Timothy T. More

cc: T. Roos

228776

to Individual Unit
+ Dev Unit #1