**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| COMMONWEALTH LAND TITLE INSURANCE COMPANY,<br>Plaintiff,<br><br>v.<br><br>IDC PROPERTIES, INC.,<br>Defendant,<br><br>v.<br><br>TIMOTHY MORE AND EDWARDS ANGELL PALMER & DODGE LLP,<br>Third Party Defendants. | C.A. No. 01-400-T |

**COMMONWEALTH LAND TITLE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Commonwealth Land Title Insurance Company ("Commonwealth"), through counsel, hereby moves for an order granting summary judgment on all of its claims against IDC Properties, Inc. In support of this motion, Commonwealth relies upon the accompanying memorandum of law.

COMMONWEALTH LAND TITLE
INSURANCE COMPANY,

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

/s/ Robert K. Taylor
Steven E. Snow (#1774)
Robert K. Taylor (#6514)
180 South Main Street
Providence, RI 02903
(401) 861-8200 / (401) 861-8210 FAX
ses@psh.com
rkt@psh.com

DATED: May 22, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing COMMONWEALTH LAND TITLE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT was filed with the Clerk of the United States District Court for the District of Rhode Island this 22nd day of May, 2007 and is available for viewing and downloading to the following ECF registered counsel of record:

W. Mark Russo, Esq. / Ferrucci, Russo P.C.
Christopher M. Mulhearn, Esq. / Ferrucci Russo P.C.
Deming E. Sherman, Esq. / Edwards Angell Palmer & Dodge LLP
Peter J. Haley, Esq. / Gordon Haley LLP
Stephen F. Gordon, Esq. / Gordon Haley LLP
John G. Fabiano, Esq. / Wilmer Cutler Pickering Hale & Dorr LLP
Harold Hestnes, Esq. / Wilmer Cutler Pickering Hale & Dorr LLP
Benjamin M. Stern, Esq. / Wilmer Cutler Pickering Hale & Dorr LLP
William R. Landry, Esq. / Blish & Cavanagh, LLP
Thomas E. Romano, Esq. / Blish & Cavanagh, LLP

/s/ Robert K. Taylor

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| COMMONWEALTH LAND TITLE INSURANCE COMPANY,<br>Plaintiff,<br><br>v.<br><br>IDC PROPERTIES, INC.,<br>Defendant,<br><br>v.<br><br>TIMOTHY MORE AND EDWARDS ANGELL PALMER & DODGE LLP,<br>Third Party Defendants. | C.A. No. 01-400-T |

**COMMONWEALTH LAND TITLE INSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff Commonwealth Land Title Insurance Company ("Commonwealth"), through counsel, submits the following memorandum in support of its motion for summary judgment on all of its claims against IDC Properties, Inc.

## I. INTRODUCTION.

This case involves a $12 million title insurance policy (the "Policy") originally issued by Commonwealth to IDC Properties, Inc. ("IDC") in January 1998. The Policy allegedly insures IDC's fee simple interest in certain parcels of land on Goat Island in Newport, as well as IDC's right to develop those parcels. IDC induced Commonwealth to issue the Policy by concealing, *inter alia*, threats of imminent title litigation by an association of residential condominium owners on Goat Island; indeed, IDC signed a tolling agreement just eight days before the Policy date in order to forestall the filing of a complaint. When the condominium

owners did file suit against IDC in 1999, they prevailed. The Rhode Island Supreme Court subsequently affirmed the judgment against IDC, but on different reasoning.

Commonwealth is seeking a declaration that IDC's failure to disclose threats of imminent title litigation relieves Commonwealth of any obligation to indemnify IDC for its loss. IDC has never submitted a proof of claim as required by the Policy, but has asserted that the value of its loss exceeds the $12 million Policy limit.

## II. <u>FACTUAL BACKGROUND.</u>

Commonwealth incorporates by reference the facts set forth in its contemporaneously submitted Statement of Undisputed Facts and accompanying exhibits.

