# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| COMMONWEALTH LAND TITLE INSURANCE COMPANY,<br>Plaintiff,<br><br>v.<br><br>IDC PROPERTIES, INC.,<br>Defendant,<br><br>v.<br><br>TIMOTHY MORE AND EDWARDS ANGELL PALMER & DODGE LLP,<br>Third Party Defendants. | C.A. No. 01-400-T |

**COMMONWEALTH LAND TITLE INSURANCE COMPANY'S LOCAL RULE 56(a) STATEMENT OF UNDISPUTED FACTS**

Pursuant to Local Rule 56(a), Commonwealth Land Title Insurance Company ("Commonwealth") submits the following Statement of Undisputed Facts in support of its contemporaneous Motion for Summary Judgment.

1. On January 13, 1988, IDC Properties, Inc.'s ("IDC") predecessor, Globe Manufacturing, recorded a declaration of condominium for Goat Island South ("GIS Condominium"), approximately 23 acres on Goat Island, Newport, Rhode Island. Globe recorded an amended and restated declaration on March 3, 1988 (the "Master Declaration"). *America Condominium Association Inc. v. IDC, Inc.*, 844 A.2d 117, 120 (R.I. 2004) ("*America Condominium I*"). The Master Declaration divided Goat Island South into six parcels, of which five were designated Master Units. The Master Units comprised the airspace above and all buildings or improvements located on the land. The land underlying each Master Unit was

designated a master limited common element. *America Condominium Association, Inc. v. IDC, Inc.*, 870 A.2d 434, 436 (R.I. 2005) ("*America Condominium II*").

2. Three of the Master Units – Capella South Condominium, America Condominium and Harbor Houses Condominium – were existing residential complexes. *America Condominium II*, 870 A.2d at 436. Two other units – the West Development Unit and the South Development Unit – were undeveloped. A third undeveloped parcel was known as the Reserved Area (later, the North Development Unit). The Master Declaration reserved to the Declarant the right through December 31, 1994 to develop the West Development Unit and South Development Unit. *America Condominium II*, 870 A.2d at 436. The Master Declaration further reserved to the declarant the right to convert the Reserved Area into a Master Unit, and if so converted, the right to develop the Master Unit through December 31, 1994. *Id*.[1]

3. To govern the newly created condominium, Globe created the Goat Island South Condominium Association ("Master Association"). America Condominium and the two other residential condominiums each had sub-condominium associations. The Members of the Master Association included every individual unit owner and the owner of each undeveloped master unit (which ownership was claimed by Globe). The Master Declaration provided that individual unit owners would be represented on the Master Association by the executive boards of the residential sub-condominium associations. These executive boards were initially appointed and controlled by Globe. *America Condominium I*, 844 A.2d at 121-122.

4. By early 1994, neither Globe nor its successor in interest, Island Development Corporation, Inc. ("IDC, Inc."), had exercised their rights to develop the West, South, or North Development Units. *America Condominium I*, 844 A.2d at 122. Faced with the impending

[1] More specifically, the declarant with regard to the Reserved Area reserved "the right to withdraw real estate, the right to convert the area to a 'Master Unit,' and the right to construct improvements on the unit, if it were created." *America Condominium II*, 870 A.2d at 439.

expiration of those rights at the end of 1994, IDC, Inc. organized a special meeting of the Master Association at which a five year extension of the declarant's development rights for the Reserved Area/North Development Unit was approved. This extension was reflected in a Third Amendment to the Master Declaration. *Id*. at 123.

5. IDC, Inc. transferred its interests in the GIS Condominium to IDC on October 19, 1994. *America Condominium I*, 844 A.2d at 122 and n. 9. IDC retained the law firm of Edwards & Angell (now Edwards Angell Palmer & Dodge) ("EAPD") to represent it in connection with matters relating to the GIS Condominium. Exhibit A (12/20/02 Deposition of Timothy More ("More Depo. Vol. I") at 13-14). Timothy More was one of the EAPD attorneys advising IDC. *Id*.[2]

6. More questioned whether the Third Amendment validly extended IDC's right to develop the Reserved Area because it was not approved by unanimous consent of all the unit owners. On December 2, 1994, More wrote to Attorney Stanley Kanter, who had represented IDC Properties' predecessor in interest:

> [Chicago Title Insurance Company] and I believe that the extension of the declarant's rights under the Master Declaration to December 31, 1999 cannot be done without the unanimous consent of all the unit owners within the Master Condominium.

Exhibit C (Complaint Ex. F) (emphasis added). More sent a copy of his letter to the president of IDC, Thomas Roos. On December 5, 1994, Attorney Kanter replied that he had discussed the matter at length with Roos:

> We advised that both the Master Declaration and the Statute could be subject to varying interpretations as to the consent that would be required to extend the Development Rights time period, which could easily subject the Declarant or the Master Association to litigation by Unit Owners dissatisfied with any vote to extend such time period. The parties noted that, if the path to unanimous consent was required, it would be highly unlikely that the

[2] More left EAPD in December, 2000. Exhibit B (1/7/03 Deposition of Timothy More ("More Depo. Vol. II") at 65).

> Declarant could obtain the consent of all of the approximately eighty-five Unit Owners and that, therefore, as above, an aggressive posture was appropriate. . . .

Exhibit D (Complaint Ex. G).

7. Following the exchange with Attorney Kanter, IDC recorded a Fifth Amendment to the Master Declaration on December 29, 1994. The Fifth Amendment among other things extended the declarant's right to develop the West Development Unit and the Reserved Area/North Development Unit until 2015. *America Condominium I* at 123-124. IDC Properties also recorded a Sixth Amendment to the Master Declaration on December 29, 1994. The Sixth Amendment purported to convert the air space over the Reserved Area into a sixth Master Unit known as the North Development Unit. *America Condominium I*, 844 A.2d at 125. The amendments were unanimously approved by the owner of the undeveloped master units (IDC) and members of the IDC-controlled executive boards of the residential condominiums, but not by the individual unit owners. *America Condominium I*, 844 A.2d at 122-125. Certain individual unit owners objected, but to no avail. *Id*. at 124-125.

8. By late 1997, IDC Properties was planning the construction of a commercial function center on the North Development Unit. Individual unit owners in the residential condominiums challenged IDC's right to build. After a meeting in September, 1997, with the litigation attorney hired by the unit owners, Matthew Medeiros, Roos wrote his lawyers, More and Turner Scott, to express concern about "the lack of confidence expressed with our positions and our apparent failure to have a coordinated focus on the same arguments." Exhibit E (Roos October 1, 1997 letter).

9. Roos followed up with a letter to More and Scott dated October 6, 1997, which summarized the unvarnished opinions of his two lawyers that a court could rule that IDC's right to build on the North Development Unit expired at the end of 1994. Exhibit F. Roos then laid

out his counterargument that the condominium documents allowed him to develop the North Development Unit in his capacity as an owner, without any time limit. *Id*.

10. More responded in a written memorandum dated October 9, 1997. More informed Roos that "I am concerned that a court would view the construction of improvements by the Declarant, albeit as a [Master Unit] Owner, as an illegal circumvention" of the Condominium Act. Exhibit G, p. 2, ¶ 2(b).

11. On November 13, 1997, representatives of the America Condominium Association met with Roos and presented him with a list of demands. The very first item stated:

> Give us your position in writing on our challenge to each of the Amendments to the Declaration you have enacted. Our Attorney has told you and your lawyers in no uncertain terms that what you did was illegal; effectively rendering them null and void. . . . Are you willing to rescind them without our having to file a complaint re same?

Exhibit H (November 12, 1997 memorandum).

12. Based on the meetings with the unit owners' counsel in the fall of 1997, More knew that the unit owners were challenging both IDC Properties' development rights, and the validity of the North Development Unit. Exhibit B (More Depo. Vol. II at 55); *see also* Exhibit A (More Depo. Vol. I at 45-46). More concluded on the basis of these discussions that "there was definitely the potential for litigation." Exhibit B (More Depo. Vol. II at 57).

13. On or about November 17, 1997, More prepared a memorandum to File discussing IDC Properties' development rights. The memorandum asserted that "[i]t is clear that under the Master Declaration and the Condominium Act that the Master Unit Owners, and not the sub-condominium owners, were the proper parties to vote on the amendment." Exhibit I (Complaint Ex. B). More made this assertion despite knowing of the position of the individual unit owners to the contrary, and despite the fact that he had researched the issue and not found

any case law that went either way. Exhibit B (More Depo. Vol. II at 60-61). The memorandum did not disclose the explicit threats of litigation made by the individual unit owners.

14. More sent his November 17, 1997 memorandum to Chicago Title Insurance Company, which had issued a policy covering certain of IDC's development rights in 1994, and asked Chicago Title for additional coverage for the North Development Unit. Exhibit J (9/7/06 Deposition of Timothy More ("More Depo. Vol. III") at 17). In a written response dated December 15, 1997, Chicago Title's state counsel, Jeffrey Meyer, specifically disagreed with the assertion in More's November 17, 1997 memo that "the law is clear" that the individual unit owners were not required to vote on the amendments to the Master Declaration. Exhibit K. In addition, Meyer was aware of "threatened litigation over the operation and management of the master condominium by the sub-condominium unit owners." *Id*.; Exhibit L (12/19/02 Deposition of Jeffrey Meyer ("Meyer Depo.") at 21-33). Meyer felt that if he issued a policy "we were just buying a claim." Exhibit L (Meyer Depo. at 30). More did not give the memorandum from Chicago Title to Commonwealth. Exhibit B (More Depo. Vol. II at 90); Exhibit M (8/31/06 Deposition of Michael Mellion ("Mellion Depo. Vol. II") at 30).

15. On or about December 4, 1997, More wrote a letter to Commonwealth's Rhode Island State Counsel Michael Mellion asking for a $5 million owners' title insurance policy insuring both the fee title to the North Development Unit and the right to construct improvements on that unit. Exhibit N (Complaint Ex. A). As was generally the case in More's experience, there was no written application. Exhibit J (More Depo. Vol. III at 14-15); Exhibit M (Mellion Depo. Vol. II at 19-20). Both More and Mellion understood that an applicant for title insurance would fully disclose any adverse claims not of record. Exhibit J (More Depo. Vol. III at 23); Exhibit M (Mellion Depo. Vol. II at 31). Furthermore, More was "certainly

aware that most insurance companies don't like to buy litigation." Exhibit B (More Depo. Vol. II at 87).

16. More had consistently sent title business to Commonwealth and Mellion over the years. Exhibit B (More Depo. Vol. II at 89). More sent Mellion his November 17, 1997 memorandum, copies of the Master Declaration, various amendments thereto, and the owner's title insurance policy issued by Chicago Title Insurance Company, dated October 21, 1994. Exhibit N. More did not provide Mellion with any other documents.

17. On December 10, 1997, the individual unit owners' lawyer wrote More demanding that IDC sign a Tolling Agreement to forestall the filing of litigation that "otherwise would be inevitable." Exhibit O (December 10, 1997 letter to More). IDC agreed to sign. The Tolling Agreement was signed on January 5, 1998, and established a tolling date of December 1, 1997. Exhibit P. The Tolling Agreement covered all claims arising out of the GIS Condominium documents, and included a representation that the signatories had secured the consent of any insurer affected by the agreement. *Id*. More did not secure Commonwealth's consent before entering into the Tolling Agreement. Exhibit B (More Depo. Vol. II at 111). He did not send a copy of the Tolling Agreement to Commonwealth. *Id*. He did not discuss the Tolling Agreement with Commonwealth. *Id.* at 99-100.

18. On December 12, 1997, Commonwealth issued a quote of $5,000 for $5 million of coverage. Exhibit Q. Thereafter Commonwealth's title examiner examined public records of the City of Newport to identify any liens, claims or defects of record. Mellion also reviewed and discussed More's November 17, 1997 memorandum with More. Exhibit R (1/9/03 Mellion Depo. ("Mellion Depo. Vol. I") at 21-22, 26-28, 30-31).

19. In reliance upon the information provided by More, as well as its own investigation of publicly recorded documents, Commonwealth issued an Owner's Title Insurance

Policy, Policy Number 228716 (the "Policy"), to IDC Properties. Exhibit S. The policy limit was $7 million.[3] The Policy insured fee simple title to the North Development Unit and certain rights to improve that Unit. In the transmittal letter to More, Commonwealth's Mellion noted that he was unable to obtain any tax, water or sewer information on the land because, according to the City of Newport, it would continue to be located in the common areas of the GIS Condominium and not distinguished as a separate lot until development occurred. Exhibit T (February 2, 1998 letter). More did not contradict this statement in any way.

20. IDC did not give Commonwealth written notice of the unit owners' explicit threats of litigation prior to the issuance of the Policy, and Commonwealth was not aware of those threats by other means. Exhibit M (Mellion Depo. Vol. II at 18-19, 35). More can not recall any conversation where he orally disclosed the unit owners' threats of imminent litigation. Exhibit B (More Depo. Vol. II at 99-100). More can not recall having told Commonwealth that the unit owners had retained litigation counsel. Exhibit J (More Depo. Vol. III at 64). He can not recall telling Commonwealth about his meetings with Attorney Medeiros where litigation was threatened. *Id*. He can not be certain that Commonwealth had any idea that litigation had been threatened. Exhibit B (More Depo. Vol. II at 101).

21. Commonwealth would not have issued a policy to IDC Properties had it been apprised of the unit owners' explicit threats. Exhibit M (Mellion Depo. Vol. II at 33-34); Exhibit R (Mellion Depo. Vol. I at 19-20, 30-31).

22. IDC Properties constructed a function center, known as the Newport Regatta Club, on the North Development Unit in 1998. *America Condominium I*, 844 A.2d at 125. On December 3, 1998, More wrote Commonwealth and requested an increase in the Policy amount

---

[3] More's December 4, 1997 letter had requested $5 million of coverage. IDC Properties asked to have the policy limits increased to $7 million in January 1998.

to $12 million, as well as additions to the property description to include the South Development Unit (also known as the "Independent Unit") and the West Development Unit. More again did not disclose the adverse claims of the individual unit owners or the existence of the Tolling Agreement. Exhibit B (More Depo. Vol. II at 120). On or about March 1, 1999, Commonwealth amended the Policy to increase the amount of coverage and to add the two additional development units. Exhibit U.

23. The condominium owners filed suit against IDC on May 29, 1999. Among the issues raised in the suit was "the status of IDC's 'title' to the units it owns." IDC Original Counterclaim, ¶ 5; *see also America Condominium I* , 844 A.2d at 125 (condominium owners' complaint "contended that when defendants failed to exercise their development rights on or before December 31, 1994, their reserved interest in the undeveloped units ceased to exist, thus implying that fee simple title then vested in plaintiffs"). IDC Properties notified Commonwealth of the suit by letter dated October 21, 1999. IDC Properties did not demand that Commonwealth provide a defense.

24. The condominium associations moved in January 2000 for partial summary judgment in their favor. On June 14, 2000, Attorney More prepared a letter to IDC's litigation counsel in which More bluntly advised him to "[d]ownplay the extension of development right issues which I believe are losers legally." Exhibit V (EAPD 0037).

25. In June 2001, the Superior Court entered an order declaring that the amendments which purported to extend IDC Properties' development rights "lacked the unanimous consent of the unit owners, and thus were not adopted in accordance with R.I.G.L. § 34-36.1-2.17 and are void ab initio and have been recorded ultra vires." Exhibit W. The order also declared that IDC Properties' development rights on Goat Island "have expired." *Id.*

26. Both sides appealed. On appeal, the plaintiffs contended "that the partial judgment, as entered, did not accurately reflect the decision of the court because it did not state that fee simple title was now vested in plaintiffs." *America Condominium I*, 844 A.2d at 126. The Rhode Island Supreme Court eventually issued two opinions. The first opinion held that title to the North Development Unit/Reserved Area belonged to the individual unit owners. *America Condominium I*, 844 A.2d at 133. IDC petitioned successfully for reargument, and the Rhode Island Supreme Court issued a second opinion in April, 2005. *America Condominium Ass'n v. IDC, Inc.*, 870 A.2d 434 ("*America Condominium II*"). The second opinion concluded that IDC had never validly created certain development units on Goat Island, including the North Development Unit, and that those areas are common elements of the GIS Condominium. *Id*. at 442.

COMMONWEALTH LAND TITLE
INSURANCE COMPANY,

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

/s/ Robert K. Taylor
Steven E. Snow (#1774)
Robert K. Taylor (#6514)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX
ses@psh.com
rkt@psh.com

Dated: May 22, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing COMMONWEALTH LAND TITLE INSURANCE COMPANY'S LOCAL RULE 56(a) STATEMENT OF UNDISPUTED FACTS was filed with the Clerk of the United States District Court for the District of Rhode Island this 22nd day of May, 2007 and is available for viewing and downloading to the following ECF registered counsel of record:

W. Mark Russo, Esq. / Ferrucci, Russo P.C.
Christopher M. Mulhearn, Esq. / Ferrucci Russo P.C.
Deming E. Sherman, Esq. / Edwards Angell Palmer & Dodge LLP
Peter J. Haley, Esq. / Gordon Haley LLP
Stephen F. Gordon, Esq. / Gordon Haley LLP
John G. Fabiano, Esq. / Wilmer Cutler Pickering Hale & Dorr LLP
Harold Hestnes, Esq. / Wilmer Cutler Pickering Hale & Dorr LLP
Benjamin M. Stern, Esq. / Wilmer Cutler Pickering Hale & Dorr LLP
William R. Landry, Esq. / Blish & Cavanagh, LLP
Thomas E. Romano, Esq. / Blish & Cavanagh, LLP

/s/ Robert K. Taylor

918573_1/6052-3

# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

COMMONWEALTH LAND TITLE INSURANCE COMPANY, Plaintiff

VS. — C.A. NO. 01-400T(RWL)

IDC PROPERTIES, INC., Defendant

* * * * * * * * * * * * * * * * *

DEPOSITION OF TIMOTHY T. MORE, ESQUIRE, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Partridge, Snow & Hahn, 180 South Main Street, Providence, Rhode Island, on December 20, 2002, at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF........ PARTRIDGE, SNOW & HAHN
BY: Robert K. Taylor, Esquire

FOR THE DEFENDANT........ BLISH & CAVANAGH
BY: William R. Landry, Esquire

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

the term unit owners, whether you mean every single unit owner within the whole project or whether you mean the master unit owners. It was my opinion at the time that under the Condominium Act and under the Goat Island Master Declaration what was required was the unanimous consent of the master unit owners, and that neither of those, neither the law nor the declaration required a consent of every single condominium unit owner within each of the sub-condominiums, and that conclusion is reflected in the memorandum attached as Exhibit B to the Complaint dated November 17, 1997. So, anyway, that was the nature of my own kind of response to Stan Kanter's letter and the issues that I raised with him.

MR. TAYLOR: Since we started talking about these letters, let's just go ahead and mark this as Exhibit 2 to your deposition.

(PLAINTIFF'S EXHIBIT 2 MARKED FOR IDENTIFICATION)

Q. Can you identify Exhibit 2?

A. Exhibit 2 is a letter from me to Stan Kanter dated December 2, 1994.

Q. Did you write this letter?

A. Yes.

Q. And did you send it to Mr. Kanter on or about December 2, 1994?

A. To the best of my knowledge, yes.

Q. Before we talk about this letter itself, can you give me the background of how you first came to know Tom Roos?

A. Tom Roos came into the office through my partner Chip Rogers.

Q. When did you first meet Tom Roos?

A. Sometime in late 1994.

Q. And was late 1994 the first time that you personally provided any services to Mr. Roos or to IDC?

A. Yes.

Q. What was the reason that you were introduced to Mr. Roos in late 1994?

A. I was introduced because Tom wanted to use Edwards & Angell, and my expertise -- one of my expertise is condominium law.

Q. Had Edwards & Angell been representing Mr. Roos prior to late 1994?

A. I don't know.

Q. How about IDC, do you know if E & A represented IDC prior to late 1994?

A. I have no knowledge. I think he was a new client but I'm really not sure.
Q. And what was your understanding in late 1994 of the particular issues that you were going to be asked to assist Mr. Roos with?
A. Tom was -- I think Tom had not too long prior to his engagement of our firm had acquired the development rights to Goat Island and the real estate rights owned by IDC, or whoever the previous company was, from his -- I think it was his father or his relatives. So Tom, having kind of taken over this development, wanted to make certain revisions to the condominium documents. One of the issues was his desire to extend the development rights and to make sure that he had the right to build out, in particular, the North Development Unit. He was also concerned about the allocation of common area charges among the master units, and he wanted to make some amendments regarding easement rights, I think, in reference to the North Development Unit in particular.
Q. And did you have meetings with Mr. Roos in late 1994 regarding these issues?
A. I believe that I did.

Q. More than one meeting?

A. I think most of the communication was by telephone.

Q. Can you give me an estimate of how frequently you were communicating with Mr. Roos in the fall and early winter -- strike that question. Can you tell me how often you were communicating with Mr. Roos in late 1994?

A. The actual dates are fairly fuzzy because I haven't looked at my time sheets. All I am really looking at is this letter of December 2, 1994, to Stan Kanter and working off of that as an estimate of when I was talking to Tom Roos about these various issues. My discussions with him went over, I think, a fairly extended period of time because the issues were complex and because it required votes of various organizations and boards, et cetera.

Q. Focusing on the issue of development rights with the North Development Unit at Goat Island, how did you first become educated on that issue?

A. By reviewing the Goat Island Master Condominium Declaration and reviewing the Goat Island Condominium Act.

condition of the America's Cup condominium building, and they were concerned that the Condominium Association was going to have to spend a lot of money to replace windows and doors and weather proofing, and I don't know about the roof, and I can't remember what the other issues were, and I always felt that the issues that they had with regards to Tom's development rights were somewhat spurious, and their interest in raising these issues was more leverage to get Tom to make the repairs of the America's Cup building than it was to certainly prevent Tom from developing the North Development Unit. It did seem to me that they could be legitimately concerned about the reallocation of expenses because it directly impacted their finances and their expenses, but the other issue regarding Tom's development rights, as I said, seemed to be an issue raised out of pique and out of anger and a desire for leverage.

Q. Well, at that meeting was the issue of whether individual unit owner's approval was needed to extend development rights raised?

A. It probably was raised.

Q. Was that the basis of Mr. Medeiros's claim that the property rates had not been validly extended?

A. Yes, to the best of my recollection.

Q. Now, this memorandum indicates that you did some research around this point in time. Do you recall what issues you researched?

A. Not independently of reading through this memorandum.

Q. And the first paragraph of Exhibit 4 also refers to a memo; do you see where I am?

THE WITNESS: First paragraph?

MR. TAYLOR: Yes.

A. Yes.

Q. Did Mr. Roos provide you with a memo around this point in time?

A. It appears from this memo that he did give me a memo, but I don't recall the memo itself.

Q. Did Mr. Roos ask you to prepare a response to the issues raised by Mr. Medeiros at the meeting you have been describing?

A. I suspect so.

Q. Was Mr. Roos concerned at that point in time about whether or not his development rights might be subject to question?