## III. <u>ARGUMENT.</u>

### A. <u>Commonwealth Is Entitled To Judgment Because IDC Failed To Disclose In Writing Known Claims Not Of Record.</u>

Policy Exclusion No. 3 provides that "defects, liens, encumbrances, adverse claims, or other matters" that are "not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy," are excluded from coverage. *See* Commonwealth Statement of Undisputed Facts Exhibit ("UF Ex.") S, Exclusion 3(b).[1] IDC's knowledge of imminent litigation threats

---

[1] The Policy provides that:

> The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damages, costs, attorneys' fees or expenses which arise by reason of:
>
> * * *
>
> 3. Defects, liens, encumbrances, adverse claims or other matters:
>
> (a) created, suffered, assumed or agreed to by the insured claimant;
>
> (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in

involving its title, and its failure to inform Commonwealth of those threats in writing, results in an exclusion from coverage of all claims related to loss, expiration or extinction of that title.

IDC plainly knew of explicit, existing adverse claims against the title sought to be insured at the time it applied for the Policy in December, 1997. IDC's president, Thomas Roos, and its attorney, Timothy More, had attended meetings with litigation counsel for the individual condominium unit owners at which the validity of the North Development Unit and the extension of IDC's development rights were challenged. Commonwealth Statement of Undisputed Facts ("UF") No. 8-12. More testified:

> Matt Medeiros [counsel for the unit owners] took the position that the amendments that had been adopted to extend the development rights were not valid, but he also took the position that even – I think he took the position even that the creation of the North Development Unit wasn't valid either.

UF Ex. B (More Depo. Vol. II at 55). A November 12, 1997 memorandum presented to Roos by the unit owners at a meeting explicitly declared that the amendments to the Master Declaration on which IDC premised its right to build were "null and void" and "illegal." UF Ex. H. More concluded on the basis of these discussions that "there was definitely the potential for litigation." UF Ex. B at 57. Furthermore, More privately told his client, Roos, that he was concerned that a court might view IDC's development of the North Development Unit as an "illegal circumvention" of the Rhode Island Condominium Act. UF Ex. G. More explained:

---

writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

(c) resulting in no loss or damage to the insured claimant;

(d) attaching or created subsequent to Date of Policy; or

(e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

"[C]ourts interpreting the standard policy language of exclusion 3 have interpreted the subsections as disjunctive." *National Credit Union Admininstration v. Ticor Title*, 873 F. Supp. 718 (D. Mass. 1995).

> I am concerned that a court would view the construction of improvements by the Declarant, albeit as a [Master Unit] Owner, as an illegal circumvention of the (i) Act's requirement that the special declarant's rights to complete improvements have a stated time limit and/or (ii) the time limit to construct improvements set forth in Section 6 of the Declaration. The public offering statement and the Declaration might lead a reasonable person to believe that the Declarant's right to construct improvements would terminate.

*Id.*, p. 2-3.

Roos was also concerned that his right to build on the North Development Unit could be challenged. After meeting with the unit owners and their lawyer, Roos wrote his own lawyers, More and Turner Scott, to express concern:

> During our meeting last week with Matt Medeiros and Harbor Houses Condominium Associations, I became somewhat uneasy by the lack of confidence expressed with our positions and our apparent failure to have a coordinated focus on the same arguments.

UF Ex. E (Roos October 1, 1997 letter). Roos followed up with a letter to More and Scott dated October 6, 1997. UF Ex. F. In that letter, he summarized the unvarnished opinions of his two lawyers:

> Though section 6.3(d) [of the Master Declaration] does not specifically state that the Reserved Area cannot be constructed upon after December 31, 1994, it could be inferred by the wording in this paragraph that this was the intent of the section.
>
> Even though section 2.3(b) very clearly provides the Owner of a Master Unit the right to construct buildings and other improvements on his Master Unit at any time, this right is contradictory to the implied limitation of development rights spelled out in section 6.3(d).
>
> Though a precise interpretation of this language would support the right of the Owner (Declarant) to construct improvements on the Master Units, a judge might either misinterpret the language or just not like developers and rule against us on a fairness basis.

*Id.* Roos then laid out his counterarguments for interpreting the condominium documents to allow him to build on the North Development Unit in his capacity as an owner. Nevertheless,

Roos was aware that the individual unit owners were vigorously contesting this position. UF Ex. A, More Depo. Vol. I at 45-46 (Q: Was Mr. Roos concerned at that point in time about whether or not his development rights might be subject to question? A: Yes. Q: And were you concerned about that possibility also in October 1997? A: Yes.).