A. Yes.
Q. And were you concerned about that possibility also in October 1997?
A. Yes.
Q. And was this memorandum consistent with your thoughts on the issue of development rights at this point in time?
A. To the best of my recollection, yes.
Q. Looking at Paragraph 1 of this memorandum.
THE WITNESS: On Page 1?
MR. TAYLOR: On Page 1, yes.
Q. The second sentence talks about a concern that you have that a court might hold that the endless right of the Declarant (albeit as an Owner) to develop three Master Units improperly circumvents either the Act's requirements or some provisions in the declaration; do you see where I am?
A. Yes.
Q. What was your concern on that issue at this point in time?
A. My concern was that the right to build improvements and to create units in a condominium are typically what's called a development right under the Condominium Act. So that the right of

the Declarant under Section 2.3 of the Declaration -- excuse me, or the right of a master unit owner under Section 2.3 of the Declaration to develop a site forever might be viewed by some untutored judge as seeming to conflict with the limitations imposed by the Condominium Act or the development rights. I'm not sure how well I've stated that. What I said in the memorandum, you know, in many ways speaks for itself.

Q. And did you continue to have the concern described in Paragraph 1 of this memorandum after October 1997?

A. I think in this memorandum, if you will notice, it said privileged and confidential advice to client. I was trying to raise any conceivable argument that I could come up with which would raise questions about Tom's rights as a developer and as a master unit owner. In some places that I can see in the memorandum, you know, I gave my opinion that certain issues that had been raised or concerns that had been raised, I didn't agree with, and I think that in regard to this issue addressed in this Paragraph 1, that my opinion over time was increasingly that there were no

C E R T I F I C A T E

I, Jane M. Poore, a Notary Public, do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to the Rules of Civil Procedure of the Superior Court, especially, but without restriction thereto, under Rule 30(b) of said Rules; that the witness was first sworn by me; that the transcript contains a true record of proceedings.

Reading and signing of the transcript was not requested by the deponent or any parties involved upon completion of the deposition.

IN WITNESS WHEREOF I have hereunto set my hand this 6th day of January, 2003.

JANE M. POORE, NOTARY PUBLIC, RPR
My commission expires 9/11/05

DATE: December 20, 2002
IN RE: Commonwealth vs. IDC
WITNESS NAME: Timothy More

# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

COMMONWEALTH LAND TITLE INSURANCE COMPANY, Plaintiff

VS. C.A. NO. 01-400T(RWL)

IDC PROPERTIES, INC., Defendant

* * * * * * * * * * * * * * * * *

VOLUME II

CONTINUED DEPOSITION OF TIMOTHY T. MORE, ESQUIRE, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Partridge, Snow & Hahn, 180 South Main Street, Providence, Rhode Island, on January 7, 2003, at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF........ PARTRIDGE, SNOW & HAHN
BY: Robert K. Taylor, Esquire

FOR THE DEFENDANT........ BLISH & CAVANAGH
BY: Thomas E. Romano, Esquire

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

and probably a half dozen conversations on the telephone with Matt.

Q. Can you place the meeting that you had with Mr. Medeiros in time?

A. Not beyond looking at this memorandum which talks about a meeting on November 13, 1997.

Q. Do you recall whether you had a meeting with Mr. Medeiros prior to the end of 1997?

A. I can't place anything in terms of time. It's too far back to know whether it was '98, '97, '96. The only way I can make any statement as to time would be to look at some other document such as this.

Q. What do you recall about the substance of the meeting that you had with Mr. Medeiros that you just referred to?

A. Well, the two basic issues that were discussed at the meeting were -- one was the physical condition of the America's Cup building. The America's Cup Directors or President of the Board, Ray Morrissette, said that the building had a lot of physical problems including particular leaks that were coming in through the windows, and the windows were having to be replaced, and the second

area of conversation had to do with the amendments to the condominium Declaration and the rights of IDC to develop the land units that it still owned.

Q. And do you recall any further details about the discussion relating to the second issue which you've identified?

A. Well, I think that, as stated in this Exhibit 5, Matt Medeiros took the position that the amendments that had been adopted to extend the development rights were not valid, but he also took the position that even -- I think he took the position even that the creation of the North Development Unit wasn't valid either.

Q. Was there a document that created the North Development Unit?

A. Yes, there was an amendment to the Declaration and a filing of the amendment to the condominium plat.

Q. Did Mr. Medeiros give you a basis for his position that the amendments to the condominium documents were not valid?

A. My recollection is that he said that every single sub-unit owner at Goat Island had to sign the amendment.

Q. And did he tell you his reason for his position?
A. I can't recall.
Q. Did he provide you with any legal support for the position that he was taking regarding the amendments to the condominium Declaration?
A. Not to the best of my recollection.
Q. Did you provide him with any statutory citations?
A. I don't recall any.
Q. Did he provide you with any case law references?
A. I'm fairly confident he did not provide me with any case law.
Q. Did he provide you with any examples of situations that he viewed as being analogous to the situation at Goat Island?
A. Not to my knowledge.
Q. Now, in addition to you and Mr. Medeiros and Mr. Roos, did anyone else attend that meeting?
A. Turner Scott, Ray Morrissette, and I believe somebody else on behalf of Matt Medeiros's clients.
Q. Where was that meeting held?
A. Matt Medeiros's office in the Turks Head Building.
Q. How long did that meeting last?

A. Maybe an hour or two.
Q. And at the conclusion of that meeting, what was -- let me start that question again. At the conclusion of that meeting, what was your understanding of any next steps that were going to be taken by any of the attendees?
A. I can't remember where we were at the end of the meeting beyond the fact that there had been no consensus reached on any of the issues.
Q. At the end of that meeting was it left that anyone was going to provide additional information in one form or another?
A. I can't recall.
Q. Was there any discussion during the course of that meeting of potential litigation over these issues that were being raised?
A. I think that at the time of the meeting and after the meeting my sense was that there was definitely the potential for litigation.
Q. Do you recall whether Mr. Medeiros or any of his clients raised the possibility of litigation at that meeting?
A. As I said, litigation was in the air, so I don't remember to what degree it was discussed at

the meeting.

Q. Now, in addition to the meeting that you attended with Mr. Medeiros, you also had some telephone conversations with him around the same time period; is that right?

A. I believe so.

Q. Can you give me an idea of how many phone calls there were?

A. As I said, to the best of my recollection there were maybe six, ten conversations. I don't think there were a lot, but there were more than one or two.

Q. And did these phone conversations precede the meeting?

A. I'm sure there were at least some conversations before the meeting.

Q. Were some of the conversations also held after the meeting?

A. I expect there were some conversations after the meeting as well.

Q. And do you recall the substance of any particular conversation that you had with Mr. Medeiros around this period of time?

A. I'm sure I must have explained to Matt why I

believed that the amendments to the Declaration were valid. I'm sure I must have said to Matt that I didn't believe that his clients had a good position with regard to the condition of the building because it had been converted well before Tom's taking ownership of the property, and that more likely than not most of the deterioration that had occurred had occurred subsequent to the condominium being formed because the America's Cup building was an existing structure at the time, and it was converted into a condominium, and so there had been disclosures at that time, and there was an engineer's report that was done contemporaneous with the creation of the America's Cup condominium which had been -- either the substance of that report or the actual report had been provided to prospective buyers.

Q. In the course of those conversations with Mr. Medeiros, do you recall him giving you any legal support for his position regarding the validity of the amendments to the condominium agreements?

A. No specific law. I mean, the basic issue has to do with the Condominium Act's requirement that

in effect an extension of development rights requires unanimous consent of the unit owners. The declarant doesn't have the right to amend the documents on that particular issue without unanimous consent of the unit owners. So it was a question of who are the unit owners. The amendment that was being adopted had to do with the Goat Island condominium. In the Goat Island condominium there were a group of master units. It was my position at the time that unanimous consent of the master unit owners was required. We then looked to see how did a master unit vote on an amendment, and there were procedures set forth in either the Master Declaration or the Sub-Unit Declarations -- Sub-Condominium Declarations that spelled out how master unit owners took action, and to the best of my recollection we followed those procedures in causing each of the master units to vote in favor of the amendments. Matt took a contrary position that unanimous consent of the owners required each of the sub-unit owners to vote. I think it's -- let's say I did as much research as I could do on the subject, and I couldn't find any case law that

went either way on the issue.

Q. Did anyone else at your law firm assist you in conducting that research?

A. No.

Q. During the conversations with Matt Medeiros, was the subject of the proposed construction on the North Development Unit raised?

A. I think it may have been. I know that Tom was building a structure. He called it something like the Clambake Building. Turner Scott was dealing with any of the local zoning issues that related to that building, and my recollection was that Tom had either started it or was about ready to start it, and I recall somewhere during the course of '97, '98, '99 thinking that Tom was going ahead and building, and the Condominium Unit Association, the plaintiffs as it were, had not taken any action to prevent him from building.

Q. When you say the Condominium Unit Association had not taken any action to prevent him from building, what sort of action were you envisioning?

A. They did not seek a restraining order in the form of an injunction. I don't recall if they filed any sort of zoning appeal challenging his

ownership to the property, or if they did, they didn't seek a stay or obtain a stay from his ability to continue building the structure.

Q. During your conversations with Mr. Medeiros that you've just been describing for me, do you recall anything that he had to say about the construction of the Clambake Club or the structure on the North Development Unit?

A. I don't recall that being a big topic of discussion. I think, as I said in the earlier deposition, my sense at the time was that the big issues had to do with the physical condition of the America's Cup building and the reallocation of common area charges among the master units, and that the issues having to do with the title to the North Development Unit and the extension of Tom's right to build on the North Development Unit and his actual construction either ongoing or clearly evident he was going to proceed, that that latter part was kind of a secondary issue; that they were really going to use that for leverage, and also my sense was that Ray Morrissette was kind of on a crusading bent. He and several of his other directors were people who would have been better

A. Yes, but the slander of title is not based on lack of insurability. It's based on lack of marketability.

Q. Well, did you have an opinion at that point in time as to whether slander of title would also affect the insurability of the parcel?

A. I don't think I thought of it in those terms because that's not the legal basis. I mean, obviously if there were a valid claim, yes, obviously I would be concerned about the issue, but one of the things that I certainly recall was discussions that I had with Michael Mellion in which we both agreed that for whatever issues might be out there, the one issue that was absolutely incontrovertible was that the North Development Unit was properly created, and, therefore, if there was any lawsuit that was challenging the validity of the North Development Unit, that we would have a very good claim against the plaintiffs, and that the suit would, in effect, be a frivolous suit.

Q. That was a discussion you also had with Mr. Mellion?

A. That was a discussion I had with Mr. Mellion.

Q. Directing your attention again to Exhibit 6 to your deposition; did you draft this memorandum?
A. This is the memorandum dated November 17, 1997, yes.
Q. And did you draft it on or about November 17, 1997?
A. To the best of my knowledge.
Q. Did anyone assist you in drafting this memorandum?
A. Not to my recollection.
Q. Did you have a secretary at the time?
A. Yes.
Q. And who was that?
A. Evelyn Vecchiarino, V-e-c-c-h-i-a-r-i-n-o.
Q. How long was she your secretary for?
A. Seven or eight years.
Q. So starting in the early 1990s?
A. At least then. It could have been earlier. Unfortunately, I have lost track. I had some very good secretaries.
Q. And then she continued with you up until the time you left Edwards & Angell?
A. That's correct.
Q. When did you leave Edwards & Angell?
A. December, the year 2000.

Q. Why did you prepare Exhibit 6?
A. My recollection is that I prepared this memorandum in connection with getting -- obtaining title insurance.
Q. All right, can you describe the circumstances that led up to your decision to prepare this memorandum?
A. I had some conversations with Tom Roos regarding title insurance. I don't recall whether Tom initiated the subject or whether I did. Tom indicated that he would like to have title insurance on the North Development Unit, and I said I would see what I could do to obtain title insurance. My recollection is that my initial communications were with Chicago Title Insurance Company because Chicago had insured the project to date, and while I was talking to Chicago, I believe that I had conversations with Michael Mellion at Commonwealth. I know that during the process of looking at title insurance I was having conversations with both Chicago and Michael, but when I started talking to Michael in relation to my discussions with Chicago, I can't recall, and I knew that -- we knew that I think the basic thing

also because I found dealing with Chicago Title is frustrating in most instances. I don't feel that the in-house counsel at Chicago Title are very competent, which is one of the reasons I don't use them very often.
Q. Do you know why Mr. Meyer put his company's position on this particular policy in writing?
A. No.
Q. Were you surprised to receive a written memorandum from him?
A. Not necessarily.
Q. Prior to the time that you received this memorandum, had Mr. Meyer given you any preliminary indication of whether or not his company would be willing to issue a title insurance policy for the North Development Unit?
A. Not to my recollection.
Q. In the course of your discussions with Mr. Meyer around this time, did you talk about the possibility of litigation relating to the Goat Island condominium?
A. I recall, either before or after this memorandum, discussing briefly Jeff's comment that they were aware of threatened litigation.

Q. And do you recall anything more about that discussion?

A. Nothing other than the fact that I was aware that there was potential for litigation, he was aware that there was potential for litigation, and that was the state of facts.

Q. Was it your understanding at this time that Mr. Meyer considered the threat of litigation to be significant in considering whether or not Chicago would issue a title insurance policy?

A. Well, I'm certainly aware that most insurance companies don't like to buy litigation, but one of the reasons why one gets insurance is to protect one's self against litigation. So my sense was that it probably was a factor in their decision making.

Q. And did Mr. Meyer also indicate to you orally that it was a factor in their decision making?

A. I don't recall.

Q. Did you tell Mr. Meyer that you were also talking with Commonwealth about the possibility of getting a title insurance policy for Goat Island?

A. I believe I did.

Q. And did he have any reaction to that?

A. Not to my recollection.
Q. Did you discuss this memorandum with anyone other than Mr. Meyer?
A. I expect I discussed it with Michael Mellion.
Q. Anyone other than him?
A. I may have discussed it with Turner Scott, Tom Roos, and Chip Rogers. In fact, I'm sure I discussed it with Tom Roos.
Q. And what was the substance of your discussion with Mr. Roos about this memorandum?
A. I think my discussion with him was that Chicago had said they would not give title insurance.
Q. And did you provide a copy of this memorandum to Mr. Roos?
A. I do not recall.
Q. Did you explain to Mr. Roos the reasons that Chicago had declined to issue a title insurance policy?
A. I expect I did but I don't recall.
Q. Do you recall having any discussions about this memorandum with Turner Scott?
A. I don't recall.
Q. And do you recall having any discussions about

this memorandum with Chip Rogers?

A. I don't recall.

Q. And do you recall having any discussions about this memorandum with Michael Mellion?

A. I am certain -- almost certain that I told Michael that Chicago had said they would not grant title insurance.

Q. You're almost certain but not totally certain; is that right?

A. Yes. I would say it's about 98 percent. One can't be certain about anything this far back, but I know that I had talked to Michael about the fact that I was talking with Chicago Title Insurance because Chicago had issued the policy on the project originally, and I know I was discussing with him that I was having, you know, some difficulty or it was taking some time to get a decision from Chicago, or perhaps I may have said it's not 100 percent sure Chicago will issue insurance, and, as I said, I have consistently over the years sent title business to Michael at Commonwealth because I felt that Michael was the best title attorney -- in-house title attorney in Rhode Island.

Q. Did you send a copy of Exhibit 9 to Mr. Mellion?
A. I don't think I did.
Q. Was there a reason that you didn't send a copy to him?
A. Probably nothing beyond the fact that the memo was addressed to me, and the subject matter of the memo really were issues that I had discussed with Michael and really were reflected in the memorandum that I had prepared dated November 17, 1997.
Q. Did Mr. Roos have any reaction to Chicago Title's decision not to issue insurance for Goat Island North Development Unit?
A. None that I can recall.
MR. TAYLOR: Mark this Exhibit 10, please.
(PLAINTIFF'S EXHIBIT 10 MARKED FOR IDENTIFICATION)
Q. Showing you what's been marked as Exhibit 10 to your deposition; can you identify this document?
A. It's a letter from me to Michael Mellion dated December 4, 1997, and somebody has written on it, which is not my handwriting.
Q. And what about that nice doodle on the top, is that yours?

A. That's not my doodle.
Q. But that is your signature on the bottom?
A. That's my signature.
Q. Was this the first communication that you had with Mr. Mellion regarding title insurance for the North Development Unit at Goat Island?
A. It would appear to be the first or almost the first. I may have had a phone conversation with him, and this may have been a follow-up letter, or this may have been -- my typical procedure with Michael is to give him a phone call first and then to follow it up with a letter.
Q. Do you recall a telephone conversation with Mr. Mellion regarding the North Development Unit prior to the date of this letter?
A. None in particular.
Q. This letter refers to some enclosures, and I'm wondering if you could identify what the enclosures were?
A. It encloses a memorandum regarding the development rights, which I presume is the memo marked as Plaintiff's Exhibit 6, and the other would be the Goat Island Master Declaration and all of the -- or most of the amendments to the

A. I have no specific recollection that we discussed that point, but since we had several conversations, and since the issue of the amendments to extend the special declarant rights I'm sure were discussed, I'm almost equally sure that we discussed the question of whether the consent of the master unit owners was what was required or whether it was the consent of each of the sub-unit owners that was required.

Q. But, again, I'm looking for a specific recollection.

A. I don't recall a specific discussion.

Q. Did you discuss with Mr. Mellion in December of 1997 Mr. Medeiros's position on the proper parties to vote on amendments to the Condominium Declaration?

A. I don't recall any specific discussion, but, again, it's likely that we did discuss the point.

Q. Well, my question was do you recall telling Mr. Mellion that Matt Medeiros was taking a position that was inconsistent with the position in the sentence that we just read?

A. I think that if I was looking at all of the conversations that I had with Michael, the points

that I could say that I can swear that we discussed were, one, that the North Development Unit had been properly created and existed and the title to it was definitely good. The second issue was that notwithstanding whatever issues that might be raised about the validity of the various amendments extending the special declarant rights, that under the Master Declaration, IDC would have the right to build out the North Development Unit.

Q. As an owner?

A. As an owner, but beyond that I just have a recollection that we discussed the issues that were alluded to in my memorandum of November 17th.

Q. Did you have any discussions with Mr. Mellion in December of 1997 about the possibility of litigation involving condominium owners at Goat Island?

A. I have no specific recollection of a conversation.

Q. So you're not prepared to testify that you disclosed to Mr. Mellion that there was threatened litigation involving the development rights for the North Development Unit at that point in time?

MR. ROMANO: Objection.

A. I can't recall with absolute certainty whether the issue was raised or whether the issue was not raised.

Q. Do you have any recollection of discussing the proposed Tolling Agreement that we looked at as a part of Exhibit Number 8 with Mr. Mellion?

A. Well, if I can't remember whether I had -- absolutely whether I had a discussion on the litigation, I certainly can't recall specifically whether we discussed the Tolling Agreement.

Q. What did you tell Mr. Mellion about Chicago Title's position on the insurance for the North Development Unit?

A. I told Michael that Chicago had refused to issue the title insurance and that I didn't agree with Chicago's position and that I didn't have much respect for the thought processes of the in-house counsel at Chicago.

Q. Did you go into any detail with Mr. Mellion about the reasons that Chicago had declined to issue insurance?

A. I don't recall any specific discussions on the subject matter. I suppose if I was Michael I would have asked why Chicago refused to issue the

insurance.

Q. But you don't remember him asking that question?

A. I don't recall a specific discussion, other than the fact that I know I told him that Chicago had refused to issue the insurance.

Q. Did you have an understanding in December of 1997 that Mr. Mellion was aware of the possibility of litigation involving Goat Island?

A. I can't say for certain whether he did or he didn't.

Q. Did you ever consider at that point in time whether or not the possibility of litigation would be material to Commonwealth in deciding whether or not to issue a title insurance policy on that parcel?

A. Yes, I think I probably did. I was aware that it was an issue for Chicago. My recollection is that I certainly would have thought that it was a material issue for Commonwealth. I don't think that -- even if I had thought it was a material issue -- that it is necessarily a legitimate reason for Commonwealth not to issue title insurance. Namely, as I said, the reason for insurance is to protect you from litigation or,

even more particularly, from an unsuccessful outcome from that litigation, and obviously for Tom Roos having title insurance puts him in a much better position if he wants to sell the property. He can say to the prospective buyer, you know, I have a title company who has insured my title. Also, it made it better for Tom to feel comfortable about going out and building on the site knowing that he had title insurance.

Q. Did you have any discussions with Mr. Roos in December of 1997 about your communications with Commonwealth about title insurance?

A. I told Tom that Commonwealth was willing to provide the title insurance.

Q. And what was his reaction?

A. He was pleased.

Q. Did you discuss Commonwealth's position on title insurance with anyone other than Mr. Roos in late 1997 or early 1998?

A. I may have told Chip Rogers and Turner Scott that Commonwealth was willing to issue title insurance.

Q. And what was Mr. Scott's reaction?

A. I don't recall having a conversation. I said

A. It's identified as a Tolling Agreement between Tom Roos and his various related entities and the America Condominium Association, Inc., the Capella South Condominium, Inc., and the Harbor Houses Condominium Association, Inc.

Q. What is the date of this agreement?

A. January 5, 1998.

Q. And this is a signed copy of the Tolling Agreement; is that right?

A. It's been signed by Tom Roos and nobody else.

Q. Do you know whether the other parties listed on this agreement ever signed this document?

A. I can't recall.

Q. And on Page 2, at the very bottom, you're identified as one of the parties to whom certain notices should be provided, correct?

A. Yes.

Q. Now, did you have any involvement in the finalization of this Tolling Agreement?

A. I'm sure that I reviewed drafts of the agreement, but I can't remember whether this document was prepared by Matt Medeiros or who. I know the type face is not a type face of an Edwards & Angell document, so I'm assuming this

came off of somebody else's machine.
Q. But you do recall reviewing this document before it was signed?
A. Yes.
Q. Did you make any changes to it?
A. I don't recall.
Q. Looking at the bottom of Page 3 of this document, paragraph 7 states that, "Each signatory hereto warrants and represents that he is unconditionally authorized to execute this Tolling Agreement on behalf of his respective entity, that he fully understands and approves the terms of this Tolling Agreement, and that he has received the consent of any insurer or other person whose rights might be affected thereby." Do you see where I am?
A. Yes.
Q. Did IDC secure the consent of Commonwealth before entering into this Tolling Agreement?
A. No, not to my knowledge.
Q. In fact, you don't ever recall sending a copy of this Tolling Agreement to Commonwealth?
A. I don't have any recollection of doing so.
Q. Do you know if anyone ever sent a copy of this Tolling Agreement to Commonwealth around the time

it was executed?
A. I have no knowledge of such.
Q. Did you ever have any discussions with Mr. Roos around this time about whether Commonwealth should be informed of the agreement?
A. I recall no conversation with Tom Roos on this subject.
Q. Do you recall having a conversation with anybody else on that subject?
A. I don't, but I don't think I ever would have thought that this reference to the consent of any insurer would have involved Commonwealth; not that I think or I recall having any recollection of that particular provision in the agreement.
Q. Well, would you agree that an agreement on the statute of limitations on claims involving development rights at the North Development Unit would affect the development rights of that unit?
A. It could, but this talks about receiving the consent of any insurer, and I certainly wouldn't have felt, wouldn't feel today that such a consent was required. I may be incorrect in that conclusion. I can't even remember whether we had the title insurance in hand at that time.

amount at this point in time?