In fact, Attorney More was reviewing a tolling agreement covering the individual unit owners' claims at the very time that Commonwealth was conducting its title examination. On December 10, 1997, the unit owners' lawyer wrote More demanding that IDC sign a Tolling Agreement retroactive to December 1 to forestall the filing of litigation that "otherwise would be inevitable." UF Ex. O (December 10, 1997 letter to More). The Tolling Agreement broadly covered all claims arising out of the GIS Condominium documents, and included a representation that the signatories had secured the consent of any insurer affected by the agreement. *Id.* More did not secure Commonwealth's consent before entering into the Tolling Agreement on January 5, 1998. UF Ex. B (More Depo. Vol. II at 111). More did not send the Tolling Agreement to Commonwealth, and testified that he had no recollection of discussing it with Commonwealth's state counsel, Michael Mellion. UF Ex. B (More Depo. Vol. II at 99-100, 111-112).

IDC also knew of defects in the rights that it sought to insure that were not disclosed to Commonwealth. For example, the November 17, 1997 memorandum that More provided to Commonwealth asserted that it was "clear" that an extension of the development rights did not require the approval of individual unit owners. UF Ex. I. More's memorandum did not disclose his own doubts about this position, or that both counsel for the individual unit owners and Chicago Title strongly disagreed, as did Attorney Kanter in his December 5, 1994 letter to More. *Id.* Indeed, More had researched the issue and not found any case law that went either way. UF Ex. B (More Depo. Vol. II at 60-61). The November 17, 1997 memorandum

given to Commonwealth also asserted without qualification that IDC had unfettered development rights as the owner of the North Development Unit. UF Ex. I. In contrast, More's October 9, 1997 memorandum to his client more accurately stated his concern that a court "would view the construction of improvements by the Declarant, albeit as a [Master Unit] Owner, as an illegal circumvention" of the R.I. Condominium Act and the Master Declaration. UF Ex. G. More was not forthcoming about this concern in his written submission to or conversations with Commonwealth.

The claims asserted by the individual unit owners and covered by the Tolling Agreement were not publicly recorded, or disclosed to Commonwealth in writing, and are therefore excluded from coverage under the Policy. In a case involving the same policy exclusion as the Policy issued to IDC, an insured's failure to disclose an adverse claim that arose between the issuance of the title commitment and the title policy was held to preclude coverage. *Kirwan v. Chicago Title Insurance Co*., 612 N.W.2d 515 (Neb. App. 2000). In *Kirwan*, the title commitment had an effective date of April l; the plaintiffs were notified of an adverse claim on or about April 9; and the plaintiffs were sued on May 16, the same date that the title policy became effective. The appeals court affirmed judgment in favor of the insurer, holding that "the policy clearly excludes from coverage those claims which the insureds had knowledge about, but failed to disclose in writing to the insurer." *Kirwan*, 612 N.W.2d at 524. The court quoted with approval the lower court's reasoning:

> The rationale of title insurance is a coverage of risks ascertainable by both parties from the public records and not otherwise ascertainable by the proposed insured and the insurer. Permitting an insured to obtain coverage for something he or she knew about, but which was unknown and unknowable to the insurer, upsets the actuarial basis and justification for title insurance. Common sense supports the application of an exclusion to such situations.

*Id*. at 525. The logic of *Kirwan* applies equally to this case.

Under Rhode Island law, the courts generally apply the same rules when construing insurance policies as they do when construing contracts. *Employer Mutual Casualty Co. v. Pires*, 723 A.2d 295, 298 (R.I. 1999); *Martinelli v. Travelers Insurance Companies*, 687 A.2d 443, 445 (R.I. 1996). The policy language controls, unless it is ambiguous. *Id*. To determine whether a policy is ambiguous, the court reads the policy in its entirety, giving each word its plain, ordinary, and usual meaning. *See id.* "If the policy terms are ambiguous or capable of more than one reasonable meaning, then we will strictly construe the policy in favor of the insured and against the insurer. However, we will not engage in mental gymnastics, nor will we stretch the language in a policy to read ambiguity into it where none is present." *Employer Mutual Casualty Co.*, 723 A.2d at 298 (citing *Mallane v. Holyoke Mutual Insurance Company in Salem*, 658 A.2d 18, 20 (R.I. 1995)). The plain language of the Policy clearly excludes coverage for adverse claims that are known to the insured but not disclosed in writing. Commonwealth is entitled to summary judgment in its favor on this ground.