A. No.

Q. And did you have any discussions with him about what sort of development, if any, he was doing on Goat Island?

A. Not really. My sense is he wasn't doing too much. Most of his energy was -- to the extent he was involved with Goat Island -- was spent, you know, perhaps dealing with this Clambake Club that he built on the North Development Unit. So, no, I don't have any other recollections of discussions.

Q. Did you have any discussions about the basis for the $12,000,000 figure that he wanted insurance on?

A. No. Again, these were his numbers.

Q. Did you have any conversations with Mr. Mellion around this point in time about increasing the amount of the title insurance policy?

A. I don't recall any discussions beyond kind of the nature of this letter, which is simply a request for more coverage and it's also insuring these two additional units.

Q. Do you recall having any discussions with

Mr. Mellion in late 1998 or early 1999 regarding the issues that are generally described in your November 17, 1997, memorandum?

A. No.

Q. And do you have -- let me start that question again. Do you recall having any discussions with Mr. Mellion in late '98 or early 1999 about the status of any disputes between IDC and the condominium owners on Goat Island?

A. I don't recall having any discussions on that subject.

Q. What was your understanding of the status of those disputes as of December 1998?

A. My understanding was somewhat tangential in the sense at this point in time the discussions with Matt Medeiros had been taken over by Bill Landry, and Bill wasn't communicating that much with me anyway. I don't know whether he was talking to Chip Rogers, but my discussions and knowledge of what was happening was very episodic.

Q. Was it your understanding in December of 1998 that there was still the possibility of litigation between the condominium owners -- the individual condominium owners and IDC?

A. Yes. I can't -- I mean, I don't know when the lawsuit was filed or which lawsuits were filed or when they were filed, but I certainly was aware that there were ongoing discussions with the condominium associations about their various claims.

Q. You weren't under the impression at this point in time that all of those disputes had gone away; is that correct?

A. That's correct.

MR. TAYLOR: Can we mark this as Exhibit 18, please.

(PLAINTIFF'S EXHIBIT 18 MARKED FOR IDENTIFICATION)

Q. Showing you what's been marked as Exhibit 18 to your deposition; can you identify this document?

A. It is a letter from me to Michael Mellion dated February 2, 1999.

Q. And is that your signature?

A. Yes.

Q. What was the purpose of this letter?

A. It says it's to enclose a copy of the Declaration to Goat Island Condominium and the Amendments One through Eight and also enclosed is a Ninth Amendment, which I believe was executed

# C E R T I F I C A T E

I, Jane M. Poore, a Notary Public, do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to the Rules of Civil Procedure of the Superior Court, especially, but without restriction thereto, under Rule 30(b) of said Rules; that the witness was first sworn by me; that the transcript contains a true record of proceedings.

Reading and signing of the transcript was not requested by the deponent or any parties involved upon completion of the deposition.

IN WITNESS WHEREOF I have hereunto set my hand this 13th day of January, 2003.

JANE M. POORE, NOTARY PUBLIC, RPR
My commission expires 9/11/05

DATE: January 7, 2003
IN RE: Commonwealth vs. IDC
WITNESS NAME: Timothy T. More

# EXHIBIT C

EDW. ‹DS & ANGELL

EXHIBIT F 5

COUNSELLORS AT LAW
*for 100 years*

Timothy T. More

2700 HOSPITAL TRUST TOWER
PROVIDENCE, RI 02903
(401) 274-9200
FAX (401) 276-6611

Writer's Direct
Dial Number:
(401) 276-6539

DEC 2 1994

December 2, 1994

Stanley J. Kanter, Esq.
Adler Pollock & Sheehan
2300 Hospital Trust Tower
Providence, RI 02903

RE: Third Amendment to First Amended and Restated Declaration of Condominium
Rhode Island South - A Waterfront Condominium

Dear Stan:

At Tom Roos' request, I am writing to ask whether you considered the applicability of Section 34-36.1-2.17 (d) in preparing the above Third Amendment. The title company and I believe that the extension of the declarant's rights under the Master Declaration to December 31, 1999 cannot be done without the unanimous consent of all of the unit owners within the Master Condominium. As I understand it, the Third Amendment was adopted pursuant to the provisions of the Master Declaration which requires a vote of 67% or more of the voting interests of all owners and sub-association board members.

With regard to compliance with Fannie Mae guidelines limiting the period of declarant control, did you discuss with Fannie Mae the possibility of limiting the period of declarant control in each of the sub-condominiums to a prescribed time period of five to seven years and leaving the period of declarant control under the Master Condominium unlimited or at a minimum to a time period in excess of five to seven years. Where the declarant under the Master Condominium documents has no rights with respect to a sub-condominium, I would assume that Fannie Mae would be much more lenient in the time periods that they allow particularly when the project is of such a size as the current project. If you had conversations with a specific Fannie Mae representative, I would greatly appreciate knowing who the person is and his or her telephone number.

A009914

Stanely J. Kanter, Esq.
Page Two
December 2, 1994

Tom is under some time pressure to get the necessary corrective votes if necessary. Therefore, if you could give me a call at your earliest convenience, it would be greatly appreciated.

Very truly yours,

Timothy T. More

cc: Charles F. Rogers, Esq.
Arthur Murphy, Esq.
Thomas Roos

T U V W X Y Z

# EXHIBIT D

Adler Pollock & Sheehan Incorporated
2300 Hospital Trust Tower
Providence, Rhode Island 02903-2443
Telephone 401-274-7200
Fax 401-751-0604/351-4607
Telex 927661

EXHIBIT G

ADLER POLLOCK & SHEEHAN

December 5, 1994

ATTORNEYS AT LAW
Walter Adler (1896-1991)
Bernard R. Pollock (1926-1984)
William J. Sheehan (retired)

Peter Lawson Kennedy
Edward L. Maggiacomo
Patrick A. Liguori
John F. Corrigan
John F. Bomster
Stanley J. Kanter
Robert E. Liguori
E. Hans Lundsten
Benjamin G. Paster
Sarah T. Dowling
Mark A. Dingley
Michael A. Kelly
Paul V. Curcio
John A. Tarantino
Patricia K. Rocha
Paul A. Campellone
Stephen Geanacopoulos
Margaret R. Hayes-Cote
Christopher C. Whitney
Mark O. Denehy
W. James McKay
Dennis H. Esposito
Victoria M. Almeida
Walter R. Stone
Paul F. Green
John B. Webster
John M. Harpootian
Robert I. Stolzman
Joseph R. Miller
Paul W. Goodale
Robert P. Brooks
W. Mark Russo
Joseph Avanzato
David A. Wollin
Michael B. Fines
Sherry A. Giarrusso
Carolyn A. Mannis
R. Bart Totten
Richard E. Stang
Melody A. Alger
Laura K. Wendell
Elizabeth M. Noonan
Karen A. Mignone
David P. Lemoie
Maria J. Goncalves
Debra A. Chionchio
Timothy A. Gagnon
Jason C. Kravitz
William S. Gorgone

Timothy T. More, Esq.
Edwards & Angell
2700 Hospital Trust Tower
Providence, RI 02903

Re: Goat Island South - A Waterfront Condominium

Dear Tim:

This is with reference to your letter of December 2, 1994 pertaining to the Third Amendment to First Amended and Restated Declaration of Condominium, Goat Island South - A Waterfront Condominium ("Third Amendment").

In mid-March, 1994, Tom Roos advised that he desired to extend the time period within which the Development Rights provided for in the Declaration of Goat Island South - A Waterfront Condominium (the "Master Declaration") could be exercised, with regard to both the Reserved Area (capitalized terms are defined in the condominium documents) and Development Unit #1, as he had determined that December 31, 1994 presented him with too short a time frame. At that time, we addressed the Master Declaration and, also, the Rhode Island General Laws, including, but not limited to, Section 34-36.1-2.17(d) (the "Statute"). Our particular concerns, in addition to the terms and provisions of the Master Declaration and the Statute, were the realities of obtaining various approvals from both the City of Newport as well as the Unit Owners.

At a meeting at our office on March 22, 1994 at which Tom Roos, Larry Walsh (of Globe Manufacturing Co.) and Turner Scott were in attendance, we discussed at length the requirements for amending the Master Declaration in light of those realities; and, thereafter, all acknowledged that it was not feasible for the Declarant to exercise the Development Rights on or before December 31, 1994 as it had not yet formed any concrete development plans for either the Reserved Area or Development Unit #1. Moreover, Turner Scott was of the opinion that, given the current political climate in Newport, it was highly unlikely that Newport officials would approve the zoning variances he deemed required for development of these

AU09910

ADLER POLLOCK & SHEEHAN



parcels prior to the year's end or in the foreseeable future. As a result, the parties agreed that an extension of the time period within which the Development Rights could be exercised for both the Reserved Area and Development Unit #1 would be required and that, due to the limited time remaining before the expiration of those Development Rights, an aggressive posture was necessary. (It should be noted that, subsequently, Tom Roos determined that the extension of time should, at that time, apply only to the Reserved Area.)

We advised that both the Master Declaration and the Statute could be subject to varying interpretations as to the consent that would be required to extend the Development Rights time period, which could easily subject the Declarant or the Master Association to litigation by Unit Owners dissatisfied with any vote to extend such time period. The parties noted that, if the path to obtain unanimous consent was followed, it would be highly unlikely that the Declarant could obtain the consent of all of the approximately eighty-five Unit Owners and that, therefore, as above, an aggressive posture was appropriate.

At a special meeting of the Master Association held on April 27, 1994, a motion to extend the Development Rights contained in Section 6.3 and Section 6.8 of the Master Declaration was approved by all Owners and Sub-Association Board Members with one Sub-Association Board member absent and one Sub-Association Board Member "withholding" his vote until the Declarant announced its intentions governing Development Unit #1 (see above). Accordingly, in terms of allocated interests, 85.29 percent voted in the affirmative, 9.9 percent were absent and not voting, and 4.81 percent withheld their vote.

In light of the foregoing, it is obvious that the parties did consider both the Master Declaration and the Statute and the possibility that unanimous consent of Unit Owners might be required; however, as it was acknowledged that that would likely prove impossible to obtain and the December 31, 1994 deadline was fast approaching, the agreed-to, aggressive avenue of approach noted above was effected.

In addition to the foregoing, as the Third Amendment was recorded with the Records of Land Evidence of the City of Newport, Rhode Island on June 13, 1994, at 3:35 p.m., in Book 645 at Page 379, we presume it was addressed in favor of the purchaser of Goat Island in the title policy obtained by it to insure that transfer.

N O P C

ADLER POLLOCK & SHEEHAN



With regard to your concerns pertaining to Fannie Mae guidelines limiting the period of Declarant control, we would note that the period in which Development Rights were to be exercised, per the original Master Declaration, was fifty years. When the then Declarant indicated a desire to obtain Fannie Mae approval for Goat Island South (which, to this date, we understand has not been obtained), the Master Declaration was amended in 1988 to reduce that time period to seven years in accordance with the Fannie Mae condominium selling guide then in effect. As part of the Third Amendment process outlined above, we spoke with Mr. Duane Cooper of Fannie Mae's Office of Project Standards (Northeast Regional Office) and were advised that Fannie Mae recognized that economic conditions since the late 1980's had hindered developers in the exercise of Development Rights and that further amendment to a condominium declaration to extend the time within which a developer could exercise its development rights for an additional period of five years would not be in contravention of the applicable Fannie Mae guidelines and would not, of itself, materially adversely affect Fannie Mae approval of a condominium development. That was the extent of our discussions with Fannie Mae representatives. For your information, Mr. Cooper's telephone number is (215) 575-1448.

We trust that the foregoing addresses your concerns and, in closing, would note that, at all times prior to the sale, we, with the concurrence of Larry Walsh, volunteered to meet with representatives of the buyer and its counsel to discuss information about which we were aware pertaining to the Island, itself, and the condominiums, in particular; however, at no time was such a meeting requested.

Very truly yours,

STANLEY J. KANTER

SJK/jag

cc: Mr. Lawrence R. Walsh
Turner Scott, Esq.
Stephen Geanacopoulos, Esq.
Joseph R. Miller, Esq.

I:\DOCS\DOCSNZ\55984-2\1264TML.SAM

bcc: Peter L. Kennedy, Esq.

AL05912

# EXHIBIT E

Roos. –
Goat Island

# IDC, INC.

Goat Island
Newport, RI 02840

Thomas R. Roos
*President*

October 1, 1997

Turner Scott
Miller, Scott, Howe & Kelley
Newport, RI 02840

Timothy More
Edwards & Angel
Providence, RI 02903

| Post-it® Fax Note 7671 | Date 10/2 | # of pages ▶ 5 |
|---|---|---|
| To Timothy More | From Tom Roos | |
| Co./Dept. | Co. IDC | |
| Phone # | Phone # | |
| Fax # 401-276-6611 | Fax # 848-5513 | |

Gentlemen:

During our meeting last week with Matt Medeiros and Unit Owner representatives of the America and Harbor Houses Condominium Associations, I became somewhat uneasy by the lack of confidence expressed with our positions and our apparent failure to have a coordinated focus on the same arguments.

I have outlined what I see as the fundamental arguments to the two primary issues raised by Mr. Medeiros. For the sake of these arguments, I am assuming that the 1994 amendments are invalid and do not exist.

Please review these two issues carefully and communicate to me where the weakness of each lies prior to my meeting next Wednesday with Phil Schub and Ray Morrissette so I can better understand the strength of our negotiating position.

Thank You,

TL

Thomas R. Roos

GIS93097.WPS

## DEVELOPMENT RIGHTS

Section 2.3(b) of the Goat Island South Declaration of Condominium reads as follows:

"An Owner or Sub-Association may change the interior design and arrangement of his or its Master Unit at any time and may construct buildings and other improvements and/or make or cause to be made any alterations or changes to the exterior or support structure of any Building or other structure or improvement located within the boundaries of the applicable Master Unit."

I would paraphrase this as

**An Owner may change the interior design and arrangement of his Master Unit <u>at any time and may construct buildings and other improvements</u> within the boundaries of the applicable Master Unit.**

After further review of the declaration I can find no other reference which in any way limits or restricts the right of an Owner to construct buildings on his Master Unit.

So far everyone has tended to fixate on the termination of the Special Development Rights as the primary reason why we might not be able to develop the Master Units.

Section 6.3(d) of the Master Declaration describes the Development Rights for the Reserved Area once it is a Master Unit.

"Provided that the Reserved Area has been converted into a Master Unit, the Declarant reserves the right , through December 31, 1994, to construct improvements on the Reserved Area and submit the Reserved Area to a Declaration of Condominium, thereby creating a condominium containing not more than 315 Units."

There is no reference whatsoever that the Declarant may not construct buildings on the Reserved Area after December 31, 1994 and any suggestion to that fact is purely assumptive in nature.

Article 6 is under the heading Special Declarant and Development Rights. These are special rights which supersede standard ownership rights for the sake of protecting the developer. When these rights expire, the rights of standard ownership as described in 2.3(b) become applicable.

Example: During the Period of Declarant Control, the developer is entitled to have a certain number of seats on the Condominium Executive Board. This, however, would not in any way limit the developers right to have Board representation after the Period of Declarant Control has expired if declarant representatives were duly elected through the standard voting process as outlined in the condominium By-Laws.

Even if, for some bizarre reason, section 2.3(b) did not apply to the IDC owned Master Units, the jurisdiction for what could or could not be built on these parcels would have to fall in the hands of the Master Executive Board by default. There is no other reasonable entity which would have jurisdiction over these parcels. Since the three development parcels own 56% of the Master Association, development decisions would continue to rest in the hands of IDC. Nowhere in the declaration is there any reference to the land being dedicated to open space. It would be unreasonable to expect that the land would remain forever vacant and be responsible to pay for Master Common Expenses.

# EXPENSE ALLOCATION ARGUMENT OUTLINE

## Direct Assessments to Sub-Associations

Section 4.1(d) of the Goat Island South Declaration of Condominium reads as follows:

"**Direct assessments may be levied against fewer than all of the Owners or Sub-Associations for the cost of any service, work or materials requested by such Owners or Sub-Associations** that benefit only those Master Units assessed, provided, however, that the Owners or Sub-Associations of two-thirds (2/3) of those Master Units being assessed agree to such assessment, and provided that the assessment is otherwise pursuant to the Act."

This section very clearly allows for a division of shared expenses according to formulas other than the Master Allocated Interest Percentages as long as the Sub-Associations agree to the assessment.

The line item assessments which are currently in dispute are items which were included in the approved operating budgets of each Sub-Association thus the Sub-Associations did agreed to the assessments.

## Definition of Master Common Expenses

The definition of a Common Expense is either an expense made by the Association or a financial liability of the Association. (Section 1.03 Act.) So by definition a Master Common Expense is either:
1) an expense made by the Master Association or
2) a financial liability of the Master Association.

Expenses made by the Master Association would be those expenses approved by the Master Association through its Budget or some other approval process.

The only financial liabilities of the Master Association which are specifically identified in the declaration are maintenance, repair, replacement and insurance of Master Common Elements and Roadways. Other unspecified liabilities of the Master Association would include taxes, filing fees and anything else required of a corporation by law.

I can find no reference to any other item which would be required to be Master Common Expense and I would assume that all other Master Expenses are purely discretionary in nature. The Master Association Members can decide what they do & do not want to spend money on through the standard budgeting process.

The Sub-Associations have each approved and ratified all Annual Operating Budgets to date through the standard budgeting process. No Budget has ever been rejected by the Unit Owners even though the Non-Declarant Unit Owners of each association have possessed the power to reject annual budgets since at least 1994. Since the Sub-Associations freely approved their budgets, the line item expenses within their budgets are by definition common expenses of those Sub-Associations.

An approval of a Sub-Association Budget is an approval of each assessment within that Budget.

When the Master Association adopted a smaller operating budget it merely shifted the discretion for certain items to the Sub-Condominiums. The Sub-Condominiums were then free to choose whether or not they wanted certain services. No one ever said they had to incur these expenses & they freely chose to incur them.

The original Master Budget included several items which should never have been included and inaccurately estimated the cost of certain services to the Master Association. Just because mistakes were made in the past does not mean that those expenses should continue into the future.

Adding the North Development Unit to the Master Association created no additional expenses to the Master Association. Subsequent budgets had the development parcels contributing almost as much in condominium fees as they had prior to 1994.

| | |
|---|---|
| 1993 | $42,821 |
| 1994 | $39,030 |
| 1995 | $35,860 |
| 1996 | $32,390 |
| 1997 | $23,937 |

# EXHIBIT F

October 6, 1997

Turner Scott
Miller, Scott, Howe & Kelley
Newport, RI 02840

Timothy More
Edwards & Angel
Providence, RI 02903

Gentlemen:

After conferring with each of you last week concerning the development rights for the Master Units on Goat Island, I decided to review the matter a little further.

As I understand it, your positions are as follows:

*Though section 6.3 (d) does not specifically state that the Reserved Area cannot be constructed upon after December 31, 1994, it could be inferred by the wording in this paragraph that this was the intent of the section.*

*Even though section 2.3 (b) very clearly provides the Owner of a Master Unit the right to construct buildings and other improvements on his Master Unit at any time, this right is contradictory to the implied limitation on development rights spelled out in section 6.3 (d).*

*Though a precise interpretation of this language would support the right of the Owner (Declarant) to construct improvements on the Master Units, a judge might either misinterpret the language or just not like developers and rule against us on a fairness basis.*

Reviewing these two sections more carefully, however, I realized that section 6.3 (d) is not describing the rights of the Declarant to construct improvements on the Reserved Area but rather the right to submit the Reserved Area to a Declaration of Condominium. Every sentence in this paragraph describes the right of the Declarant to create a Sub-Condominium on the Reserved Area

Section 2.3 of the Goat Island South Declaration of Condominium reads as follows:

"(a) In accordance with the Act, **the Declarant reserves the right to change the interior design and arrangement of all Master Units, to construct additional buildings and other improvements on any Master Unit** and/or to alter the boundaries between Master Units by Subdivision of a Master Unit into one or more Master Units or by merger of one or more Master Units into one Master Unit, **so long as the Declarant owns the Master Units so changed or altered."**

"(b) **An Owner** or Sub-Association **may change the interior design and arrangement of his or its Master Unit at any time and may construct buildings and other improvements** and/or make or cause to be made any alterations or changes to the exterior or support structure of any Building or other structure or improvement **located within the boundaries of the applicable Master Unit."**

Section 1.27 defines **Owner as "the Declarant or other person or persons owning a Master Unit**, which Master Unit is not a Sub-Condominium".

Section 6.3(d) reads

"Provided that the Reserved Area has been converted into a Master Unit, the Declarant reserves the right , through December 31, 1994, to construct improvements on the Reserved Area and submit the Reserved Area to a Declaration of Condominium, thereby creating a condominium containing not more than 315 Units. In the event the Reserved area is converted into a condominium as provided herein, it shall be a "Sub-Condominium" as defined herein, and shall be governed by the provisions of this Master Declaration. The Sub Association of the Sub Condominium thereby created shall have a percentage liability for the Master Common Expenses and a percentage vote equal to the Master Allocated Interest associated with the Reserved Area as provided in Sub Section 6.4(b) above. Each Unit Owner in such Sub-Condominium shall have an interest in the Master Common Elements equal to his Allocated Interest Percentage of the Master Allocated Interest of the Sub-Association. Any such conversion of the Reserved Area into a Sub-Condominium shall not result in any reallocation of the Master Allocated Interest of any other Master Unit, Sub Association or Unit."

and what effect that would have on the Master Association. The right to construct improvements on the Reserved Area is only briefly mentioned in the first sentence in a very general manner and only as that right relates to the creation of a Sub-Condominium.

The creator of this document realized that the rights to construct improvements on a Master Unit are described clearly in section 2.3 and do not have any time limitation. The time limitation described in section 6.3(d) is intended as a limitation on the right of the Declarant to create the Sub-Condominium not for the right of the Declarant to construct improvements.

Since the time limitation on the development right described in section 6.3(d) applies to the creation of a Sub-Condominium it is in no way contradictory to the construction rights outlined in section 2.3, therefore, we can look to section 2.3 to describe our rights to construct buildings on the Master Units.

Section 2.3 appears to clearly state the right to construct buildings and other improvements on any Master Unit without any specific time limitation by the Developer, Owner or Sub-Association.

I realize that you two must be getting tired of revisiting this issue over & over again but these are extremely valuable rights which I do not want to be negotiating away if the facts are clearly on our side.

Please take the time to **carefully** study sections 2.3 & 6.3 of the Master Declaration one more time, keeping in mind the arguments I have outlined, and let me know where my logic is flawed.

Thank You,

TL

Thomas R. Roos

# EXHIBIT G

E & A

EDWARDS & ANGELL

# MEMORANDUM

**PRIVILEGED AND CONFIDENTIAL ADVICE TO CLIENT**

More Ex 4 for ID 12/26/02 J.P.