**B. Commonwealth Is Entitled To Summary Judgment Because IDC Misrepresented Material Information About The Risk Being Insured.**

It is well established that a misrepresentation by an insured to an insurer that is material to the risk voids the policy. As Chief Justice John Marshall observed nearly 200 years ago in a case where the insured's property was destroyed by fire,

> The contract for insurance is one in which the underwriters, generally, act on the representation of the assured; and that representation ought consequently to be fair, and to omit nothing which it is material for the underwriters to know. It may not be necessary that the person requiring insurance, should state every incumbrance on his property, which it might be required of him to state, if it was offered for sale; but fair dealing requires that he should state every thing which might influence, and probably would influence, the mind of the underwriter in forming or declining the contract.

*Columbian Insurance Co. v. Lawrence*, 27 U.S. 25, 49 (1829). Rhode Island follows the same

rule. *Guardian Life Insurance Co. of America v. Tillinghast*, 512 A.2d 855, 859 (R.I. 1986) ("a material misrepresentation, even though innocently made, is a basis for rescinding a contract."); *Evora v. Henry*, 559 A.2d 1038, 1040 (R.I. 1989) ("We have previously examined the effect of a misstatement of fact in an application for insurance. The theory clearly evinced by these cases is that a material misrepresentation in an insurance application makes voidable, without a concomitant demonstration of fraud, an insurance contract that is issued upon the application."); *Carpenter v. American Ins. Co*., 5 Cas. 105 (R.I. 1839) ("A misrepresentation of a material fact, whether it be made through mistake or design, avoids a policy of insurance underwritten on the faith thereof.").

In the insurance context, a material misrepresentation is one that induces the insurer to issue a policy. *Evora v. Henry*, 559 A.2d at 1040 ("We believe that a number of jurisdictions have adequately defined material misrepresentation. Many courts have adopted the view that a material representation in an insurance application is any representation that induces the insurer to insure the applicant."). The misrepresentation need not be an affirmative statement, either written or oral. It can be "`any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts."' *Travelers v. Spidell*, 682 A.2d 471, 473 n. 1 (R.I. 1996) (quoting *Halpert*, 107 R.I. at 413, 267 A.2d at 734). *See also Nash v. Trustees of Boston University*, 776 F. Supp. 73, 83 (D.R.I. 1990), *aff'd*, 946 F.2d 960 (1st Cir. 1991) (misrepresentation occurs "when half truths are uttered that are misleading;" if the maker "knows or believes that the matter is not as he represents it to be" or "knows or believes [it] to be materially misleading because of his failure to

state additional or qualifying matter"; or "when the fraud is grounded in either affirmative acts or concealment.").[2]

Numerous court decisions apply these principles to title insurance. For example, in *Parker v. Title & Trust Company*, 233 F.2d 505 (9th Cir. 1956), the insurance company brought an action seeking cancellation of certain title policies on the grounds that Parker had obtained the policies through fraudulent concealment of facts material to the risk assumed – namely, that title to one of two parcels insured was in the United States. Parker argued that the lower court judgment against him should be reversed because, even if he had knowledge of the defect, he had no obligation to disclose the defect to the title company. The Ninth Circuit disagreed and upheld the lower court, finding that "[t]he fraud here . . . consisted in the implied representation that Parker knew of no reason why a title policy should not be issued." *Parker*, 233 F.2d at 512. The court further observed,

> whatever may be the rule respecting the right of a contracting party to remain silent concerning material facts known to him and which he knows are unknown to the other party, yet if he undertakes to make some statement respecting the matter, he cannot indulge in half-truths.

*Parker*, 233 F.2d at 510. *See also Pioneer Nat'l Title Ins. Co. v. Lucas*, 155 N.J. Super. 332, 382 A. 2d 933 (1978) ("An insurance contract, including one of title insurance, requires the highest degree of good faith and fair dealing between the parties. It requires the insured to advise the insurer of such matters that he knows might influence the insurer in entering into or declining the risk, at least where such facts are not of record and are not discoverable therefrom by the insurer."); *Weir v. City Title Ins. Co.*, 125 N.J. Super. 23 308 A.2d 357 (1973) (considering changed circumstances between time of application and issuance of policy, "it was the obligation

---

2 *See also* Restatement (Second) of Contracts § 161 (1981), which states that nondisclosure of a fact is equal to an assertion of fact if a person "knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing."