**TO:** T. Roos

**FROM:** Timothy More TM

**DATE:** October 9, 1997

**RE:** Goat Island

---

SUMMARY:

Regarding the issues raised by Matthew Medeiros, I have done some brief research to see if any case law exists, and reviewed the Condominium Act R.I.G.L. 34-36.1 (the "Act"), the Declaration and your memo. My conclusions are:

1. As to the right to develop your Master Units, I concur with your argument that as an Owner, your company should have the right under Section 2.3 of the Declaration to develop your Master Unit. I am concerned that a court might hold that the endless right of the Declarant (albeit as an Owner) to develop three Master Units improperly circumvents (a) the Act's requirement that the special Declarant's right to complete improvements have a stated time limit and/or (b) the time limit on the Declarant's rights to construct improvements set forth in Section 6 of the Declaration. The court might then prohibit the Declarant or its future assigns from further development.

2. As to the right to terminate services and the reallocation of expenses to the sub-associations, I concur that the only clearly mandated common expenses are maintenance, repairs and insurance. However, Section 4.1(d) of the Declaration, provides that a directly allocated expense must <u>benefit</u> <u>only</u> the Owners assessed. The security service was part of the original budget prepared by the Declarant and arguably benefits all of the Units. Water is a basic service which for a number of years was billed as a common expense. An argument can be made also that the proposed reallocation, and the by-law amendment, are self-serving to your company. The Act imposes a fiduciary duty on the Declarant and prohibits unconscionable actions generally. Accordingly a court might decide on principles of equity and contract law that the reallocation was illegal. It is hard to quantify this possibility.

3. The one year time limit to challenge an amendment to the declaration adopted by an association on its face would bar a challenge to the disputed amendments to the Declaration and by-laws. Whether the amendments were self-serving should be immaterial to the one-year time limit. M. Medeiros presumably will argue that the amendments were not properly adopted by the Master Association and/or the board members of the

EX. 3
9-26-02

subassociations. I do not agree with his statement that the Unit Owners are entitled to vote on the amendments.

ANALYSIS:

1. Amendment to Declaration.

M. Medeiros posits that any amendment to the Master Declaration must be approved by the Unit Owners of the sub condominiums. R.I.G.L. 34-36.1-2.20 Master Associations makes a distinction between a master association which is a condominium association versus one which is an organization that is the delegate of sub associations. Goat Island is the former because it is comprised of (Master) unit owners and not associations. The former should have the rights and powers of a normal condominium association. For example, R.I.G.L. 34-36.1-2.20(d) provides that various powers of unit owners of a master association are held by the unit owners who have the right to elect the executive committee of the master association. The Goat Island executive committee is elected by the Master Unit Owners. Accordingly, under the Act, the Declaration could be amended like any other declaration by the vote of its (master) unit owners. Section 10.1 of the Declaration provides that generally the Declaration may be amended by a vote of at least 67% in all voting interests of all [Master Unit] Owners and sub association Board Members. The sub association Executive Boards have the authority to take all action not specifically reserved to the Unit Owners. (See, e.g., America's By-laws Section 2.10). Therefore the Board Members should have the power to vote on the Amendments.

Accordingly, M. Medeiros' general conclusion is incorrect. Specific amendments may be subject to other requirements.

2. Extension of Rights to Develop North Development Unit.

(a) Amendment to Declaration. R.I.G.L. 34-36.1-2.17(d) does require unanimous approval of unit owners to extend or expand a declarant's rights and prohibits any techniques, such as powers of attorneys, to circumvent this requirement. We did obtain unanimous approval of the Owners. However, an argument could be made that the master unit structure of Goat Island, which allowed the Declarant to maintain control of all Master Unit votes, is such a prohibited technique.

(b) Right as an Owner. In your memo you correctly note that the Owner of each master Unit has the right under Section 2.3(b) of the Declaration to construct improvements within a Master Unit. You posit that the Declarant's rights are additive to and not in limitation of your company's rights as an Owner. Under this theory, it is immaterial whether the amendment extending the Declarant's rights was valid. Based upon the documents, I concur with your argument. However, I am concerned that a court would view the construction of improvements by the Declarant, albeit as a [Master Unit] Owner, as an illegal circumvention of the (i) Act's requirement that the special declarant's rights to

complete improvements have a stated time limit and/or (ii) the time limit to construct improvements set forth in Section 6 of the Declaration. The public offering statement and the Declaration might lead a reasonable person to believe that the Declarant's right to construct improvements would terminate. It is not made clear that the right to construct improvements (which is ordinarily a special declarant right and appears to be a special declarant right in Section 6) is actually a right that all Owners have has forever.
the Declarant, as an

For example, several courts have treated long term recreational leases as transferring de facto title to the unit owners where the condominium unit purchasers had reasonable expectations based on sales representations that the recreational facility was part of the condominium. The Act gives a court substantial latitude in devising a remedy if the court determines that a provision is unconscionable.

(c) Equitable Arguments. You also have equitable arguments that denial of the right to build would leave you with an unbuildable Unit and that you have been paying taxes and expenses on this Unit for several years.

3. Reallocation of Expenses.

(a) Amendment to By-Law. Regarding the by-law amendment that requires direct allocation, R.I.G.L. 34-36.1-3.02 gives the association the power to amend its by-laws. R.I.G.L. 34-36.1-2.12 provides that a master association acting as an association may amend its by-laws like any other association. R.I.G.L. 34-36.1-3.03 authorizes the executive board to act on behalf of the association except as provided in the declaration. Section 5.5 of the by-laws provide that they may be amended in the same manner and by the same vote as provided in the Declaration.

There is a prohibition against discriminatory amendments, but the reallocation of expenses is not inherently discriminatory. The amendment to reallocate expenses based on use should not require the vote of the subcondominium unit owners.

(b) Original Declaration. Also, as noted in your memo, Section 4.1(d) of the original Restated Declaration does allow for direct assessments against fewer than all (Master) Owners for services, etc. requested by and benefiting only the assessed Owners when approved by 67% of the Units benefited. This is authorized by R.I.G.L. 34-36.1-3.15. The basic intent of this provision is to provide for extraordinary or special work or services to less than all units where the work is specifically requested. The Master Association is responsible for all expenses which do involve "maintenance and replacement of and repairs to" Master Common Elements and those portions of the Master Limited Common Elements not underlying a Master Unit. (Declaration para. 4.1(c)). Arguably, as you suggest, all other expenses could become direct assessments.

The counter arguments are that

PRIVILEGED AND CONFIDENTIAL ADVICE TO CLIENT

1. The Master Association budget prepared by the Declarant and delivered with the Public Offering Statement included the costs for certain services, including in particular water and security.

2. Such services arguably benefit all Master Units.

3. The reallocation and the by-law amendment were done to benefit the Declarant.

4. The reallocation is unreasonable.

You have a valid rejoinder that

1. to allocate water based on metered usage is fair

2. security services are not so fundamental that such service must be continued forever if a majority of the Master Units do not want the service.

3. several budgets have been approved with the reallocated expenses.

A court might conclude on the basis of the aforementioned counter arguments that the votes to revise the by-laws and reallocate expenses were self-serving and violated the representations in the offering materials. In several cases the courts have noted that the enforcement of condominium documents are to be based on reasonableness. I believe that if the reallocation of expenses is reasonable you should prevail.

4. One-Year Time Limit.

R.I.G.L. 34-36.1-2.17(b) expressly limits the time of a challenge to an amendment adopted by an association to one (1) year. The amendments in dispute were adopted by the Goat Island Association. Several sub associations have known of the amendments for several years and have allowed the Owner of the North Development Unit to pay common expenses based upon the amendments. The objectors might argue that the vote of the association to adopt the amendments was self-serving to your company and that your Units paid less as a result of the amendments. Even if the amendments are self-serving, that should not overcome the one-year time limit.

M. Medeiros presumably will attack the amendments on the basis that they were not properly adopted, i.e., that correct procedures were not followed. I disagree with the one argument he made, namely, that the amendments should have been voted on by the Unit Owners (see paragraph 1 above). I cannot envision what other arguments he might have.

# EXHIBIT H

File: Condo issues

AMERICA CONDOMINIUM ASSOCIATION, INC.

NOV. 12th, 1997

For meeting with Tom Roos of IDC, Inc. on Nov. 13th, 1997

ISSUES WITH IDC, INC. THAT ARE COMMON TO ALL 3 SUB-ASSOCIATIONS

1. Give us your position in writing on our challenge to each of the Amendments to the Declaration you have enacted. Our Attorney has told you and your lawyers in no uncertain terms that what you did was illegal; effectively rendering them null & void. Further, we believe Turner Scott is fully aware that these were illegal. Yet, he prepared them and recorded them anyway, as-directed by you. We can't offer to have these Amendments stand if they're illegal to begin with. Are you willing to rescind them without our having to file a complaint re. same?
2. We want your position in writing as to just how many square feet of land are in the following parcels:
   a) All of Goat Island South. (A.P. 46, Lot #1)
   b) All of the land in the residential portion of Goat Island South. (South of fence)
   c) The Master Common Element areas of the residential portion, including the private road.
   d) The Master Common Element portion of the North Development Unit. (Including the Private Roadway Easement)
   e) All of the North Development Unit
3. Do you acknowledge what is clearly evident on the survey; that, part of the Private Roadway easement is on the North Development Unit; and that is Master Common Element?
4. It seems quite apparent that you're counting that part of the Roadway that's on the North Development Unit as part of the square footage of land for your voting allocation purposes.
5. On a copy of the recorded Master Condo survey plan, show us the exact location of the "New Parking Easement".
6. Is the "New Parking Easement in effect? If yes, please explain it's duration and who it's for.
7. Was it your intent that the entire "Original Parking Easement" is now for the specific benefit of the Marina? If not, than just what part of the North Development Unit is there dedicated parking for the Marina?
8. Do you acknowledge that, in spite of what Guy Weston might find, our Declaration prohibits you from counting any residential condo parking for commercial use?
9. Do you agree that the Pavilion can have its' own parking requirements since either IDC or the Hotel can hold functions there?
10. On the survey plan, show us exactly where the clambake bldg. would be located, along with outdoor customer tables; along with the location of where the live entertainment would be conducted; along with the location of where the audience for the outdoor entertainment would be located.

Mores
Bar 18
12/20/02 J.P.

Ex. 6
9-26-02

11. Your outdoor entertainment application stated that you have seating capacity for 2,000 people. Show us where those people would be seated.
12. What kind of activity would you host that would draw a crowd that large?
13. Where would they park?
14. You are, no doubt, aware that your staff has allowed unauthorized cars in the past to park within the residential condo complex.; and possibly even charged admission. That certainly makes a mockery of "security". Give us your intent on this for the future; especially given your statement of seating 2,000 people.
15. Also, show us exactly where the parking for the Clambake customers will be located; as well as the parking for the IDC corporate employees. Also, indicate on the same plan exactly where the Hotel parking is located on the North Development Unit at this time.
16. What's going to happen to the heli-pad easement and the dock-storage easement?
17. Are you willing to give us a copy of the unrecorded 35 page agreement you entered into with Tom Rodgers re. the Individual Unit and Harbor House #19? You should be aware that it will be requested in the production of documents anyway, if litigation becomes necessary. If you're willing to produce it now, please advise, and do so at your earliest convenience.
18. We maintain we have the recorded, perpetual right to pass over any paved walkway and roadway in Goat island South. This applies to the turn-around at the south end also. We also maintain that you do not have the right to hinder our rights re same; nor to relocate any of those walkways and roadways. We need your position in writing to determine if legal action is required to clarify, rectify, and to protect our rights.
19. We also intend to maintain our rights to access both gazebos and the platform on the S.E. corner of the Island. These 3 structures are not included in the metes and bounds descriptions of Goat Island South. At this point, we maintain they are concrete, permanent wharves. Our access to these is protected by State Laws for access to the public and to the Residents of Goat Island. Any attempt on your part to limit our access will be challenged. And, based on your comments thus far, we feel challenged already. We insist on a clarification on this matter, once and for all.
20. We need your written position on the water and sewer overage charge issue. We maintain you owe us the money. When these defective water-line installations were made, it was on your property. Now that you've sold the Hotel, you're trying to wash your hands of responsibility. Obviously, when you sold the Hotel, all these matters were settled between you and the Hotel. If this can't be settled now, it's going to litigation.
21. The access to the beach falls into the same category as the walkways and gazebos. Give us your written position so we can evaluate how we'll proceed to clear this up once and for all.
22. Re. the pet issue, that Amendment was just as illegal as all the other Amendments you've recorded. Are you willing to rescind it?
23. Explain your position re. the North Development Unit not having paid its' share of the Budget for the 1st 6 months of 1995. Are you willing to concede that you owe that money?

24. Give us your position of Phil Schub's presentation of what he thinks IDC owes for the Master Budget going back to 1992.
25. We want your justification in writing re. your continuing control over Capella. We think the statement you and Turner made at Capella's Annual Meeting was ludicrous and self-serving. In case you forgot, you and Turner both said: " The Rhode Island Condominium Act does not apply to Capella." Explain exactly what you meant by that. Our position: On the same day that IDC, Inc., the Successor Declarant, took title, IDC, Inc. passed title onto IDC Properties, Inc., which is not the Declarant. Capella was legally under Declarant control for perhaps as little as a few minutes. Yet, you've been making believe the units you own in Capella are still owned by the Declarant.
26. We've been promised a copy of the breakdown of insurance premiums and insured values for all the segments of Goat island South. Still haven't seen it. Please produce.
27. A large percentage of the Residents of Goat Island would like a minimum amount of lighting at the south end of the Island so they can walk safely around there after dark. We need to know how you feel about this. It probably should be a Master Common expense. It would also complement the security of the Island. Is there anything in your agreement with Tom Rodgers that presents a problem with this idea? Why wait till someone gets hurt? It would seem to make sense for the security of HH #19 also.
28. Re. Judge Pfeiffer's decision re. NC870503, NC880480, NC890534, NC900529, all consolidated, on item #16, page 21: " It is undisputed that there is 243,000 square feet of excess land on the Goat Island Complex based on the Zoning Ordinance's density requirements." Please explain just what was meant by excess land; and exactly where is it?
29. Please produce a copy of the sanitary sewage plan for all of Goat Island. Where are the pipes and pumping stations. What kind of arrangements are in place between any and all entities of Goat Island and the City? Who's got the obligation for the maintenance and repair? Who's collecting money and paying out money for this maintenance and repair? Has anyone ensured that all the restaurants on-line have fully automatic grease traps? Has this issue been examined for the Clambake bldg? How is that going to impact the existing lines and pump stations? Who owns the pipes and pump stations? It's a whole different problem when it's all force mains. You can't just randomly add a branch force main onto the existing line.
30. Explain how we ended up paying a bill of several thousands about 2 years ago for a sewage pump problem.

# EXHIBIT I

EXHIBIT B

E
&
A
EDWARDS & ANGELL

# MEMORANDUM

TO: File

FROM: Timothy T. More

DATE: November 17, 1997

RE: IDC Regarding Goat Island/North Development Unit/Title Issues

---

By an amendment dated December 29, 1994, IDC, Inc., as Declarant, created the North Development Unit. IDC bases its build-out rights on the North Development Unit under two separate theories: (1) the amendment to the Goat Island Declaration adopted by the unanimous consent of the Master Unit Owners dated December 29 ("1994 Amendment") which extended the Declarants' special declarant's rights to December 31, 2015 and (2) Sections 2.3(a), 2.3(b) and 10.2 of the Master Declaration.

1. 1994 Amendment. The 1994 Amendment extended the Special Declarant's rights to December 31, 2015. The 1994 Amendment was adopted by the unanimous consent of the Master Unit Owners. It is clear that under the Master Declaration and the Condominium Act that the Master Unit Owners, and not the sub-condominium owners, were the proper parties to vote on the amendment. Because IDC controlled the Boards of each of the sub-associations one may question whether the vote of the subassociations is invalid. Even if the amendment is invalid, there is a one year statute of limitations in the Condominium Act (Section 34-36.1-2.17) for challenging the validity of an amendment to a Declaration adopted by an association. This amendment was adopted almost 3 years ago by the Goat Island Master Association and subsequently IDC spent significant moneys in architectural, legal and other professional fees in reliance on its rights to develop the North Development Unit. In the absence of fraud, a court should find that the one year statute of limitations and/or laches bars any attack on the 1994 amendment.

2. Right to Buildout Unit as a Unit Owner. The second and totally independent basis for IDC's right to build are Sections 2.3(a), 2.3(b) and 10.2(a) of the Declaration.
These sections give the Declarant and any other Unit Owner the right to build on any Master Unit. These are normal provisions for a condominium, such as Goat Island, in which the Units consist only of land. In normal residential condominiums, such as the America's Cup, a unit owner is not allowed to alter the owner's unit because such alteration would affect the common elements that comprise the building. Furthermore, in the Goat Island Master Condominium each of the Master Units is viewed as separate development with different types of buildings and units and except for the Master Common Elements each Master Unit operates independently.

The right of each Master Unit Owner to construct improvements is permitted by Section 34-36.1-2.11 of the Condominium Act: Such rights were exercised recently by the Harbour House condominium unit owners when the Harbour House Sub Association recently authorized the increase in size of the buildings comprising the Harbour House Condominium. Also, as a matter of equity IDC is paying common area charges with respect to all of its Master Units.

# EXHIBIT J

UNITED STATES DISTRICT
DISTRICT OF RHODE ISLAND

COMMONWEALTH LAND TITLE INSURANCE COMPANY,
Plaintiff,
VS. C.A. NO. 01-400T
IDC PROPERTIES, INC.,
Defendant and Third Party Plaintiff,
VS.
TIMOTHY MORE, And EDWARDS ANGELL PALMER DODGE, LLP,
Third Party Defendants.

DEPOSITION OF TIMOTHY MORE AND 30(b)6 DEPOSITION FOR EDWARDS ANGELL PALMER & DODGE, LLP, in the above-entitled cause, taken on behalf of the Defendant and Third Party Plaintiff, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of Ferrucci Russo, PC, 55 Pine Street, Providence, Rhode Island, on September 7, 2006, at 10:00 a.m.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RI 02915
(401) 437-3366



APPEARANCES:

For the Plaintiff:
PARTRIDGE SNOW & HAHN, LLP
BY: ROBERT K. TAYLOR, ESQUIRE
180 South Main Street
Providence, RI 02903

For the Defendant and Third Party Plaintiff:
GORDON HALEY, LLP
BY: PETER J. HALEY, ESQUIRE
101 Federal Street
Boston, MA 02110

For the Third Party Defendants:
WILMER CUTLER PICKERING HALE and DORR, LLP
BY: HAROLD HESTNES, ESQUIRE
60 State Street
Boston, MA 02109



INDEX


| WITNESS | PAGE |
|---|---|
| TIMOTHY MORE | |
| Examination by Mr. Haley | 6 |
| Examination by Mr. Taylor | 61 |


EXHIBITS

DEFENDANT AND THIRD PARTY PLAINTIFF


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition of Edwards Angell Palmer Dodge, LLP, 3 pp | 6 |
| 2 | Notice of Deposition of Timothy More, 2 pp | 6 |
| 3 | Correspondence dated 12/4/97 to Michael Mellion from Timothy More, With Enclosure, 3 p | 16 |
| 4 | Memo dated 12/15/97 to Tim Moore From Jeff Meyer, 1 p | 18 |
| 5 | Correspondence dated 12/10/97 to Timothy More with Tolling Agreement, 4 pp | 26 |
| 6 | Tolling Agreement, 5 pp | 29 |
| 7 | Correspondence dated 1/7/98 to Mary Beth Furia from Timothy More with Enclosure, 6 pp | |
| 8 | Correspondence dated 12/5/94 to Timothy More from Stanley Kanter, 3 pp | 31 |
| 9 | Correspondence dated 12/2/94 to Stanley Kanter from Timothy More, 2 pp | 31 |
| 10 | Memorandum dated 9/28/01 to William Landry from Timothy More, 2 pp | 37 |
| 11 | Privileged and Confidential Memorandum To William Landry and Thomas Roos from Timothy More, 1 p | 38 |




EXHIBITS (CONTINUED)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 12 | Correspondence dated 8/23/99 to Thomas Roos from Timothy More, 3 pp | 40 |
| 13 | Correspondence dated 11/3/99 to Thomas Roos from Timothy More, 4 pp | 43 |
| 14 | Correspondence dated 4/14/99 to Timothy More from Michael Mellion, 1 p | 47 |
| 15 | Document entitled Endorsement, 2 pp | 47 |
| 16 | Fax Cover Sheet dated 12/3/98 and Correspondence dated 12/3/98 to Michael Mellion from Timothy More, 2 pp | 49 |
| 17 | Correspondence dated 2/2/99 to Michael Mellion from Timothy More, 1 p | 49 |
| 18 | Copy of Folder Cover No. 34545.0001 and Correspondence dated 2/6/98, 3/8/99 and 3/15/99 to Thomas Roos from Timothy More, 10 pp | 51 |
| 19 | Copies of Invoices dated 12/2/04, 1/5/05, 2/2/05, 4/4/05, 13 pp | 54 |
| 20 | Third Party Complaint and Demand For Trial By Jury, 7 pp | 56 |
| 21 | Answer of Edwards Angell Palmer & Dodge, LLP and Timothy More, 8 pp | 56 |
| 22 | Rhode Island Supreme Court citation America Condominium Association v. IDC, Inc., et al., dated 4/8/05, 9 pp | 59 |


PLAINTIFF'S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 23 | Faxed correspondence dated 3/3/99, 4/5/97, Settlement Agreement, 1997 Tax Bill, 10 pp | 69 |




COPY

the extent of the conversation. Subsequently, I had a conversation with him regarding how much insurance he wanted, and ultimately, I had a conversation with him telling him that the title insurance would be issued.

**Q. And other than that, did Mr. Roos provide you with any specific instruction or directions with respect to how the title insurance would be acquired?**

A. No, because he wasn't sure that he would be able to get it. He was somewhat surprised at the fact that he could get it.

**Q. And how do you know that?**

A. Just in the nature of the conversation.

**Q. And what about the conversation led you to believe he was surprised he could get it?**

A. Because it was -- his inquiry was more along the lines of, you know, "Gee, could I get title insurance?" I said, "I believe you should be able to get title insurance." So he didn't call up saying, "I want to get title insurance because I know I can get title insurance."

**Q. And do you recall him using the words, "Gee, can I get title insurance," or is that your –**



A. That's my language 10 years after the conversation.

**Q. And do you have any notes or memoranda or anything else which would evidence those conversations?**

A. I have no notes or memorandums on any matter relating to this transaction other than a few letters which Mr. Hestnes has provided to me.

**Q. And had you procured title insurance for your clients before in the course of your practice?**

A. Yes.

MR. HESTNES: Any clients?

MR. HALEY: Any clients.

A. Yes.

**Q. And how frequently had you done that?**

A. Oh, maybe three or four times a year.

**Q. And is it something you considered yourself experienced in?**

A. Yes.

**Q. And with respect to procuring title insurance, what was it that you understood your obligations as the attorney looking for title insurance to be?**

A. The client asked for title insurance. My objective is to obtain title insurance.

**Q. And with respect to the relationship between you**



**and the title insurance company, how does that process work? Was there a written application?**

A. No. I mean, I sent a letter to --

MR. HESTNES: Is this just in general or applied to any of the transactions here now?