of [insured] and his attorney to forthwith bring the matter to the attention of and make full disclosure to [insurer]. The defect was manifestly material to the risk that [insured] sought to have [insurer] undertake, and fair dealing demanded no less.”); *Lawyers Title v. D.S.C. of Newark*, 544 So.2d 1070 (Fla. App. 4th Dist. 1989) (“the courts have been loathe to impose liability on a title insurer for a condition of which the insured had actual, express knowledge”); *Rosenblatt v. Louisville Title Co.*, 218 Ky. 714, 292 S.W. 333 (1927) (failure to disclose possible defect in deed renders policy unenforceable); *Vaughan v. U.S. Title Guaranty & Indemnity Co.*, 137 App. Div. 623 (NY App. Div. 1910) (the insurer, “upon issuing the title insurance, naturally assumed that the [insured]’s deed was genuine, and the concealment of facts within the [insured]’s knowledge, tending to show that it was not, was as fraudulent as affirmative misstatements.”).

It is the insured’s duty to disclose information material to the risk, regardless of whether the title insurance company requests it. *See, e.g.*, *Collins v. Pioneer Title Ins. Co.*, 629 F.2d 429 (6th Cir. 1980). In *Collins*, the plaintiff secured an option to purchase a tract of land. Before the option expired, the owners of the land entered into a second sales contract with another buyer for the same piece of land, subject to the option expiring. Collins purported to exercise his option the day after it expired, and proceeded to closing knowing that the party to the second sales contract intended to seek specific performance. Collins, acting through his attorney, also obtained title insurance on the land. After the policy issued, Collins put the insurance company on notice of the specific performance claim, and the insurance company denied coverage under the policy.

Ruling in favor of the title insurance company, the court held that Collins’ lawyer’s failure to disclose the specific performance claim voided the policy, notwithstanding the fact the insured had not made an actual false statement:

> While Collins did not make a false statement on an insurance application, Collins through his agent, Ables, failed to disclose Chalupsky's claim to Pioneer. The insured's duty "to make a fair disclosure of the facts" means that he or she must disclose information which is material to the risk involved. Whether information not disclosed is material is a question of law for the court.

629 F.2d at 434 (citations omitted).[3]

Commonwealth did not require IDC to submit a written application for title insurance, consistent with More's experience. UF No. 15. Nevertheless, both More and Mellion understood that an applicant for title insurance would fully disclose any adverse claims not of record. UF Ex. J (More Depo. Vol. III at 23) ("So normally, you want a title company to know the most amount of information possible, so that they can either address the issue or evaluate the issue, advise you as to their opinion on the issue, so you can inform your client appropriately, and for that client to make, you know, the appropriate decisions."); UF Ex. M (Mellion Depo. Vol. II at 31) ("My understanding of the way business is done in Rhode Island or has always been done is that that's the duty on the part of whoever sent us the title to disclose to us."). IDC did not fully disclose, and misrepresented by omission, several material facts including: (1) explicit threats of imminent litigation by the residential subcondominium owners; (2) the execution of the Tolling Agreement on January 5, 1998, just days before the Policy was issued on January 13; (3) Attorney More's knowledge that it was not "clear" that the 1994 votes to extend development rights could properly exclude individual unit owners; and (4) More's

---

[3] The court also held that the fact that Collins dealt with the insurance company through his lawyer was of no import:

> [H]e knew that Pioneer was not informed of Chalupsky's [the party to the second sales contract] claim. He admitted that he had received a copy of [his attorney's] Preliminary Report on Title and an owner's binder from Pioneer, neither of which mentioned Chalupsky's claim. Furthermore, he knew the importance of the Chalupsky claim to the risk assumed by Pioneer. * * * We simply do not believe that Collins . . . expected that Pioneer would insure the title without exception for Chalupsky's claim, then being litigated, if it knew all the facts.

*Id.* at 434.

concerns, omitted from the memorandum he prepared for Commonwealth, about the validity of IDC's assertion that it had the unfettered right to build on the undeveloped units as Owner. Commonwealth would not have issued the Policy to IDC had it been aware of these facts. UF No. 21.