MR. HALEY: Just in general.

A. In general, there is no application form.

**Q. And other than making the phone call, is there anything else required of you in making the application for title insurance?**

A. No.

**Q. And with respect to the information required by the title insurance company, what is your understanding of what your obligations are with respect to providing them with information concerning the property?**

MR. TAYLOR: Objection to the form, time frame.

A. The title policies -- in some situations, title companies issue commitment letters, and sometimes they don't issue commitment letters. They just issue the policy. If the commitment is issued, then the commitment normally has certain requirements that the title company wants to see



satisfied before they'll issue a policy. It may be providing corporation documents. It may be providing a corporate vote. It may be providing evidence of some discharges, you know, whatever the commitment requires. In this case, in the case of the policy issued by Commonwealth, there was no commitment letters, I recall.

(PAUSE)

(OFF THE RECORD)

(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 3 MARKED FOR IDENTIFICATION)

**Q. Mr. More, I show you a copy of what's been marked Exhibit 3 which is a letter from you to Michael Mellion; is that correct?**

A. Yes.

**Q. And is that how the request for title insurance was initiated, in this instance?**

A. I am not sure whether I made a phone call first, and this was a follow-up letter or whether the letter came first. My guess is that I had a phone call with Michael first.

**Q. And –**

A. Because that would be my normal procedure.

**Q. And do you recall what the substance of that phone**

**call was?**
A. Substance of the phone call was that IDC was looking for title insurance on the North Development Unit.
**Q. And attached to the letter is a memorandum dated November 17, 1997, that was prepared by you?**
A. Yes.
**Q. And did you have any conversations with Mr. Mellion concerning the memorandum?**
A. Yes.
**Q. What conversations were those?**
A. Well, we went over the issues that were involved, that are identified in this memorandum, and I don't know whether it was in that conversation or in another conversation that would have been reasonably contemporaneous with this letter, and with the request for title insurance, that I also applied to Chicago Title for title insurance, and that Chicago was, you know, having concerns about issuing title insurance on the North Development Unit.
**Q. And did Chicago ultimately decline to issue title insurance?**
A. Yes.



**Q. And what was your understanding of why they declined to issue title insurance?**
A. The reasons are set forth in the letter from Jeff Meyer to me.
MR. HALEY: If we can mark that as --
MR. HESTNES: Have you marked the --
MR. HALEY: We did mark the memorandum as part of Exhibit 3, and we'll mark the Meyer memorandum as Exhibit 4.
(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 4 MARKED FOR IDENTIFICATION)
**Q. Mr. More, I show you what's been marked as Exhibit 4. Is that the memorandum -- the response from Jeff Meyer that you referred to?**
A. Yes.
**Q. And did Jeff Meyer also express to you a concern that he was aware that the condominium association was contemplating suit against IDC Properties?**
A. It is so stated in this memo to me.
**Q. And what conversations did you have with Mr. Meyer about the memo?**
A. I had a number of conversations with Jeff over some period of time, and I don't know whether it was two weeks or three weeks or what the time



frame was, but over the issues that he notes in his memo to me.
**Q. And did you tell Mr. Mellion that Chicago Title had declined to provide title insurance coverage?**
A. At some point, prior to the end of 1997, I did.
**Q. And was that in a phone conversation?**
A. Yes.
**Q. And do you have any notes or memoranda of that conversation or anything else which evidenced the conversation?**
A. I don't have any, but -- I don't have any of my files. They could exist, but I don't have them.
**Q. And why did you tell Mr. Mellion that?**
A. I told him that for two reasons; one is that it meant that I would need to get the insurance from Commonwealth because I wasn't going to be getting it from Chicago; and I told him that because it was part and parcel of the whole, you know, issue for getting title insurance. It was part and parcel of kind of the whole set of facts that surrounded, you know, IDC's desire to get title insurance. But I think from Tom Roos's point of view, he was at some point -- maybe it had already started, I don't know -- building on the North



Development Unit, and so he was looking for title insurance because he was going to make an investment on the property, and he had already made an investment on the property, and certainly the disputes with the America's Cup and Capella Condominium Unit owners was an ongoing situation.
**Q. And did you ever show Mr. Mellion a copy of the document marked as Exhibit 4 or provide a copy of that to him?**
A. I do not believe I did.
**Q. And what was Mr. Mellion's response to you when you told him that Chicago Title had declined to provide coverage?**
A. I do not recall.
**Q. And you said that -- in your response to the prior question, that one of the issues involved in the application for title insurance was the dispute with the condominium association. And is that something that Mr. Mellion was informed of, to your knowledge?**
A. I believe that he was, by me.
**Q. And other than by you, are you aware of any other information that was provided to Mr. Mellion concerning the dispute?**

A. I'm unaware of anything else.

**Q. And with respect to the information regarding Chicago Title's decision to decline coverage, is that something you believe you had an obligation to share with Mr. Mellion?**

A. I don't think I formed an opinion on that matter.

**Q. And would it be part of your ordinary practice in applying for title insurance to advise the insurance company if another insurer had declined coverage?**

MR. TAYLOR: Object to the form.

A. That's an interesting question. I don't really have an answer to it.

**Q. With respect to your practice in applying for title insurance, generally, did you have any understanding or opinion as to what sort of things needed to be told to the title insurance company or what you had some obligation to inform the title insurance company of?**

MR. TAYLOR: Object to the form.

A. I mean, I think, let me just answer by saying that the number of times over my career as a lawyer where I've had a title company refuse to



issue insurance and then I go to another title company has not been all that frequent. I do know that about four years ago, I had a situation in which Commonwealth refused to insure the title to a condominium project, and so I went to Mortgage Guarantee, and certainly, at that time, I informed them that Commonwealth was not prepared to issue the title insurance. I explained to them exactly why Commonwealth wasn't prepared to issue the title insurance. And Mortgage Guarantee said we think Commonwealth is being too conservative, and we're prepared to issue the title insurance. So I think that as a basic matter, my inclination would be to inform title company number 2 if title company number 1 is not going to issue the title insurance.

Part of the reason for getting title insurance is, obviously, to protect your client, but it's also to red flag problems because you don't want your client to get into a situation where they're running into litigation which can materially affect the marketability of title, which is -- and the developer may cause -- suffer damages which will never be compensated by title



insurance. So normally, you want a title company to know the most amount of information possible, so that they can either address the issue or evaluate the issue, advise you as to their opinion on the issue, so you can inform your client appropriately, and for that client to make, you know, the appropriate decisions.

So that if, for example, in this case, Commonwealth had come back and said we don't want to issue the title insurance, I would have said to Tom Roos, "I've got two title companies in Rhode Island who are not willing to insure your title. I would be very careful about making any further investment in this property if you don't have title insurance, because if you ever go to sell this property or you ever want to get a mortgage on this property, you may have an impossible time getting title insurance, which means, in essence, you'd never be able to sell the property."

So for that reason, it would have been in my best interest and my client's best interest, and part of just, I think, who I am as a person and as a lawyer to have told Michael what I understood to be the issues, what I understood to be the



position of Chicago Title, and why I would have no reason to have not fully disclosed to Michael what the situation was.

**Q. No one ever told you not to disclose anything to Mr. Mellion, did they?**

A. No.

**Q. Mr. Roos never provided you any instruction or direction as to what to tell Mr. Mellion or what not to tell him?**

A. No.

**Q. And with respect to the issue here and the issue identified in Exhibit 4 of Mr. Meyer's memorandum, that related, did it not, to the question of whether or not in an enacting the amendments to the Condominium Declaration, a vote of just the master condominium unit owners or all the sub-condominium unit owners was required to make the amendment effective; is that correct?**

A. That's one of the issues.

**Q. And did you discuss that issue with Mr. Mellion?**

A. Yes.

**Q. And what discussion did you have with Mr. Mellion concerning that issue?**

A. The discussion with Mr. Mellion was that it was

**your understanding and was it your opinion while you represented IDC Properties, Inc., that, in fact, they held title to the master units?**

A. It was my opinion that subject to the state of facts -- beyond which I didn't know about -- having to do with the title, which I would refer to the title company and the title insured policies, that IDC Properties owned the development rights to the North Development Unit, and that after 1994, when we filed the amendment to create the North Development Unit, IDC owned that master unit, and that prior to that -- prior to 199 -- the end of 1994, that IDC Properties owned a couple of other master units.

MR. HALEY: I don't have any further questions.

(OFF THE RECORD)

MR. TAYLOR: Mr. More, my name is Robert Taylor. I represent Commonwealth Land Title Insurance Company. I just have some follow-up questions.

EXAMINATION BY MR. TAYLOR

**Q. You indicated earlier during your deposition today that you believe that you had had some discussion**



**with Mr. Mellion about disagreements between IDC Properties and the unit owners; is that correct?**

A. Yes.

**Q. When were those? When did you have those discussions with Mr. Mellion?**

A. In December, and perhaps late November 1997.

**Q. Could you be more specific than that?**

A. No.

**Q. And what did you tell him about the disagreements?**

A. To the best of my recollection, I had discussions with Michael that were similar to my discussions with Jeff Meyer at Chicago Title, in that we covered the issues under the Condominium Act, the questions of extension of the development rights, the questions of the right to build out the unit, and the questions of the ongoing disagreements with the America's Cup and Capella South Condominium Unit Owner's Association in which, among other things, they were challenging the creation of the North Development Unit, because the one conversation that I really remember with Michael was that we both adamantly agreed that the North Development Unit had been properly created and was a valid unit. Apart from



any question of the right to build the unit out, apart from any other issue, it was clear that the North Development Unit had been created and any arguments to the contrary didn't seem to have any merit whatsoever.

**Q. Did you tell Mr. Mellion in the fall of 1997 that the condominium individual unit owners had challenged the creation of the North Development Unit?**

A. My recollection is that we had discussions that they were challenging the validity of the creation of the North Development Unit.

**Q. Did you tell Mr. Mellion that in a specific telephone call that you can recall?**

A. Not in any specific telephone conversation. I believe that we had several conversations because at the same time, I was trying to get Chicago Title to issue the policy and then to reconsider the position that they set forth in this memo to me of December 15, 1997. Inasmuch as the fact that Chicago had the existing policy, it would have made more sense to stay with Chicago if Chicago had been willing to issue the insurance.

**Q. Did you tell Mr. Mellion in the fall of 1997 that**



**the America Condominium Unit had retained counsel in connection with disagreements over Goat Island?**

A. I don't recall.

**Q. Do you recall telling him whether Matt Medeiros was involved at that point in time in any way?**

A. I don't recall.

**Q. Do you recall telling Mr. Mellion you had been in a meeting with Mr. Medeiros and Mr. Roos and others earlier that fall regarding Goat Island?**

A. I don't recall.

**Q. Do you recall telling Mr. Mellion that litigation was in the air at that point in time?**

A. I -- I certainly would have said that the disagreements that existed between the Capella and America's Cup Condominium Association and IDC certainly could have resulted in litigation, because the nature of the claims, if they didn't get resolved amicably, were certainly going to be resolved by litigation. So did I say that the lawsuit was likely or unlikely or was going to be filed, that I don't recall. It's just that there certainly were discussions that there was serious disagreements particularly pertaining to the physical condition of the America's Cup Building

and the Capella South Building.
**Q. Did you tell Mr. Mellion in the fall of 1997 that a lawsuit had been threatened related to Goat Island?**
A. Like I said, I don't know whether I would have expressed it in those terms or simply that there were serious issues involving IDC and Capella and the America's Cup that could result in litigation.
**Q. And do you recall using those words with Mr. Mellion, that there were disagreements that could result in litigation?**
A. Not specifically, no.
**Q. At the time, was it your belief that the primary disagreement between the individual unit owners and Mr. Roos related to the condition of the buildings on Goat Island?**
A. Yes.
**Q. And did you communicate that to Mr. Mellion in the fall of 1997?**
A. I don't recall.
**Q. If I could direct you back to what's been marked as Exhibit 10 to your deposition.**
**(PAUSE)**
**Q. September 28, 2001, memo from you to Mr. Landry.**



A. Uh-huh.
**Q. Do you have that in front of you?**
A. Yes.
**Q. Why did you prepare this?**
A. I don't recall. I mean, I don't recall whether Bill Landry asked me to do this or whether I volunteered to do this.
**Q. Did you discuss this memorandum with Mr. Landry?**
A. I may have had a conversation with him, but I don't recall.
**Q. Do you recall having a conversation with Mr. Landry about this memorandum?**
A. No.
**Q. Do you recall discussing this memorandum with anyone besides Mr. Landry?**
A. Not to my recollection.
**Q. Did you inform Mr. Roos that you were preparing this memorandum?**
A. I don't believe so.
**Q. And did you ever communicate to him what was contained in this memorandum?**
A. Not that I can recall.
**Q. Did you discuss this memorandum with anyone else at Edwards & Angell?**



A. No.
**Q. Directing your attention to Paragraph 5 of this memorandum, there is a reference in the first sentence of Paragraph 5 to a "corrective memo"; do you see that?**
A. Yes.
**Q. What does that refer to?**
A. I don't know.
**Q. Do you recall --**
A. Oh, yes, I do know. The corrective memo, at least I believe -- no, I shouldn't speculate because I'm just not really sure.
**Q. In all the documents that you've looked at in connection with your depositions in this case, have you seen any copy of what you believe to be the corrective memo referred to in this?**
A. No, I think it might be the memo I did where I ultimately concluded that the consent of all of the sub-condominium owners was required in order to extend the development rights, but I'm not sure that's what it referred to.
**Q. Do you have a recollection of any memorandum that you chose not to send to the title company?**
A. No.



**Q. When you left Edwards & Angell, did you take any actions to delete any computerized information that you may have generated during your tenure there?**
A. No.
**Q. You had a computer when you left Edwards & Angell?**
A. Yes.
**Q. Did you leave that computer at the firm?**
A. Yes.
**Q. Prior to your departure from Edwards & Angell, did you have any discussions with the firm about what would happen to the computerized information contained on your computer?**
A. No.
**Q. Sitting here today, would it be your belief that the corrective memorandum as referred to here in Exhibit 10 would have been contained in the computer system at Edwards & Angell when you left?**
A. I believe there's a hard copy or should be a hard copy. My guess would be is that at this point in time, whatever was on that computer probably has been trashed and gone off to the landfill, but --
**Q. Do you know whether it was Edwards & Angell's**

# EXHIBIT K

MEMO

TO: TIM MOORE

FROM: JEFF MEYER

RE: GOAT ISLAND CONDOMINIUM

DATE: DECEMBER 15, 1997

Please be advised that we have reviewed the Memorandum which you sent to us regarding Goat Island Condominium.

We do not agree with your assertion that the law is clear that the Master Unit Owners are the proper parties to vote on the amendment in question, particularly in the case where the Master Condominium Association is controlled by the Declarant. We are also aware of threatened litigation over the operation and management of the master condominium by the sub-condominium unit owners. We feel that there is a substantial risk that the sub-condominium unit owners may allege that there was fraud in the manner in which this amendment was created.

Furthermore, it is our opinion that as of December 31, 1994, the development rights for the creation of any units within Goat Island Condominium expired. It is our position that once these rights expired, they may not be re-created or extended without the unanimous consent of the owners and mortgagees of the applicable sub-condominium units.

Please be advised that for the reasons stated above, Chicago Title Insurance Company is not willing to insure the sub-condominium units within North Development Unit without a judgment validating the creation of such units and the extension of the development rights by a court of competent jurisdiction.

If you have any questions in this regard, please do not hesitate to contact me.

Jeff – is reconsidering

EX. 4
9-26-07

# EXHIBIT L

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| COMMONWEALTH LAND TITLE INSURANCE COMPANY, Plaintiff | * | |
| VS. | * | C.A. NO. 01-400T(RWL) |
| IDC PROPERTIES, INC., Defendant | * | |

* * * * * * * * * * * * * * * * *

DEPOSITION OF JEFFREY MEYER, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Partridge, Snow & Hahn, 180 South Main Street, Providence, Rhode Island, on December 19, 2002, at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF.......... PARTRIDGE, SNOW & HAHN, LLP
BY: Robert K. Taylor, Esquire

FOR THE DEFENDANT.......... BLISH & CAVANAGH, LLP
BY: Thomas E. Romano, Esquire

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

but the pressure point here is in '97 that they were finally ready to go, as I understood it, with the construction, and without title insurance, they couldn't get a loan to do the construction.

Q. When did you first come to believe that the development rights for the North Development Unit had expired?

A. About the time of the '94 closing. Everyone, I think, agreed that per the documents, December 31st of '94 they were gone.

Q. Well, were you aware of an amendment that was passed at the end of '94 that purported to extend those development rights?

A. Not when we did the closing. That happened after the fact. It was talked about, but this, you see, is dated December 29th. This closing, I can't tell you the exact date, but I'm going to say October or November. As I recall there was still a couple of weeks remaining in the year.

Q. So then at the time of the closing you were not aware of any extension of the development rights?

A. Just a discussion of them, but I don't believe any documents had been prepared. There were no specifics.

Q. And, again, who was involved in the discussion about an extension that you can recall?

A. Well, it would have been the people at Edwards & Angell, either Arthur or Tim talking about it and asking me in general what my position would be.

Q. And do you recall when you first learned that there had been an amendment that purportedly extended the development rights?

A. As I recall, I found out about it after it had been recorded.

Q. And how did you find out about it?

A. Somewhere between the time that it was recorded and this '97 memorandum, it had been sent to me as evidence that things were extended. I don't remember by whom or when I received it.

Q. And do you recall at what point in time you came to believe that the purported December, 1994, extension of the development rights was not valid?

A. I thought it was not valid right from the very beginning because you didn't have all of the unit owners and all of the mortgagees signing it, and I also knew that these associations, that is, the sub-associations which are members of the master

association were controlled by the Declarant, which I thought were two fatal flaws. That you could not, no matter what you put on record, if you didn't have the unanimous consent of the unit owners and the mortgage holders, you didn't have anything.

Q. How did you know that there had never been consent by all these unit owners and mortgage holders?

A. Well, somewhere along the line I got the vote of the association, and I knew that that's what they had done. There was no evidence produced that the unit owners, number one, had been contacted individually and, number two, that they had signed anything.

Q. When you say you got the vote of the association, what do you mean by that?

A. There was a -- maybe it was in the amendment. Somewhere there is a document. It's either the amendment or a separate document where all of the associations agree to the amendment. I'm not sure exactly how the mechanics work, but it was clear to me that is what they had done. The sub-associations had signed, not the individual unit owners.

Q. Do you remember how you got a copy of that document?

A. Whatever I got was forwarded to me by the Declarant's representatives because they were lobbying me to get title insurance, so they produced these documents, and I just don't remember. I know there was an amendment on record. I don't know whether there is another document beyond that. The amendment itself may have been signed. I'm sure it's signed by all the sub-associations, but I don't know if there is a separate vote that goes with it or not. It could be it's just that one document. I knew they didn't have the unit owners. There are just too many unit owners out there for that to really be feasible, and that was the argument right along; it was too difficult to get everybody's consent. There was too many people. And the fact that the unit owners were disgruntled over a number of other issues made it very unlikely that they were going to sign. That was part of what was presented to me. I knew that from being in practice in Newport, that the unit owners were disgruntled with the Declarant, and the likelihood

that they would all consent to helping the Declarant was very remote.

Q. Did your involvement in the closing in 1994 alert you also to some of these issues?

A. Only the discussion about the amendment and extending the Declarant's rights, I recall that coming out of the closing. The business about the disgruntlement of the unit owners I knew separately from that.

Q. In the context of discussions around the time of the closing that you mentioned several times, do you recall anyone saying that they, meaning IDC, had a strategy for addressing the problem or the issue of extending the development rights?

A. I recall at the '94 closing that they were going to try to work on something. I don't know that the final plan had been formulated at the closing. It had been formulated at the end of the year when they did this amendment, but I don't think it was formulated at that closing. It was identified as an issue that had to be dealt with, and I was asked about what my thoughts were on extending the development rights.

Q. Do you recall anyone indicating that the strategy

for dealing with that issue was going to have to be an aggressive strategy or words to that effect?

A. No. What I recall about that closing is that there were a lot of closed-door sessions, and I wasn't in the room for the entire transaction. I was there on sort of an as-needed basis. I recall discussions going on, but I wasn't a party to them.

Q. And did you have any concerns at that time about whether or not IDC Properties would be able to successfully extend its development rights?

A. Absolutely.

Q. And did you express those concerns to anybody?

A. I recall being asked about it, and every time that I was asked about it, I said you can't do -- absent having unanimous consent of the unit owners and the mortgagees, you can't do it once it expires.

Q. Going back again to late 1994, can you give me a little bit more detail about your knowledge of outstanding disputes between the individual unit owners and the condominium owner at Goat Island?

A. We did a number of individual unit owner closings when I was in private practice in

Newport; some of which were Declarant sales and some of which were resales. In the course of that, it was generally known that there was disgruntlement with the Declarant, and somewhere along the line I remember being specifically told that the unit owners had already mobilized and they had gone to talk to Sandy Resnick.

Q. Who is Sandy Resnick?

A. Sandy Resnick is an attorney in Warwick.

Q. And do you recall whether you were told he had been approached by the unit owners in 1994?

A. I don't recall when that happened. I just know that I knew it by the end of December of '97.

Q. And I believe you mentioned earlier that you had spoken with Sandy Resnick about the issue of development rights at Goat Island?

A. Yes, I remember having one discussion. I don't know that I called him specifically. As I recall, I happened to be at another closing, which had nothing to do with Goat Island, and happened to mention what these guys were trying to do, and I thought it was crazy, and it was just a very general discussion.

Q. And can you put a time frame on that at all?

A. Between '94 and '97.

Q. Do you recall whether you requested that IDC Properties provide you with a copy of any documents supporting the purported extension of the development rights?

A. I remember in '97 having Tim More call me and explain to me what he wanted to do, and I recall -- which I do with everybody -- saying send me what you have and let me look at it. So do I remember exactly what he sent me? No, but I know that that's how I would have gotten this '94 amendment because we didn't do any post '94 title work that would have produced it.

Q. Okay, and, again, can you be anymore specific in your recollection of what Mr. More told you when he initially called you in 1997 about development rights?

A. I recall that he went over his position, and each conversation was more contentious than the one before it because he was convinced that he was right and I was wrong. He explained that -- he put a lot of emphasis on the fact that this amendment had been on record for more than a year, and he cited the particular section of the Condo.

Act that allows for or talks about an amendment being on record for more than one year. I disagreed with that, said I didn't care how long it was on record, that if it wasn't validly adopted, that particular section didn't carry any weight. He was, I remember, rather caustic in his remarks, not only about my position but basically that I was, you know, just not up to the task of understanding the Condo Act.

Q. In those conversations did Mr. More discuss with you any conversations that he, More, had had with his client Tom Roos?