Far from disclosing the unit owners' express written assertion that the amendments to the Master Declaration creating the North Development Unit and extending IDC's development rights were "illegal" and "null and void," UF Ex. H, More was silent because he knew that Commonwealth, like Chicago Title, would not issue a policy if those threats were disclosed. More admitted that he was "certainly aware that most insurance companies don't like to buy litigation." UF Ex. B (More Depo. Vol. II at 87). Commonwealth reasonably relied on More, a partner at a large and reputable Providence law firm with whom Commonwealth had done business before, to make a full and fair disclosure of all material facts. Instead, More made partial and misleading disclosures in his November 17, 1997 memorandum to Commonwealth and his conversations with Michael Mellion which lead Mellion to agree to issue a policy insuring IDC's actively disputed right to build on the North Development Unit.

More admitted he could not recall any conversation with Commonwealth where he disclosed the unit owners' threats of imminent litigation:

> Q: Did you have any discussions with Mr. Mellion in December of 1997 about the possibility of litigation involving condominium owners at Goat Island?
>
> A: I have no specific recollection of a conversation.
>
> Q: So you're not prepared to testify that you disclosed to Mr. Mellion that there was threatened litigation involving the development rights for the North Development Unit at that point in time?
>
> Mr. Romano: Objection.
>
> A: I can't recall with absolute certainty whether the issue was raised or whether the issue was not raised.

> Q: Do you have any recollection of discussing the proposed Tolling Agreement that we looked at as Exhibit 8 with Mr. Mellion?
>
> A: Well, if I can't remember whether I had -- absolutely whether I had a discussion on the litigation, I certainly can't recall specifically whether we discussed the Tolling Agreement.

UF Ex. B (More Depo. Vol. II at 99-100).

Further, More could not recall having told Commonwealth that the unit owners had retained counsel. UF Ex. J (More Depo. Vol. III at 64). He could not recall telling Commonwealth about his meetings with Attorney Medeiros where litigation was threatened. *Id*. He admitted he could not be certain that Commonwealth had any idea that litigation had been threatened:

> Q: Did you have an understanding in December of 1997 that Mr. Mellion was aware of the possibility of litigation involving Goat Island?
>
> A: I can't say for certain whether he did or he didn't.

UF Ex. B (More Depo. Vol. II at 101).

Commonwealth's Mellion testified that More did not inform him about threatened litigation over the title to the North Development Unit and IDC Properties' developments rights, and that he was not aware of those threats by other means. UF Ex. M (Mellion Depo. Vol. II at 18-19; 35). Mellion also testified that he would not have issued a policy to IDC had he been apprised of the unit owners' explicit threats. UF No. 21. IDC's failure to disclose material facts to Commonwealth either orally or in writing voids coverage under the Policy.

### C. Commonwealth Should Be Granted Summary Judgment Under The Known Loss Doctrine Because Defects In IDC's Title Were A Known Loss.

Any loss suffered by IDC arising from an inability to develop the North Development Unit is not covered by the Policy under the known loss doctrine. The known loss

doctrine is a basic precept of insurance law that prohibits an insured from shifting a known loss to the insurer. As described by the Massachusetts Supreme Judicial Court:

> [T]he basic purpose of insurance is to protect against fortuitous events and not against known certainties. Parties wager against the occurrence or nonoccurrence of a specified event; the carrier insurers against a risk, not a certainty. *Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 29 (1st Cir. 1981). It follows from this general principle that an insured cannot insure against the consequences of an event which has already begun. *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 63 (3d Cir. 1982). Once the risk is eliminated, the contract for insurance no longer exists. *Bartholomew v. Appalachian Ins. Co. supra.* Courts have found that the insurable risk is eliminated in the instance where an insured knows, when it purchases a policy, that there is a substantial probability that it will suffer or has already suffered a loss. At that point, the risk ceases to be contingent and becomes a probable or known loss. When the insured has evidence of a probable loss when it purchases the policy, the loss is uninsurable under that policy. *See Outboard Marine Corp. v. Liberty Mut. Ins. Co., supra.* This rule has been recognized in Massachusetts and by leading authorities on the subject of insurance. *See Bettigole v. American Employers Ins. Co.,* 30 Mass.App.Ct. 272, 274, 567 N.E. 2d 1259 (1991); Couch, Insurance §§ 1.5, 2:7 (rev. 2d ed. 1984); R. Keeton & A. Widiss, Insurance Law § 4 (1988).