A. Not that I recall. I can't recall anything specific.

Q. Did he tell you anything about Tom Roos' position on this particular issue?

A. Oh, I don't know that he specifically said it. He was obviously advocating that this get done, and I knew that Tom Roos, even at the closing in '94, wanted to develop all these other units, and that's what the whole point of it was. I don't know if he specifically reiterated it in '97, but I certainly understood that was the case.

Q. Do you recall asking Mr. More to provide you with

some sort of legal analysis supporting his position?
A. No. As I recall, he sent it to me as a directive as to why it is that I was wrong and he was right. I don't know exactly what he sent me, but the memorandum that I'm referring to, I think, would have had that in it.
Q. Now, looking back at Exhibit 3, and at the second sentence of the second full paragraph, it says, "We are also aware of threatened litigation over the operation and management of the master condominium by the sub-condominium unit owners. We feel that there is a substantial risk that the sub-condominium unit owners may allege that there was fraud in the manner in which this amendment was created." Did I read that correctly?
A. Yes, you did.
Q. What was the information that you had at this point in 1997, in December, about the risk of litigation?
A. The unit owners, as I understood it, were unhappy about the fact that there were unpaid condominium fees that were owed by the Declarant or the predecessor to the Declarant. I know that

part of those fees had to do with security guards out there, who was going to pay for them, and then there were, as I understood it, points of argument between the Declarant and these unit owners. The Declarant supposedly had not paid fees, and they were -- I remember the number of $400,000 being bantered around as the number, and that's why I felt that given their temperament on those issues, they were very unlikely to agree on an extension of the development rights on the North Development Unit, and if we went ahead and insured that based on this scheme that they had come up with to amend it at the end of '94, that we were just buying a claim.

Q. In December of 1997 were you aware that any of the unit owners had already threatened to claim that the extension of the development rights was invalid?

MR. ROMANO: Objection.

MR. TAYLOR: You can answer.

A. No.

Q. Where was the information that you were receiving about the position of the individual unit owners coming from?

A. Just in the normal dealings with either attorneys in Newport or closings that I had done. Through rumor, conversation, it had come to me that there were issues. I don't remember specifically from whom.

Q. In your conversations with Mr. More in late 1997, did he ever mention to you a Tolling Agreement between the unit owners and IDC Properties?

A. Not that I recall.

Q. Did he ever mention to you that there was a possibility that a Tolling Agreement between those parties would be entered?

A. No.

Q. Did you discuss with Mr. More the risk of litigation by unit owners?

A. Absolutely.

Q. What did he say about that?

A. That I was being overly cautious. Every point that I attempted to make in my conversations with him, he contested.

Q. Was it your understanding that Mr. More was suggesting that litigation by the unit owners was unlikely at that point in time?

A. I don't know what he thought, but he certainly

argued to me that I was being overly cautious and this was not something to be worried about.

Q. Do you recall any further specifics about a discussion with Mr. More at this point in time in late 1997 about potential litigation involving the unit owners at Goat Island?

A. I know that I pointed out to him that was my position, and we were not willing to go forward on this basis because I thought the risk of litigation was way too great. He disagreed, and that's when he told me I didn't understand condominium law. I recall the last conversation being very abrupt, very terse. He was angry with me and, you know, he's got marked here, "Jeff -- is reconsidering." He was always pushing me, and I said no, no, no, but it wasn't just one no, it was more than one no.

Q. Well, let's talk a little bit more about the note at the bottom of Exhibit 3.

A. Okay.

Q. Which appears to say, "Jeff -- is reconsidering." Is that your handwriting?

A. No.

Q. Do you recall having any conversation with

Mr. More in which you indicated that you would reconsider your position on insuring the development rights?

A. I do remember we would argue and argue and argue, and finally just to get him off the phone I said, all right, I'll think about it. So, yes, but we basically covered the same material in every conversation. They all went the same way. I made the points that I've made in this memorandum. He disagreed. He got angry. So, yes, but I never reconsidered in his favor.

Q. After the date of this memorandum that has been marked as Exhibit 3, do you recall having any further conversations with Mr. More about the subject of insurance on development rights for Goat Island?

A. No.

Q. Did you have any discussions around that subject with anybody representing IDC Properties or Mr. Roos?

A. No.

Q. After the date of this memorandum, do you have any idea what happened regarding insurance -- title insurance for the development rights?

A. Well, I heard through the title grapevine -- and this is from attorneys calling into my office reporting or asking questions about whether or not they can insure a title -- that, in fact, construction had begun on the Clambake Club and that it was insured by Commonwealth, Commonwealth Title, and I remember thinking I don't understand how they could have taken that risk, and this litigation comes up frequently. It has since '97 with attorneys calling me saying, okay, this litigation is outstanding, there are lis pendens that are filed, how does this affect our unit? Can we go forward? Do we need to get indemnity? And for a period of time IDC was giving indemnities against legal costs or unpaid fees. Not the Clambake Club. I'm talking about some of the residential units that make up part of the Goat Island group of condominiums.

Q. Does Chicago Title still have title insurance policies outstanding on property at Goat Island?

A. Absolutely, quite a number of them.

Q. Since the date of this memorandum, have you had any conversations at all with Mr. More?

A. Yes, but not on this subject.

CERTIFICATE

I, Jane M. Poore, a Notary Public, do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to the Rules of Civil Procedure of the Superior Court, especially, but without restriction thereto, under Rule 30(b) of said Rules; that the witness was first sworn by me; that the transcript contains a true record of proceedings.

Reading and signing of the transcript was not requested by the deponent or any parties involved upon completion of the deposition.

IN WITNESS WHEREOF I have hereunto set my hand this 7th day of January, 2003.

JANE M. POORE, NOTARY PUBLIC, RPR
My commission expires 9/11/05

DATE: December 19, 2002
IN RE: Commonwealth vs. IDC
WITNESS NAME: Jeffrey Meyer

# EXHIBIT M

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

COMMONWEALTH LAND TITLE INSURANCE COMPANY,
Plaintiff,
VS. C.A. NO. 01-400T
IDC PROPERTIES, INC.,
Defendant and Third Party Plaintiff,
VS.
TIMOTHY MORE and EDWARDS ANGELL PALMER DODGE, LLP
Third Party Defendants.

DEPOSITION OF MICHAEL MELLION, in the above-entitled cause, taken on behalf of the Defendant and Third Party Plaintiff, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of Ferrucci Russo, 55 Pine Street, Providence, Rhode Island, on August 31, 2006, at 10:00 a.m.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RI 02915
(401) 437-3366



APPEARANCES:

For the Plaintiff:
PARTRIDGE SNOW & HAHN, LLP
BY: ROBERT K. TAYLOR, ESQUIRE
180 South Main Street
Providence, RI 02903

For the Defendant and Third Party Plaintiff:
GORDON HALEY, LLP
BY: PETER J. HALEY, ESQUIRE
101 Federal Street
Boston, MA 02110

For the Third Party Defendants:
EDWARDS ANGELL PALMER & DODGE, LLP
BY: DEMING SHERMAN, ESQUIRE
2800 Financial Plaza
Providence, RI 02903



INDEX


| WITNESS | PAGE |
|---|---|
| MICHAEL MELLION | |
| Examination by Mr. Haley | 6 |


Note: Instructions to the Witness may be found on Page 81.

EXHIBITS

DEFENDANT/THIRD PARTY PLAINTIFF


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Subpoena, 3 pp | 7 |
| 2 | Correspondence dated 12/4/97 to Michael Mellion from Timothy More With Enclosure, 3 pp | 16 |
| 3 | Memorandum dated 11/17/97 to File From Timothy More, 2 pp | 18 |
| 4 | Correspondence dated 12/12/97 to Timothy More from Michael Mellion, 2 pp | 25 |
| 5 | Memo dated 12/15/97 to Timothy More From Jeff Meyer, 1 p | 28 |
| 6 | Tolling Agreement dated 1/5/98, 5 pp | 33 |
| 7 | Examiner's Expense Sheet, Order No. 228716, 1 p | 35 |
| 8 | Memorandum dated 1/6/98 to John from Michael, 2 pp | 36 |
| 9 | Chicago Title Insurance Company Insurance Policy, Date of Policy October 21, 1994, 9 pp | 39 |
| 10 | Examiner's Expense Sheet Order Number 228716, 2 pp | 41 |
| 11 | Commonwealth Land Title Insurance Company Owner's Policy Of Title Insurance, 10 pp | 43 |
| 12 | Correspondence dated 2/2/98 to Timothy More from Michael Mellion With Enclosure, 2 pp | 43 |
| 13 | Copy of printout from Commonwealth Order No. 228716, 2 pp | 46 |




EXHIBITS (CONTINUED)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 14 | Title Run document, 2 pp | 47 |
| 15 | Third Amendment To First Amended And Restated Declaration Of Condominium Goat Island South - A Waterfront Condominium, 6 pp | 51 |
| 16 | Rhode Island Judicial Systems And Sciences Docket Event Listing, 1 p | 54 |
| 17 | Handwritten notes dated Goat Island South Condo, 5 pp | 57 |
| 18 | Handwritten document entitled IDC Properties dated 1/13/98, 2 pp | 57 |
| 19 | Handwritten document entitled IDC Marina, IDC Properties, Inc., IDC Hotel, Inc., IDC, Inc., dated 10/21/94, 10 pp | 57 |
| 20 | Correspondence dated 12/3/98 to Michael Mellion from Timothy More With Fax Cover Sheet, 2 pp | 57 |
| 21 | Correspondence dated 2/2/99 to Michael Mellion from Timothy More, 1 p | 60 |
| 22 | Title Run document, 2 pp | 60 |
| 23 | Faxed Correspondence dated 3/1/99 to Timothy More from Michael Mellion, 1 p | 65 |
| 24 | Correspondence dated 4/14/99 to Timothy More from Michael Mellion, 1 pp | 66 |
| 25 | Endorsement dated 3/1/99, 2 pp | 66 |
| 26 | Memorandum dated 12/6/00 to Michael Mellion from Joseph Hall, 3 pp | 68 |
| 27 | Faxed correspondence dated 12/8/00 To Joseph Hall from Michael Mellion, 1 p | 68 |
| 28 | Correspondence dated 5/2/01 to David Miller from Michael Mellion, 1 p | 74 |
| 29 | Copy of E-mail dated 5/8/01 to Dianne Wilczynski from Michael Mellion, 1 p | 79 |




COPY

Page 17

A. We would occasionally do business with him. I really can't recall how frequently, but I know a couple deals a year, two or three deals a year, could be more.
**Q. And with respect to the law firm Edwards & Angell, how frequently did you deal with them?**
A. On a regular basis.
**Q. What do you mean by that?**
A. They would send us title work or ask us to bid on deals that they were involved with as those deals came up.
**Q. And they were a valued customer of Commonwealth?**
A. Yes.
**Q. And does Commonwealth keep track of how much business it writes for Edwards & Angell?**
A. The business side may have done that. I never did.
**Q. Did you ever see any of that information?**
A. Not to my knowledge, no.
**Q. And when you say you bid on business, there's a competitive market for title insurance; is that correct?**
A. That's correct.
**Q. And other insurers would bid on the same work; is that correct?**

Page 18

A. Yes, if it was put out to bid, that particular deal.
MR. HALEY: Mark this Exhibit 3, please.
(DEFENDANT'S EXHIBIT 3 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, Exhibit 2 has a memorandum attached to it, and Exhibit 3 appears to be that memorandum with your handwriting on it; is that correct?**
A. That's correct.
**Q. And you read the memorandum when you received it?**
A. Yes.
**Q. And did you form any opinions about the title after reviewing the memorandum?**
A. I don't recall if I informed them after that, but I apparently agreed with the analysis contained in the memorandum.
**Q. Is it fair to say that the title insurance that Mr. More was requesting was not a simple matter?**
A. That's fair to say.
**Q. And did the statement in the memorandum looking at Paragraph 1 -- the paragraph numbered 1, the third sentence there says, "Even if the amendment is invalid, there is a one year statute of limitations in the Condominium Act for challenging the validity of an amendment to a Declaration adopted by an association." You were aware, were you not then, that there was a possibility that the amendment could be challenged?**

Page 19

A. No, I wasn't aware of the possibility.
**Q. Well, for what purpose did you think Mr. More was making reference to the statute of limitations?**
A. As far as I knew, this was a theoretical evaluation of what occurred. I wasn't aware of any actual controversy about it.
**Q. And when you asked Mr. More about the existence of any actual controversy, what did he tell you?**
MR. TAYLOR: Object to the form of the question.
A. I don't believe I ever asked him about any controversy. It didn't occur to me there was one.
**Q. Did Mr. More or IDC Properties fill out an application for the title insurance?**
A. I don't think so.
**Q. Is there such – does Commonwealth have such a thing?**
A. In the old days, they had a form. People would walk in and fill out a form, but normally, the way business was done when I was there, we would get either a letter or a phone call or, later on, an E-mail asking us if we were interested in bidding on the insurance or asking us to actually do the title.

Page 20

**Q. And did you require the potential insured or their counsel to fill out any statement as to the title matters or the issues?**
A. No.
**Q. Did you ever ask Mr. More any questions that he refused to answer?**
A. No.
**Q. Did you ever request of Mr. More any information concerning the title to the property that he refused to provide to you?**
A. Not that I recall.
**Q. With respect to the handwriting on the memorandum, could you tell me what the annotation above the line on the right-hand side of the page means, 1.0 –**
A. That's a dollar a thousand. That's the price, a dollar a thousand.
**Q. And what's the second line, "+"?**

A. Yes.
**Q. And how he is employed, if you know?**
A. He was the manager of Chicago Title.
**Q. And did you talk to him on any regular basis?**
A. We talked occasionally, not on a regular basis.
**Q. And in this matter, you were aware that Chicago Title had issued a title policy on the property previously; is that correct?**
A. I think I eventually saw a policy. Whether I knew at the time that they issued one, I can't say.
**Q. Do you ever have any conversations with Mr. More or anyone else about whether or not Chicago had been asked to bid on the title insurance being issued in December 1997?**
A. I don't recall that, no.
**Q. And did you ever ask Mr. More whether or not Chicago had refused to issue the title insurance?**
A. No.
**Q. Did you have any reason to believe that had you asked Mr. More that question, he would not have given you an honest answer?**
A. I assume if I asked him the question, he would have given me an honest answer.



**Q. And with respect to this memorandum that we marked as Exhibit 5, you did not see this at the time the title insurance was issued; is that correct?**
A. That's correct.
**Q. And if you had seen it at the time the title insurance issued, would it have affected your decision to issue the title insurance?**
A. Yes.
**Q. And how would it have affected it?**
A. I don't believe I would have offered to insure the title.
**Q. Why not?**
A. Because I know one other company has determined that that would create a marketability issue they refuse to insure.
**Q. And why is it that you didn't ask either on a written application or ask Mr. More the question whether or not anyone else had refused to issue insurance on the property?**
MR. TAYLOR: Object to the form of the question.
A. I don't think I ever asked anyone that at the time of application.
**Q. Why not?**



A. I suppose I'm assuming that if someone has, they will tell me that. My understanding of the way business is done in Rhode Island or has always been done is that that's the duty on the part of whoever sent us the title to disclose to us.
**Q. And what's the basis of that understanding?**
A. Well, if they are applying for issuance of a title insurance policy through counsel, the counsel in my judgment has an obligation to tell me whether there's a problem with the title that's not something that could be revealed by a record examination.
**Q. And with respect to the memorandum that's made reference to in the first page -- in the first paragraph of Exhibit 5, "Please be advised that we have reviewed the Memorandum which you sent to us regarding Goat Island Condominium," you received a memorandum from Mr. More as well; is that correct?**
A. Exhibit 3, yes.
**Q. And is it your -- after your review of the memorandum, though, you were still willing to issue title insurance; is that correct?**
A. Yes.
**Q. But you believe that Mr. More had an obligation to**



**tell you if he had sent the memorandum to anyone else, and they had reached a different conclusion?**
MR. TAYLOR: Object to the form of the question.
A. If he knew that another title company had refused to insure, yes, I believe he had an obligation to tell me that.
**Q. And when you made the decision to insure after the review of the memorandum, you were relying on your own independent judgment and skill in evaluating the facts of the memorandum; is that correct?**
THE WITNESS: Would you repeat the question? I'm sorry.
MR. HALEY: Sure.
**Q. When you reviewed the memorandum that we've marked as Exhibit 3 and made the decision to issue title insurance, you were relying upon your own independent review of the memorandum and judgment and skill in assessing that title issuance; is that correct?**
A. Yes.
(PAUSE)
MR. HALEY: Mark that Exhibit 6, please.

A. Yes.
**Q. And how he is employed, if you know?**
A. He was the manager of Chicago Title.
**Q. And did you talk to him on any regular basis?**
A. We talked occasionally, not on a regular basis.
**Q. And in this matter, you were aware that Chicago Title had issued a title policy on the property previously; is that correct?**
A. I think I eventually saw a policy. Whether I knew at the time that they issued one, I can't say.
**Q. Do you ever have any conversations with Mr. More or anyone else about whether or not Chicago had been asked to bid on the title insurance being issued in December 1997?**
A. I don't recall that, no.
**Q. And did you ever ask Mr. More whether or not Chicago had refused to issue the title insurance?**
A. No.
**Q. Did you have any reason to believe that had you asked Mr. More that question, he would not have given you an honest answer?**
A. I assume if I asked him the question, he would have given me an honest answer.



**Q. And with respect to this memorandum that we marked as Exhibit 5, you did not see this at the time the title insurance was issued; is that correct?**
A. That's correct.
**Q. And if you had seen it at the time the title insurance issued, would it have affected your decision to issue the title insurance?**
A. Yes.
**Q. And how would it have affected it?**
A. I don't believe I would have offered to insure the title.
**Q. Why not?**
A. Because I know one other company has determined that that would create a marketability issue they refuse to insure.
**Q. And why is it that you didn't ask either on a written application or ask Mr. More the question whether or not anyone else had refused to issue insurance on the property?**
MR. TAYLOR: Object to the form of the question.
A. I don't think I ever asked anyone that at the time of application.
**Q. Why not?**



A. I suppose I'm assuming that if someone has, they will tell me that. My understanding of the way business is done in Rhode Island or has always been done is that that's the duty on the part of whoever sent us the title to disclose to us.
**Q. And what's the basis of that understanding?**
A. Well, if they are applying for issuance of a title insurance policy through counsel, the counsel in my judgment has an obligation to tell me whether there's a problem with the title that's not something that could be revealed by a record examination.
**Q. And with respect to the memorandum that's made reference to in the first page -- in the first paragraph of Exhibit 5, "Please be advised that we have reviewed the Memorandum which you sent to us regarding Goat Island Condominium," you received a memorandum from Mr. More as well; is that correct?**
A. Exhibit 3, yes.
**Q. And is it your -- after your review of the memorandum, though, you were still willing to issue title insurance; is that correct?**
A. Yes.
**Q. But you believe that Mr. More had an obligation to**



**tell you if he had sent the memorandum to anyone else, and they had reached a different conclusion?**
MR. TAYLOR: Object to the form of the question.
A. If he knew that another title company had refused to insure, yes, I believe he had an obligation to tell me that.
**Q. And when you made the decision to insure after the review of the memorandum, you were relying on your own independent judgment and skill in evaluating the facts of the memorandum; is that correct?**
THE WITNESS: Would you repeat the question? I'm sorry.
MR. HALEY: Sure.
**Q. When you reviewed the memorandum that we've marked as Exhibit 3 and made the decision to issue title insurance, you were relying upon your own independent review of the memorandum and judgment and skill in assessing that title issuance; is that correct?**
A. Yes.
(PAUSE)
MR. HALEY: Mark that Exhibit 6, please.

(DEFENDANT'S EXHIBIT 6 MARKED FOR IDENTIFICATION)

**Q. Mr. Mellion, I show you what's been marked as Exhibit 6 which is a document entitled Tolling Agreement, and that has a date on it on the second to last page of January 5, 1998. Did you ever discuss with Mr. More whether or not IDC Properties had entered into a tolling agreement?**

A. No.

**Q. Did you ever discuss with Mr. More whether or not IDC Properties was aware of any threatened or potential claims against the property?**

A. No.

**Q. Do you have any reason to believe that if you had asked him the question, whether or not there had been a tolling agreement entered into or whether or not there had been any potential or threatened claims, that he would not have given you an honest answer to those questions?**

A. I assume if I asked him a question, he would give me an honest answer.

**Q. And if you had seen the tolling agreement, is it your testimony that you would not have issued the title insurance?**



A. That's my testimony, yes.

**Q. Why?**

A. Because there's clearly a controversy regarding the title. If there's a pending attack on the title, I'm certainly not going to insure the title to it.

**Q. And you believe that Mr. More had an obligation to tell you that; is that correct?**

A. That's correct.

**Q. And the basis for that belief is what?**

MR. TAYLOR: Objection, asked and answered.

A. Well, fundamental honesty, I mean, for the transaction. Anyone who's giving me a deal, in my opinion, has the obligation to disclose to me any knowledge they have that's detrimental to the title.

**Q. You never asked Mr. More, did you, "Is there anything else about the title I should know"?**

A. No.

**Q. You never asked Mr. More whether or not there were any claims or potential claims with respect to the title?**

A. No, I didn't.



**Q. Prior to the issuance of title insurance, had you ever been to Goat Island to take a look at the property?**

A. I may have been to Goat Island, but not particularly to look at the property through this title.

**Q. Were you aware from any other source that there were any disputes or issues in connection with the condominium?**

A. No.

**Q. Do you ever talk to Mr. Meyer at Chicago Title or anyone else from any other title company about the property?**

MR. TAYLOR: Object to the form of the question, time.

MR. HALEY: Prior to the issuance of the policy.

A. No.

MR. HALEY: Would you mark this 7, please?

(DEFENDANT'S EXHIBIT 7 MARKED FOR IDENTIFICATION)

**Q. Mr. Mellion, I show you what's been marked as Exhibit 7. Could you tell me what that is?**



A. This is an Examiner's Expense Sheet.

**Q. And who is the examiner?**

A. CFR would be Celeste Riendeau.

**Q. And other than -- and this particular expense sheet refers to the issuance of the endorsement amending the policy in 1999; is that correct?**

A. No, I don't actually recall what we did to the policy at that point. It reflects work she did in 1999, but I don't have an actual present recollection of what I did then.

MR. HALEY: Mark this as 8, please.

(DEFENDANT'S EXHIBIT 8 MARKED FOR IDENTIFICATION)

**Q. Mr. Mellion, I show you what's been marked as Exhibit 8; do you recognize that?**

A. It's a memo that I wrote to our title plant manager.

**Q. I'm sorry, title --**

A. Plant manager.

**Q. Okay. And what was his name?**

A. John Eleuterio.

**Q. And why were you sending this to him?**

A. This is a memo instructing him to have an examination prepared for us.

CERTIFICATE

I, Jeannette A. Freelove, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of Michael Mellion, witness in the above-entitled cause, was taken by me at the offices of Ferrucci Russo, PC, 55 Pine Street, Providence, Rhode Island, commencing at 10:00 a.m. on August 31, 2006; that previous to the testimony of said witness, who was of lawful age, the witness was sworn by me; whereupon the witness was first duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth; and that the witness thereupon testified as in the foregoing-annexed transcript.