*SCA Services, Inc. v. Transportation Insurance Co.*, 419 Mass. 528, 532-33, 646 N.E.2d 394 (1995) (emphasis added). *See also Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 29 (1st Cir. 1981) ("The concept of insurance is that the parties, in effect, wager against the occurrence or non-occurrence of a specified event; the carrier insures against a risk, not a certainty.").

The Rhode Island Supreme Court applied the known loss doctrine in *Insurance Company of North America v. Kayser-Roth Company*, 770 A.2d 403 (R.I. 2001). In *Kayser-Roth*, the defendant was sued by an insurer that had issued comprehensive liability policies in 1982 and 1983. The insurer contended that at the time the policies were issued, Kayser-Roth knew that contamination at a site owned by one of its former subsidiaries would almost certainly give rise to a loss. Therefore, the insurer argued, the known loss doctrine precluded coverage for environmental clean up costs. Kayser-Roth argued that it first became aware of its potential

liability to the Government for clean-up costs in 1984, when it received notice from the EPA that it was a potentially responsible party.

The Rhode Island Supreme Court summarized the known loss doctrine as follows:

> The known loss doctrine is applied when the insured has knowledge, before the inception of an insurance policy, that the insured has suffered the threat of an immediate economic loss, as a result of some event, and that the reality of that loss occurring is a certainty. *See generally* 3 Eric Mills Holmes, *Holmes's Appleman on Insurance 2d* § 16.4 at 290 (1998) (the known loss doctrine "applies only where the insured is aware of a threat of loss so immediate that it might be stated that the loss was already in progress and such was known at the time of application or issuance of the policy since this doctrine is designed to prevent fraud when coverage is sought to be misused to insure a certainty rather than a fortuity").

*Kayser-Roth*, 770 A.2d at 415. The Court agreed with the company that the risk of liability for remedial costs did not become imminent until after the Kayser-Roth received notice from the EPA in 1984:

> Before the EPA action, the only claim ever brought against Kayser-Roth was brought by a single landowner seeking compensation for property damage. Kayser-Roth successfully defended that claim. Accordingly, although Kayser-Roth was aware that it potentially could be subjected to suits for property damage, it did not know, and had no reason to know, at least until 1984, that it could be subjected to a suit from the government for cleanup costs. Therefore, First State's known loss defense was properly denied.

*Kayser-Roth*, 770 A.2d at 416.

The known loss doctrine precludes coverage of IDC Properties' loss of development rights on Goat Island. Unlike the insured in *Kayser-Roth*, IDC Properties had received notice of the claims of the individual unit owners <u>before</u> it applied for the Policy; indeed, the individual unit owners would have filed suit challenging IDC Properties' title but for the Tolling Agreement negotiated in December 1997. Furthermore, as More ultimately conceded to IDC Properties' litigation counsel, the arguments that IDC validly extended its

development rights in December 1994 were "losers legally." UF No. 24. Because IDC Properties had knowledge of the defects in its title, the risk of claims based on such defects was no longer an insurable risk. The loss was already in progress; it was merely a matter of time before it occurred.

COMMONWEALTH LAND TITLE
INSURANCE COMPANY,

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

/s/ Robert K. Taylor
Steven E. Snow (#1774)
Robert K. Taylor (#6514)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX
ses@psh.com
rkt@psh.com

DATED: May 22, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing COMMONWEALTH LAND TITLE INSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT was filed with the Clerk of the United States District Court for the District of Rhode Island this 22nd day of May, 2007 and is available for viewing and downloading to the following ECF registered counsel of record:

W. Mark Russo, Esq. / Ferrucci, Russo P.C.
Christopher M. Mulhearn, Esq. / Ferrucci Russo P.C.
Deming E. Sherman, Esq. / Edwards Angell Palmer & Dodge LLP
Peter J. Haley, Esq. / Gordon Haley LLP
Stephen F. Gordon, Esq. / Gordon Haley LLP
John G. Fabiano, Esq. / Wilmer Cutler Pickering Hale & Dorr LLP
Harold Hestnes, Esq. / Wilmer Cutler Pickering Hale & Dorr LLP
Benjamin M. Stern, Esq. / Wilmer Cutler Pickering Hale & Dorr LLP
William R. Landry, Esq. / Blish & Cavanagh, LLP
Thomas E. Romano, Esq. / Blish & Cavanagh, LLP

/s/ Robert K. Taylor

911835_1/6052-3