I further certify that the foregoing deposition was taken down by me in stenotype and was later reduced to computer-aided transcription; and that the foregoing is a true and accurate record of the testimony of said witness.

Pursuant to Rule 30, the witness, with agreement of the parties, hereby requests to read and sign the transcripts.

Pursuant to Rule 5(d) and 30(f)(1) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court. Therefore, original is delivered and retained by Attorney Haley.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of August, 2006.

Jeannette Freelove, Notary Public

JEANNETTE A. FREELOVE, NOTARY PUBLIC
Certified Court Reporter
My Commission expires July 17, 2009
DATE: August 31, 2006
IN RE: Commonwealth v. IDC Properties
WITNESS NAME: Michael Mellion

# EXHIBIT N

EXHIBIT A

EDWARDS & ANGELL
A Partnership Including Professional Corporations

COUNSELLORS AT LAW
since 1894

Timothy T. More
Direct Dial: (401) 276-6539
Tmore@ealaw.com

2700 HOSPITAL TRUST TOWER
PROVIDENCE, RI 02903-2499
(401) 274-9200
FAX (401) 276-6611



12/12/97

December 4, 1997

1.88K Premium

Michael Mellion, Esq.
Commonwealth Land Title Insurance Company
7 Thurber Boulevard
Smithfield, RI 02917

RE: Goat Island/North Development Unit

Dear Michael:

IDC would like to purchase approximately $5,000,000 in title insurance on the North Development Unit. Enclosed is a memorandum regarding the development rights (which IDS would like to have insurance on) and copies of the declaration and various amendments.

What would the cost be. If you could give me a reasonably quick response, I would be appreciative.

Very truly yours,

Timothy T. More

Enclosures

# EXHIBIT O

Medeiros Karmen + Sanford Inc.
One Turks Head Place, Suite 700
Providence, Rhode Island 02903-2215
Telephone 401 831-0700
Fax 401 274-2752 or 861-7249

Medeiros
Karmen
Sanford

December 10, 1997

VIA HAND DELIVERY

Timothy T. More, Esq.
Edwards & Angell
2700 Hospital Trust Tower
Providence, RI 02903

**Re: Goat Island South Condominium**

Dear Tim:

tolling agreement may not protect rights of individual unit owners

The unit owners associations' for Goat Island South Condominium have considered your client's proposal for mediation of this dispute, in an attempt to avoid the litigation that otherwise would be inevitable. I have recommended, and my clients have agreed, to participate in good faith in mediation, on the following conditions:

(1) A Tolling Agreement, in a form substantially similar to that which I have enclosed, is executed by each signatory on or before December 31, 1997. IDC Properties, Inc. shall undertake the effort to obtain the signature of Globe Manufacturing Co. If, however, Globe does not sign the Tolling Agreement on or before the 31st of December, the Association shall file a complaint against Globe to eliminate a potential statute of limitations issue that otherwise might arise in January 1998.

(2) IDC and/or Mr. Roos shall bear the expenses associated in utilizing the mediation process, including the mediator's fee. I am told that Mr. Roos has already agreed to this condition.

EX. 8
9-26-02

Matthew F. Medeiros
Robert Karmen
Paul M. Sanford
Fausto C. Anguilla
Stacey P. Nakasian
Mary Beth Furia
Owen S. Mudge, Jr.

(3) The Association shall have full and free access to all documents relevant to the matters at issue in the mediation.

may need two mediators (4) The person to be selected jointly by the parties shall be a professional mediator.

Unfortunately, I am scheduled to undergo surgery tomorrow and will be unavailable for a couple of weeks. Therefore, please call Mary Beth Furia, who is an associate in my office, once you have had occasion to consider these issues. In the meantime, it is my understanding that Mr. Morrissette and Mr. Roos may be having additional discussions directly along these lines.

Sincerely yours,

Matthew F. Medeiros

Enclosure
MFM/rls/ml/ir

cc: Mr. Raymond J. Morrissette (w/encl.)

# EXHIBIT P

EXHIBIT H

TOLLING AGREEMENT

Upon the exchange of mutual consideration, receipt of which is hereby acknowledged, the parties agree that:

1. In the event that the condominium unit owners' association of (i) Goat Island South - A Waterfront Condominium, (ii) the America Condominium, (iii) the Capella South Condominium and/or (iv) the Harbor Houses Condominium (collectively, the "Associations"), being associations of unit owners for condominiums located on Goat Island, in the City of Newport, State of Rhode Island (collectively, the "Condominiums"), and/or any individual unit owner who is a member of any of the Associations ("Unit Owner"), shall file on or before June 30, 1998, or such earlier date as provided in section 3 hereof in the event of termination of this agreement, an action, suit, proceeding at law or in equity, or otherwise assert any claim against (i) IDC Properties, Inc., (ii) IDC, Inc., (iii) Island Development Corp., and/or (iv) Thomas R. Roos (collectively, the "Declarants") in any way relating to or arising from (i) any of the documents, including amendments, pursuant to which the Condominiums were created and/or are governed, maintained and organized, (ii) the procedure by which the Associations have and/or will adopt amendments to the Condominiums' respective declarations and by-laws, (iii) the Declarants' special declarant rights and special development rights, (iv) the allocation of common element expenses in the Condominiums, (v) any allegations, including allegations previously communicated in writing, as to the condition of the Condominiums and any construction, repair and improvements relating to the Condominiums, or (vi) the parties' respective interpretation of the

18546-1

PLAINTIFF'S EXHIBIT NO. 12 FOR IDENTIFICATION DATE 1/7/03 RPTR JP

Rhode Island Condominium Act, such action, suit, proceeding at law or in equity and/or claim shall be deemed to have been commenced, filed and served, for purposes of statute of limitations, laches, waiver, estoppel or similar defenses, on December 1, 1997.

2. The parties further agreement that they shall not file against the other any legal action contemplated by this agreement in a court of law so long as this agreement remains in effect. This Tolling Agreement does not preclude the Associations or any Unit Owner from initiating any action, suit, proceeding at law or in equity, and/or otherwise assert any claim against Globe Manufacturing Co.

3. This agreement may be terminated by any of the parties at any time upon 45 days prior written notice, in which case any action, suit, proceeding at law or in equity and/or claim filed by any Association or Unit Owner shall be deemed to have been commenced, filed and served on December 1, 1997, provided such action, suit, proceeding at law or in equity and/or claim is commenced within such 45-day period.

4. Written notice terminating this agreement shall be served via registered mail by the United States Postal Service to each of the following individuals at the addresses provided below.

Mr. Thomas R. Roos
c/o IDC, Inc.
1116 Capella - Goat Island
Newport, RI 02840

Timothy Moro, Esq.
Edwards & Angell
2700 Hospital Trust Tower
Providence, RI 02903

Turner Scott, Esq.
Miller, Scott, Howe & Kelly
122 Touro Street
Newport, RI 02840

Mr. Raymond J. Morrissette
America Unit #308
Goat Island
Newport, RI 02840

Dr. Philip Schub
147 Highland Street
Cheshire, CT 06410

and

Matthew F. Medeiros, Esq.
Medeiros Karmon + Sanford Inc.
One Turks Head Place, Suite 700
Providence, RI 02903

5. This Tolling Agreement shall be binding on the successors, representatives, employees, heirs and assigns of the parties hereto.

6. Nothing herein shall be deemed to waive any other right or any defense which any party hereto may have nor be deemed an admission or assertion of liability by any party hereto.

7. Each signatory hereto warrants and represents that he is unconditionally authorized to execute this Tolling Agreement on behalf of his respective entity, that he fully understands and approves the terms of this Tolling Agreement, and that he has received the consent of any insurer or other person whose rights might be affected thereby.

IN WITNESS WHEREOF, the undersigned have executed this agreement as of the 5 th day of January, 1998.

IDC PROPERTIES, INC.

By: ______________________

IDC, INC.

By: ______________________

ISLAND DEVELOPMENT CORP.

By: ______________________

______________________
THOMAS R. ROOS, Individually

GOAT ISLAND SOUTH CONDOMINIUM ASSOCIATION, INC.

By: ______________________

AMERICA CONDOMINIUM ASSOCIATION, INC.

By: ______________________

CAPELLA SOUTH CONDOMINIUM
ASSOCIATION, INC.

By: ______________________

HARBOR HOUSES CONDOMINIUM
ASSOCIATION, INC.

By: ______________________

# EXHIBIT Q

COMMONWEALTH LAND TITLE INSURANCE COMPANY
Seven Thurber Blvd. | Smithfield, RI 02917 | 401-233-2900 | fax 401-233-0099

**Commonwealth**

PLAINTIFF'S
EXHIBIT NO. 11
FOR IDENTIFICATION
DATE: 1/7/03 RPTR. JP

December 12, 1997

VIA FAX TO 276-6611
NUMBER OF PAGES: 2

FAXED

Timothy T. More, Esq.
Edwards & Angell
2700 Hospital Trust Plaza
Providence, Rhode Island 02903

RE: Goat Island/North Development Unit
$5,000,000.00 Owner's Policy Insuring Title to North Development Unit and Development Rights to Construct Improvements

Dear Tim:

I am writing to confirm our bid of $1.00 per thousand dollars of liability to issue a $5,000,000.00 Owner's Policy insuring the fee title to the North Development Unit of Goat Island South - A Waterfront Condominium, and the Development Rights to construct improvements on that unit.

In addition to this charge for premiums, our other charges include:

a. **Title Examination:** $150. per each half-day ( which is also the minimum charge); $300.00 per each full day of examination. For example, if the total examination time was a day and half, the charge would be $450.00.

b. **Miscellaneous Charges:**

i. **Copies:** we will bill for reimbursement of actual charges for copies from City Hall.

ii. **Travel:** we will bill $50.00 for each day of travel to Newport.

iii. **Municipal lien certificate:** we will bill $30.00 for obtaining each municipal lien certificate, plus $8.00 each for recording.

iv. **Commitment:** we will bill $100.00 for preparation of a title Commitment.

v. **Legal Review:** In the event that complex title or non-title issues arise that require extraordinary review time, we will bill at the rate of $125.00 per hour.

Due to the year-end rush, we cannot guarantee that will be able to complete a title search before the end of the year. If it is absolutely necessary that this be completed before year-end, please let us know.

If you have any questions about this proposal, please let me know.

Very truly yours,

Michael B. Mellon
Rhode Island State Counsel

MBM:mm

# EXHIBIT R

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COMMONWEALTH LAND TITLE
INSURANCE COMPANY,
Plaintiff

VS.

C.A. NO. 01-400/S

IDC PROPERTIES, INC.,
Defendant

COPY

DEPOSITION OF **MICHAEL B. MELLION, ESQ.**, taken on behalf of the Defendant, pursuant to the Federal Rules of Civil Procedure on Thursday, January 9, 2003 at 10:05 a.m. at the offices of Blish & Cavanagh LLP, 30 Exchange Terrace, Providence, Rhode Island before Linda F. Oakley, RPR, Inc., Notary Public.

APPEARANCES:

PARTRIDGE SNOW & HAHN LLP
BY: STEVEN E. SNOW, ESQ.
BY: ROBERT K. TAYLOR, ESQ.
Counsel for the Plaintiff

BLISH & CAVANAGH LLP
BY: WILLIAM R. LANDRY, ESQ.
Counsel for the Defendant

REPORTING ASSOCIATES
10 Dorrance Street, Suite 617
Providence, RI 02903

whether or not they have expired?
A Well, sure. I want to make sure before
I insure any interest in real estate that it's
a valid interest.
Q And under the condominium act you are aware
that there is a requirement that development
rights be subject to some type of expiration
time period, correct?
A Yes. My recollection is that there is a
requirement that development rights be limited
in time.
Q Okay. And that if development rights
established in a declaration are somehow going
to be changed, that the condominium
association members have to be involved in
that process, correct?
A I'd have to look at the statute again. I know
there are various requirements for extending
or creating or whatever, but I don't recall
them independently.
Q Okay. But if you were in a particular
instance to be asked to evaluate a risk
concerning development rights, I assume that
issues, such as the propriety of votes to
extend rights, were properly handled, correct?

A So you're asking about a situation in which they've been extended?
Q Yes. Or changed.
A I'd have to look at the declaration. And I'd have to look at the statute to see what procedures need to be followed. And then I would attempt to verify that those procedures had been followed.
Q Had you had experience prior to 1997 with disputes between unit owners and developers with respect to the existence of development rights?
MR. SNOW: You being him personally?
MR. LANDRY: Yes.
MR. SNOW: As opposed to the company.
A I don't remember a situation in which I was being asked to evaluate development rights when there was a dispute as to whether they were properly extended or created, et cetera, no.
Q Okay. Do you recall in the course of your professional work, or your work with Commonwealth, being exposed to a situation where unit owners were in litigation with

developers, declarants?
A Well, if that was the situation, then there would be no hope of issuing the policy.
Q If there was litigation?
A Oh, yes.
Q Were you familiar with any instances prior to 1997 of association members or unit owners and declarants being in litigation?
A I don't recall any.
Q In any condominium?
A I don't recall any, no.
Q Would you agree with me that the relationship between declarants slash developers and unit purchasers in condominiums has often been an uneasy relationship?
A I don't have any personal knowledge of that.
Q I want to show you a document that we can mark as Exhibit 1 to this deposition. And ask if you recognize it.
(PHOTOSTATIC COPY OF LETTER ON STATIONERY OF EDWARDS & ANGELL FROM TIMOTHY T. MORE TO MICHAEL MELLION, ESQ. DATED DECEMBER 4, 1997 WAS MARKED DEFENDANT'S EXHIBIT NO. 1, IDENTIFICATION)
A Yes, I recognize that.

Q You recognize that as a copy of the letter you got from Tim More back in December of 1997?
A Yes.
Q Do you recognize the handwritten markings on the exhibit?
A Yes, I do.
Q Whose are those?
A They're mine.
Q Okay. Could you tell me, what is that? A sailboat at the top?
A Ha-ha-ha. Well, I suppose it became a sailboat. I don't know what it started out to be, but it turned into a sailboat.
Q And do you recall what the significance of 12/12 in '97 might be?
A No, as a matter of fact, I don't.
Q How about the other entries below that?
A That's the dollar K. That's a dollar a thousand premium. Exam. I may have been discussing approximate premium cost and what else we charged for. And that's, that's probably why I would have written a note like that is my guess.
Q And would you also have circled the words "regarding the development rights" in the

letter itself?
A Yes. I'm sure I circled that.
Q Do you recall when you made these entries in relation to when you received the letter?
A I don't actually recall, but my guess is that I called him in response to his letter and spoke on the telephone with him. That would be, that's probably the significance of 12/12 is probably when I spoke with him. But, again, that's just a guess.
Q Do you have a present recollection of actually having had a conversation with Mr. More regarding the substance of this letter?
A Actually, I don't have a present recollection of the conversation, no.
Q But you do recall that one most likely occurred?
A Oh, sure. I'm sure we discussed it.
Q So I take it you don't have a present recollection of what you said in that conversation or what Mr. More said?
A I can only assume it was a routine conversation because I think I would have remembered anything that he would have told me about this that would have been out of the

ordinary.

Q Was a request to provide five million dollars in title insurance on development rights something that you would have regarded as out of the ordinary back in December of 1997?

A Well, I think the letter is requiring or requesting five million on the North Development Unit, meaning it's a unit.

Q Had Commonwealth been involved in issuing title insurance with respect to the Goat Island condominiums before 1997?

A I'm not sure. I don't think we insured anything in that area that he was talking about. It's possible we insured some units, residential condominiums that are also on the Island.

Q Okay. Do you have a present recollection of whether that happened or not?

A The residential units?

Q Yes.

A I don't have a present recollection, but my guess is we probably insured a few of them.

Q Okay. Did you become aware as a result of your communications with Mr. More that another title insurance company had insured title to

A Well, I remember Tim sent me a memo, which was his thinking on the issue. I read that memo. I reviewed the statutes, and I reviewed the declaration.
Q Did you do anything else?
A I don't recall doing anything else, other than doing that.
Q Now, the declaration was a very substantial document, was it not?
A It was a complex piece of work, I believe, yes.
Q And did you learn by reviewing that that Goat Island was actually structured as multiple condominiums?
MR. SNOW: Objection to the form of the question. You can answer.
A I think in reviewing the declaration I realized that there were sub-condos created. There was a master condo, I believe, and then there were some sub-condos.
Q Had you ever seen that before in Rhode Island?
A I think Imperial Place is structured similarly to that. It's unusual, I believe.
Q Is this the -- did Imperial Place come before or after 1997?

A Well, I think Imperial Place was created prior to '97.
Q Okay. But, in any event, is it fair to say that it wasn't typical to see a condominium structure that involved a master condominium?
MR. SNOW: Objection to the form of the question. You can answer.
A I hadn't seen many.
Q Had you seen any?
A Imperial Place is the one that I can think of.
Q You recall having had some involvement in that master condominium before 1997?
A We've insured units there.
Q Did you ever insure, did Commonwealth ever insure any development rights there?
A Not to my knowledge.
Q In any event, I take it that when you reviewed the documents, you saw that there was a Goat Island South condominium that included several units, and that there were also three other condominiums established on Goat Island, correct?
MR. SNOW: Objection to the form of the question. You can answer.
A I knew there were other condos. If you're

asking me right now to recite to you what the structure is, I can't do that.
Q Okay.
A I don't have a present recollection.
MR. LANDRY: Let me mark another document as an exhibit. We'll call this Exhibit 2.
(PHOTOSTATIC COPY OF TWO-PAGE MEMORANDUM TO FILE FROM TIMOTHY T. MORE DATED NOVEMBER 17, 1997 WAS MARKED DEFENDANT'S EXHIBIT NO. 2, IDENTIFICATION)
Q I want to give you a chance to review it. But when you're ready, I'm going to ask you if you recognize this document.
(Brief interruption)
Q Do you recognize that?
A Yes, I do.
Q Is that a copy of the memo that Mr. More described in his letter of December 4th, 1997?
A I think it is, yes.
Q And so, this is the Memorandum that you reviewed as part of your assessment of this particular risk?
A Yes.
Q Okay. Now, directing your attention to the

first numbered paragraph, it says the 1994 Amendment. You understood, did you not, that that was an amendment through which the development rights with respect to the North Unit at Goat Island were purportedly extended to 2015, correct?

MR. SNOW: Objection to the form of the question. You can answer.

A Well, that's what it says, yes.

Q Okay. And you also knew from reading that, did you not, that there was a potential issue as to whether or not the proper votes had been taken to extend those development rights to 2015?

MR. SNOW: Objection to the form of the question. You can answer.

A Would you repeat the question or read back the question?

Q You knew, from reviewing this paragraph of the Memorandum, that there was a potential legal question as to whether or not the proper votes had been taken to extend the development rights to 2015?

MR. SNOW: Objection to the form of the question.

A Well, it's clear that Tim had some questions about it 'cause he wrote about it in here.
Q Well, in fact, beginning on the fifth line of that first numbered paragraph he wrote, did he not, that, "Because IDC controlled the Boards of each of the sub-associations one may question whether the vote of the sub-associations is invalid." Do you recall reading that?
A Yeah.
Q Do you recall considering the risk presented by that particular observation?
A Well, it seems totally theoretical. I mean, if no one is actually questioning it, then it's not an issue. If one is conducting a dry analysis, hypothetically, which is what it appears to me to be here, --
Q Is that how Commonwealth goes about evaluating risks? Whether or not there's somebody out there that's actually raising an issue?
A Oh, absolutely.
Q As opposed to whether an issue existed?
A Oh, absolutely. I always want to know that.
MR. SNOW: Objection to the form of the question.

Q Pardon me?
A I always want to know that.
Q Is that the only thing you want to know?
A That's enough.
Q That's enough for you?
A Oh, yes. I may totally agree with someone's opinion, but I know if there's someone out there challenging it, I'm not going to insure that title.
Q Well, is the legal risk, apart from whether there's a potential plaintiff associated with that risk, something that's relevant to Commonwealth and its analysis of risk?
MR. SNOW: Objection to the form of the question. You can answer.
A If I'm evaluating a particular title and I see a legal question, I can choose to accept, based on a legal risk, choose to accept that or discount it, or say that there's no likelihood that someone will challenge it if they're trying to assess whether it's an acceptable risk. So if I look at a defect in a deed, for instance, I have to determine whether I think that could result in a real problem or not. And there are many factors to

consider in doing that.
Q Okay. One of those factors is whether or not the statute of limitations has expired, correct?
A Well, it depends what the issue is. There might be a statute that says after twenty years a restriction is invalid; and it's been thirty years since the restriction, so I can rely upon the statute.
Q Right. And there is a statute in Rhode Island that says that votes taken by condominium associations have to be challenged within one year of when they're taken, correct?
A I won't dispute your characterization of that. I don't recall that, that actual statute, but I'm sure there's something like that in the General Laws.
Q Well, let's keep reading the first paragraph. After Mr. More raised the question of whether the vote of the sub-association might be invalid, he went on to point out, did he not, that, "Even if the amendment is invalid, there is a one-year statute of limitations in the Condominium Act for challenging the validity of an amendment to a Declaration adopted by an

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, SC.

BE IT KNOWN that I, Linda F. Oakley, Registered Professional Reporter and Notary Public, reported stenographically the foregoing deposition at the time and place stated in the caption hereof; that I was then and there a Notary Public in and for the State of Rhode Island; that by virtue thereof I was authorized to administer an oath; that the deponent, Michael B. Mellion, Esq., before testifying was duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said witness was transcribed by me; that the foregoing pages, 3 through 55, inclusive, contain a full, true, and correct transcription of the notes of said deposition.

I FURTHER CERTIFY that request was made for review of the transcript by the parties.

I FURTHER CERTIFY that I am not of counsel, nor attorney for either or any of the parties to said action or otherwise interested in the event thereof, and that I am not related to either or any of the parties to said cause.

IN WITNESS WHEREOF I have hereunto subscribed my name and affixed my seal of office this 9th day of January 2003.

Linda F. Oakley

REGISTERED PROFESSIONAL REPORTER
NOTARY PUBLIC

MY COMMISSION EXPIRES:
July 22, 2005

# EXHIBIT S

ISSUED BY
COMMONWEALTH LAND TITLE INSURANCE COMPANY

**Commonwealth**
A LANDAMERICA COMPANY

# OWNER'S POLICY OF TITLE INSURANCE

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, COMMONWEALTH LAND TITLE INSURANCE COMPANY, a Pennsylvania corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured, but only to the extent provided in the Conditions and Stipulations.

IN WITNESS WHEREOF, COMMONWEALTH LAND TITLE INSURANCE COMPANY has caused its corporate name and seal to be hereunto affixed by its duly authorized officers, the Policy to become valid when countersigned by an authorized officer or agent of the Company.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Attest: Wm. Chadwick Perrine, Secretary

By: Janet A. Alpert, President

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the affect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) created, suffered, assumed or agreed to by the insured claimant;

   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

   (c) resulting in no loss or damage to the insured claimant;

   (d) attaching or created subsequent to Date of Policy; or

   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.
4. Any claim, which arises out of the transaction vesting in the Insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

   (a) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or

   (b) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:

   (i) to timely record the instrument of transfer; or

   (ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

# CONDITIONS AND STIPULATIONS

**1. DEFINITION OF TERMS.**

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A, and, subject to any rights or defenses the Company would have had against the named insured, those who succeed to the interest of the named insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a) (iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

**2. CONTINUATION OF INSURANCE AFTER CONVEYANCE OF TITLE.**

The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

**3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.**

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

**4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.**

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

**5. PROOF OF LOSS OR DAMAGE.**

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgement of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim.

**6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.

To pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations to the insured under this policy, other than to make the payment required, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.



Conditions and Stipulations Continued Inside Cover

CONTROL NO. 206-241781

# CONDITIONS AND STIPULATIONS

(Continued)

**7. DETERMINATION, EXTENT OF LIABILITY AND COINSURANCE.**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A; or,

(ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the Amount of Insurance stated in Schedule A at the Date of Policy is less than 80 percent of the value of the insured estate or interest or the full consideration paid for the land, whichever is less, or if subsequent to the Date of Policy an improvement is erected on the land which increases the value of the insured estate or interest by at least 20 percent over the Amount of Insurance stated in Schedule A, then this Policy is subject to the following:

(i) where no subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that the amount of insurance at Date of Policy bears to the total value of the insured estate or interest at Date of Policy; or

(ii) where a subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that 120 percent of the Amount of Insurance stated in Schedule A bears to the sum of the Amount of Insurance stated in Schedule A and the amount expended for the improvement.

The provisions of this paragraph shall not apply to costs, attorneys' fees and expenses for which the Company is liable under this policy, and shall only apply to that portion of any loss which exceeds, in the aggregate, 10 percent of the Amount of Insurance stated in Schedule A.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

**8. APPORTIONMENT.**

If the land described in Schedule A consists of two or more parcels which are not used as a single site, and a loss is established affecting one or more of the parcels but not all, the loss shall be computed and settled on a pro rata basis as if the amount of insurance under this policy was divided pro rata as to the value on Date of Policy of each separate parcel to the whole, exclusive of any improvements made subsequent to Date of Policy, unless a liability or value has otherwise been agreed upon as to each parcel by the Company and the insured at the time of the issuance of this policy and shown by an express statement or by an endorsement attached to this policy.

**9. LIMITATION OF LIABILITY.**

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

**10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.**

All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto.

**11. LIABILITY NONCUMULATIVE**

It is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy to the insured owner.

**12. PAYMENT OF LOSS.**

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

**13. SUBROGATION UPON PAYMENT OR SETTLEMENT.**

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to these rights and remedies in the proportion which the Company's payment bears to the whole amount of the loss.

If loss should result from any act of the insured claimant, as stated above, that act shall not void this policy, but the Company, in that event, shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(b) The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

**14. ARBITRATION**

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

**15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.**

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

**16. SEVERABILITY.**

In the event any provision of the policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

**17. NOTICES, WHERE SENT.**

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to: Consumer Affairs Department, P.O. Box 27567, Richmond, Virginia 23261-7567.

# OWNER'S POLICY OF TITLE INSURANCE (10-17-92)

AMERICAN LAND TITLE ASSOCIATION

ISSUED BY
COMMONWEALTH LAND TITLE INSURANCE COMPANY

Commonwealth
A LANDAMERICA COMPANY

Title Insurance Since 1876

HOME OFFICE:
101 Gateway Centre Parkway, Gateway One
Richmond, Virginia 23235-5153

B 1190-3

## A WORD OF THANKS .....

As we make your policy a part of our permanent records, we want to express our appreciation of this evidence of your faith in Commonwealth Land Title Insurance Company.

There is no recurring premium.

This policy provides valuable title protection and we suggest you keep it in a safe place where it will be readily available for future reference.

If you have any questions about the protection provided by this policy, contact the office that issued your policy or you may write to:

Consumer Affairs Department

**Commonwealth Land Title Insurance Company**

P.O. Box 27567
Richmond, Virginia 23261-7567
TOLL FREE NUMBER: 1-800-446-7086

Commonwealth

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Owner's Title Insurance Policy
Schedule A

Policy No. 228716
File No. 228716
Order No. 228716

Amount of Insurance: $7,000,000.00

Premium: Standard Rates

Date and Time of Policy: January 13, 1998 at 9:00 A.M.

1. Name of Insured:

IDC Properties, Inc., a Rhode Island corporation

2. Your interest in the land referred to in this policy is FEE SIMPLE.

3. The land referred to in this policy is situated in the City of Newport, County of Newport, State of Rhode Island, and is identified in accordance with Exhibit A attached hereto and made a part hereof.

PROPERTY ADDRESS: North Development Unit, Goat Island South - A Waterfront Condominium

NOTE: This property address has been included for the Company's indexing purposes only. This policy does not insure against loss or damage by reason of any inaccuracy in this address, or by reason of any failure to include an address.

Countersigned: ______________________________

Authorized Officer or Agent: Michael B. Mellion

This Policy is Valid Only If Schedule B, Face Page and Cover page Are Attached

Exhibit A

Policy No: 228716
File No. 228716
Order No. 228716

Parcel 1

ALL THAT CERTAIN lot or parcel of land with all the buildings and improvements thereon being designated as NORTH DEVELOPMENT UNIT as set forth on that certain plan entitled, "MASTER PLAN GOAT ISLAND SOUTH-A WATERFRONT CONDOMINIUM PROJECT NO. 870219 SCALE 1"=100' DATED 9/1987 BOARDMAN ASSOCIATES 1028 East Main Road PORTSMOUTH, RI 02871 1 of 19 SHTS", revision dated 12/22/94, bounded and described as follows:

BEGINNING at a point describing the northeast corner of the Master Common Elements Reserved Area, the property herein described in the County and City of Newport, Rhode Island;

THENCE proceeding southerly 50.00 feet to a corner, bounded easterly in part by Master Common Elements, in part by the Goat Island Causeway, and again in part by Master Common Elements;

THENCE turning an interior angle of 147°14'29" and proceeding southwesterly 74.39 feet to a corner, bounded southeasterly by Master Common Elements;

THENCE turning an interior angle of 214°56'45" and proceeding southerly 379.95 feet to a corner, bounded easterly by Master Common Elements;

THENCE turning an interior angle of 179°39'37" and proceeding southerly 857.73 feet to a corner, bounded easterly by Master Common Elements;

THENCE turning an interior angle of 87°30'07" and proceeding westerly 20.03 feet to a corner;

THENCE turning an interior angle of 174°03'56" and proceeding westerly 433.65 feet to a corner;

THE two above described courses being bounded southerly by Master Common Elements;

THENCE turning an interior angle of 87°58'52" and proceeding northeasterly 354.97 feet along the face of a seawall;

THENCE turning an interior angle of 174°32'13" and proceeding northeasterly 206.49 feet to a corner;

Exhibit A

Policy No: 228716
File No. 228716
Order No. 228716

THENCE turning an interior angle of 207°27'25" and proceeding northerly 244.38 feet to a corner;

THE three above described courses being bounded westerly by Narragansett Bay East Passage.

THENCE turning an interior angle of 86°17'02" and proceeding easterly 330.39 feet to a corner, bounded northerly by land now or formerly of GOAT ISLAND PT REALTY CORP. (Hotel Parcel);

THENCE turning an interior angle of 270°00'00" and proceeding northerly 493.15 feet to a corner, bounded westerly by land now or formerly of GOAT ISLAND PT REALTY CORP. (Hotel Parcel);

THENCE turning an interior angle of 87°49'31" and proceeding easterly 59.42 feet to a point and place of beginning, bounded northerly by land now or formerly of GOAT ISLAND PT REALTY CORP. (Hotel Parcel);

SAID last course making an interior angle of 90°00'00" with the first above described course.

Parcel 2

The Special Declarant's Right, through the Termination Date as defined in the Fifth Amendment to First Amended and Restated Declaration of Condominium dated December 29, 1994 and recorded December 29, 1994 at 3:12 P.M. in Book 669 at Page 317, to construct improvements on the North Development Unit.

Parcel 3

The right of a Declarant, in said Declarant's capacity as Owner as that term is defined in Article 1.27 of the First Amended and Restated Declaration of Goat Island South - A Waterfront Condominium, to exercise the right granted to an Owner in Article 2.3(b) in said Declaration to construct buildings and other improvements on the North Development Unit.

Owner's Title Insurance Policy
Schedule B - Exceptions

Policy No: 228716
File No. 228716
Order No. 228716

This policy does not insure against loss or damage by reason of the following:

1. Rights or claims of parties other than insured in actual possession of any or all of the land.
2. Unrecorded easements, discrepancies or conflicts in boundary lines, shortage in area and encroachments which an accurate and complete survey would disclose.
3. Unfiled mechanics' or materialmen's liens.
4. Riparian rights of others in and to the water of any stream and/or rivers lying along and/or crossing the land.
5. IF THE LAND IS A CONDOMINIUM UNIT SITUATED IN RHODE ISLAND:
(a) Terms and provisions as set forth in the Declaration of Condominium and By-Laws as recorded, as the same may be amended.
(b)Terms and provisions of the Condominium Ownership Act, R.I.G.L. Sec. 34-36-1, as amended, and/or the Rhode Island Condominium Act, R.I.G.L. Sec. 34-36.1-1.01, as amended.
6. IF THE LAND IS SUBJECT TO ANY RECORDED COVENANTS, CONDITIONS, AND/OR RESTRICTIONS: Any provision in any recorded covenants, conditions and restrictions which indicate any preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin are hereby deleted.
7. Taxes and Assessments (including Liens not yet due and payable) as follows:

    a. Any unpaid taxes.
    b. Water and sewer charges heretofore and hereafter assessed.

8. Rights and obligations as set forth in decisions of the City of Newport and the Rhode Island Coastal Resources Management Council regarding the Goat Island Connector and Causeway, a public right of way, recorded in Book 399 at Page 499 and in Book 389 at Page 501.

9. Rights of the public and the of the State of Rhode Island in and to that part of the land presently lying under the waters of Narragansett Bay.

10. Rights of the United States government to change and alter the harbor, bulkhead or pierhead lines adjacent to the land, and to establish harbor, bulkhead or pierhead lines different from the present lines.

11. Rights of the United States government, the State of Rhode Island and the City of Newport, or any of their departments or agencies, to regulate and control the use of the piers, bulkheads, and land presently under water.

12. Land Disposition Agreement by and between the Redevelopment Agency of Newport, Rhode Island and Island Development Corporation recorded in Book 224 at Page 506, as amended in Book 243 at Page 721.

13. Four hundred (400) square foot easement granted for the Goad Island Light together with the necessary right of ingress and egress through Goat Island to maintain said Light, and easement to maintain power lines thereto, as referenced in the deed from the United States of America to The Redevelopment Agency of Newport recorded in Book 211 at Page 286.

## Owner's Title Insurance Policy
## Schedule B - Exceptions

Policy No: 228716
File No. 228716
Order No. 228716

14. Easement to pass and repass for purpose of maintaining causeway as described in the deed from the Redevelopment Agency of Newport to the City of Newport recorded in Book 224 at Page 502.

15. Restrictions contained in deed from the Redevelopment Agency of Newport to Island Development Corp. recorded in Book 224 at Page 576.

16. Easement granted to the City of Newport for vehicular and pedestrian usage recorded in Book 243 at Page 686.

17. Easements to Newport Electric Company recorded in Book 431 at Page 448 and in Book 431 at Page 452.

18. Terms and provisions of the Declaration creating Goat Island South - A Waterfront Condominium dated January 12, 1988 and recorded January 20, 1988 at 3:26 P.M. in Book 115 at Page 138, as amended by the following amendments:
    a. First Amended and Restated Declaration of Condominium, Goat Island South - A Waterfront Condominium dated March 3, 1988 and recorded March 4, 1988 at 11:54 A.M. in Book 118 at Page 303;
    b. First Amendment to First Amended and Restated Declaration of Condominium dated May 31, 1991 and recorded May 31, 1991 at 3:54 P.M. 505 at Page 359;
    c. Second Amendment to First Amended and Restated Declaration of Condominium dated as of June 20, 1991 and recorded April 28, 1992 at 10:30 A.M. in Book 543 at Page 229;
    d. Third Amendment to First Amended and Restated Declaration of Condominium dated as of April 27, 1994 and recorded June 13, 1994 at 3:35 P.M. in Book 645 at Page 379;
    e. Fourth Amendment to First Amended and Restated Declaration of Condominium dated as of November 15, 1994 and recorded December 23, 1994 at 2:08 P.M. in Book 669 at Page 190;
    f. Fifth Amendment to First Amended and Restated Declaration of Condominium dated December 29, 1994 and recorded December 29, 1994 at 3:12 P.M. in Book 669 at Page 317;
    g. Sixth Amendment to First Amended and Restated Declaration of Condominium dated December 29, 1994 and recorded December 29, 1994 at 3:13 P.M. in Book 669 at Page 328;
    h. Seventh Amendment to First Amended and Restated Declaration of Condominium dated as of July 20, 1995 and recorded July 8, 1996 at 3:37 P.M. in Book 731 at Page 222; and
    i. Eighth Amendment to First Amended and Restated Declaration of Condominium dated as of August 20, 1997 and recorded September 3, 1997 at 11:50 A.M. in Book 776 at Page 17.

19. Terms and provisions of the Rhode Island Condominium Act, R.I.G.L. § 34-36.1-1.01, et seq., as amended.

20. Terms and conditions of Assent by the Rhode Island Coastal Resources Management Council recorded in Book 593 at Page 258.

21. Terms and conditions of Lease by and between Island Development Corp., as Lessor, and Mac-Gray Company, Inc., as Lessee, as evidenced by Notice of Lease recorded in Book 612 at Page 42, as amended in Book 636 at Page 233.

Owner's Title Insurance Policy
Schedule B - Exceptions

Policy No: 228716
File No. 228716
Order No. 228716

22. Lease, Option and Easement Agreement by and between IDC Marina, Inc. and Goat Island PT Realty Corp. dated October 19, 1994 and recorded October 21, 1994 at 3:14 P.M. in Book 661 at Page 47.

23. Reservation contained in deed dated October 26, 1983 and recorded in Book 304 at Page 911.

24. Terms and conditions as set forth in deed from Island Development Corp. to I.D.C., Inc. recorded in Book 661 at Page 2.

25. Terms and conditions as set forth in Deed from I.D.C., Inc. to IDC Properties, Inc. recorded in Book 661 at Page 170.

26. Terms and conditions of Easement Agreement by and between Goat Island South Condominium Association, Inc., Goat Island Realty Corp. and IDC Properties, Inc. dated as of November 15, 1994 and recorded December 2, 1994 at 3:49 P.M. in Book 666 at Page 429.

27. Terms and conditions of Consent and Release by between Goat Island South Condominium Association, Inc. dated as of November 15, 1994 and recorded December 5, 1994 at 3:54 P.M. in Book 666 at Page 497.

28. The following conditions shown on that certain plan entitled "Survey Map North Development Unit Goat Island South - A Waterfront Condominium Boardman Associates Project No. 870219 Scale 1" = 60' Date 9/1987" and recorded December 29, 1994 at 3:16 P.M.:

    a. Parking easement of 71,535 square feet along easterly boundary of land;
    b. Two 10' easement areas;
    c. Helipad easement;
    d. Easement for dock storage and maintenance.

# EXHIBIT T

Seven Thurber Boulevard | Smithfield, RI 02917-1854 | 401-233-2900 | fax 401-233-0099

**Commonwealth**

February 2, 1998

Timothy T. More, Esq.
Edwards & Angell
2700 Hospital Trust Plaza
Providence, Rhode Island 02903

COPY

RE: IDC Properties, Inc.
North Development Unit, Goat Island South - A Waterfront Condominium
Our File No. 228716

Dear Tim:

Enclosed is our Owner's Policy No. 228716 insuring the title of IDC Properties, Inc. to the North Development Unit of Goat Island South - A Waterfront Condominium, as well as the special declarant's right to construct improvements on this unit. I was unable to obtain any tax or water and sewer information on this land, because, according to my examiner, the City of Newport still has this land located within the common area of the Condominium. Until development occurs, the City will not distinguish this as a separate lot, again according to what my examiner was told.

I have also enclosed our invoice for premium and services rendered in connection with the issuance of this policy.

Please hold this policy in escrow until such time as our invoice has been paid, after which you may deliver it to the insured.

Of course, please call with any questions or comments on these enclosures.

Very truly yours,

Michael B. Mellion
Rhode Island State Counsel

PLAINTIFF'S EXHIBIT NO 13 FOR IDENTIFICATION DATE 1/7/03 RPTR JP

MBM:mm
Enclosures

# EXHIBIT U

# FAX

**Commonwealth**

Seven Thurber Boulevard
Smithfield, Rhode Island 02917-1859

**Date:** March 1, 1999

**Number of Pages:** 4

FAXED

| | |
|---|---|
| **To:** | **Timothy T. More, Esq.** |
| | **Edwards & Angell** |
| **Phone:** | **276-6539** |
| **Fax:** | **351-5444** |

| | |
|---|---|
| **From:** | Michael B. Mellion |
| | R.I. State Counsel |
| **Phone:** | (401) 233-2900 Ext. 701 |
| **Toll Free:** | (800) 284-9009 |
| **Direct Fax:** | (401) 233-9670 |
| **Branch Fax:** | (401) 233-0099 |

**REMARKS:**

RE: Goat Island South - Our File No. 228716

Tim:

Enclosed are copies of a pro-forma Endorsement to the Owner's Policy adding the two units, and our invoice. I would like to discuss the Endorsement with you.

DEFENDANT'S EXHIBIT
23-Mellion
8/31/06

*This facsimile contains privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this facsimile is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have received this facsimile in error, please call us immediately. Thank You.*

Commonwealth

COMMONWEALTH LAND TITLE INSURANCE COMPANY

EXHIBIT D

DEFENDANT'S EXHIBIT 25 - Mellion 8/31/06 Fuller

Endorsement

Policy No.: 228716
File No.: 228716
Order No.: 228716

To be annexed to and form a part of Policy No. 228716 insuring I.D.C. Properties, Inc as set forth in said Policy .

The said Policy is hereby amended in the following manner:

SCHEDULE A

**Amount of Insurance:** The Amount of Insurance is hereby increased to $12,000,000.00.

**Date and Time of Policy:** The Date and Time of Policy is hereby changed to February 7, 1999 at 9:00 A.M.

**Item 3:** Exhibit A is hereby amended by the addition of Parcels 4 and 5 as set forth in Exhibit A -1 attached hereto and made a part hereof.

SCHEDULE B

**Item 29** is hereby added as follows:

29. Any claim or question arising out of the fact that Development Unit #1 and Individual Unit are not separately assessed for real estate taxation by the Newport Tax Assessor.

The total liability of the Company under said Commitment/Policy and any endorsements attached thereto shal not exceed, in the aggregate, the face amount of said Commitment/Policy and costs which the Company is obligated under the provisions of said commitment/policy to pay.

This endorsement is made a part of said Commitment/Policy and is subject to the exclusions, schedules, endorsements, conditions, stipulations and terms thereof, except as modified by the provisions hereof.

Nothing herein contained shall be construed as extending or changing the effective date of said Commitment /Policy, unless otherwise expressly stated.

**In Witness Whereof Commonwealth Land Title Insurance Company** has caused its corporate name to be hereunto affixed by its duly authorized officer or agent on the 1st day of March, 1999.

**Commonwealth Land Title Insurance Company**

By:____________________________________

Authorized Officer or Agent: Michael B. Mellion

Exhibit A-1

Policy No. 228716
File No. 228716
Order No. 228716

Parcel 4

Development Unit #1 within Goat Island South - A Waterfront Condominium in the City of Newport, County of Newport, State of Rhode Island created by the Declaration of Condominium of Goat Island South - A Waterfront Condominium dated January 12, 1988 and recorded in the Land Evidence Records of the City of Newport on January 20, 1988 at 3:26 P.M. in Book 135 at Page 138, as amended.

Parcel 5

Individual Unit within Goat Island South - A Waterfront Condominium in the City of Newport, County of Newport, State of Rhode Island created by the Declaration of Condominium of Goat Island South - A Waterfront Condominium dated January 12, 1988 and recorded in the Land Evidence Records of the City of Newport on January 20, 1988 at 3:26 P.M. in Book 135 at Page 138, as amended.

# EXHIBIT V

Timothy T. More
Direct Dial: (401) 276-6539
Email: Tmore@ealaw.com

July 20, 2006

Letter was prepared June 14, 2000

William Landry, Esq.
Blish & Cavanagh
30 Exchange Terrace
Providence, RI 02903-1765

RE: Goat Island

Dear Bill:

I have seen a recent decision of Judge Thunberg which rewrote a lease based upon her perceptions of fairness. Accordingly, my two cents are:

1. Stress the right to build as a unit owner.

2. Stress the basic elements of real estate in relation to the right to build, i.e., the condominium act allows restrictions on the common law/constitutional right to build. This would remove some of the "tax code" like discussions.

3. Downplay the extension of development right issues which I believe are losers legally, which make IDC appear overbearing and which may confuse the judge as to the winning issue. .

To my mind, IDC's winning argument is quite simple. The risk is that the judge decides that IDC is overbearing and gets lost in the 100 pages of memoranda with the result that the judge decides to punish IDC.

Very truly yours,

Timothy T. More

STATE OF RHODE ISLAND
NEWPORT, Sc.

SUPERIOR COURT

AMERICA CONDOMINIUM ASSOCIATION, INC., CAPELLA SOUTH CONDOMINIUM ASSOCIATION, INC. and HARBOR HOUSES CONDOMINIUM ASSOCIATION, INC.,
Plaintiffs

v.

IDC, INC., IDC PROPERTIES, INC., and THOMAS R. ROOS,
Defendants

C.A. No. NC 99-232

PARTIAL JUDGMENT

In the above matter, it is hereby declared and adjudged, pursuant to Rules 54(b) and 57 of the Rules of Procedure, that:

1. Plaintiffs' motion for partial summary judgment is granted as follows: Based on the controlling statutes and condominium documents, defendants' purported extensions of its development rights are annulled. The Third, Fourth and Fifth Amendments to the First Amended Goat Island South Condominium Declaration lacked the unanimous consent of the unit owners, and thus were not adopted in accordance with R.I.G.L. §34-36.1-2.17, and are void ab initio and have been recorded ultra vires. Therefore:

a) Defendants' development rights on Goat Island have expired.

b) Defendants' alleged voting rights as exercised are null and void.

c) The Master Association is without the legal authority to act on behalf of the unit owners, as it did in adopting the Third, Fourth and Fifth

Amendments.

2. Defendants' Motion For Partial Summary Judgment is denied.

ENTER: BY ORDER:

________________________ ________________________

Presented by:

________________________

William R. Landry #2494
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903-1765
Telephone: (401) 831-8900
Telecopy: (401) 490-7640

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2001, a true copy of the within document was forwarded by telecopy to counsel of record, as follows:

Michael P. DeFanti, Esq.
Charles Blackman, Esq.
Hinckley, Allen & Snyder
1500 Fleet Center
Providence, RI 02903

________________________

idc1504.prj