UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| COMMONWEALTH LAND TITLE INSURANCE COMPANY, Plaintiff, | |
| v. | Civil Action No. 01-400 T |
| IDC PROPERTIES, INC., Defendant and Third Party Plaintiff | |
| v. | |
| TIMOTHY MORE, and EDWARDS ANGELL PALMER DODGE LLP Third Party Defendants. | |

AFFIDAVIT OF COUNSEL APPENDING EXHIBITS IN OPPOSITION TO MOTIONS OF PLAINTIFF AND THIRD PARTY DEFENDANT FOR SUMMARY JUDGMENT

I, Peter J. Haley, on oath, do depose and state that:

1. I am an attorney in good standing. I represent the Defendant and Third Party Plaintiff IDC Properties, Inc., in this action. I make this affidavit to submit to the Court, copies of pleadings, exhibits, transcripts and documents produced by the parties in this case, in connection with the opposition of IDC Properties to the motions for summary judgment filed by the Plaintiff and Third Party Defendant. The following exhibits are true and accurate copies:

2. Exhibit A- Deposition Transcript of Timothy More, September 7, 2006.

3. Exhibit B –Deposition Transcript of Michael Mellion, August 31, 2006.

4. Exhibit C- Document produced by Edwards Angell Palmer & Dodge – EA 0002819

5. Exhibit D- Document produced by Edwards Angell Palmer & Dodge – EA 0001425

6. Exhibit E - Document produced by Edwards Angell Palmer & Dodge – EA 0002178-2182.

7. Exhibit F -Deposition Exhibits – T. More Exhibits 10 and 11.

8. Exhibit G- Document produced by Edwards Angell Palmer & Dodge – EA 0003367.

9. Exhibit H- Document produced by Edwards Angell Palmer & Dodge – EA 0001464.

10. Exhibit I -Deposition Exhibit – M. Mellion Exhibit 2.

11. Exhibit J -Deposition Exhibit – M. Mellion Exhibit 14.

12. Exhibit K -Deposition Exhibit – M. Mellion Exhibit 22.

13. Exhibit L- Answers to Interrogatories of Edwards Angell Palmer & Dodge.

14. Exhibit M-Answers to Interrogatories of Timothy More.

15. Exhibit N - Document produced by Edwards Angell Palmer & Dodge – EA 0002221-2224.

16. Exhibit O – Continued Deposition Transcript of Timothy T. More, January 7, 2003.

Signed under the penalties of perjury this ___29th___ of June, 2007.

/s/ Peter J. Haley
Peter J. Haley

P:\Clients\Roos\Newport\Plead\Aff of Counsel sj.doc

**Certification**

I hereby certify that on this 29th day of June, 2007, I served a true and accurate copy of the foregoing upon the following via e-mail.

**Steven E. Snow, Esq. -** ses@psh.coml; tlc@psh.com

**Deming E. Sherman, Esq.**
dsherman@eapdlaw.com

**Peter J. Haley, Esq.** haley@gordonhaley.com; Haggerty@gordonhaley.com; notices@gordonhaley.com

**Stephen F. Gordon, Esq.**
sgordon@gordonhaley.com; haggerty@gordonhaley.com; notices@gordonhaley.com

I hereby certify that on this 29th day of June, 2007, I served a true and accurate copy of the foregoing upon the following via first-class mail.

Beth E. Bookwalter, Esq.
Harold Hestnes, Esq.
**Wilmer Cutler Pickering Hale & Dorr LLP**
60 State Street
Boston, MA 02109

/s/ W. Mark Russo

# EXHIBIT A

UNITED STATES DISTRICT
DISTRICT OF RHODE ISLAND

COMMONWEALTH LAND TITLE INSURANCE COMPANY,
Plaintiff,
VS. C.A. NO. 01-400T
IDC PROPERTIES, INC.,
Defendant and Third Party Plaintiff,
VS.
TIMOTHY MORE, And EDWARDS ANGELL PALMER DODGE, LLP,
Third Party Defendants.

DEPOSITION OF TIMOTHY MORE AND 30(b)6 DEPOSITION FOR EDWARDS ANGELL PALMER & DODGE, LLP, in the above-entitled cause, taken on behalf of the Defendant and Third Party Plaintiff, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of Ferrucci Russo, PC, 55 Pine Street, Providence, Rhode Island, on September 7, 2006, at 10:00 a.m.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RI 02915
(401) 437-3366



APPEARANCES:

For the Plaintiff:
PARTRIDGE SNOW & HAHN, LLP
BY: ROBERT K. TAYLOR, ESQUIRE
180 South Main Street
Providence, RI 02903

For the Defendant and Third Party Plaintiff:
GORDON HALEY, LLP
BY: PETER J. HALEY, ESQUIRE
101 Federal Street
Boston, MA 02110

For the Third Party Defendants:
WILMER CUTLER PICKERING HALE and DORR, LLP
BY: HAROLD HESTNES, ESQUIRE
60 State Street
Boston, MA 02109



INDEX


| WITNESS | PAGE |
|---|---|
| TIMOTHY MORE | |
| Examination by Mr. Haley | 6 |
| Examination by Mr. Taylor | 61 |


EXHIBITS

DEFENDANT AND THIRD PARTY PLAINTIFF


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition of Edwards Angell Palmer Dodge, LLP, 3 pp | 6 |
| 2 | Notice of Deposition of Timothy More, 2 pp | 6 |
| 3 | Correspondence dated 12/4/97 to Michael Mellion from Timothy More, With Enclosure, 3 p | 16 |
| 4 | Memo dated 12/15/97 to Tim Moore From Jeff Meyer, 1 p | 18 |
| 5 | Correspondence dated 12/10/97 to Timothy More with Tolling Agreement, 4 pp | 26 |
| 6 | Tolling Agreement, 5 pp | 29 |
| 7 | Correspondence dated 1/7/98 to Mary Beth Furia from Timothy More with Enclosure, 6 pp | |
| 8 | Correspondence dated 12/5/94 to Timothy More from Stanley Kanter, 3 pp | 31 |
| 9 | Correspondence dated 12/2/94 to Stanley Kanter from Timothy More, 2 pp | 31 |
| 10 | Memorandum dated 9/28/01 to William Landry from Timothy More, 2 pp | 37 |
| 11 | Privileged and Confidential Memorandum To William Landry and Thomas Roos from Timothy More, 1 p | 38 |




EXHIBITS (CONTINUED)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 12 | Correspondence dated 8/23/99 to Thomas Roos from Timothy More, 3 pp | 40 |
| 13 | Correspondence dated 11/3/99 to Thomas Roos from Timothy More, 4 pp | 43 |
| 14 | Correspondence dated 4/14/99 to Timothy More from Michael Mellion, 1 p | 47 |
| 15 | Document entitled Endorsement, 2 pp | 47 |
| 16 | Fax Cover Sheet dated 12/3/98 and Correspondence dated 12/3/98 to Michael Mellion from Timothy More, 2 pp | 49 |
| 17 | Correspondence dated 2/2/99 to Michael Mellion from Timothy More, 1 p | 49 |
| 18 | Copy of Folder Cover No. 34545.0001 and Correspondence dated 2/6/98, 3/8/99 and 3/15/99 to Thomas Roos from Timothy More, 10 pp | 51 |
| 19 | Copies of Invoices dated 12/2/04, 1/5/05, 2/2/05, 4/4/05, 13 pp | 54 |
| 20 | Third Party Complaint and Demand For Trial By Jury, 7 pp | 56 |
| 21 | Answer of Edwards Angell Palmer & Dodge, LLP and Timothy More, 8 pp | 56 |
| 22 | Rhode Island Supreme Court citation America Condominium Association v. IDC, Inc., et al., dated 4/8/05, 9 pp | 59 |


PLAINTIFF'S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 23 | Faxed correspondence dated 3/3/99, 4/5/97, Settlement Agreement, 1997 Tax Bill, 10 pp | 69 |




COPY

(DEPOSITION COMMENCED 10:15 A.M.)
TIMOTHY MORE
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Could you state your full name for the record, please, and spell your last name?
THE WITNESS: Timothy More, M-O-R-E.
MR. HESTNES: Can we establish for the record the usual stipulations?
MR. HALEY: Yes, we'll agree to waive the sealing and the filing of the deposition to the extent that those may be required. We'll agree to reserve all objections except as to the form of the question until the time of trial, and we'll agree to provide the witness with an opportunity to read and sign his deposition.
MR. HESTNES: Before any notary public.
MR. HALEY: Before any notary public.
MR. HESTNES: I would also like at this time to understand that you are granting a full waiver of the attorney/client privilege which would otherwise be vested in IDC with respect to



some of the documents being considered here and perhaps some of the testimony that you seek to elicit from this witness.
MR. HALEY: That's correct. My name is Peter Haley. I represent IDC Properties, Inc., and affirm Mr. Hestnes's statement as to the waiver of the attorney/client privilege by IDC Properties, Inc., is correct. If you could mark that as 1 and that as 2.
(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBITS 1 AND 2 MARKED FOR IDENTIFICATION)
EXAMINATION BY MR. HALEY
**Q. Can you state your name, please?**
A. Timothy More.
**Q. What's your address, Mr. More?**
THE WITNESS: Office?
MR. HALEY: Sure.
A. 50 South Main Street, Providence, Rhode Island.
**Q. I show you a copy of what's been marked as Exhibit Number 1, the Notice of Deposition directed to you in this case, and also a copy of what has been marked as Exhibit 2 which is a Notice of Deposition Pursuant to Rule 30(b)6 of the Federal Rules of Civil Procedure directed to Edwards**



**Angell Palmer & Dodge, LLP, and it's my understanding that you are here to testify on behalf of Edwards, Angell Palmer & Dodge, LLP, in accordance with the notice marked as Exhibit 2; is that correct?**
A. Yes.
**Q. And have you seen the notice before?**
A. No.
**Q. If I could direct your attention to Exhibit A of the notice.**
MR. HESTNES: That is on the 30(b)6?
MR. HALEY: On the 30(b)6, Exhibit 2, the last page -- actually, I apologize. The 30(b)6 is marked as 1, I noticed.
**Q. I just turn your attention to the last page of what's marked Exhibit 1. Have you seen that list before?**
A. No.
**Q. With respect to the items numbered 1 through 7 on Exhibit A, do you have information with respect to those items on behalf of Edwards Angell Palmer & Dodge, LLP?**
MR. HESTNES: Well, to save time --
A. Yes.



MR. HESTNES: To save time, we have made the search of records. Mr. More is no longer with the firm of Edwards & Angell, and we will produce the records pursuant to that subpoena, which are here now.
MR. HALEY: And you have records or documents to produce?
MR. HESTNES: Yes, I do.
MR. HALEY: Great.
MR. HESTNES: These are included as are these which are -- well, let's go off the record for a moment.
MR. HALEY: Sure.
(OFF THE RECORD)
**Q. Mr. More, you had been previously deposed in this action. Have you reviewed those deposition transcripts prior to coming here today?**
A. I reviewed them last evening.
**Q. And are those -- is the testimony that you gave in those depositions true and correct to the best of you knowledge, information and belief?**
A. Yes.
**Q. And is there anything in your testimony that you reviewed that you wish to correct, amend or alter**

Page 9

**in any manner?**
A. No.
**Q. What year did you graduate from law school?**
A. 1970.
**Q. Where did you graduate from?**
A. University of Virginia.
**Q. Where did you go to undergrad?**
A. Yale.
**Q. What year did you graduate from Yale?**
A. '67.
(OFF THE RECORD)
**Q. How are you employed now?**
A. Self-employed.
**Q. As?**
A. As a lawyer.
**Q. Are you admitted to the bar in Rhode Island?**
A. Yes.
**Q. When were you first admitted?**
A. 1970.
**Q. Are you admitted in any other jurisdictions?**
A. Not at the moment.
**Q. Have you previously been admitted in any other jurisdictions?**
A. Florida.

Page 10

**Q. And why did your membership in the Florida bar terminate?**
A. Because I never practiced down there and didn't feel it was worth maintaining the fees to -- or paying the fees to maintain them.
**Q. Are you a member in good standing of the bar in Rhode Island?**
A. Yes.
**Q. Have you ever been the subject of any disciplinary actions, complaints or anything else from the board of -- bar overseers of Rhode Island?**
A. No.
**Q. And how long did you practice at Edwards Angell Palmer & Dodge?**
A. 30 years.
**Q. Did you work for them right out of law school?**
A. Yes.
**Q. What was the reason for your departure?**
A. Reason for my departure was that I was going to go off and form a single practice, and go to part-time graduate school, and that's the basic reason I left.
**Q. And at some point, did you become a partner at Edwards & Angell?**

Page 11

A. Yes.
**Q. When was that?**
A. Around 1976.
**Q. And were you a partner until the time of your departure?**
A. Yes.
**Q. And that was in December of 2000?**
A. Yes.
**Q. And when did you first start representing Thomas Roos and IDC Properties, Inc.?**
A. Somewhere around 1994, to the best of my recollection.
**Q. And when did you stop representing them?**
A. My last representation was a year ago.
**Q. And that was 2005?**
A. I believe so.
**Q. And you represented Mr. Roos individually; is that correct?**
A. No.
**Q. Who did you represent?**
A. IDC Properties.
**Q. And did you also do work for IDC, Inc.?**
A. I might have. I can't remember the distinction between the entities.

Page 12

**Q. And when you say, "The distinction between the entities," what entities are you speaking about?**
A. You mentioned IDC Properties and IDC, Inc.
**Q. How about IDC Marina or IDC Clambake?**
A. I do not believe I have represented them.
**Q. To your knowledge, were they represented by Edwards & Angell?**
A. No, I have no knowledge of that.
MR. HESTNES: You mean that at any time?
MR. HALEY: At any time, yes.
**Q. At some point in 1997, you contacted Chicago Title and Commonwealth Land Title for the purposes of acquiring title insurance on property owned by IDC Properties, Inc., on Goat Island; is that correct?**
A. Yes.
**Q. And how did that come about?**
A. Phone call from Thomas Roos where he asked me whether it would be possible to get insurance primarily on the North Development Unit, and I said it probably would be possible to do so.
**Q. And what other conversations did you have with Mr. Roos at the time about the title insurance?**
A. At that initial conversation, I expect that was

the extent of the conversation. Subsequently, I had a conversation with him regarding how much insurance he wanted, and ultimately, I had a conversation with him telling him that the title insurance would be issued.

**Q. And other than that, did Mr. Roos provide you with any specific instruction or directions with respect to how the title insurance would be acquired?**

A. No, because he wasn't sure that he would be able to get it. He was somewhat surprised at the fact that he could get it.

**Q. And how do you know that?**

A. Just in the nature of the conversation.

**Q. And what about the conversation led you to believe he was surprised he could get it?**

A. Because it was -- his inquiry was more along the lines of, you know, "Gee, could I get title insurance?" I said, "I believe you should be able to get title insurance." So he didn't call up saying, "I want to get title insurance because I know I can get title insurance."

**Q. And do you recall him using the words, "Gee, can I get title insurance," or is that your --**



A. That's my language 10 years after the conversation.

**Q. And do you have any notes or memoranda or anything else which would evidence those conversations?**

A. I have no notes or memorandums on any matter relating to this transaction other than a few letters which Mr. Hestnes has provided to me.

**Q. And had you procured title insurance for your clients before in the course of your practice?**

A. Yes.

MR. HESTNES: Any clients?

MR. HALEY: Any clients.

A. Yes.

**Q. And how frequently had you done that?**

A. Oh, maybe three or four times a year.

**Q. And is it something you considered yourself experienced in?**

A. Yes.

**Q. And with respect to procuring title insurance, what was it that you understood your obligations as the attorney looking for title insurance to be?**

A. The client asked for title insurance. My objective is to obtain title insurance.

**Q. And with respect to the relationship between you**



**and the title insurance company, how does that process work? Was there a written application?**

A. No. I mean, I sent a letter to --

MR. HESTNES: Is this just in general or applied to any of the transactions here now?

MR. HALEY: Just in general.

A. In general, there is no application form.

**Q. And other than making the phone call, is there anything else required of you in making the application for title insurance?**

A. No.

**Q. And with respect to the information required by the title insurance company, what is your understanding of what your obligations are with respect to providing them with information concerning the property?**

MR. TAYLOR: Objection to the form, time frame.

A. The title policies -- in some situations, title companies issue commitment letters, and sometimes they don't issue commitment letters. They just issue the policy. If the commitment is issued, then the commitment normally has certain requirements that the title company wants to see



satisfied before they'll issue a policy. It may be providing corporation documents. It may be providing a corporate vote. It may be providing evidence of some discharges, you know, whatever the commitment requires. In this case, in the case of the policy issued by Commonwealth, there was no commitment letters, I recall.

(PAUSE)

(OFF THE RECORD)

(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 3 MARKED FOR IDENTIFICATION)

**Q. Mr. More, I show you a copy of what's been marked Exhibit 3 which is a letter from you to Michael Mellion; is that correct?**

A. Yes.

**Q. And is that how the request for title insurance was initiated, in this instance?**

A. I am not sure whether I made a phone call first, and this was a follow-up letter or whether the letter came first. My guess is that I had a phone call with Michael first.

**Q. And --**

A. Because that would be my normal procedure.

**Q. And do you recall what the substance of that phone**

**call was?**
A. Substance of the phone call was that IDC was looking for title insurance on the North Development Unit.
**Q. And attached to the letter is a memorandum dated November 17, 1997, that was prepared by you?**
A. Yes.
**Q. And did you have any conversations with Mr. Mellion concerning the memorandum?**
A. Yes.
**Q. What conversations were those?**
A. Well, we went over the issues that were involved, that are identified in this memorandum, and I don't know whether it was in that conversation or in another conversation that would have been reasonably contemporaneous with this letter, and with the request for title insurance, that I also applied to Chicago Title for title insurance, and that Chicago was, you know, having concerns about issuing title insurance on the North Development Unit.
**Q. And did Chicago ultimately decline to issue title insurance?**
A. Yes.



**Q. And what was your understanding of why they declined to issue title insurance?**
A. The reasons are set forth in the letter from Jeff Meyer to me.
MR. HALEY: If we can mark that as --
MR. HESTNES: Have you marked the --
MR. HALEY: We did mark the memorandum as part of Exhibit 3, and we'll mark the Meyer memorandum as Exhibit 4.
(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 4 MARKED FOR IDENTIFICATION)
**Q. Mr. More, I show you what's been marked as Exhibit 4. Is that the memorandum -- the response from Jeff Meyer that you referred to?**
A. Yes.
**Q. And did Jeff Meyer also express to you a concern that he was aware that the condominium association was contemplating suit against IDC Properties?**
A. It is so stated in this memo to me.
**Q. And what conversations did you have with Mr. Meyer about the memo?**
A. I had a number of conversations with Jeff over some period of time, and I don't know whether it was two weeks or three weeks or what the time



frame was, but over the issues that he notes in his memo to me.
**Q. And did you tell Mr. Mellion that Chicago Title had declined to provide title insurance coverage?**
A. At some point, prior to the end of 1997, I did.
**Q. And was that in a phone conversation?**
A. Yes.
**Q. And do you have any notes or memoranda of that conversation or anything else which evidenced the conversation?**
A. I don't have any, but -- I don't have any of my files. They could exist, but I don't have them.
**Q. And why did you tell Mr. Mellion that?**
A. I told him that for two reasons; one is that it meant that I would need to get the insurance from Commonwealth because I wasn't going to be getting it from Chicago; and I told him that because it was part and parcel of the whole, you know, issue for getting title insurance. It was part and parcel of kind of the whole set of facts that surrounded, you know, IDC's desire to get title insurance. But I think from Tom Roos's point of view, he was at some point -- maybe it had already started, I don't know -- building on the North



Development Unit, and so he was looking for title insurance because he was going to make an investment on the property, and he had already made an investment on the property, and certainly the disputes with the America's Cup and Capella Condominium Unit owners was an ongoing situation.
**Q. And did you ever show Mr. Mellion a copy of the document marked as Exhibit 4 or provide a copy of that to him?**
A. I do not believe I did.
**Q. And what was Mr. Mellion's response to you when you told him that Chicago Title had declined to provide coverage?**
A. I do not recall.
**Q. And you said that -- in your response to the prior question, that one of the issues involved in the application for title insurance was the dispute with the condominium association. And is that something that Mr. Mellion was informed of, to your knowledge?**
A. I believe that he was, by me.
**Q. And other than by you, are you aware of any other information that was provided to Mr. Mellion concerning the dispute?**

A. I'm unaware of anything else.

**Q. And with respect to the information regarding Chicago Title's decision to decline coverage, is that something you believe you had an obligation to share with Mr. Mellion?**

A. I don't think I formed an opinion on that matter.

**Q. And would it be part of your ordinary practice in applying for title insurance to advise the insurance company if another insurer had declined coverage?**

MR. TAYLOR: Object to the form.

A. That's an interesting question. I don't really have an answer to it.

**Q. With respect to your practice in applying for title insurance, generally, did you have any understanding or opinion as to what sort of things needed to be told to the title insurance company or what you had some obligation to inform the title insurance company of?**

MR. TAYLOR: Object to the form.

A. I mean, I think, let me just answer by saying that the number of times over my career as a lawyer where I've had a title company refuse to



issue insurance and then I go to another title company has not been all that frequent. I do know that about four years ago, I had a situation in which Commonwealth refused to insure the title to a condominium project, and so I went to Mortgage Guarantee, and certainly, at that time, I informed them that Commonwealth was not prepared to issue the title insurance. I explained to them exactly why Commonwealth wasn't prepared to issue the title insurance. And Mortgage Guarantee said we think Commonwealth is being too conservative, and we're prepared to issue the title insurance. So I think that as a basic matter, my inclination would be to inform title company number 2 if title company number 1 is not going to issue the title insurance.

Part of the reason for getting title insurance is, obviously, to protect your client, but it's also to red flag problems because you don't want your client to get into a situation where they're running into litigation which can materially affect the marketability of title, which is -- and the developer may cause -- suffer damages which will never be compensated by title



insurance. So normally, you want a title company to know the most amount of information possible, so that they can either address the issue or evaluate the issue, advise you as to their opinion on the issue, so you can inform your client appropriately, and for that client to make, you know, the appropriate decisions.

So that if, for example, in this case, Commonwealth had come back and said we don't want to issue the title insurance, I would have said to Tom Roos, "I've got two title companies in Rhode Island who are not willing to insure your title. I would be very careful about making any further investment in this property if you don't have title insurance, because if you ever go to sell this property or you ever want to get a mortgage on this property, you may have an impossible time getting title insurance, which means, in essence, you'd never be able to sell the property."

So for that reason, it would have been in my best interest and my client's best interest, and part of just, I think, who I am as a person and as a lawyer to have told Michael what I understood to be the issues, what I understood to be the



position of Chicago Title, and why I would have no reason to have not fully disclosed to Michael what the situation was.

**Q. No one ever told you not to disclose anything to Mr. Mellion, did they?**

A. No.

**Q. Mr. Roos never provided you any instruction or direction as to what to tell Mr. Mellion or what not to tell him?**

A. No.

**Q. And with respect to the issue here and the issue identified in Exhibit 4 of Mr. Meyer's memorandum, that related, did it not, to the question of whether or not in an enacting the amendments to the Condominium Declaration, a vote of just the master condominium unit owners or all the sub-condominium unit owners was required to make the amendment effective; is that correct?**

A. That's one of the issues.

**Q. And did you discuss that issue with Mr. Mellion?**

A. Yes.

**Q. And what discussion did you have with Mr. Mellion concerning that issue?**

A. The discussion with Mr. Mellion was that it was

uncertain as to whether all of the sub-condominium unit owners had to vote on the amendment to extend the development rights.

**Q. And did you have an opinion as to that issue?**

A. At the time, I thought that it was reasonable to take the position that the sub-condominium owners did not have to vote on the extension.

**Q. And at some point in time, did you change your opinion?**

A. Yes.

**Q. When was that?**

A. I'm not sure of the time, but I wrote -- I did an internal opinion or memorandum or something where I came to that conclusion.

**Q. And Exhibit 3, which on the second page contains your file memorandum dated November 17, 1997 --**

**(OFF THE RECORD)**

**Q. The last sentence on the first page of the file memorandum dated November 17, 1997, says, "In the absence of fraud, a court should find that the one year statute of limitations and/or laches bars any attack on the 1994 amendment." Why were you concerned with the one-year statute of limitations?**



A. Well, if the 1994 amendment had not been approved by the right parties, then there was a question as to whether the lapse of three years in the filing of any action by the America's Cup or Capella Condominium Association would bar any such suit from being filed that would challenge the validity of the 1994 amendment.

**Q. And at that point in time in November of 1997, did you have any information regarding the likelihood of any challenge to the amendment by the condominium association?**

A. I don't know how to quantify the term "likelihood." There was -- I had been at a meeting with Tom Roos and Matt Medeiros and Ray Morrissette, and perhaps some others, where there was a discussion about a possible lawsuit being filed. I was aware that subsequent to that meeting that Matt Medeiros was continuing to pursue the issues that were discussed at that meeting. I know that Edwards & Angell turned over any issues of potential litigation to Bill Landry, and I saw a proposed Tolling Agreement.

(OFF THE RECORD)

(DEFENDANT AND THIRD PARTY PLAINTIFF'S



EXHIBIT 5 MARKED FOR IDENTIFICATION)

**Q. Mr. More, I show you what's been marked as Exhibit 5, which is a letter to you dated December 10, 1997, from Mr. Medeiros and attached to it is a -- the first paragraph makes reference to a Tolling Agreement in a form substantially similar to that which I have enclosed, and stapled to the letter is a three-page Tolling Agreement. To your knowledge, is that a letter that you received from Mr. Medeiros?**

A. I believe I did.

**Q. And did you ever discuss this letter or the subject of the letter with Mr. Mellion?**

A. I don't recall.

**Q. Did you ever discuss with Mr. Mellion the Tolling Agreement that was entered into between the condominium association and IDC Properties, Inc.?**

A. I don't recall.

MR. HESTNES: Off the record for a moment.

(OFF THE RECORD)

**Q. Mr. More, is the Tolling Agreement something that you would ordinarily have discussed with the title insurance company in applying for title insurance?**



A. I don't know whether the Tolling Agreement as such would have been something I would have discussed because all the Tolling Agreement says is that the parties agree that they're not going to file a lawsuit at the present time because there had been continued discussions. So other than the fact that if the Tolling Agreement hadn't been signed, there might have been less chance that there would have been a lawsuit, I don't -- I guess I don't see the Tolling Agreement as a material document in and of itself because the real issue was if there were outstanding disputes, and that had been communicated, I believe, by me to Commonwealth.

So that was the important aspect that I communicated, I believe, and the Tolling Agreement really seems to me to be secondary. So I don't know whether -- I'm not sure whether I did communicate it or I didn't communicate it, but I don't view it as being as relevant to the situation as communicating that there were disputes.

**Q. And you did not believe that you had any -- and let's just mark the Tolling Agreement as 6.**

**(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 6 MARKED FOR IDENTIFICATION)**

THE WITNESS: You know, assuming I received this letter dated December 10 on or around the 12th, ultimately the question of getting this agreement signed was a Bill Landry issue, and I do not believe that I was involved in having the agreement signed. So I don't even know, you know, whether it was signed by December 31 or not.

MR. HESTNES: Off the record.

(OFF THE RECORD)

(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 7 MARKED FOR IDENTIFICATION)

**Q. Mr. More, I show you what's been marked as Exhibit 7, which is a letter from you to Mary Beth Furla at Medeiros & Sanford. Is that your signature on the letter?**

A. It is.

**Q. And that was forwarding to her the Tolling Agreement on behalf of Mr. Roos; is that correct?**

A. Yes.

**Q. And Medeiros & Sanford represented the condominium association, the potential plaintiffs; is that**



**correct?**

A. They represented the America Condominium Association and the Capella South Condominium Association. I'm not sure whether they represented anybody else.

**Q. And in your mind, did the existence of the Tolling Agreement make it more or less likely that claims may be brought by the condominium associations against Mr. Roos and IDC Properties?**

A. It only made it more likely in the sense that if it had not been signed, then certain rights of the America's Cup and Capella South Condominium Associations might have expired.

**Q. And that was not something that you felt you had any obligation to share with Mr. Mellion; is that correct?**

A. I don't think I formed an opinion on the subject at the time.

**Q. Did you form an opinion on the subject at any later time?**

A. No.

**Q. And if you did feel that you had an obligation to share it with him, would you have shared it with him?**



A. Yes.

**Q. And did you ever have any discussions with Mr. Roos or anyone else about whether or not Mr. Mellion should be provided a copy of the Tolling Agreement?**

A. Not that I can recall.

(PAUSE)

(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 8 MARKED FOR IDENTIFICATION)

MR. HALEY: Mark that as 9, too.

(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 9 MARKED FOR IDENTIFICATION)

**Q. Mr. More, I show you what's been marked as Exhibits 8 and 9, marked out of order a little bit. Exhibit 9 is a letter dated December 2, 1994. Is that your signature on the second page?**

A. Yes.

**Q. And is that a letter you sent to Mr. Kanter?**

A. Yes.

**Q. And that 8 is a letter dated December 5, 1994, sent to you from Mr. Kanter. Is that a letter that you received from Mr. Kanter?**

A. Yes.

**Q. And with respect to the letter that you received**



**from Mr. Kanter, which is attached to Commonwealth's Complaint in this action as Exhibit G, the information which Mr. Kanter makes reference to in there concerning the decisions regarding the extension of the development rights, was that information that was shared to Mr. Mellion by you?**

THE WITNESS: Could you play that back?

(PENDING QUESTION READ)

MR. TAYLOR: Object to the form.

(PAUSE)

A. I'm not sure I understand your question.

**Q. Well, directing your attention to Page 2 of Exhibit 8, in the second full paragraph there, Mr. Kanter states that, "We advised that both the Master Declaration and the Statute could be subject to varying interpretations as to the consent that would be required to extend the Development Rights time period, which could easily subject the Declarant or the Master Association to litigation by Unit Owners dissatisfied with any vote to extend such time period."**

A. That sentence certainly is reflected in

Jeff Meyer's memo to me and was reflected in my conversations with Michael Mellion.

**Q. So to your knowledge, Mr. Mellion was aware that the manner in which the declarant rights were extended might possibly be the subject of litigation between IDC Properties and the unit owners?**

MR. TAYLOR: Object to the form.

A. Yes.

**Q. And is that fact something that you felt you had an obligation to share with or tell Mr. Mellion?**

A. Like I said, I don't think that I thought about whether I had an obligation to tell Mr. Mellion anything. I felt that it was the appropriate thing to do, and it was just something that I did.

**Q. And did you ever have any discussions with Mr. Roos or anyone else with respect to sharing this information with Mr. Mellion or not sharing it with him?**

A. My conversations with Tom Roos on title insurance were fairly short, as I recall. They really might have been only two or three conversations. The initial conversation where he raised the possibility, I said I would see what I



could do. Perhaps at that conversation or a subsequent one, he gave me a dollar amount of what he wanted. I told him that I had obtained the title insurance through Commonwealth. I probably told him that I was unable to get the title insurance through Chicago because I think it was he, actually, who had mentioned that Chicago had issued the policy when he bought the property, and that I should check with them because, otherwise, in my normal dealings, I went through Commonwealth.

And conversation subsequent to the issuance of the original policy where Tom called up and said he wanted more title insurance, and in that conversation, I believe I reiterated what I had said in the first conversation where he specified an amount, that the amount of the title insurance that he was requesting might be substantially more than the property was worth, in which case he was wasting his money. But he did not provide to me any information as to valuations or the basis upon which he was determining that he wanted 5 million dollars of coverage or 12 million dollars of coverage. These were just amounts that he said he



wanted to get.

**Q. Did Mr. Mellion ever ask you for any information that you declined to provide to him?**

A. Not that I know of.

**Q. And at some point in time, you were aware, were you not, that Commonwealth commenced this action against IDC Properties claiming that it should have been informed of certain information, and as a result, seeks a declaration that it's not obligated to make any payment under the policy?**

A. Yes.

**Q. And after that suit was filed, did you continue to do business with Commonwealth?**

A. Yes.

**Q. And subsequently, you're aware that Mr. Mellion is employed by Fidelity National Title Insurance Company?**

A. Yes.

**Q. And has Mr. Mellion sought to do business with you in his capacity as an employee at Fidelity?**

A. I think I initiated discussions with Fidelity about becoming an approved attorney. I believe I had a conversation with Michael about that, and a woman from his office came and met with me and



gave me an application form. So Michael did not initiate it, but he certainly was receptive to my becoming an approved attorney for Fidelity.

**Q. After the suit was filed in this action by Commonwealth, did you have any discussions with Mr. Mellion regarding the suit or the subject matter of the suit?**

A. We might have had a two-second conversation where Michael said he didn't want to say anything about the lawsuit.

**Q. At any point in time, did Mr. Mellion tell you that he was upset or unhappy or displeased with your conduct in making the application for title insurance in this matter?**

A. Not to me.

**Q. To your knowledge, did he say that to somebody else?**

A. I have no knowledge on the subject.

**Q. Did you ever have any conversations with anyone else from Commonwealth regarding the subject of the lawsuit?**

A. I had a brief conversation with Sally O'Neel.

**Q. And what was that conversation?**

A. To the best of my recollection, I said that I

was sorry that Michael felt that he did not have information which I thought I had given him.

**Q. And what did Ms. O'Neel say to you?**

A. I cannot recall beyond the fact that it was a pleasant conversation. That's it.

MR. HALEY: Mark that as the next exhibit, please.

(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 10 MARKED FOR IDENTIFICATION)

**Q. Mr. More, I show you what's been marked as Exhibit 10, which is a memorandum to William Landry from you dated September 28, 2001. I'll just give you a minute to look at it.**

(PAUSE)

**Q. Is this a memorandum that you sent to Mr. Landry?**

A. Yes.

**Q. And are the statements in the memorandum true and correct?**

A. To the best of my knowledge.

**Q. And in the first sentence in the paragraph numbered 1, you say, "I am confident that I mentioned that there were disagreements with the unit owners relating to the title." What makes you confident about that?**



A. My memory.

**Q. Why is that something in particular that you remember?**

A. My conversations with Jeff Meyer over the position that Chicago Title was taking really annoyed me, and the fact that I had spent and was spending so much time on the -- or had spent so much time on the IDC matter made me strongly disagree with the position that Chicago Title was taking, and, therefore, in talking with Michael Mellion, I'm quite confident that I would have given a full review of my opinion of Jeff Meyer and the position that Chicago Title was taking because I strongly disagreed with it.

(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 11 MARKED FOR IDENTIFICATION)

**Q. Mr. More, I show you what's been marked Exhibit 11, which is a memorandum to William Landry and Thomas Roos from you dated January 8, 2003. Is that your name or initials next to your typewritten name?**

A. Yes.

**Q. And is this something that you sent to Mr. Landry and Mr. Roos?**



A. Yes.

**Q. And are the statements in it true and correct?**

**(PAUSE)**

A. Yes.

**Q. The second sentence in Exhibit 11 in the paragraph numbered 1 says, "I cannot recall if we discussed the potential for litigation although I believe it is likely that the issue did come up particularly after Chicago mentioned the issue in its 'turn-down' letter." Do you distinguish the potential for litigation and disagreements with the unit owners?**

A. No.

**Q. And do you remain confident that you discussed with Mr. Mellion the fact that there were disagreements with the unit owners relating to title?**

A. Yes.

**Q. And the first paragraph says that you informed Mellion orally and in writing that, (a) there were issues regarding the amendment signed by the Master Unit Owners, and (b) Chicago would not issue insurance. With respect to any writing that was provided to Mr. Mellion, other than the**



**initial letter to him enclosing your November 17, 1997, file memorandum, are there any other writings that you're aware of that you provided to Mr. Mellion with respect to the issues regarding the amendment signed by the master unit owners and/or the fact that Chicago title would not issue insurance?**

A. No, and I think actually -- I think I might correct that first sentence because I certainly informed him orally and in writing that there were issues regarding the amendment, but I don't know that I ever gave him anything in writing that Chicago did not issue insurance.

**Q. Other than that conversation, is there anything else about the January 8, 2003, memorandum that you feel is inaccurate or needs to be corrected?**

A. No.

(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 12 MARKED FOR IDENTIFICATION)

**Q. Mr. More, I show you what's been marked as Exhibit 12, which is a letter to Mr. Roos dated August 23, 1999. Is that your signature on the last page?**

A. Yes.

**Q. And this was a legal opinion provided to Mr. Roos**

**by Edwards & Angell; is that correct?**
A. Yes.
**Q. And what was the purpose of providing the opinion?**
**(PAUSE)**
A. The purpose of the opinion was to opine on whether the voting control of IDC Properties, Inc., over the Goat Island South Condominium Association, by virtue of IDC's ownership of the North Development Unit, the Individual Unit, and the South Development Unit, violates the Condominium Act or any other law.
**Q. And is this an opinion that Mr. Roos asked you for?**
A. I believe so.
**Q. And was it your understanding that he was going to rely upon the opinion?**
A. I don't know.
**Q. And did you ever provide anything to Mr. Roos correcting, retracting, amending, at all any of the opinions set forth in Exhibit 12?**
A. I don't recall.
**Q. Is there anything that would refresh your recollection concerning that?**
A. If I saw all of my files in the matter -- I



cannot recall why Tom even wanted this letter.
**Q. You are aware, are you not, that at some point the condominium association commenced litigation against Mr. Roos and IDC Properties, Inc.?**
A. I only have the vaguest recollection of a lawsuit being filed.
**Q. And had you reviewed the lawsuit or the facts of the lawsuit at the time you issued the opinions set forth in Exhibit 12?**
A. I cannot remember.
**Q. Did you review the opinions or facts set forth in Exhibit 12 with anyone else at Edwards & Angell?**
A. I don't recall, but it is entirely possible that I would have given a copy of this opinion to Chip Rogers before I sent it out.
**Q. And other than you believe it was possible, do you recall any conversations with Mr. Rogers concerning the opinion?**
A. No.
**Q. At the time in 1999, did Edwards & Angell have any procedures or requirements or guidelines for the issuing of legal opinions by members of the firm?**
A. I believe it did.
**Q. And what were those?**



A. I believe opinion letters were supposed to be reviewed by another partner.
**Q. And was that done in this instance with respect to Exhibit 12?**
A. I have no recollection.
**Q. And other than being reviewed by another partner, was there a committee or anything else that needed to review opinion letters or authorize their release?**
A. Not that I can recall.
**Q. And were the requirements for the issuance of opinion letters in 1999 the subject of any writing? Was there a firm guideline or procedure that was in writing with respect to the issuance of opinion letters?**
A. I can't recall.
MR. HALEY: Mark that as 13, please.
(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 13 MARKED FOR IDENTIFICATION)
**Q. Mr. More, I show you what's been marked as Exhibit 13, which is a letter dated November 3, 1999, addressed to Mr. Roos. Is that your signature on the fourth page of the letter?**



A. It is.
**Q. And this opinion was provided, was it not, after the litigation had already been commenced by the America Condominium Association?**
A. The letter so indicates.
**Q. Do you have any reason to believe it's incorrect?**
A. No.
**Q. And what was the purpose of providing this opinion?**
A. The purpose was to opine on the right of IDC, Inc., to own and build out the North Development Unit, the South Development Unit, and Development Unit Number 1 within the Goat Island Condominium.
**Q. And you provided Mr. Roos with the opinion that he had the full right to own and build out the North Development Unit, the South Development Unit and the Development Unit Number 1; is that correct?**
**(PAUSE)**
**(OFF THE RECORD)**
A. Yes.
**Q. And Mr. More, have you reviewed the opinions of the Rhode Island Supreme Court in the America Condominium litigation issued in 2004 and on April 8, 2005?**

A. Yes.
**Q. And based on your review of those opinions, is it fair to say that, in fact, IDC, as owner, did not have the right to develop the IDC units as set forth in your opinion of November 3, 1999?**
A. The Supreme Court in its ignorance did come to a contrary conclusion.
**Q. And in fact, the Supreme Court has the final say as to the law in Rhode Island; is that correct?**
A. Yes.
**Q. I take it it's your opinion that the Supreme Court was in error?**
A. Yes.
**Q. Did you ever issue any amendments, edits, clarifications, or corrections to Exhibit 13, in the opinion letter dated November 3, 1999?**
THE WITNESS: I'm sorry. Any --
**Q. Did you ever issue any edits, clarifications, amendments, or retractions of Exhibit 13, the opinion letter dated November 3, 1999?**
A. Not that I recall. I'd actually forgotten I had even written either of these two letters from 1999 until you gave them to me today.
**Q. And with respect to Exhibit 13, did you review this at all with anyone else in the firm?**



A. I don't specifically recall.
**Q. And did you follow any particular procedures or guidelines for the issuance of the firm opinion letters when this was issued?**
A. I don't recall.
**Q. Do you recall any conversations you ever had with Mr. Roos concerning this letter?**
A. No.
(OFF THE RECORD)
(BRIEF RECESS)
**Q. Mr. More, after the issuance of the original title insurance, the policy was further amended to increase the limit of insurance from 5 million to 12 million; do you recall that?**
A. Yes.
**Q. And additionally, the South Unit and the Development Unit Number 1 were added to the endorsement?**
A. I believe so.
**Q. And at that time, did you have any conversations with Mr. Mellion about the existence of the Tolling Agreement between the condominium association and IDC Properties?**



A. My recollection is that the conversations with Michael regarding the increase in the coverage were fairly short, and there was no particular discussion of legal issues relating to the condominium.
Q. And --
MR. HESTNES: Can we get a time frame of this?
MR. HALEY: Sure.
(OFF THE RECORD)
(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBITS 14 AND 15 MARKED FOR IDENTIFICATION)
**Q. Mr. More, I show you what's been marked as Exhibits 14 and 15, which is a letter dated April 14, 1999, to you from Mr. Mellion, and Exhibit 15, an endorsement to the title insurance policy. The letter to you from Mr. Mellion, is that a letter you received from him enclosing the endorsement?**
A. I believe so.
**Q. And the second sentence in the letter says, "Please call with any questions or comments about this Endorsement." Did you have any conversations with Mr. Mellion about the endorsement?**



A. I don't recall.
**Q. On the Exhibit 15, the date and time of the policy is February 7, 1999, at 9:00 a.m. Do you recall why there was such a difference between the endorsement being sent to you and the effective date of the endorsement?**
A. No.
**Q. And Mr. Mellion's letter says that the endorsement is dated March 1, 1999. Are you aware or have you ever seen any other endorsements in this policy other than the one marked as Exhibit 15?**
A. I don't recall.
**Q. And in connection with the issuance of the endorsement, do you recall at all any conversation you had with Mr. Mellion concerning the claims of the condominium unit owners at that time?**
A. I don't recall.
**Q. And did you have any conversations with Mr. Mellion at that time, late 1998/early 1999, concerning Chicago Title's original refusal to issue a title insurance policy in 1997?**
A. I don't recall.
MR. HALEY: Mark this 16 and 17, please.

(DEFENDANT AND THIRD PARTY PLAINTIFF'S
EXHIBITS 16 AND 17 MARKED FOR IDENTIFICATION)
**Q. Mr. More, I show you what's been marked Exhibits 16 and 17. Exhibit 16 is a facsimile cover sheet and a letter dated December 3, 1998, to Mr. Mellion. Is that your signature on the letter?**
A. Yes.
**Q. Is this a letter that you sent to Mr. Mellion requesting the increase of the title insurance?**
A. Yes.
**Q. And did you have any conversation with Mr. Roos or anyone else from IDC Properties at the time regarding this increase?**
A. Yes.
**Q. What conversations were those?**
A. Tom Roos called me to ask if I could get an increase in the amount of title insurance.
**Q. And other than Mr. Roos asking to increase the amount of the title insurance, did you have any other conversations with Mr. Roos regarding the title insurance?**
A. I presume I told him that I was successful in getting the title insurance at some point in time.



**Q. Other than that, do you recall any other conversations you had with him concerning the title insurance at this time?**
A. No.
**Q. And directing your attention to Exhibit 17, which is a letter dated February 2, 1999, addressed to Mr. Mellion, is that your signature?**
A. Yes.
**Q. Is this a letter that you sent to Mr. Mellion?**
A. Yes.
**Q. And did you have any discussions with Mr. Mellion regarding the declarations to Goat Island and Amendments 1 through 8 or Amendment 9 after sending this letter?**
A. I don't recall.
**Q. And do you know if prior to sending this letter, Mr. Mellion had copies of the declaration or the Amendments 1 through 9?**
A. I don't know.
**Q. Those amendments would be recorded and would be available in the registry, to your knowledge, would they not?**
A. Yes.
**Q. And do you recall anything else about the increase**

**in the title insurance policy, any o**
**conversations that you had with I**
**this time?**
A. No.
**Q. You did not have any further c**
**Chicago Title at the time you so**
**the level of title insurance?**
A. No.
**Q. Other than Chicago Title or Commonwealth Title, did you ever make application to or have discussions with any other title insurance company regarding title insurance on the property?**
A. No.
MR. HALEY: 18.
(DEFENDANT AND THIRD PARTY PLAINTIFF'S
EXHIBIT 18 MARKED FOR IDENTIFICATION)
**Q. Mr. More, I show you a document which has been marked as Exhibit 18, the front page of which is a folder cover. Do you recognize that as a folder maintained by you at Edwards & Angell?**
A. No.
**Q. Do you recognize the folder cover at all?**
A. I don't recognize it.
**Q. And do you know what the initials MSA stand for**



**after which follows your name and Providence, Rhode Island?**
A. Yes.
**Q. What does that stand for?**
A. Matter Supervising Attorney.
**Q. And was that an acronym used by Edwards & Angell while you were there?**
A. Yes.
**Q. And with respect to the Number 34545.0001, do you recognize that number at all?**
A. No.
**Q. And did Edwards & Angell have a practice of maintaining numbers for their client files?**
A. I have no knowledge one way or another on that.
**Q. Directing your attention to the second page of the document, it has the words Title Insurance; is that your handwriting?**
A. It looks like my handwriting.
**Q. And then there's a letter to Mr. Roos dated February 6, 1998; is that your signature?**
A. Yes.
MR. HESTNES: Off the record.
(OFF THE RECORD)
**Q. If you turn to the document dated March 8, 1999 --**

A. Yes.
**Q. Is that your signature there?**
A. Yes.
**Q. Is that a letter that you sent to Mr. Roos?**
A. Yes.
**Q. And do you recall any discussions that you had with Mr. Roos regarding the draft endorsement for the title insurance?**
A. No.
**Q. And if you turn to the very last page of the exhibit, which is a letter dated April 15, 1999, is that your signature?**
A. Yes.
**Q. And is this a letter that you sent to Mr. Roos?**
A. Yes.
**Q. And do you recall any amendments or discussions about the form of the title insurance between March 8, 1999, and April 15, 1999?**
A. No.
**Q. Other than the documents set forth in Exhibit 18, are you aware of any other written communications or memoranda that you sent to Mr. Roos regarding the title insurance?**
A. No, I didn't even remember these, so --



MR. HALEY: Mark that as 19, please.
(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 19 MARKED FOR IDENTIFICATION)
**Q. Mr. More, I show you what's been marked as Exhibit 19, the first page of which appears to be an invoice directed to IDC, Inc., from Edwards & Angell. While you were at Edwards & Angell, did you have the responsibility for billing IDC, Inc., or IDC Properties?**
A. I can't recall.
**Q. And --**
MR. HESTNES: I notice these are mostly 2004 and '05.
MR. HALEY: That's correct.
**Q. Directing your attention to the third to last page on Exhibit 19, it's an invoice dated April 4, 2005.**
A. Yes.
**Q. And to your knowledge, did Edwards & Angell continue to perform legal work for IDC, Inc., through April of 2005?**
A. I have no knowledge beyond these invoices that you have given me.
**Q. And based on your review of the invoice, does it**



**appear to you that as of April 4, 2005, Edwards & Angell was continuing to perform legal work for IDC, Inc.?**
MR. HESTNES: I would object to that question. Mr. More was not a member of the firm from January 1 of 2000, I believe, to the present time, so how could he give an answer to an internal document.
MR. HALEY: I think because he's the designated witness under Rule 30(b)6 to the deposition notice.
MR. HESTNES: Fair enough.
A. It would appear that Edwards & Angell was rendering a bill to IDC, so one presumes they were doing work at the request of IDC, but I have no knowledge of the work or the relationship, or that even there was a relationship.
**Q. And you testified earlier that you were doing work for Mr. Roos or IDC Properties through 2005 individually?**
A. During 2005, I believe.
**Q. And when did that work cease during 2005?**
A. I can't recall the specific time frames within 2005.



**Q. At some point, did it cease?**
A. It ceased in the sense that they weren't -- IDC Properties and their lawyers were not asking me to do anything more.
**Q. And what work were you doing for IDC Properties in 2005?**
A. I was consulting with Tom Roos and various lawyers representing IDC with regard to drafting amendments to the Goat Island Condominium Declaration.
**Q. Anything else other than that?**
A. I had discussions with Tom regarding the Supreme Court decisions, and I gave him some recommendations on what I thought he should be doing to protect his rights -- property rights to the Goat Island Master Condominium Units.
**Q. Anything else besides that?**
A. No.
MR. HALEY: 20 and 21.
(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBITS 20 AND 21 MARKED FOR IDENTIFICATION)
**Q. Mr. More, I show you what's been marked as Exhibits 20 and 21 in this deposition. 20 is the Third Party Complaint and Demand For Trial By**

**Jury, and 21 is the Answer filed on behalf of yourself and Edwards Angell Palmer & Dodge, LLP. Have you seen these pleadings before?**
A. I believe so.
**Q. And directing your attention to Paragraph 13 on Page 3 of Exhibit 20, which is the Third Party Complaint --**
MR. HESTNES: Paragraph what?
MR. HALEY: Paragraph Number 13.
A. 13, yes.
**Q. The Complaint says that, "IDC and its officers and employees had no active role in procuring the policy," which is defined above to mean the title insurance in this matter of 12 million dollars. Are you aware of any active role that IDC or any of its officers or employees took in procuring the title insurance policy in this matter?**
A. Yes.
**Q. What role is that?**
A. They -- Tom Roos called me up and said he wanted title insurance, and then he called me up subsequently and said he wanted to increase the amount of the title insurance.
**Q. And other than those two requests, is there any**



**other role that you're aware of that IDC and officers and/or employees had in procuring the title insurance policy?**
A. Not that I'm aware of.
**Q. And with respect to Exhibit Number 21, the Answer, and directing your attention to the Tenth Affirmative Defense on Page 6 of the exhibit, it states that, "IDC's own fraudulent conduct bars its claims." Are you aware, Mr. More, of any fraudulent conduct by IDC in this matter?**
THE WITNESS: Which one are you referring to?
MR. HALEY: Page 6 of the answer.
THE WITNESS: Oh, Page 6.
MR. HALEY: The Tenth Affirmative Defense.
(PAUSE)
A. I have personally never reviewed or considered the merits of any of these affirmative defenses.
**Q. My question is are you aware of any fraudulent conduct on behalf of IDC in this matter?**
A. None that comes to mind.
**Q. With respect to the Eleventh Affirmative Defense, are you aware of anything IDC did or failed to do**



**to mitigate its damages?**
A. Well, the only thing that I recommended to IDC that they do to mitigate their damages is to seek legislation from the General Assembly that would have modified the Condominium Act to basically ratify the validity of the title to the North Development Unit and the other condominium units that were involved in the Supreme Court decisions.
**Q. Anything else?**
A. Not that I know of.
MR. HALEY: Can we just go off the record for a second?
(OFF THE RECORD)
(DEFENDANT AND THIRD PARTY PLAINTIFF'S EXHIBIT 22 MARKED FOR IDENTIFICATION)
**Q. Mr. More, I show you what I've marked an Exhibit 22, which is the opinion of the Rhode Island Supreme Court dated April 8, 2005. You've review this opinion before?**
THE WITNESS: Is this the second decision?
MR. HALEY: Yes, it is.
A. I have -- I think I have reviewed it.
**Q. And directing your attention to Page 8 of the**



**exhibit, and with respect to the discussion concerning the North Unit, the Court states that, "IDC Properties attempted to create a unit in the airspace above the land described as the North Unit, while land itself became a master limited common element." During your representation of IDC Properties, was it your understanding that it was possible to have a condominium unit which consisted of the land above the North Unit -- or the airspace, rather, above the North Unit?**
A. Yes.
**Q. And directing your attention to the last page of the exhibit, Page 9 --**
A. I want to make sure I'm getting the right page. The top of the page says Page 9 of 10. Below that, it says Page 8.
**Q. It's the very last page of the exhibit.**
A. Oh, okay.
**Q. In the second to last paragraph of the opinion, the court states, "These master units, so-called, always were common elements, subject to the exercise of said development rights, and title rested with the unit owners in common ownership from the creation of the condominium." Was it**

**your understanding and was it your opinion while you represented IDC Properties, Inc., that, in fact, they held title to the master units?**

A. It was my opinion that subject to the state of facts -- beyond which I didn't know about -- having to do with the title, which I would refer to the title company and the title insured policies, that IDC Properties owned the development rights to the North Development Unit, and that after 1994, when we filed the amendment to create the North Development Unit, IDC owned that master unit, and that prior to that -- prior to 199 -- the end of 1994, that IDC Properties owned a couple of other master units.

MR. HALEY: I don't have any further questions.

(OFF THE RECORD)

MR. TAYLOR: Mr. More, my name is Robert Taylor. I represent Commonwealth Land Title Insurance Company. I just have some follow-up questions.

EXAMINATION BY MR. TAYLOR

**Q. You indicated earlier during your deposition today that you believe that you had had some discussion**



**with Mr. Mellion about disagreements between IDC Properties and the unit owners; is that correct?**

A. Yes.

**Q. When were those? When did you have those discussions with Mr. Mellion?**

A. In December, and perhaps late November 1997.

**Q. Could you be more specific than that?**

A. No.

**Q. And what did you tell him about the disagreements?**

A. To the best of my recollection, I had discussions with Michael that were similar to my discussions with Jeff Meyer at Chicago Title, in that we covered the issues under the Condominium Act, the questions of extension of the development rights, the questions of the right to build out the unit, and the questions of the ongoing disagreements with the America's Cup and Capella South Condominium Unit Owner's Association in which, among other things, they were challenging the creation of the North Development Unit, because the one conversation that I really remember with Michael was that we both adamantly agreed that the North Development Unit had been properly created and was a valid unit. Apart from



any question of the right to build the unit out, apart from any other issue, it was clear that the North Development Unit had been created and any arguments to the contrary didn't seem to have any merit whatsoever.

**Q. Did you tell Mr. Mellion in the fall of 1997 that the condominium individual unit owners had challenged the creation of the North Development Unit?**

A. My recollection is that we had discussions that they were challenging the validity of the creation of the North Development Unit.

**Q. Did you tell Mr. Mellion that in a specific telephone call that you can recall?**

A. Not in any specific telephone conversation. I believe that we had several conversations because at the same time, I was trying to get Chicago Title to issue the policy and then to reconsider the position that they set forth in this memo to me of December 15, 1997. Inasmuch as the fact that Chicago had the existing policy, it would have made more sense to stay with Chicago if Chicago had been willing to issue the insurance.

**Q. Did you tell Mr. Mellion in the fall of 1997 that**



**the America Condominium Unit had retained counsel in connection with disagreements over Goat Island?**

A. I don't recall.

**Q. Do you recall telling him whether Matt Medeiros was involved at that point in time in any way?**

A. I don't recall.

**Q. Do you recall telling Mr. Mellion you had been in a meeting with Mr. Medeiros and Mr. Roos and others earlier that fall regarding Goat Island?**

A. I don't recall.

**Q. Do you recall telling Mr. Mellion that litigation was in the air at that point in time?**

A. I -- I certainly would have said that the disagreements that existed between the Capella and America's Cup Condominium Association and IDC certainly could have resulted in litigation, because the nature of the claims, if they didn't get resolved amicably, were certainly going to be resolved by litigation. So did I say that the lawsuit was likely or unlikely or was going to be filed, that I don't recall. It's just that there certainly were discussions that there was serious disagreements particularly pertaining to the physical condition of the America's Cup Building

and the Capella South Building.
**Q. Did you tell Mr. Mellion in the fall of 1997 that a lawsuit had been threatened related to Goat Island?**
A. Like I said, I don't know whether I would have expressed it in those terms or simply that there were serious issues involving IDC and Capella and the America's Cup that could result in litigation.
**Q. And do you recall using those words with Mr. Mellion, that there were disagreements that could result in litigation?**
A. Not specifically, no.
**Q. At the time, was it your belief that the primary disagreement between the individual unit owners and Mr. Roos related to the condition of the buildings on Goat Island?**
A. Yes.
**Q. And did you communicate that to Mr. Mellion in the fall of 1997?**
A. I don't recall.
**Q. If I could direct you back to what's been marked as Exhibit 10 to your deposition.**
**(PAUSE)**
**Q. September 28, 2001, memo from you to Mr. Landry.**



A. Uh-huh.
**Q. Do you have that in front of you?**
A. Yes.
**Q. Why did you prepare this?**
A. I don't recall. I mean, I don't recall whether Bill Landry asked me to do this or whether I volunteered to do this.
**Q. Did you discuss this memorandum with Mr. Landry?**
A. I may have had a conversation with him, but I don't recall.
**Q. Do you recall having a conversation with Mr. Landry about this memorandum?**
A. No.
**Q. Do you recall discussing this memorandum with anyone besides Mr. Landry?**
A. Not to my recollection.
**Q. Did you inform Mr. Roos that you were preparing this memorandum?**
A. I don't believe so.
**Q. And did you ever communicate to him what was contained in this memorandum?**
A. Not that I can recall.
**Q. Did you discuss this memorandum with anyone else at Edwards & Angell?**



A. No.
**Q. Directing your attention to Paragraph 5 of this memorandum, there is a reference in the first sentence of Paragraph 5 to a "corrective memo"; do you see that?**
A. Yes.
**Q. What does that refer to?**
A. I don't know.
**Q. Do you recall --**
A. Oh, yes, I do know. The corrective memo, at least I believe -- no, I shouldn't speculate because I'm just not really sure.
**Q. In all the documents that you've looked at in connection with your depositions in this case, have you seen any copy of what you believe to be the corrective memo referred to in this?**
A. No, I think it might be the memo I did where I ultimately concluded that the consent of all of the sub-condominium owners was required in order to extend the development rights, but I'm not sure that's what it referred to.
**Q. Do you have a recollection of any memorandum that you chose not to send to the title company?**
A. No.



**Q. When you left Edwards & Angell, did you take any actions to delete any computerized information that you may have generated during your tenure there?**
A. No.
**Q. You had a computer when you left Edwards & Angell?**
A. Yes.
**Q. Did you leave that computer at the firm?**
A. Yes.
**Q. Prior to your departure from Edwards & Angell, did you have any discussions with the firm about what would happen to the computerized information contained on your computer?**
A. No.
**Q. Sitting here today, would it be your belief that the corrective memorandum as referred to here in Exhibit 10 would have been contained in the computer system at Edwards & Angell when you left?**
A. I believe there's a hard copy or should be a hard copy. My guess would be is that at this point in time, whatever was on that computer probably has been trashed and gone off to the landfill, but --
**Q. Do you know whether it was Edwards & Angell's**

**practice during your tenure there to maintain backup for electronic records at the firm?**
A. I do not know.
**Q. Could I direct your attention now to Exhibit 18?**
**(PAUSE)**
**Q. And in particular to the 7th page of that document, which is the letter to Mr. Roos dated March 8, 1999.**
A. Yes.
**Q. And this letter refers to a draft endorsement; do you see that?**
A. Yes.
**Q. Who prepared the draft endorsement?**
A. Commonwealth.
**Q. And did they submit the draft endorsement to you for review?**
A. It appears so.
**Q. Do you recall making any changes to the Commonwealth draft endorsement?**
A. No.
MR. TAYLOR: Can we mark this as Exhibit 22, please?
MR. HALEY: It's 23, Rob.
(PLAINTIFF'S EXHIBIT 23 MARKED FOR



IDENTIFICATION)
(PAUSE)
**Q. Have you had a chance to review Exhibit 23?**
A. Yes.
**Q. Can you identify this document?**
A. It's a letter from me to Michael Mellion dated March 3, 1999, which appears to make reference to a settlement agreement between IDC, Inc., and the Tax Assessor of the City of Newport.
**Q. Is that your signature on the letter dated March 3, 1999?**
A. Yes.
**Q. Does the first page of this agreement indicate that this document was sent to Mr. Mellion by fax on or about March 3?**
A. Yes.
**Q. And that he was sent 10 pages?**
A. Yes.
**Q. Why did you send Mr. Mellion this letter?**
A. I sent him the letter because the settlement agreement pertained to real estate taxes on the part of the Goat Island property owned by IDC.
**Q. And did Mr. Mellion request a copy of the settlement agreement?**



A. I do not recall.
**Q. Do you recall discussing the settlement agreement with Mr. Mellion?**
A. No.
**Q. The letter dated March 3, 1999, refers to Paragraph 5 of the proposed agreement; do you see that?**
A. Yes.
**Q. And Paragraph 5 of the agreement indicates that the City of Newport is agreeing not to assess development rights on non-common land for certain lots and parcels for a certain period of time; correct?**
A. Yes.
**Q. And it also cancels certain tax invoices; right?**
A. Yes.
**Q. Did you discuss with Mr. Mellion around this time the assessment of the development rights by the City of Newport?**
A. I don't recall this letter or the settlement agreement or anything about it.
**Q. Okay. Who is William Corcoran?**
A. He's a lawyer in Newport, Rhode Island.
**Q. And do you know whether in April of 1997 he was**



**representing one of the parties to these tax cases?**
A. I don't know beyond the fact that it would appear as if he was representing IDC in this matter.
**Q. Do you know whether he may have represented the City of Newport?**
A. He could have.
**Q. In the fall of 1997 or early 1998, did you ever have any discussions with Mr. Mellion about an indemnity by IDC of Commonwealth Land Title Insurance?**
A. Not that I can recall.
**Q. You've had occasion over the years to secure title insurance for other clients; correct?**
A. Yes.
**Q. In any of those situations, have you ever discussed the possibility of an indemnity being offered to protect the title insurance company against threatened claims?**
MR. HESTNES: What are we talking about --
MR. TAYLOR: Yes, the indemnity.
A. I certainly have seen -- I think I have seen

policies where the title company would say that they would provide coverage only upon a decision of the highest appellant court. So I -- and I may have seen other types of endorsements on policies where the title company has tried to limit their exposure in the event of litigation.

**Q. Did you have any discussions with Mr. Roos in the fall of 1997 or early 1998 about the possibility of offering Commonwealth indemnity against threatened litigation?**

A. I don't recall.

**Q. You made it clear to Mr. Mellion in the fall of 1997 that you had little regard for the legal analysis of Chicago Title in connection with the Goat Island policy; correct?**

A. Yes.

**Q. You felt very strongly that Chicago's analysis was completely off base; correct?**

A. Well, as to the key element of the one -- well, my strongest disagreement was their refusal to provide insurance. I agreed with them that there was enough gray in the question of whether the development rights had been extended, that if that was the sole basis upon which we were hanging our



hat, I wouldn't have had any real problems with their declining insurance. Where I had a really strong objection was the fact that, in my opinion, the North Development Unit had been properly created, and Section 2.3(b), or whatever it was, of the documents plus the Condominium Act clearly allowed IDC to develop the unit, but the most basic issue was over the creation of the North Development Unit, and I thought as to that point, there was absolutely no question whatsoever. And my sense was that ultimately, Chicago really was not willing to insure because they were concerned about potential lawsuits.

**Q. In the November 1997 memorandum that you shared with Mr. Mellion --**

**(OFF THE RECORD)**

THE WITNESS: I want to add to that last -- I've had -- over a period of time, I've had a number of disagreements with Jeff Meyer on issues where I, you know, really disagreed with what he had -- what he concluded. So it was kind of a history of not agreeing with Jeff Meyer and almost always agreeing with Michael Mellion.

**Q. Again, do you have that November 1997 memorandum**



**in front of you?**

A. Yes.

**Q. And one of the things that's mentioned in that memorandum is a one-year statute of limitations; correct?**

THE WITNESS: Could you repeat that, please?

**Q. One of the things that's mentioned in that memorandum is a one-year statute of limitations; correct?**

A. Yes.

**Q. And you believe you discussed that statute of limitations with Mr. Mellion?**

A. I believe that I had perhaps a brief discussion with him on the subject. I don't recall any extended discussion over the statute of limitations.

**Q. But you did not share a copy with him of the Tolling Agreement?**

A. Not that I can recall.

MR. TAYLOR: No further questions.

MR. HESTNES: Nothing.

THE REPORTER: Would you both like a copy?



MR. TAYLOR: Yes.

MR. HESTNES: Yes.

(DEPOSITION CLOSED AT 12:40 P.M.)

CERTIFICATE

I, Jeannette A. Freelove, a Notary Public, in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of Timothy More, Defendant in the above-entitled cause, was taken by me at the offices of Ferrucci Russo, PC, 55 Pine Street, Providence, Rhode Island, commencing at 10:00 a.m. on September 7, 2006; that previous to the testimony of said witness, who was of lawful age, the witness was sworn by me; whereupon the witness was first duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth; and that the witness thereupon testified as in the foregoing-annexed transcript.

I further certify that the foregoing deposition was taken down by me in stenotype and was later reduced to computer-aided transcription; and that the foregoing is a true and accurate record of the testimony of said witness.

Pursuant to Rule 30, the Witness, with agreement of the parties, hereby requests to read and sign the transcript.

Pursuant to Rule 5(d) and 30(f)(1) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court. Therefore, original is delivered and retained by Attorney Haley.

IN WITNESS WHEREOF, I have hereupon set my hand this 18th day of August, 2005.

Jeannette A. Freelove Notary Public

JEANNETTE A. FREELOVE, NOTARY PUBLIC
Certified Court Reporter
My Commission expires July 17, 2009

DATE: September 7, 2006
IN RE: Commonwealth v. IDC Properties, et al.
WITNESS NAME: Timothy More

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

COMMONWEALTH LAND TITLE INSURANCE COMPANY,
Plaintiff,
VS. C.A. NO. 01-400T
IDC PROPERTIES, INC.,
Defendant and Third Party Plaintiff,
VS.
TIMOTHY MORE and EDWARDS ANGELL PALMER DODGE, LLP
Third Party Defendants.

DEPOSITION OF MICHAEL MELLION, in the above-entitled cause, taken on behalf of the Defendant and Third Party Plaintiff, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of Ferrucci Russo, 55 Pine Street, Providence, Rhode Island, on August 31, 2006, at 10:00 a.m.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RI 02915
(401) 437-3366



APPEARANCES:

For the Plaintiff:
PARTRIDGE SNOW & HAHN, LLP
BY: ROBERT K. TAYLOR, ESQUIRE
180 South Main Street
Providence, RI 02903

For the Defendant and Third Party Plaintiff:
GORDON HALEY, LLP
BY: PETER J. HALEY, ESQUIRE
101 Federal Street
Boston, MA 02110

For the Third Party Defendants:
EDWARDS ANGELL PALMER & DODGE, LLP
BY: DEMING SHERMAN, ESQUIRE
2800 Financial Plaza
Providence, RI 02903



INDEX


| WITNESS | PAGE |
|---|---|
| MICHAEL MELLION | |
| Examination by Mr. Haley | 6 |


Note: Instructions to the Witness may be found on Page 81.

EXHIBITS

DEFENDANT/THIRD PARTY PLAINTIFF


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Subpoena, 3 pp | 7 |
| 2 | Correspondence dated 12/4/97 to Michael Mellion from Timothy More With Enclosure, 3 pp | 16 |
| 3 | Memorandum dated 11/17/97 to File From Timothy More, 2 pp | 18 |
| 4 | Correspondence dated 12/12/97 to Timothy More from Michael Mellion, 2 pp | 25 |
| 5 | Memo dated 12/15/97 to Timothy More From Jeff Meyer, 1 p | 28 |
| 6 | Tolling Agreement dated 1/5/98, 5 pp | 33 |
| 7 | Examiner's Expense Sheet, Order No. 228716, 1 p | 35 |
| 8 | Memorandum dated 1/6/98 to John from Michael, 2 pp | 36 |
| 9 | Chicago Title Insurance Company Insurance Policy, Date of Policy October 21, 1994, 9 pp | 39 |
| 10 | Examiner's Expense Sheet Order Number 228716, 2 pp | 41 |
| 11 | Commonwealth Land Title Insurance Company Owner's Policy Of Title Insurance, 10 pp | 43 |
| 12 | Correspondence dated 2/2/98 to Timothy More from Michael Mellion With Enclosure, 2 pp | 43 |
| 13 | Copy of printout from Commonwealth Order No. 228716, 2 pp | 46 |




EXHIBITS (CONTINUED)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 14 | Title Run document, 2 pp | 47 |
| 15 | Third Amendment To First Amended And Restated Declaration Of Condominium Goat Island South - A Waterfront Condominium, 6 pp | 51 |
| 16 | Rhode Island Judicial Systems And Sciences Docket Event Listing, 1 p | 54 |
| 17 | Handwritten notes dated Goat Island South Condo, 5 pp | 57 |
| 18 | Handwritten document entitled IDC Properties dated 1/13/98, 2 pp | 57 |
| 19 | Handwritten document entitled IDC Marina, IDC Properties, Inc., IDC Hotel, Inc., IDC, Inc., dated 10/21/94, 10 pp | 57 |
| 20 | Correspondence dated 12/3/98 to Michael Mellion from Timothy More With Fax Cover Sheet, 2 pp | 57 |
| 21 | Correspondence dated 2/2/99 to Michael Mellion from Timothy More, 1 p | 60 |
| 22 | Title Run document, 2 pp | 60 |
| 23 | Faxed Correspondence dated 3/1/99 to Timothy More from Michael Mellion, 1 p | 65 |
| 24 | Correspondence dated 4/14/99 to Timothy More from Michael Mellion, 1 pp | 66 |
| 25 | Endorsement dated 3/1/99, 2 pp | 66 |
| 26 | Memorandum dated 12/6/00 to Michael Mellion from Joseph Hall, 3 pp | 68 |
| 27 | Faxed correspondence dated 12/8/00 To Joseph Hall from Michael Mellion, 1 p | 68 |
| 28 | Correspondence dated 5/2/01 to David Miller from Michael Mellion, 1 p | 74 |
| 29 | Copy of E-mail dated 5/8/01 to Dianne Wilczynski from Michael Mellion, 1 p | 79 |




COPY

EXHIBITS (CONTINUED)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 30 | Faxed correspondence dated 5/9/01 To David Miller from Michael Mellion, 1 p | 80 |
| 31 | Faxed correspondence dated 5/16/01 To David Miller from Michael Mellion, 1 p | 81 |
| 32 | RI Supreme Court Citation from America Condominium Association, et al., v. IDC, Inc., et al., dated 3/23/04, 30 pp | 85 |
| 33 | RI Supreme Court Citation from America Condominium Association, et al., v. IDC, Inc., et al., dated 4/8/05, 9 pp | 85 |
| 34 | Copy of Folder Number 228716A with Memorandums dated 12/16/98 and 2/12/99 To John from Michael, 4 pp | 89 |



(DEPOSITION COMMENCED AT 10:05 A.M.)

MICHAEL MELLION

Being duly sworn, deposes and testifies as follows:

THE REPORTER: Could you state your full name for the record, please, and spell your last name?

THE WITNESS: Michael Mellion, M-E-L-L-I-O-N.

MR. HALEY: Rob, if it's acceptable to you, we could waive the sealing and filing of the deposition and agree to reserve all objections except as to form of the question until the time of trial.

MR. TAYLOR: We'll agree to reserve all objections except those as to form, and we will want to read and --

(OFF THE RECORD)

MR. HALEY: And the witness will have the opportunity to read and sign the deposition in accordance with the applicable rules.

(OFF THE RECORD)

EXAMINATION BY MR. HALEY

**Q. Could you state your name, please?**



A. Michael Mellion.

**Q. What's your address, Mr. Mellion?**

A. It's 5 Geneva Street in Pawtucket, Rhode Island.

MR. HALEY: Mark that as Exhibit 1.

(DEFENDANT'S EXHIBIT 1 MARKED FOR IDENTIFICATION)

**Q. Mr. Mellion, I show you what's been marked as Exhibit 1. Are you here this morning in accordance with that subpoena?**

A. Yes.

**Q. Are you represented by counsel today?**

A. Yes.

**Q. Who is that?**

A. Robert Taylor from Partridge Snow.

**Q. And are you paying for Mr. Taylor's service?**

A. No.

**Q. Do you know who's paying them?**

A. I assume Commonwealth Title.

**Q. And how are you employed?**

A. I am employed by Fidelity National Title Insurance Company.

**Q. And what do you do for them?**

A. I am a State Manager and State Counsel.



**Q. And how long have you been employed by Fidelity?**

A. Since October 15 of '05.

**Q. And does Fidelity have any relationship with either Commonwealth Land Title Insurance Company or Chicago Title Insurance?**

A. Chicago, yes. Chicago is a subsidiary of Fidelity.

**Q. And when did you leave Commonwealth?**

A. I left, I believe, October 1 -- between October 1st and 15th of '05.

**Q. So you went from Commonwealth directly to Fidelity?**

A. Yes.

**Q. And how did that come about?**

A. I was offered a position with Fidelity.

**Q. Were you actively looking for a position at the time?**

A. No.

**Q. Were you, at any time, discharged from your position at Commonwealth?**

A. No.

**Q. And when did you start work at Commonwealth?**

A. I think it was November of 1989.

**Q. And before that, you were a lawyer in private**

**practice in Rhode Island?**
A. Yes.
**Q. And for how many years was that?**
A. Since 1977.
**Q. You graduated from Suffolk Law School?**
A. Yes.
**Q. And your undergraduate degree from Brown?**
A. Yes.
**Q. What year was that?**
A. '73.
**Q. Did you work at all in between college and law school, any full-time position?**
A. Yes, I had a job with Almacs Grocery Stores, warehouse work for one year.
**Q. With respect to your position at Fidelity, is that similar to your position at -- is it similar to the duties and responsibilities you had at Commonwealth?**
A. It's similar, but I have duties as manager of the office, which I did not have at Commonwealth.
**Q. Did you receive any letters of recommendation or reference from anyone at Commonwealth at the time that you took the Fidelity position?**
A. No.



**Q. Did you seek any?**
A. No.
**Q. And briefly, with respect to your experience at Commonwealth between 1989 and 2005, did your position change at all during that time period?**
A. No, I started as state counsel, and ended as state counsel, did become assistant vice president a couple of years before that.
**Q. And what were your duties as state counsel?**
A. I handled commercial transactions for the office. I consulted with agents on title issues. I did seminars for the agents and for the legal community.
**Q. And how many people -- where was your office based?**
A. Initially, it was in Downtown Providence on South Main Street, and then we moved to Thurber Boulevard in Smithfield.
**Q. And how many people worked in the office?**
A. It was about 20.
**Q. And were you the person in charge of the office?**
A. No, I was just a state counsel. I was not the manager.
**Q. And the manager was Sally O'Neel?**



A. Sally O'Neel, and at the time I left, it was Albert Antonio.
**Q. When did Ms. O'Neel leave the office?**
A. I think the end of 2001 or 2002. I can't remember the year, either one of those two.
**Q. How many people held the position of state counsel in the office?**
MR. TAYLOR: Object to the form of the question. During what time period?
MR. HALEY: During the period 1989 to 2005.
A. Just me.
**Q. Do you know who state counsel now is for Commonwealth?**
A. M'Liss Rinaldi, I believe it is now.
**Q. Have you ever met Tom Roos?**
A. No.
**Q. Have you ever talked to him on the phone?**
A. No.
**Q. Have you ever met anyone who's employed by IDC Properties?**
A. Not to my knowledge.
**Q. Do you know the phone number at IDC Properties?**
A. No.



**Q. Did you ever visit their offices?**
A. No.
**Q. Other than Tim More, have you talked to anyone on behalf of IDC Properties?**
A. Not to my knowledge, no.
**Q. Did you ever receive any correspondence, E-mail or any communication from anyone directly from IDC Properties or on behalf of IDC Properties other than Tim More?**
A. Nothing that I would recall.
**Q. Is there anything that would refresh your recollection concerning that?**
A. I don't think so. I can look at the file, but I don't recall ever speaking to anyone other than Tim, with respect to that time.
**Q. How long have you known Tim?**
A. Probably since I started at Commonwealth, which was 1989.
**Q. And how did you come to meet him?**
A. Probably just through business transactions. He was representing a client who was seeking title insurance.
**Q. Was Mr. More ever an agent for Commonwealth?**
A. I don't believe so, no.

**Q. And with respect to issuance of title insurance policies in Rhode Island, were policies issued by or on behalf of Commonwealth through agents?**
A. Yes.
**Q. And was that generally the case, or how was the division between policies issued directly from the office or through agents?**
A. We issued directly through the office for what we call approved attorneys, who are not agents. They can't issue their own policies. They don't have their own policies in their office. What the link is between them is a good question. It could be 50/50. I'm not really sure.
**Q. When you refer to that 50/50, the split between agents and policies issued directly from --**
A. Yes, I can't be accurate about that because I wasn't -- that was the business side that I really wasn't knowledgeable about.
**Q. And was Mr. More an approved attorney?**
A. I believe after he left Edwards & Angell, he may have become an approved attorney.
**Q. Was he an approved attorney at the time the policies in this matter were issued in 1998 and 1999?**



A. I don't think so.
**Q. And what's the process to become an approved attorney?**
A. Submit an application to the company, and the company reviews the application to see what the experience level is of the person, and then makes the decision whether to appoint that person as an approved attorney.
**Q. And in making that decision, they're evaluating the skill and competence of the lawyer?**
A. Uh-huh.
MR. HALEY: You need to --
A. Yes.
MR. HALEY: Thank you.
**Q. And with respect to the policies issued by an agent, how does that work? The agent assumes responsibility for the policy?**
A. Yes.
**Q. How does that differ from a policy issued directly by the office?**
A. We do what's call the underwriting. We look at the title evidence submitted by the approved attorney and determine that everything has been properly examined to the extent that it's



disclosed in the application, and that the documents they submit are in good form and all other requirements have been met for the issuance of the policy. For an agent, the agent does all of that.
**Q. And if there's something wrong with the policy or there is a claim on the policy, if the agent has made an error, the agent can be liable to Commonwealth for that; is that correct?**
A. That's correct.
**Q. And with respect to the policies issued directly by Commonwealth, there isn't any third party who has responsibility for the underwriting? That responsibility lies with Commonwealth; is that correct?**
THE WITNESS: You're talking about a direct matter, a commercial matter, we did in-house?
MR. HALEY: Yes.
A. That's correct. Generally speaking, that's correct.
**Q. And with respect to the policies issued in this case, were these commercial matters that you dealt with in-house?**



A. Yes.
**Q. You previously testified in this case; do you recall that?**
A. Yes.
**Q. And have you reviewed your deposition transcript?**
A. Yes.
**Q. And is there anything that you testified to previously that you wish to amend or correct or now believe was --**
A. No, there's nothing I wish to correct.
MR. HALEY: Mark that Exhibit 2, please.
(DEFENDANT'S EXHIBIT 2 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you what's been marked as Exhibit 2. Do you recognize that document?**
A. Yes.
**Q. And is that a letter that you received from Mr. More?**
A. Yes.
**Q. And is that your handwriting on the letter?**
A. Yes, it is.
**Q. And prior to receiving this letter from Mr. More, how frequently did you deal with him?**

A. We would occasionally do business with him. I really can't recall how frequently, but I know a couple deals a year, two or three deals a year, could be more.
**Q. And with respect to the law firm Edwards & Angell, how frequently did you deal with them?**
A. On a regular basis.
**Q. What do you mean by that?**
A. They would send us title work or ask us to bid on deals that they were involved with as those deals came up.
**Q. And they were a valued customer of Commonwealth?**
A. Yes.
**Q. And does Commonwealth keep track of how much business it writes for Edwards & Angell?**
A. The business side may have done that. I never did.
**Q. Did you ever see any of that information?**
A. Not to my knowledge, no.
**Q. And when you say you bid on business, there's a competitive market for title insurance; is that correct?**
A. That's correct.
**Q. And other insurers would bid on the same work; is**



**that correct?**
A. Yes, if it was put out to bid, that particular deal.
MR. HALEY: Mark this Exhibit 3, please.
(DEFENDANT'S EXHIBIT 3 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, Exhibit 2 has a memorandum attached to it, and Exhibit 3 appears to be that memorandum with your handwriting on it; is that correct?**
A. That's correct.
**Q. And you read the memorandum when you received it?**
A. Yes.
**Q. And did you form any opinions about the title after reviewing the memorandum?**
A. I don't recall if I informed them after that, but I apparently agreed with the analysis contained in the memorandum.
**Q. Is it fair to say that the title insurance that Mr. More was requesting was not a simple matter?**
A. That's fair to say.
**Q. And did the statement in the memorandum looking at Paragraph 1 -- the paragraph numbered 1, the third sentence there says, "Even if the amendment is**



**invalid, there is a one year statute of limitations in the Condominium Act for challenging the validity of an amendment to a Declaration adopted by an association." You were aware, were you not then, that there was a possibility that the amendment could be challenged?**
A. No, I wasn't aware of the possibility.
**Q. Well, for what purpose did you think Mr. More was making reference to the statute of limitations?**
A. As far as I knew, this was a theoretical evaluation of what occurred. I wasn't aware of any actual controversy about it.
**Q. And when you asked Mr. More about the existence of any actual controversy, what did he tell you?**
MR. TAYLOR: Object to the form of the question.
A. I don't believe I ever asked him about any controversy. It didn't occur to me there was one.
**Q. Did Mr. More or IDC Properties fill out an application for the title insurance?**
A. I don't think so.
**Q. Is there such -- does Commonwealth have such a thing?**
A. In the old days, they had a form. People would



walk in and fill out a form, but normally, the way business was done when I was there, we would get either a letter or a phone call or, later on, an E-mail asking us if we were interested in bidding on the insurance or asking us to actually do the title.
**Q. And did you require the potential insured or their counsel to fill out any statement as to the title matters or the issues?**
A. No.
**Q. Did you ever ask Mr. More any questions that he refused to answer?**
A. No.
**Q. Did you ever request of Mr. More any information concerning the title to the property that he refused to provide to you?**
A. Not that I recall.
**Q. With respect to the handwriting on the memorandum, could you tell me what the annotation above the line on the right-hand side of the page means, 1.0 --**
A. That's a dollar a thousand. That's the price, a dollar a thousand.
**Q. And what's the second line, "+"?**

A. Plus attorney's fees.
**Q. And who would the attorney's fees -- what were the attorney's fees? What is that in reference to?**
A. It would be another charge we would make.
**Q. A charge for you retaining outside counsel or a charge for your services?**
A. For our services.
**Q. And did you ever have a practice -- did Commonwealth ever have a practice, while you were there, of having outside counsel review title issues or matters?**
A. I never did that myself, no.
**Q. Do you know if anyone else at Commonwealth ever did that?**
A. I don't have any knowledge of that.
**Q. And with respect -- at the time that Mr. More delivered this memorandum to you in December of 1997, you regarded Mr. More as a competent real estate counsel; is that correct?**
A. Yes.
**Q. And you trusted and valued his opinion; is that correct?**
A. Yes.
**Q. And the firm that he worked for was a prominent**



**firm in the City, which also had a substantial and good representation?**
A. Yes.
**Q. And you were relying on those things in evaluating the memorandum and the title?**
A. Yes.
**Q. With respect to the writing on Exhibit 3, it says, "Existing Chicago policy or other would be useful." What does that refer to?**
A. Well, it refers to the possibility that if somebody else has issued a policy, it would be useful to look at it in evaluating the title.
**Q. Why would that be useful?**
A. Well, we would either use it as a guide to our own examination, or depending upon the nature of the deal, sometimes we would use that policy as a -- what we call a start. We would write as a base on that, and then examine the title formally.
**Q. On the theory that because you were relying on the work done by the prior issuance of the title insurance?**
A. No, if we had another company that had insured an owner's policy or issued an owner's policy, then that tells us they have liability as well,



and they've probably done a complete exam. So we would compare their work against ours to make sure we found what they found or see if we found other items that they didn't.
**Q. Would you go back and review their earlier work in comparing your work to ours -- theirs?**
A. It depends. A deal like this, we would most likely go back as far as we could to do the deal ourselves, the entire title ourselves, and use Chicago's policy as a reference source.
**Q. And why is that that you would go back and review it yourself on a deal -- when you say, "A deal like this," what about this deal would merit that?**
A. It was a complicated structure, so I wanted to make sure I understood the structure.
**Q. On the bottom of the page on Exhibit 3 is the word "Agree"; is that your writing?**
A. Yes, it is.
**Q. And what did you mean by that?**
A. I agreed with the analysis that in the absence of fraud, a court should find that a one-year statute of limitations bars attack on the amendment.
**Q. And were you relying on that analysis in issuing**



**the policy?**
A. Well, I didn't really consider this to be a problem because it wasn't structured as a problem or presented as a problem, but I just agreed with the analysis presented in it. It seemed to me to make sense.
**Q. Did Mr. More's reference to the statute of limitations in the earlier sentence we read or in this sentence, the last sentence in Paragraph Number 1, raise in your mind any concerning that there might be a challenge to the amendment?**
A. No.
**Q. Did you discuss this memorandum with Mr. More?**
A. I don't recall that, no.
(OFF THE RECORD)
(ATTORNEY SHERMAN NOW PRESENT AT 10:30 A.M.)
**Q. Other than Mr. More, did you discuss Exhibit 3 with anyone else?**
A. Not that I recall.
**Q. And you don't recall having any discussions with Mr. More about it?**
A. I don't remember any, no.
MR. HALEY: Mark this as 4, please.
(DEFENDANT'S EXHIBIT 4 MARKED FOR

IDENTIFICATION)
**Q. Mr. Mellion, I show you what's been marked as Exhibit 4. Is that a letter that you sent to Mr. More?**
A. Yes.
**Q. And that was your bid for the title insurance he requested?**
A. Yes.
**Q. And did you discuss this letter with him at all before sending it?**
A. I can't recall. I know -- I think I discussed the price, a dollar a thousand, but beyond that, I don't recall discussing the actual details.
**Q. Were you using E-mail at this time?**
A. I don't remember. Good question.
**Q. Have you ever seen any copies of E-mails between yourself and Mr. More?**
THE WITNESS: On this deal?
MR. HALEY: On any deal during this time period.
A. I just don't remember. That's a good question.
**Q. Do you have copies of E-mails with anyone involving this transaction or have you ever seen copies or reviewed copies of E-mails with anyone**



**involved in this transaction?**
A. I don't recall having E-mail capability then or using E-mail on this deal. I just can't give you an answer.
**Q. And the Exhibit 4 makes reference to title examination charges. What was the purpose of that?**
THE WITNESS: Are you talking about Subsection A?
MR. HALEY: Yes.
THE WITNESS: What was the purpose of --
MR. HALEY: The title examination.
A. The purpose of the title examination is to see what was on record with respect to the condominium.
**Q. And to form an opinion as to whether or not Commonwealth would be willing to insure the title?**
A. Yes, that would certainly be the basis for that.
**Q. And then there's a reference in the second page of Exhibit 4 to Legal Review, and a charge of $125 per hour. It says, "In the event that complex title or non-title issues arise that require**



**extraordinary review time, we will bill at the rate $125 an hour." Were there any complex title or non-title issues in this matter that required extraordinary review?**
A. I don't recall billing for any. It's possible I did. I just don't recall whether I did or not.
**Q. And other than yourself, did anyone else perform any review of the title issues?**
A. Other than the examiner who actually did the title, I don't think anyone else did.
**Q. And what did you understand Mr. More's obligations to be with respect to the application for title insurance?**
A. To disclose any knowledge he had about any off record issues with the title.
**Q. And anything else other than that?**
THE WITNESS: By the time of the application?
MR. HALEY: Yes.
A. Well, just the normal details like who's involved, who the owner is going to be, or if it was a loan policy, we would want to know who the lender is and the amount of the loan, details like that.



**Q. And did you believe that Mr. More understood his obligations to you in the same way that you understood them and have testified to them?**
A. Yes, I think so.
**Q. And what was the basis for that belief?**
A. That's just the way title business is conducted.
**Q. And other than it being just the way title business is conducted, did you ever make any communications to Mr. More in this matter or any other matter in which you told him that you believed him to have certain responsibilities with respect to the application for insurance?**
A. I don't think so, no.
MR. HALEY: Mark that Exhibit 5, please.
(DEFENDANT'S EXHIBIT 5 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you what's been marked as Exhibit 5 in the deposition. It's a memorandum to Tim More from Jeff Meyer. Do you know Jeffrey Meyer?**
A. Yes.
**Q. And did you know him in 1997?**

A. Yes.
**Q. And how he is employed, if you know?**
A. He was the manager of Chicago Title.
**Q. And did you talk to him on any regular basis?**
A. We talked occasionally, not on a regular basis.
**Q. And in this matter, you were aware that Chicago Title had issued a title policy on the property previously; is that correct?**
A. I think I eventually saw a policy. Whether I knew at the time that they issued one, I can't say.
**Q. Do you ever have any conversations with Mr. More or anyone else about whether or not Chicago had been asked to bid on the title insurance being issued in December 1997?**
A. I don't recall that, no.
**Q. And did you ever ask Mr. More whether or not Chicago had refused to issue the title insurance?**
A. No.
**Q. Did you have any reason to believe that had you asked Mr. More that question, he would not have given you an honest answer?**
A. I assume if I asked him the question, he would have given me an honest answer.



**Q. And with respect to this memorandum that we marked as Exhibit 5, you did not see this at the time the title insurance was issued; is that correct?**
A. That's correct.
**Q. And if you had seen it at the time the title insurance issued, would it have affected your decision to issue the title insurance?**
A. Yes.
**Q. And how would it have affected it?**
A. I don't believe I would have offered to insure the title.
**Q. Why not?**
A. Because I know one other company has determined that that would create a marketability issue they refuse to insure.
**Q. And why is it that you didn't ask either on a written application or ask Mr. More the question whether or not anyone else had refused to issue insurance on the property?**
MR. TAYLOR: Object to the form of the question.
A. I don't think I ever asked anyone that at the time of application.
**Q. Why not?**



A. I suppose I'm assuming that if someone has, they will tell me that. My understanding of the way business is done in Rhode Island or has always been done is that that's the duty on the part of whoever sent us the title to disclose to us.
**Q. And what's the basis of that understanding?**
A. Well, if they are applying for issuance of a title insurance policy through counsel, the counsel in my judgment has an obligation to tell me whether there's a problem with the title that's not something that could be revealed by a record examination.
**Q. And with respect to the memorandum that's made reference to in the first page -- in the first paragraph of Exhibit 5, "Please be advised that we have reviewed the Memorandum which you sent to us regarding Goat Island Condominium," you received a memorandum from Mr. More as well; is that correct?**
A. Exhibit 3, yes.
**Q. And is it your -- after your review of the memorandum, though, you were still willing to issue title insurance; is that correct?**
A. Yes.
**Q. But you believe that Mr. More had an obligation to**



**tell you if he had sent the memorandum to anyone else, and they had reached a different conclusion?**
MR. TAYLOR: Object to the form of the question.
A. If he knew that another title company had refused to insure, yes, I believe he had an obligation to tell me that.
**Q. And when you made the decision to insure after the review of the memorandum, you were relying on your own independent judgment and skill in evaluating the facts of the memorandum; is that correct?**
THE WITNESS: Would you repeat the question? I'm sorry.
MR. HALEY: Sure.
**Q. When you reviewed the memorandum that we've marked as Exhibit 3 and made the decision to issue title insurance, you were relying upon your own independent review of the memorandum and judgment and skill in assessing that title issuance; is that correct?**
A. Yes.
(PAUSE)
MR. HALEY: Mark that Exhibit 6, please.

Page 33

(DEFENDANT'S EXHIBIT 6 MARKED FOR IDENTIFICATION)

**Q. Mr. Mellion, I show you what's been marked as Exhibit 6 which is a document entitled Tolling Agreement, and that has a date on it on the second to last page of January 5, 1998. Did you ever discuss with Mr. More whether or not IDC Properties had entered into a tolling agreement?**

A. No.

**Q. Did you ever discuss with Mr. More whether or not IDC Properties was aware of any threatened or potential claims against the property?**

A. No.

**Q. Do you have any reason to believe that if you had asked him the question, whether or not there had been a tolling agreement entered into or whether or not there had been any potential or threatened claims, that he would not have given you an honest answer to those questions?**

A. I assume if I asked him a question, he would give me an honest answer.

**Q. And if you had seen the tolling agreement, is it your testimony that you would not have issued the title insurance?**

Page 34

A. That's my testimony, yes.

**Q. Why?**

A. Because there's clearly a controversy regarding the title. If there's a pending attack on the title, I'm certainly not going to insure the title to it.

**Q. And you believe that Mr. More had an obligation to tell you that; is that correct?**

A. That's correct.

**Q. And the basis for that belief is what?**

MR. TAYLOR: Objection, asked and answered.

A. Well, fundamental honesty, I mean, for the transaction. Anyone who's giving me a deal, in my opinion, has the obligation to disclose to me any knowledge they have that's detrimental to the title.

**Q. You never asked Mr. More, did you, "Is there anything else about the title I should know"?**

A. No.

**Q. You never asked Mr. More whether or not there were any claims or potential claims with respect to the title?**

A. No, I didn't.

Page 35

**Q. Prior to the issuance of title insurance, had you ever been to Goat Island to take a look at the property?**

A. I may have been to Goat Island, but not particularly to look at the property through this title.

**Q. Were you aware from any other source that there were any disputes or issues in connection with the condominium?**

A. No.

**Q. Do you ever talk to Mr. Meyer at Chicago Title or anyone else from any other title company about the property?**

MR. TAYLOR: Object to the form of the question, time.

MR. HALEY: Prior to the issuance of the policy.

A. No.

MR. HALEY: Would you mark this 7, please?

(DEFENDANT'S EXHIBIT 7 MARKED FOR IDENTIFICATION)

**Q. Mr. Mellion, I show you what's been marked as Exhibit 7. Could you tell me what that is?**

Page 36

A. This is an Examiner's Expense Sheet.

**Q. And who is the examiner?**

A. CFR would be Celeste Riendeau.

**Q. And other than -- and this particular expense sheet refers to the issuance of the endorsement amending the policy in 1999; is that correct?**

A. No, I don't actually recall what we did to the policy at that point. It reflects work she did in 1999, but I don't have an actual present recollection of what I did then.

MR. HALEY: Mark this as 8, please.

(DEFENDANT'S EXHIBIT 8 MARKED FOR IDENTIFICATION)

**Q. Mr. Mellion, I show you what's been marked as Exhibit 8; do you recognize that?**

A. It's a memo that I wrote to our title plant manager.

**Q. I'm sorry, title --**

A. Plant manager.

**Q. Okay. And what was his name?**

A. John Eleuterio.

**Q. And why were you sending this to him?**

A. This is a memo instructing him to have an examination prepared for us.

**Q. And other than yourself and Mr. Eleuterio, was there anyone else involved in the issuance of the insurance policy originally, in the evaluation of the policy on behalf of Commonwealth?**
A. John wasn't involved in the examination of the title. He was just responsible for getting it assigned to an examiner who would do that.
**Q. And other than the examiner who he assigned and yourself, was there anyone else involved at Commonwealth who reviewed the title issues?**
A. I don't remember anyone else being involved.
**Q. Would that be the normal course of events in issuing title?**
A. Well, it would depend upon what the title issues were, and the amount of the deal. For instance, Providence Place Mall, when coverages were requested which were outside the scope of what I could agree to, I would have to consult with my regional counsel, and if he felt it necessary, he would consult with the counsel at headquarters.
**Q. And what was the limit of your review authority at the time in the end of 1997, beginning of 1998?**
A. I don't recall.



**Q. Was this policy, the 5 million dollars, initially requested within your limits?**
A. Yes.
**Q. And who was regional counsel at the time?**
A. Roger Blauvelt.
**Q. And did you ever review this policy with Mr. Blauvelt before its issuance?**
A. I don't recall doing so, no.
**Q. And the memorandum on the first numbered paragraph says, "Examine the title forward from the date of the Chicago policy." Why was it that you didn't make any examination prior to the date of the Chicago policy?**
A. I must have felt confident that that policy was a good place to start.
**Q. In making that decision, you were relying upon the fact that Chicago had done a competent job of reviewing the title before it issued its policy?**
A. Yes.
**Q. So with respect to the title issues that might have existed up to October 21, 1994, you did not make any independent judgment or review about those issues; is that correct?**
A. If that's the date of the Chicago policy, I



wouldn't have looked behind it at that point unless whatever I saw on the record after that made me want to go back and take another look at something.
**Q. Well, with respect to the date of the Chicago title policy, the memorandum says, "Attached is a copy of a Chicago's Owner's policy dated October 21, 1994"?**
A. Oh, you're right.
**Q. Do you have any reason to believe that's inaccurate?**
A. No.
MR. HALEY: We might as well mark that is as 9, please.
(DEFENDANT'S EXHIBIT 9 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you what's been marked Exhibit 9, which is copy of a Chicago policy, and on the third page of the exhibit, Owner's Policy, that indicates an issuance date of October 21, 1994; is that correct?**
A. Yes, it does. That's what it says.
**Q. And is this the policy that you were relying upon in issuing the title insurance that you issued for**



**Commonwealth?**
A. I assume so. It's the same date. I don't see a number in my memo referring to this number, but it's the same date.
**Q. And in your review of the title issues in connection with the issuance of the Commonwealth policy, did you ever encounter anything which made you -- caused you to look back beyond the date of the Chicago policy to make any independent examination of those issues prior to October 21, 1994?**
A. I don't recall doing so.
**Q. Other than relying upon the independent judgment and skill that Chicago brought to bear in issuing its policy, was there anything else about the Chicago policy which caused you to rely upon it?**
A. That it was an owner's policy.
**Q. And what about the fact that it was an owner's policy caused you to rely upon it?**
A. Well, Chicago would have liability under its own owner's policy as well.
**Q. Liability to?**
A. The insured.
**Q. And under Commonwealth's policy, would**

**Commonwealth have any rights back against the Chicago title policy?**
A. No.
**Q. Did you ever make any evaluation or receive any information about the value of the property that you were insuring in this Commonwealth policy issued in 1998?**
A. Not that I remember.
**Q. And subsequent to the issuance of the policy, at any time up to the present, have you ever made any evaluation or received any information about the value of the property that was insured?**
A. Not that I remember, no.
**Q. Do you remember having any discussions with anyone about the value?**
A. Only, I guess, with Tim as to what value he wanted on it.
(PAUSE)
MR. HALEY: Mark that as 10, please.
(DEFENDANT'S EXHIBIT 10 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you what's been marked as Exhibit 10 which is another examiner's expense sheet, and the initials on this indicate the**



**examiner also was Celeste Riendeau; is that correct?**
A. Yes.
**Q. And this examination -- and the dates are January 13, 1998, and January 16, 1998 -- would have been in connection with the original issuance of the policy; is that correct?**
A. I don't recall the date the policy was issued.
**Q. Well, I will show you a copy of a letter dated February 2, 1998, to Mr. More, and I'll show you a copy of the policy.**
**(PAUSE)**
A. Well, the policy is dated January 13, '98, which is the same day as the first entry by Celeste as to her exam. So exactly what she did out there on the same date, I don't recall. She would probably have prepared some sort of update conclusion sheet, I assume would be the reason she went out there. The 16th, I don't know why she would be going out there. Copies -- to get additional copies. She's got $99 worth of copies on that day.
MR. HALEY: Let's mark the policy as 11.



(DEFENDANT'S EXHIBIT 11 MARKED FOR IDENTIFICATION)
MR. HALEY: Mark the letter as 12, please.
(DEFENDANT'S EXHIBIT 12 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, we've marked the title insurance policy issued as of -- effective as of January 13, 1998, as Exhibit 11, and the letter to Mr. More dated February 2, 1998. Is it possible that you didn't deliver the policy to Mr. More until February 2, 1998, but made it effective as of January 13, 1998?**
A. Well, apparently, I didn't send it to him until February 2. So what the significance of the actual date is usually would depend on recording of a document.
**Q. But there were no documents recorded in this instance; correct?**
A. I don't believe there were.
**Q. Other than Celeste Riendeau, do you know of anyone else who performed any title examination in connection with the issuance of this policy?**
A. I don't remember.



**Q. Did you ever have any conversations with Ms. Riendeau about the title insurance policy?**
THE WITNESS: About the policy?
MR. HALEY: About the policy or the title issues or the issuance of the policy, anything having to do with the property.
A. I assume I might have discussed with her whatever she -- with regard to the examination that she did, but I don't think I discussed anything about the preparation of the policy. That would be unusual.
**Q. And with respect to your discussions with her about the examination, what do you recall about those?**
A. I really don't recall anything.
**Q. And do you know how long those discussions took place?**
A. Well, I don't recall the discussions. Usually they would be fairly brief. I would be asking her, "I need another copy of this," or "I need this document," or -- that would usually be the nature, or if I -- yes, that would usually be what I would be talking about.
**Q. And would it generally be the case that the**

examination performed by the title examiner would be completed before the effective date of the policy?
A. Yes.
Q. And with respect to Exhibit Number 12, that encloses an invoice to Mr. More for the policy; is that correct?
A. Yes.
Q. And that does not indicate, does it, any extraordinary legal review?
A. That's correct.
Q. And to your knowledge, was there any separate bill or charge that isn't reflected in this invoice for this particular policy?
A. I don't recall there being one.
Q. If you had made a legal review, would you have charged Mr. More for it?
A. I think so, yes.
Q. Is it fair to assume then that you didn't perform any extraordinary legal review in this matter?
A. Other than looking at the documents and making my own evaluation of what they said, no.
MR. HALEY: Mark this as 13, please.
(DEFENDANT'S EXHIBIT 13 MARKED FOR



IDENTIFICATION)
Q. Mr. Mellion, I show you what's been marked as Exhibit 13. Do you recognize that?
A. It looks like a printout of a computer screen for this order.
Q. And is this a computer screen that was part of the Commonwealth setup?
A. Yes, it was on our system.
Q. And this was the order -- the order number is 228716, which is the policy number for the policy that was issued; is that correct?
A. Yes.
Q. And who is the customer?
A. Edwards & Angell.
Q. And why is Edwards & Angell listed as the customer and not IDC Properties, Inc.?
A. Because we listed our customer as the party who sent us the title work.
Q. And the contact person is Tim More; is that correct?
A. Yes.
Q. And the order entry date, what does that mean?
A. That's normally the date that we would get the title in.



Q. Normally the date that you would --
A. Get the request for the title.
Q. Okay. From the customer?
A. Yes.
Q. And then the priority date is what?
A. When the customer wants the title.
Q. And what does Direct/Indirect refer to?
A. Direct was in-house work where we would be issuing the policy. Indirect would be someone else issuing the policy, like an agent or an approved attorney.
Q. In the second data field after Property Owner, it says IDC Properties, Inc., and then there's AP and AL. What does that refer to?
A. Assessor's plat and assessor's lot.
MR. HALEY: Mark that as 14, please.
(DEFENDANT'S EXHIBIT 14 MARKED FOR IDENTIFICATION)
Q. Mr. Mellion, I show you what's been marked as Exhibit 14. Could you tell me what that is?
A. That's a conclusion sheet.
Q. And what is a conclusion sheet?
A. That's what the examiner submits after the examiner has examined the title.



Q. And did you review this prior to issuing the title?
A. I assume I did, yes.
Q. And it says, "Title Run To: January 13, 1998"?
A. Yes.
Q. And that would have been the date on which the examination concluded; is that correct?
A. That's the date on which they would have run through to, yes.
Q. So this conclusion sheet would have to have been generated on or after January 13, 1998; is that correct?
A. Yes.
Q. And the "Start," what does that make reference to?
A. That's the date, I believe, of the Chicago policy.
Q. So Ms. Riendeau would not have made -- this indicates that she didn't make any examination prior to October 21, 1994; is that correct?
A. Yes.
Q. And there's a note on the first page, "See my notes next page." If we turn to the second page of Exhibit 14, the first paragraph says, "Reminder that you told me to hold off on getting copies

**that you requested." Do you know what that means?**
A. Other than that I told her not to get copies.
**Q. Do you know what copies she was referring to?**
A. No, I don't actually recall.
**Q. If we look at Exhibit Number 8, there's a number of requests for copies in the Paragraphs Numbered 2, 3 and 4. Do you know if you ever received those copies or if those were the copies that you had Ms. Riendeau hold off on getting you?**
A. Those are the only copies I requested. I don't recall why I would have told her not to get them. To tell you the truth, I don't remember.
**Q. And it appears from this memorandum, does it not, that she did not get you the copies, directing your attention, again, to the second page of the exhibit?**
A. Right. She reminded me I told her not to get the copies.
**Q. That's on the second page of Exhibit 14; is that correct?**
A. Yes, it's Item Number 1.
**Q. And with respect to the second paragraph on that page, it says, "To refresh your memory, no MLC" -- and that refers to municipal lien certificate; is**



**that correct?**
A. That's correct.
**Q. "Is possible at the City has locus located within the common areas. Until development occurs, the City will not distinguish as a separate plat and lot." With respect to her reference, "To refresh your memory," had you had a prior discussion with her about that?**
A. I assume so.
**Q. And do you remember anything about it?**
A. No.
**Q. And with respect to the note in Paragraph 2, did that raise any concerns in your mind about the ownership of the property being insured?**
A. No.
**Q. And if the property was owned by IDC Properties, Inc., would you expect it to be assessed to IDC Properties, Inc.?**
A. I would expect the assessor to do that, yes.
**Q. And the fact that this note seems to indicate that the assessor assessed the property to the common areas of the condominium didn't raise any concerns in your mind about the title to the property?**
A. It, I assume, made me believe that they didn't



understand the condominium.
**Q. When you say, "They didn't understand the condominium" --**
A. The assessor.
**Q. That the assessor didn't understand the condominium?**
A. Uh-huh.
**Q. But you felt that you had a good enough understanding about it to understand where the title lay?**
A. Yes.
(PAUSE)
MR. HALEY: Mark that as 15, please.
(DEFENDANT'S EXHIBIT 15 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I direct your attention to Exhibit 15, which is a document entitled Third Amendment To First Amendment And Restated Declaration Of Condominium Gold Island South - Waterfront Condominium, and that document is dated as of April 27, 1994; is that correct?**
A. Yes, it says it's made and executed as of the 27th day of April, 1994.



**Q. And the very last page of the document which is an attestation form from the notary indicates that it was signed by Mr. Roos on May 31, 1994; is that correct?**
A. It indicates that he appeared before her on May 31, 1994.
**Q. Okay. In any event, this document would have been available at the time you issued the policy in 1998; correct?**
A. Yes.
**Q. And with respect to the handwriting on the left-hand side of the margin, do you recognize that?**
A. That's Celeste's handwriting.
**Q. Okay. And the handwriting on the right is your handwriting?**
A. That's correct.
**Q. Do you know when you made those notes?**
A. Sometime after she got me the copy or I received the copy. I don't recall exactly when.
**Q. But it would have been prior to the issuance of the policy in 1998?**
A. Yes.
**Q. And what does the note say on the right-hand side**

**of the page?**
A. "Extends development rights in reserved area until December" -- "12/31/99, but not by unanimous consent."
**Q. And why did you make that reference, "Not by unanimous consent"?**
A. I assume the document doesn't disclose it was done by unanimous consent.
**Q. And did you believe unanimous consent was required?**
A. Well, I don't have any present recollection of it. I've got notes on the remainder of this that seem to indicate, needed unanimous consent.
**Q. And the note on the top of Page 2 of the Exhibit 15 says, "Isn't unanimous consent required"?**
A. Yes, that's what it says.
**Q. And then at the bottom of the page, it says, "Needed unanimous consent to extend development rights," and what is the rest of that?**
A. "But withdrawal is not the issue."
**Q. And what does that mean?**
A. The issue I was concerned with didn't concern withdrawal of real estate.
**Q. What issue were you concerned with?**



A. Well, without reading this over thoroughly, again, and the whole title, I can't tell you at the moment.
**Q. Then on the third page of the exhibit, it says, "Needed unanimous consent!"; is that correct?**
A. Yes.
**Q. And did you ever resolve that issue in your own mind before issuing title insurance about whether or not -- why the declaration rights were extended without unanimous consent, whether or not that was effective?**
A. I assume I did because I did issue the policy. So I assume it was in my mind not an issue.
**Q. And do you know why in your mind it was not an issue?**
A. No, just my analysis must have led me to that conclusion.
**Q. And that was an analysis you performed on your own?**
A. Yes.
MR. HALEY: Mark that 16, please.
(DEFENDANT'S EXHIBIT 16 MARKED FOR IDENTIFICATION)
(OFF THE RECORD)



**Q. Now, I show you what is marked Exhibit 16. Do you recognize that?**
A. It looks like a docket listing from Superior Court.
**Q. And why was that in the Commonwealth pile?**
A. I don't recall.
**Q. And would it be Commonwealth's normal practice to run a -- run the civil dockets in the relevant jurisdictions to see if the insured was a party to any action?**
A. No, normally, the only reason I ask for this is if there was a notice of lis pendens on record.
**Q. And do you recall in this case if there was a notice of lis pendens on record?**
A. I don't recall.
**Q. And do you recall ever having any discussions with Ms. Riendeau about this?**
A. I don't recall, no.
**Q. I apologize. I think that copy we have, there's handwriting on the left-hand margin which is cut off. Could we mark -- substitute this one? We'll mark that as 16. The handwriting is a little easier --**
**(SO NOTED)**



**(OFF THE RECORD)**
**Q. The handwriting there says, "This may be of interest," which is underlined; is that correct?**
A. Yes, that's what it says.
**Q. And do you recognize that as Ms. Riendeau's handwriting?**
A. I think that's her writing, yes.
**Q. And do you recall ever having any discussions with her about this particular case?**
A. I don't recall discussing it with her, no.
**Q. And is that your handwriting down the bottom, it says, "Re: Conditions of building"?**
A. Yes.
**Q. And do you recall making any review of the pleadings in this case?**
A. I assume I did if I understood what the subject matter of the litigation was.
**Q. And did you ever have any discussions with Mr. More about this matter?**
A. I don't recall.
(OFF THE RECORD)
MR. HALEY: The one entitled Goat Island South is 17, and the one that says IDC Properties 1/13/98 is 18, and the one that says

10/21/94 is 19.
(DEFENDANT'S EXHIBITS 17, 18 AND 19 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you what we've marked as Exhibits 17, 18 and 19. Do you recognize those?**
A. These look like Celeste's run sheets.
**Q. And that would have been the -- when you say a "run sheet," what is that?**
A. These are notes that the examiner prepares the document -- the run that she did, the title search that she did.
**Q. And would you have reviewed these?**
A. I usually doesn't review the run sheets, no.
**Q. And with respect to Exhibit Number 18 or -- I'm sorry. Exhibit Number 19, that's dated 10/21/94; is that her handwriting as well?**
A. I think so.
MR. HALEY: Exhibit 20.
(DEFENDANT'S EXHIBIT 20 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you what has been marked as Exhibit 20, which is a facsimile letter sent to you in December 1998, it says. Do you see that?**
A. Yes.



**Q. And it says that IDC would like to increase the amount of its title insurance policy from 7 million to 12 million and to add the South Development Unit and Development Unit Number 1, also known as the west unit. This is a letter that you received from Mr. More?**
A. Yes, it's got my writing on it.
**Q. And the handwriting down the bottom is yours?**
A. Yes, it is.
**Q. And the 228716 is a reference to the original policy; is that correct?**
A. Yes.
**Q. And did you have any discussions with Mr. More at the time he made this request?**
A. I assume I did.
**Q. And do you recall any of those discussions?**
A. What I recall is that he was in a hurry for this.
**Q. And did he tell you why he was in a hurry for it?**
A. No, his client wanted it, I guess.
**Q. And with respect to the increase of the policy from 7 million to 12 million, was that within the scope of your authority?**
A. Yes.



**Q. And did you -- in connection with the issuance of this amendment to the policy, did you have any discussions with anyone else, Mr. Blauvelt, or anyone else at Commonwealth regarding that?**
A. No, not that I remember.
**Q. And at this time, you were not aware of the tolling -- you still were not aware of the tolling agreement between IDC Properties and the condominium association?**
A. That's correct. I was not aware of that.
**Q. And did you make any inquiries of Mr. More at that time about whether there had been any challenges to the amendments or to the ownership issues?**
A. No.
**Q. And did you ask him for any documents or communications which he refused to provide to you?**
A. No.
**Q. And in issuing the endorsement, the amendment increasing the value, you were continuing to rely on Mr. More's good faith in making the application; is that correct?**
A. That's correct.
(PAUSE)
(DEFENDANT'S EXHIBIT 21 MARKED FOR



IDENTIFICATION)
**Q. Mr. More, I show you what's been marked as Exhibit Number 21, which is a letter to you dated February 2, 1999. It says, "Enclosed is the Declaration to Goat Island and Amendments One through Eight. Also enclosed is a Ninth Amendment which I believe was executed and recorded." This is a letter you received from Mr. More?**
A. That's a letter he sent me.
**Q. Do you have any reason to believe you did not receive it?**
A. No.
**Q. And had you not seen the Declaration to Goat Island and the Amendments 1 through 8 prior to February 1999?**
A. I assume I did. I don't recall those.
**Q. And did you have any discussions with Mr. More that you recall that led to him providing this information to you?**
A. I don't remember.
MR. HALEY: 22.
(DEFENDANT'S EXHIBIT 22 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you what's been marked as**

Page 61

**Exhibit Number 22, and this is a title summary that was done by Ms. Riendeau for you in connection with the issuance of the endorsement, the amendment to the policy; is that right?**
A. I believe so, yes.
**Q. And it indicates that the title run was until February 7, 1999?**
A. Yes.
**Q. If I could direct your attention to the second page of Exhibit 22, did you review this document?**
A. I assume I did. I don't recall doing so, but I would assume I would have.
**Q. It says that, "The Newport Tax Assessor added Development Unit Number 1 and Individual Unit parcels to the common elements of the Goat Island South Condo in 1995. He was told by Attorney William Cochoran that the development rights expired December 31, 1994. My review of the condominium documents leads me to believe that the development rights were extended at least to 12/31/99." Did this comment raise any concerns in your mind about the title to the parcels that you were issuing insurance on?**
A. Not that I recall. I must have resolved them

Page 62

in favor of the validity of the title.
**Q. But you were aware, were you not, that there was, at least in the assessor's mind, the view that the property that you were insuring for 12 million was not owned by IDC Properties who you were issuing the insurance to?**
A. Repeat the question, please.
MR. HALEY: Sure.
**Q. You were aware, were you not, that the property that you were insuring for 12 million dollars was not owned by IDC Properties, Inc., in the mind of the assessor, but was owned by the condominium association?**
A. I don't think that's what this says.
**Q. Well, it indicates, does it not, that the property, Development Unit Number 1 and Individual Unit, are assessed to -- as common elements of the Goat Island South Condominium; correct?**
A. They added them to the common elements in '95, yes. I don't always place a lot of stock in what an assessor says is subject to or the state of the title, because, in my mind, the assessor isn't really -- his function is to tax real estate; doesn't really, in my opinion, have the same

Page 63

expertise I would in reviewing the title. So if I came to a different conclusion than the assessor did, I would trust my conclusion over that of the assessor.
**Q. But it's clear, is it not, that the assessor's conclusion was that the property was not owned by IDC Properties, Inc.?**
A. It says he was told by an attorney that the development rights expired. I don't really know what the assessor thought. I mean, we know what the assessor did. That's all I can tell you.
**Q. And how would your decision to trust your opinion over the opinion of the assessor or the attorney referenced, Mr. Cochoran, differ from your need to know the opinion of Mr. Meyer or the opinion of counsel to the condominium association about the title?**
A. I don't understand your question.
**Q. Sure. My question is you're aware, in connection with the issuance of this title insurance, that the assessor for the City of Newport believes that the property is not owned by the insured, and your response to that fact is you trust your opinion over the opinion of the assessor; correct?**

Page 64

A. If an assessor has an opinion different than mine about a title after my review, I would trust my opinion as to the evaluation of that over the assessor.
**Q. And my question is, but you testified earlier that had you known that Mr. Meyer had an opinion different than yours, that you would not have issued the title insurance?**
A. Oh, yes, if another title company has refused to insure the title, then I would weigh that much more heavily than that of an opinion of an assessor.
**Q. And what about the opinion of the lawyers for the condominium association who believed that the development rights had expired in 1994?**
MR. TAYLOR: Object to the form of the question.
A. I have no idea who Mr. -- Attorney William Cochoran represented, so I didn't know he was an attorney for the association.
**Q. Did you ever call Mr. Cochoran?**
A. No.
**Q. Why not?**
A. Didn't occur to me to call him.

Page 65

**Q. And what about the assessor, did you ever have any further discussion with the assessor?**
A. I don't believe I talked to the assessor, no.
**Q. And do you recall any conversations you had with Ms. Riendeau about this issue?**
A. I don't recall any, no.
**Q. Did you ever talk to Mr. More about this issue?**
A. Not that I remember.
(DEFENDANT'S EXHIBIT 23 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you what's been marked as Exhibit 23, which is a fax dated March 1, 1999. It was sent by you to Mr. More; is that correct?**
A. Yes.
**Q. And it says, "Tim: Enclosed are copies of a pro forma Endorsement to the Owner's Policy adding the two units and our invoice. I would like to discuss the Endorsement with you." What were you discussing -- did you have that discussion with Mr. More?**
A. I don't remember.
**Q. And do you recall what that was about?**
A. I don't.
**Q. And do you recall any particular concerns you had**

Page 66

**about the endorsement?**
A. I don't recall, no.
**Q. And you eventually did issue the endorsement; is that correct?**
A. We did, yes.
MR. HALEY: This is 24, and this is 25.
(DEFENDANT'S EXHIBITS 24 AND 25 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you what's been marked as Exhibits 24 and 25. Exhibit 24 is a cover letter dated April 14, 1999, with the endorsement to the policy, and Exhibit Number 25 is the endorsement, and the effect of the endorsement was to increase the insurance to 12 million dollars; is that correct?**
A. Yes.
**Q. And also, to add the two parcels described on Exhibit A-1?**
A. Yes.
**Q. And with respect to the parcels originally insured, and with respect to these two parcels, they were insured in fee simple; is that correct?**
A. I have to look at the policy again. Which

Page 67

exhibit was that?
MR. HALEY: The policy is Exhibit Number 11.
(PAUSE)
A. Yes. Parcel 1 is fee simple. Parcel 2 and 3 are development rights.
**Q. Well, where did you get that from?**
A. My reading of Parcel 2 and Parcel 3.
**Q. But the --**
A. Parcel 1 is a fee simple parcel.
**Q. So that Parcel 1 was the so-called North Development Unit; is that correct?**
A. Yes, designated as the North Development Unit.
**Q. And what Commonwealth was insuring was that IDC Properties, Inc., owned the North Development Unit in fee simple; is that correct?**
A. Yes.
**Q. And did you believe that to be accurate at the time you issued the policy?**
A. Yes, I did.
**Q. And with respect to the endorsement, the endorsement doesn't change Paragraph Number 2 of the policy, does it?**
THE WITNESS: The Schedule A you're

Page 68

referring to?
MR. HALEY: Right.
A. No, I don't believe it does.
**Q. So Paragraph Number 2 which says your interest in the land referred to in this policy is fee simple still refers to the Parcels 4 and 5, does it not?**
A. Yes, it would.
**Q. So Development Unit Number 1 and Individual Unit were insured in fee simple as -- IDC Properties, Inc., was insured to the extent it owned those two parcels in fee simple; correct?**
A. Yes.
**Q. And did you believe that to be correct at the time you issued the policy?**
A. Yes.
MR. HALEY: Want to take 5 minutes?
THE WITNESS: Yes.
(OFF THE RECORD)
(BRIEF RECESS)
(DEFENDANT'S EXHIBITS 26 AND 27 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you what's been marked as Exhibits 26 and 27. The first one is a memorandum directed to you from Joseph Hall, Esquire, dated**

**December 6, 2000. Do you recall receiving this?**
THE WITNESS: Are you referring to 26?
MR. HALEY: Yes.
A. I don't recall receiving it, but I'm sure I did. I just don't have a recollection of it.
**Q. And the memorandum reflects that there was at that time a dispute over title to the property and a lis pendens had been filed by the condominium association as the condominium association lawsuit has been started; is that correct?**
THE WITNESS: I'd have to read this, again, to answer your question.
(PAUSE)
THE WITNESS: I'm sorry. What was the question?
**Q. I was just summarizing the memorandum which refers to -- at this point, the lawsuit by the condominium had been initiated, and they had filed a notice of lis pendens, and Mr. Hall was requesting that you continue to insure the individual units on behalf of IDC Properties; is that accurate?**
A. I think he's referring to the units in the



residential condos.
**Q. Right. Not the master unit, but the individual condominium units and --**
A. The residential.
**Q. And the residential units?**
A. There's a condominium called Capella, C-A-P-E-L-L-A, South Condo and Harbor House Condos. I think that's what they were concerned with getting insurance for.
**Q. And if I could direct your attention to Exhibit 27, which appears to be a fax that you sent to Mr. Hall in response dated December 8, 2000, is this something that you sent to Mr. Hall?**
A. Yes.
**Q. And in that, you proposed to Mr. Hall that Commonwealth will agree to continue to issue the insurance for the individual -- insure the remaining units, the residential units, in America and Capella if IDC Properties will agree to release any rights it may have in the title insurance to the West Development, North Development and South Development units; is that a correct summary of your proposal?**
A. I'm sorry. I was reading it while you were



talking.
MR. HALEY: I'm sorry.
THE WITNESS: Could you repeat it?
**Q. My question is, so in this Exhibit Number 27, what you're proposing to Mr. Hall is Commonwealth will insure the individual residential units if IDC Properties will agree to release any claims it has under the title insurance issued for the west, north and south units; correct?**
A. Yes.
**Q. And IDC Properties did not agree to release those claims; right?**
A. I think that's correct, yes.
**Q. And do you recall any discussions that you had with Mr. Hall about this proposal?**
A. I believe I must have spoken with him on the phone, but I don't actually recall the conversations.
**Q. Why was it that you were trying to get IDC to release its rights under the title insurance?**
A. To avoid a claim.
**Q. And did you believe that IDC had a claim at that time that you were making a proposal?**
A. They certainly were making noises they had a



claim, yes.
**Q. You didn't make any reference in here -- at this time, you were aware the lawsuit had started; correct?**
A. I think so, yes.
**Q. And were you aware at that time of the tolling agreement that had been entered into?**
A. I don't think I knew about the tolling agreement.
**Q. And were you aware that Chicago Title had refused to issue title insurance?**
A. I'm not sure when I found that out.
**Q. How did you find that out?**
A. A conversation with Jeff Meyer.
**Q. When was that?**
A. It was sometime after I issued the policy. I don't recall exactly when.
**Q. And what transpired in that conversation? Do you recall that conversation?**
A. Yes, I think he called me about something else, and somehow we got on the subject of these, and he told me that he knew about this. He knew about the controversy beforehand, and I think in that conversation, I think that's when he told me he

had refused to insure, and that he had told this to Tim, so --

**Q. And what was your response to Mr. Meyer?**

A. I was flabbergasted.

**Q. And did he tell you how he came to know about the controversy?**

A. He lived in Newport, I think, or at least he practiced in Newport, so he had a lot of contacts there. So I think he was aware of it as a result of his contacts through Newport.

**Q. And to your knowledge, was it something that was generally aware to members of the condominium association in Newport? Had there been any newspaper articles about it or was it generally public knowledge?**

A. I don't know that.

**Q. Other than that one conversation with Mr. Meyer, have you had any further conversation with Mr. Meyer about the title insurance?**

A. It's possible.

**Q. Do you recall any of those?**

A. No.

**Q. And after Mr. Meyer told that, did you call up Mr. More?**



A. I don't remember doing so.

**Q. Have you ever had any discussions with Mr. More about the policy since the start of this action?**

A. I don't think I ever discussed it with him, no.

**Q. Did you continue to issue title insurance on behalf of Fidelity to Mr. More or his clients?**

THE WITNESS: On behalf of Fidelity?

MR. HALEY: Yes.

A. We have not, as far as I know.

**Q. And with respect to Commonwealth, did you continue to issue title insurance to Mr. More or his clients while you were at Commonwealth?**

A. Through Edwards & Angell, I believe we did, yes.

(OFF THE RECORD)

(BRIEF RECESS)

(DEFENDANT'S EXHIBIT 28 MARKED FOR IDENTIFICATION)

**Q. Mr. Mellion, I show you a copy of what's been marked as Exhibit 28. Is that your signature on the letter?**

A. Yes.

**Q. And that's the letter you sent to Mr. Miller?**

A. Yes.



**Q. And who is Mr. Miller?**

A. Mr. Miller is our claims counsel.

**Q. Has does Lawyers Title Insurance Corporation relate to Commonwealth Land Title Insurance Company?**

A. Sister corporations.

**Q. And when did you first discuss this claim with Mr. Miller?**

A. I don't recall that, but it must have been around the time of this letter, I assume.

**Q. With respect to the decision to initiate suit in this action and bring a declaratory judgment action against IDC Properties to deny coverage under the policy, who made that decision?**

A. It must have been the Claims Department.

**Q. Were you part of that decision?**

A. It's possible I was consulted about it, but I don't have responsibility for denying claims or that sort of thing. That's handled by the Claims Department.

**Q. And who handled that decision in this case?**

A. I assume it was Mr. Miller.

**Q. And other than Mr. Miller, are you aware of anyone else who made the decision?**



A. I'm not aware of anyone else.

**Q. Did Mr. Miller consult with you in making that decision?**

A. I'm assuming we had conversations, yes.

**Q. And do you recall any of those conservations?**

A. No, but I'm assuming they were title related.

**Q. And do you recall anything you said to Mr. Miller or Mr. Miller said to you about the title?**

A. No.

**Q. And you exchanged E-mails with Mr. Miller with respect to this title issue?**

A. I don't recall doing so, but I assume if we had E-mail then, that's another alternate way of corresponding by that time.

**Q. Did you retain any copies of E-mails or any other correspondence between you and Mr. Miller?**

THE WITNESS: Did I at the time retain them?

MR. HALEY: Yes.

A. I assume so, yes.

**Q. And how would you have retained them?**

A. Just leave them in the computer.

**Q. And do you have any copies of them now?**

A. No.

Page 77

**Q. In your individual possession, do you have copies of any documents relevant to this proceeding?**
A. No, only my deposition transcript.
**Q. And you don't have any copies of correspondence, communication or any other documents which relate to the title insurance policies and endorsement issued by Commonwealth in this action?**
A. No, I don't have any of those copies.
**Q. Do you continue to do any business with Mr. More since you left Commonwealth?**
A. We attempted to have him sign up as an approved attorney, but he has declined or hasn't signed the agreement.
**Q. And when was that?**
A. Well, it started in October of 2005, so sometime after that.
**Q. And how did you go about making that attempt?**
A. I think I called him, and I had our representative call him.
**Q. And what did you say to him when you called him?**
A. I asked him if he want to be an approved attorney.
**Q. And were you willing to make him an approved attorney?**

Page 78

A. Yes.
**Q. And you trusted his judgment, skill, and good faith in applying for title insurance policies?**
A. I thought a lot about that. After this happened, the first time, I refused to have any dealings with him, until my manager at the time, Sally O'Neel, essentially said -- she asked me essentially to get over it, and we want to do business with Tim and Edwards & Angell, so please talk to him again. So I did.
**Q. And you were willing to and continue to be willing have him be an approved attorney for Fidelity; is that correct?**
A. Yes.
**Q. With respect to the Exhibit Number 28, the second paragraph says, "This is an extremely complex condominium scheme, and the issues discussed in the litigation are also very complex." Did you believe at the time that the policy was issued that it was an extremely complex condominium scheme?**
A. Yes, it was certainly out of the ordinary.
**Q. And as something that was out of the ordinary, it had an additional element of risk; is that**

Page 79

**correct?**
A. Yes.
MR. HALEY: Mark that as 29, please.
(DEFENDANT'S EXHIBIT 29 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you what's been marked as Exhibit Number 29, which appears to be an E-mail printed from your computer, message from you to Dianne Wilczynski. Who is Dianne Wilczynski?**
A. She is an assistant in the Claims Department or was at the time.
**Q. And other than this E-mail at the time you printed this out, did you print out any other messages?**
A. I don't recall.
**Q. Do you recall when or why you printed this out?**
A. Well, I try to keep a complete file, so usually when I would get E-mails, I would be printing them out, and adding them, just like I would getting a fax or letter.
**Q. And you would put them in the file?**
A. Generally, yes.
**Q. And who is the cc on the message to you, wlwdam@aol.com? Do you know who that is?**
A. No.

Page 80

**Q. Did you ever have any discussions with -- well, let's mark this as 30, please.**
**(DEFENDANT'S EXHIBIT 30 MARKED FOR IDENTIFICATION)**
**Q. Mr. Mellion, I show you what's been marked as Exhibit 30, that's a fax that you sent to Mr. Miller?**
A. Yes.
**Q. And it says, "I faxed this on Friday to Buddy." Who is buddy?**
A. Buddy is David's boss.
**Q. And is he a lawyer as well?**
A. I think he's a lawyer, yes.
**Q. And did you ever have any discussions with -- and what's Buddy's last name, Reems (phonetic)?**
A. Yes, that's right.
**Q. And did you ever have any discussions with Mr. Reems about this claim?**
A. I don't recall any.
**Q. And how about discussions with Mr. Snow?**
THE WITNESS: At the time of this memo?
MR. HALEY: Yes.
THE WITNESS: Other than --

MR. TAYLOR: Before you continue, let me just remind you you shouldn't be disclosing the contents of any discussions with counsel. You may disclose whether or not you had any conversation, yes or no.
A. I think I had conversations with Steve Snow before this memo, yes.
**Q. And what were those conversations?**
MR. TAYLOR: Objection. I instruct the witness not to answer.
A. As far as I can remember --
MR. HALEY: No --
MR. TAYLOR: Stop.
THE WITNESS: Okay.
(SO NOTED)
MR. HALEY: Mark that as 31, please.
(DEFENDANT'S EXHIBIT 31 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you what's been marked as Exhibit 31, another fax to you from Mr. Miller making reference to policy jacket. What is the policy jacket?**
A. Those are the terms and conditions of the contract of insurance. It's the boilerplate.



**Q. So if we look at Exhibit 11, which is the policy, the first four pages of that exhibit would be the so-called policy jacket; is that correct?**
A. Yes.
**Q. And do you know if at the time that the policy was issued in January 1998, that you actually transmitted the policy jacket to Mr. More?**
A. When I sent the policy out, it would have been with the jacket.
**Q. And with respect to this fax to Mr. Miller, was there some confusion about which jacket went with the policy?**
A. Yes, I don't believe I would generally keep a photocopy of the jacket when I sent the policy. So what we would have in our file would be the schedules, Schedule A and Schedule B.
**Q. Which would be the fifth page of Exhibit 11; right?**
A. Yes, everything that's not in the jacket.
**Q. So in your file, you don't actually have a copy of exactly what was sent to Mr. More? You just have a copy of the last -- everything after Page 4 of Exhibit 11?**
A. Right. I didn't keep the jackets because I



knew what they were essentially, so I didn't need to make a photocopy of the jacket at the time.
**Q. And in this fax, you're indicating you're not exactly sure which jacket was sent to Mr. More; is that correct?**
A. No, I'm pretty sure I knew it was a '92 jacket, but the jackets differed in that the Commonwealth logo changed at a certain point. So the jacket would look different because it would have a different logo on it.
**Q. And how do you know that this was the only jacket that you were using in 1998?**
A. Because we didn't issue any other forms of ALTA policies in '98.
**Q. And where do you go to find out what jacket you were using in 1998? I mean, how did you find -- when you sent this fax to Mr. Miller, how did you find the jacket that you sent to him?**
A. We have a supply of preprinted jackets that we use in-house that do not have policy numbers on them. Our policy numbers were put on the actual policies themselves, so we had unnumbered jackets.
**Q. And you took those from a supply closet or file?**
A. Yes.



**Q. Okay. And sent that to Mr. Miller saying that is what we were using in 1998?**
A. Well, I would take them -- I answered, "Yes," a little prematurely. That's how I would take it to send the policy out. I would take it off the shelf, attach it to the policy, send it to the customer. What I was being asked, I suppose, is which jacket was being used, and I would get them from the same source. This was a '92 jacket, and I was explaining to him I'm not sure when our logo changed, so it may not be precisely the same one that was sent to Tim.
**Q. And in the condominium association litigation that we discussed, there was an opinion issued by the Supreme Court of Rhode Island in March of 2004, and a subsequent opinion issued by the Supreme Court of Rhode Island on April 8, 2005. Did you review those opinions?**
A. I believe I read the first one, and I think I read the second one.
(PAUSE)
MR. HALEY: Let's just mark those as 32 and 33.
(DEFENDANT'S EXHIBITS 32 AND 33 MARKED

FOR IDENTIFICATION)
**Q. And I show you copies of those opinions. We marked the March 2004 opinion as Exhibit Number 32, and the April '05 opinion as Exhibit Number 33. And you're not quite sure you read 33? You know you read 32; right?**
A. I know I read 32, and I think, since then, I've read 33. I didn't read it at the time it came out, but I read it, I think, at least once.
**Q. After reading those opinions, did you make any further decisions or evaluations of the claim of IDC Properties under this title insurance policy?**
MR. TAYLOR: Object to the form of the question.
A. I didn't make any other decisions about the claim, no.
**Q. And that was being done by Mr. Miller?**
A. Yes.
**Q. And in fact, you never made any decisions about whether the claim was valid or not; right? Those were all decisions being made by Mr. Miller?**
A. Or the Claims Department, yes.
**Q. Did you ever discuss with anyone the second opinion Exhibit Number 33 -- anyone in**



**Commonwealth?**
A. I don't think so.
**Q. And if I could direct your attention to Exhibit Number 3, which we marked previously, which is Mr. More's file memorandum dated November 17, 1997, and on the second page of that exhibit, the third sentence in the Paragraph Number 2 says, "These are normal provisions for a condominium, such as Goat Island, in which the Units consist only of land." When you read this in 1997, Mr. Mellion, was it your understanding that a condominium unit in Rhode Island could consist of only land?**
A. I think that was my opinion, yes, that you could have a land only unit.
**Q. And is it now your understanding after reading the April '05 opinion that you cannot have a land only unit?**
A. No, we have a statute that specifically authorized land only unit. The condominium statute was amended. So, in fact, you can now, by statute, have them.
**Q. But respect to at the time that this condominium was created, Goat Island South, is it your**



**understanding that a land only unit was not permissible?**
A. I'm not sure that's what the case said. I think the case said that you could have them if you did them in the proper way. I think there was a flaw in the way it was created, if I'm remembering the case correctly.
**Q. And what was that flaw?**
A. I don't recall. I'd have to read the case again.
**Q. And with respect to the creation of the condominium unit in 1988, in your title examination review, you did not review that at all; is that correct?**
THE WITNESS: The creation of what?
**Q. The creation of the Goat Island South Condominium in 1988, you did not review that because it was -- it came before the Chicago Title insurance policy; correct?**
A. I'm not sure if I still understand your question. You're saying I didn't review the declaration?
MR. HALEY: Right.
A. I think I did review the declaration.



**Q. You did review the declaration?**
A. I believe I did.
**Q. And why is it you believe you did?**
A. Because I wouldn't have had an understanding of the way the condo was put together unless I read the declaration.
**Q. And was it your understanding and belief that the condominium was put together correctly and in accordance with Rhode Island law after your review of the declaration?**
A. That was my understanding.
**Q. And is that still your understanding?**
A. Well, the Supreme Court seems to disagree with me.
**Q. So when you first issued the title insurance policy then, you made an independent judgment, did you not, that the condominium was put together correctly?**
A. That was my opinion.
**Q. Okay. And that was a judgment you made on behalf of Commonwealth Land Title Insurance Company?**
A. That's correct.
MR. HALEY: I don't think I have -- let's go off the record for a minute.

(OFF THE RECORD)
(BRIEF RECESS)
(DEFENDANT'S EXHIBIT 34 MARKED FOR IDENTIFICATION)
**Q. Mr. Mellion, I show you a document we marked as Exhibit 34, and this would be the folder for the endorsement to the policy increasing the amount to 12 million dollars and adding the other 2 units; is that correct?**
A. Yes, that would be the supplemental order.
**Q. And again, there's an order sheet for this supplement, and it indicates that the order entry date was December 19, 1998, is that --**
A. December 17, '98.
**Q. And it was requested by you, those are your initials, MBM?**
A. Yes.
**Q. The direct policy, again, being issued directly by Commonwealth?**
A. Yes.
**Q. And the customer, again, was Edwards & Angell?**
A. Correct.
**Q. And directing your attention to the last page of the exhibit, that's a memorandum that you sent to**



**Mr. Eleuterio?**
A. Yes, Eleuterio.
**Q. Eleuterio. And it says in the second paragraph of that memorandum, "I believe we based our policy on the Chicago policy in the file, which itself insures both these units"; was that correct, as far as you know?**
THE WITNESS: Was what correct?
MR. HALEY: Your statement that the policy was based on the Chicago policy.
A. Yes.
**Q. And with respect to the reference to Celeste Riendeau, her prior examination starting from the time of the Chicago policy, it says, "Please verify this with her; if she did, I suppose we can begin with that policy again, and then run forward from the date of our policy." Was that, in fact, what you did do?**
**(PAUSE)**
A. I'd have to look at whatever came back as a result of this to see when they started.
**Q. Is that your handwriting?**
A. Yes, it is.
**Q. And what are the initials down the bottom there?**



A. Oh, that's just an abbreviation for "Thanks."
(PAUSE)
MR. HALEY: I don't have any further questions. Mr. Taylor and I have a dispute about the scope of document production which doesn't seem like it would implicate your testimony at all, but in the unlikely event that we're produced documents later which somehow do involve you, then I'll suspend for the limited purpose of preserving whatever rights I might have to examine you with respect to those documents, subject to whatever rights Mr. Taylor asserts to object to that, but --
MR. TAYLOR: We reserve all rights to object.
MR. HALEY: Other than that, I'm through.
MR. SHERMAN: I have no questions.
MR. TAYLOR: No questions.
(OFF THE RECORD)
THE REPORTER: Would you both like copy?
MR. TAYLOR: Yes, a mini with index.
MR. SHERMAN: Yes, a mini.



(DEPOSITION ADJOURNED AT 12:20 P.M.)

CERTIFICATE

I, Jeannette A. Freelove, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of Michael Mellion, witness in the above-entitled cause, was taken by me at the offices of Ferrucci Russo, PC, 55 Pine Street, Providence, Rhode Island, commencing at 10:00 a.m. on August 31, 2006; that previous to the testimony of said witness, who was of lawful age, the witness was sworn by me; whereupon the witness was first duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth; and that the witness thereupon testified as in the foregoing-annexed transcript.

I further certify that the foregoing deposition was taken down by me in stenotype and was later reduced to computer-aided transcription; and that the foregoing is a true and accurate record of the testimony of said witness.

Pursuant to Rule 30, the witness, with agreement of the parties, hereby requests to read and sign the transcripts.

Pursuant to Rule 5(d) and 30(f)(1) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court. Therefore, original is delivered and retained by Attorney Haley.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of August, 2006.

Jeannette Freelove, Notary Public

JEANNETTE A. FREELOVE, NOTARY PUBLIC
Certified Court Reporter
My Commission expires July 17, 2009
DATE: August 31, 2006
IN RE: Commonwealth v. IDC Properties
WITNESS NAME: Michael Mellion

# EXHIBIT C

Edwards & Angell LLP

2800 Financial Plaza Providence, RI 02903 401.274.9200 *fax* 401.276.6611

February 3, 2005

Thomas R. Roos
IDC, Inc.
2 Goat Island
Newport, RI 02840

**Re: <u>2005 Rhode Island Profit Corporation Annual Reports</u>**

Dear Mr. Roos

Enclosed are the 2005 Rhode Island Profit Corporation Annual Reports for the entities listed below:

1. Goat Island Grill, Inc.
2. Historic Resorts, Inc.
3. IDC Charters, Inc.
4. IDC Clambakes, Inc.
5. IDC Hotel, Inc.
6. IDC, Inc.
7. IDC Marina, Inc.
8. IDC Properties, Inc.
9. IDC Rum Runner, Inc.
10. Newport Time Resorts, Inc.
11. Ocean Cliff Development, Inc.

Kindly execute each report and return them to me, along with eleven (11) checks in the amount of $50.00 each made payable to "Rhode Island Secretary of State" for the filing fees, in the enclosed self-addressed, stamped envelope provided for your convenience.

If you have any questions, please feel free to call me at 276-6449.

Sincerely,

Donna M. Pheland
Paralegal

Enclosures
cc: Charles F. Rogers, Jr., Esq.

# EXHIBIT D

AO 440 (Rev. 5/85) Summons in a Civil Action

# United States District Court

DISTRICT OF RHODE ISLAND

COMMONWEALTH LAND TITLE INSURANCE COMPANY

V.

IDC PROPERTIES, INC.

## SUMMONS IN A CIVIL ACTION

CASE NUMBER: CA 01-400 T

A true copy attest Michael DeFalco 8/31/01

TO: (Name and Address of Defendant)

IDC Properties, Inc. c/o:
Charles F. Rogers, Jr.
Edwards & Angell, LLP, Suite 2800
One Financial Plaza
Providence, RI 02903

YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address) Steven E. Snow, Esq., Partridge Snow & Hahn LLP, 180 South Main Street, Providence, RI 02903

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

CLERK

DATE August 24, 2001

BY DEPUTY CLERK

EAPD 0001425

# EXHIBIT E

IDC Properties - Misc

# EDWARDS & ANGELL, LLP

COUNSELLORS AT LAW
since 1894
Timothy T. More
Direct Dial: (401) 276-6539
Email: Tmore@ealaw.com

2800 BANKBOSTON PLAZA
PROVIDENCE, RI 02903-2499
(401) 274-9200
FAX (401) 276-6611

November 3, 1999

William Landry, Esq.
30 Exchange Terrace
Providence, RI 02903

Dear Bill:

Enclosed is a shorter version of the opinion per your request.

Very truly yours,

Timothy T. More

Enclosure

cc: Thomas Roos
C Rogers

EAPD 0002178

# EDWARDS & ANGELL, LLP

COUNSELLORS AT LAW

Timothy T. More, Esq.
Direct Dial: (401) 276-6539
E-Mail: tmore@ealaw.com

2800 BANKBOSTON PLAZA
PROVIDENCE, RI 02903-2499
(401) 274-9200
FAX (401) 276-6611

November 3, 1999

Mr. Thomas Roos
IDC, Inc.
1116 Capella - Goat Island
Newport RI 02840

RE: Goat Island Condominium

Dear Tom:

In connection with the pending litigation between America Condominium Association, Inc. et al ("Plaintiffs") and IDC, Inc. et al, you have asked our opinion as to the right of IDC, Inc. ("IDC") to own and build out the North Development Unit, the South Development Unit and Development Unit #1 ("IDC Units") within the Goat Island Condominium. The South Development Unit and Development Unit #1 were created by the recording of the original Goat Island South Declaration, as amended and restated ("Declaration"). The North Development Unit was created by the Sixth Amendment to the Declaration pursuant to the special Declarant rights in Section 6.3(b) of the Declaration. The special Declarant rights in Section 2.3(a) and 10.2 and Article 6 allow the Declarant to develop the IDC Units. The original Declaration provided that the special declarant rights would expire on December 31, 1994 ("Original Expiration Date"). This date was changed several times by amendments to the Declaration. The final expiration date of December 31, 2015 was set by the Fifth Amendment to the Declaration.

The Plaintiffs have questioned (a) whether the Fifth Amendment was adopted in accordance with the Declaration and the Act; (b) whether the IDC Units reverted to Master Common Elements upon the Original Expiration Date because they had not been developed as of that date; and (c) assuming that the IDC Units continue to exist, whether IDC lost its right to build out the IDC Units upon the Original Expiration Date.

A. Continued Existence of Units. The first issue that you have asked us to opine on is whether the IDC Units reverted to Master Common Elements because the IDC Units had not been developed as of the Original Expiration Date. There is no provision in Chapter 34-36.1 of the General Laws of Rhode Island, known as the Rhode Island Condominium Act of 1982 ("Act") or the Declaration which provides for the termination of a Unit except in connection with the termination of the condominium. Commonwealth Land Title Insurance

EAPD 0002179

Company recently issued an owner's title insurance policy insuring the title to the IDC Units (see Exhibit A attached). Based on the foregoing and assuming that Globe Manufacturing Co., as Declarant, and IDC, as successor Declarant, validly held the special Declarant rights under the Declaration at the time the IDC Units were created, our opinion is that the IDC Units validly exist and have not reverted to or otherwise become Master Common Elements.

B. Right to Build on Master Units. Two legal theories support IDC's continued right to build on the IDC Units: (1) Section 2.3(b) of the Master Declaration and (2) the Fifth Amendment to the Declaration adopted by the unanimous consent of the Master Unit Owners ("Owners") and Sub-Association Boards dated December 29, 1994 ("1994 Amendment") which extended the Declarant's special declarant's rights to December 31, 2015.

1. Right to Buildout the IDC Units. Section 2.3(b) of the Declaration gives any Owner or Sub-Association the right to build on its Unit. This is a normal provision for a condominium, such as Goat Island, in which certain Units consist only of land. (The Goat Island Condominium is not a "land only unit" condominium under the Act because it predates the 1991 Amendment to Section 34-36.1-2.01 of the Act that expressly set forth the right to create such condominiums. Condominiums, such as the Goat Island Condominium, were permitted under the Act before said 1991 Amendment. See, e.g., the comment to Section 34-36.1-2.02 which refers to campsite condominiums and subdivision condominiums "where the units might consist of unimproved lots and the airspace above them"). In normal residential condominiums, such as the America's Cup, a unit owner is not allowed to alter the common elements or the structure of the owner's unit because such alteration would affect the structure of the building that is owned collectively by all of the unit owners. In the Goat Island Condominium each of the Units is viewed as separate development with different types of buildings and units and except for the Master Common Elements each Unit operates independently.

At common law an individual has the right, and tenants in common have individual and collective rights, to build on their land. Any statutory prohibition of the right of an owner to build on the owner's land would be a violation of due process and constitute an inverse condemnation.

The foregoing right of each Owner and Sub-Association to construct improvements is regulated by Section 34-36.1-2.11 of the Act:

> *34-36.1-2.11. Alterations of units. -- Subject to the provisions of the declaration* and other provisions of law, a unit owner:
>
> (1) may make any improvements or alterations to his unit that does not impair the structural integrity or mechanical

> systems or lessen the support of any portion of the condominium;
>
> (2) may not change the appearance of the common elements, or the exterior appearance of a unit or any other portion of the condominium, without permission of the association;

The key phrase in this section is "Subject to the provisions of the declaration." As made clear by the comments to the Uniform Condominium Act "[t]his section deals with . . . impermissible alterations of the exterior of a unit and the common elements . . . *The stated rules, of course, may be varied by the declaration where desired.*" Section 2.3(b) of the Declaration clearly varies the stated rules of Sec. 34-36.1-2.11.

The right to build was exercised recently by the Harbour House condominium unit owners when the Harbour House Sub-Association authorized the increase in size of the buildings comprising the Harbour House Condominium without seeking the consent of any other Sub-Association or Owner. Similarly major repairs, alterations, demolition and reconstruction to any of the three Sub-Condominium Units would not require the approval of the Master Executive Board, the Owners or other Sub-Associations.

The mere fact that each Owner and Sub-Association has rights (afforded to a unit owner under the Act) which may be the same as, or similar to, some of the development rights afforded to a declarant under the Act does not make them illegal or deprive a former declarant, acting as unit owner, from exercising such rights as a unit owner. For example, it is commonly recognized that after the declarant's special voting rights have expired, the declarant may vote as a unit owner with respect to any units owned by the declarant.

The Act grants the declarant special rights irrespective of whether from time to time the declarant is a unit owner. Thus there may be times when the right to improve a Unit may be held solely by the Declarant and other times when the right may be held by the Declarant and a Sub-Association.

The Act requires that the Declaration specify a time within which these rights may be exercised. Because the Act expressly supersedes the rule against perpetuities (Sec. 34-36.1-2.03(b)), a declaration could set a time limit of 999 years for the exercise of even the development right to create units. Certain of these rights may be unique to a declarant but the right to make improvements and alterations to a unit is also reserved to unit owners under Sec. 34-36.1-2.11 described above.

The development of the IDC Units should not create any unusual burden on the Sub-Condominium Associations and will enable IDC to create income and uses that will allow IDC to pay for IDC's share of the Master Common Expenses. IDC's rights as a Unit Owner

are no greater than that of the Sub-Associations with respect to constructing new improvements on each respective Unit. Accordingly, our opinion is that a court would not find that the exercise by IDC of its rights under Section 2.3(b) violative of, or invalid under, the prohibitions of Section 34-36.1-1.10 (unconscionability) or 34-36.1.11 (good faith) or 34.36.1-1.04:

> A declarant may not act under a power of attorney, or use any other device, to evade the limitations or prohibitions of this chapter or the declaration.

Based on the foregoing, our opinion is that IDC, as Owner, has the right to develop the IDC Units in accordance with Section 2.3(b) of the Declaration.

2. <u>1994 Amendment</u>. The validity of the 1994 Amendment involves consideration of a number of complex issues. You and the plaintiffs in your pending litigation have not agreed on the answers to these issues. Because in our opinion IDC, as an Owner, has the right to develop the IDC Units, we do not believe that it is necessary to analyze these issues.

This opinion is delivered solely for your benefit and without our express written consent may not be relied upon by any other party.

Very truly yours,

Timothy T. More

RI_299030/6#Q#05!.DOC/TMORE

# EXHIBIT F

PLAINTIFF'S EXHIBIT
10 - More
9/7/04 [handwritten initials]

Memorandum

To: William Landry, Esq.

From: Timothy T. More, Esq.

Re: IDC/Commonwealth Land Title Insurance Company

Date: September 28, 2001

---

Because I lack my time sheets and other documents in my files at E&A I cannot give a definitive response to the complaint However, my initial response is:

1. In my conversations with Michael Mellion in December, 1997, I certainly advised him that Chicago Title was unwilling to provide title insurance and I am confident that I mentioned that there were disagreements with the unit owners relating to the title. I do not recall discussing the tolling agreement with Mellion.

2. My letter to Kanter of December 2, 1994, and my November 17, 1997, memo are consistent. The Fourth Amendment was adopted by a unanimous consent of the Master Unit Owners – which addressed the concern in my letter to Kanter that the Third Amendment was not adopted by unanimous consent.

3. I cannot remember whether I discussed with Mellion the actual votes that were taken to approve the Fourth Amendment, but typically the title company requests votes.

4. The fact that the owner of an individual unit expressed opposition is hardly a material defect when it was clear to all that we were taking the position that individual unit owners had no right to vote. The judge's decision does not hold that all of the individual unit owners must vote; rather that the vote of the Master Units, as done, was not in compliance with the Act.

5. I do not know the timing between my corrective memo, which the title company does not have, and the increase in the insurance from $5,000,000 to $12,000,000.

6. Since IDC, as a master unit owner, should still have the right to build, I am not sure that the loss of development rights is significant. The decision does not prohibit IDC, as a unit owner, from creating a condominium out of the Development Unit and I do

Case 1:01-cv-00400-T-DLM Document 81-4 Filed 06/29/2007 Page 13 of 45

not recall whether the Declaration prohibits such creation.

PLAINTIFF'S EXHIBIT
11 - More
9/7/06

**PRIVILEGED AND CONFIDENTIAL**

Memorandum

To: William Landry, Thomas Roos

From: Timothy T. More, Esq.

Re: Blish & Cavanagh/IDC

Date: January 8, 2003

---

1. I informed Mellion orally and in writing that (a) there were issues regarding the amendment signed by the Master Unit Owners and (b) Chicago would not issue insurance. I cannot recall if we discussed the potential for litigation although I believe it is likely that the issue did come up particularly after Chicago mentioned the issue in its "turn-down" letter.

2. The policy insured title to the North Development Unit which was created by an amendment signed only by IDC as developer. The last insurance policy or endorsement insured two other Master Units which are definitely not part of the litigation. Mellion and I agreed that the North Development Unit was validly created. The only title issue in dispute was the continuation of the special declarant rights which arguably had little value to IDC. NOTE: The tolling agreement does not relate to the amendment to create the North Development Unit. I believe IDC was already building on the North Development Unit. (Did the lawsuit challenge IDC's title to the Unit?)

3. The tolling agreement was about the structural problems, the reallocation of common expenses and IDC's right to maintain de facto control of the Master Association and thereby *inter alia* to amend the Declaration. I showed no rush to obtain the title insurance, i.e., to obtain it before a lawsuit was filed. The policy was issued one month after tolling agreement was signed.

# EXHIBIT G

**STATE OF RHODE ISLAND**
**NEWPORT COUNTY, SC**

**SUPERIOR COURT**

**THOMAS R. ROOS** :
**PLAINTIFF** :
:
**VS.** : **C.A. NO. 05-267**
:
**IDC CLAMBAKES, INC.** :

**NOTICE OF VOLUNTARY DISMISSAL**

Petitioner, Thomas R. Roos, hereby files this Notice of voluntary dismissal dismissing the instant action pursuant to R.I. Super. Ct. R. Civ. P. 41(a)(1). Petitioner submits that the instant notice of voluntary dismissal is consistent with R.I. Super. Ct. R. Civ. P. 66(j).

Thomas R. Roos,

By his Attorney,

Edward J Bertozzi

Edward J. Bertozzi, Jr. (#1124)
Edwards & Angell, LLP
2800 Financial Plaza
Providence, RI 02903
Tel.: (401) 274-9200
Fax: (401) 6611

Dated: June 16, 2005

6/16/05 NEWPORT SUPERIOR
EBM

# EXHIBIT H

l) The "Tolling Agreement" is defined as the January 5, 1998 Tolling Agreement entered into by IDC Properties, Inc., IDC, Inc., Island Development Corp., Goat Island South Condominium Association, Inc., America Condominium Association, Inc., Capella South Condominium Association, Inc., and Harbor Houses Condominium Association, Inc.

## INTERROGATORIES

**INTERROGATORY NO. 1:** Please identify all officers, directors and employees of IDC Properties, Inc., and its predecessors in interest by year, from 1994 to the present.

**INTERROGATORY NO. 2:** Please describe the corporate structure of IDC Properties, Inc. including its corporate parents, subsidiaries and affiliates, if any.

**INTERROGATORY NO. 3:** For each entity identified in response to Interrogatory No. 2 above, please identify the owners, partners and/or shareholders and their respective ownership interests.

**INTERROGATORY NO. 4:** Please identify all title insurance company representatives with whom You have communicated regarding title or development right insurance for the Goat Island South Condominium or any associated land or improvements.

**INTERROGATORY NO. 5:** Please identify all persons who participated in discussing, negotiating or drafting the Tolling Agreement.

**INTERROGATORY NO. 6:** Please identify the members of each Goat Island South Condominium sub-condominium executive board, by year, from 1994 to the present.

**INTERROGATORY NO. 7:** Please identify all persons with knowledge of facts relevant to the allegations of Your counterclaim.

Tom Romano

831 - 8900

# EXHIBIT I

EDWARDS & ANGELL
A Partnership Including Professional Corporations

COUNSELLORS AT LAW
*since 1894*

Timothy T. More
Direct Dial: (401) 276-6539
Tmore@ealaw.com

2700 HOSPITAL TRUST TOWER
PROVIDENCE, RI 02903-2499
(401) 274-9200
FAX (401) 276-6611



12/12/97

December 4, 1997

Michael Mellion, Esq.
Commonwealth Land Title Insurance Company
7 Thurber Boulevard
Smithfield, RI 02917

RE: Goat Island/North Development Unit

Dear Michael:

IDC would like to purchase approximately $5,000,000 in title insurance on the North Development Unit. Enclosed is a memorandum regarding the development rights (which IDS would like to have insurance on) and copies of the declaration and various amendments.

What would the cost be. If you could give me a reasonably quick response, I would be appreciative.

Very truly yours,

Timothy T. More

Enclosures

DEFENDANT'S EXHIBIT
Mellion
8/31/06

EDWARDS & ANGELL

# MEMORANDUM

**TO:** File

**FROM:** Timothy T. More

**DATE:** November 17, 1997

**RE:** IDC Regarding Goat Island/North Development Unit/Title Issues

---

By an amendment dated December 29, 1994, IDC, Inc., as Declarant, created the North Development Unit. IDC bases its build-out rights on the North Development Unit under two separate theories: (1) the amendment to the Goat Island Declaration adopted by the unanimous consent of the Master Unit Owners dated December 29 ("1994 Amendment") which extended the Declarants' special declarant's rights to December 31, 2015 and (2) Sections 2.3(a), 2.3(b) and 10.2 of the Master Declaration.

1. <u>1994 Amendment</u>. The 1994 Amendment extended the Special Declarant's rights to December 31, 2015. The 1994 Amendment was adopted by the unanimous consent of the Master Unit Owners. It is clear that under the Master Declaration and the Condominium Act that the Master Unit Owners, and not the sub-condominium owners, were the proper parties to vote on the amendment. Because IDC controlled the Boards of each of the sub-associations one may question whether the vote of the subassociations is invalid. Even if the amendment is invalid, there is a one year statute of limitations in the Condominium Act (Section 34-36.1-2.17) for challenging the validity of an amendment to a Declaration adopted by an association. This amendment was adopted almost 3 years ago by the Goat Island Master Association and subsequently IDC spent significant moneys in architectural, legal and other professional fees in reliance on its rights to develop the North Development Unit. In the absence of fraud, a court should find that the one year statute of limitations and/or laches bars any attack on the 1994 amendment.

2. Right to Buildout Unit as a Unit Owner. The second and totally independent basis for IDC's right to build are Sections 2.3(a), 2.3(b) and 10.2(a) of the Declaration.
These sections give the Declarant and any other Unit Owner the right to build on any Master Unit. These are normal provisions for a condominium, such as Goat Island, in which the Units consist only of land. In normal residential condominiums, such as the America's Cup, a unit owner is not allowed to alter the owner's unit because such alteration would affect the common elements that comprise the building. Furthermore, in the Goat Island Master Condominium each of the Master Units is viewed as separate development with different types of buildings and units and except for the Master Common Elements each Master Unit operates independently.

The right of each Master Unit Owner to construct improvements is permitted by Section 34-36.1-2.11 of the Condominium Act: Such rights were exercised recently by the Harbour House condominium unit owners when the Harbour House Sub Association recently authorized the increase in size of the buildings comprising the Harbour House Condominium. Also, as a matter of equity IDC is paying common area charges with respect to all of its Master Units.

# EXHIBIT J

**Commonwealth**
COMMONWEALTH LAND TITLE INSURANCE COMPANY

Order #: 228716
Buyer:
Requested By: MBM
Examiner: CFR

TITLE RUN TO: 1/13/98
START: 10/21/94 3:19
Street
City/Town: Newport
AP: 46
Lot 1
Recorded Plat Goat Island South Condo
Lot
PC/PB:

TITLE IN: I.D.C., INC
From:
Tenancy:
Book: Page: By: Deed Dated: Rec'd:
Doc Stamps $
N.P.

FIRST MORTGAGE:
Mortgagee: Amt $ Open End?
Book Page: Deed Dated: Rec'd: N.P.:
☐ Same Owners/Legal Description as above. ☐ See Remarks Below.
☐ Assignments: Amends.; A/L&R

SECOND MORTGAGE:
Mortgagee: Amt $ Open End?
Book Page: Deed Dated: Rec'd: N.P.:
☐ Same Owners/Legal Description as above. ☐ See Remarks Below.
☐ Assignments: Amends.; A/L&R

TAXES: Valuation $ Tax $ Acct #

~~RESTRICTIONS:~~ See my NOTES NEXT PAGE

EASEMENTS: 666/429 PAVILLION EASEMENT

OTHER: Consent & Release C 666/497

SEE Schedule B Chicago Title Policy # 946190133 for BACK TITLE ENCUMBRANCES

DEFENDANT'S EXHIBIT 14 - Mellion 8/31/06 [signature]

① Reminder that you told me to hold off on getting copies that you requested

② To refresh your memory, NO HLC is possible @ the City has lines located w/in the commonareas. Until development occurs, the city will not distinguish as a separate plat a Lot

③ Two new amendments since Chicago Title policy (#'s 7&8); copies supplied

# EXHIBIT K

Commonwealth

COMMONWEALTH LAND TITLE INSURANCE COMPANY

DEFENDANT'S EXHIBIT 22 Mellion 8/31/06 Fulone

Order#: 228916A
Buyer:
Requested By: MBM
Examiner: CFR

TITLE RUN TO: 2/4/99

Street: City/Town: Newport

AP: 46 Lot: ADDED TO COMMON ELEMENTS

Recorded Plat: Goat Island South Condo Lot: Development UNIT #1 INDIVIDUAL UNIT PC/PB: 16-9

TITLE IN: IDC Properties, Inc

From: Island Development Corp RI Corp Tenancy:

Book: 661 Page: 2 By: QC Deed Dated: 10/19/94 Rec'd: 10/21/94 3:11

Doc. Stamps $ 58,894- N.P.

FIRST MORTGAGE: ⌀

Mortgagee: Amt $ Open End?

Book: Page: Deed Dated: Rec'd: N.P.:

☐ Same Owners/Legal Description as above. ☐ See Remarks Below.

☐ Assignments: Amends.; A/L&R

SECOND MORTGAGE:

Mortgagee: Amt $ Open End?

Book: Page: Deed Dated: Rec'd: N.P.:

☐ Same Owners/Legal Description as above. ☐ See Remarks Below.

☐ Assignments: Amends.; A/L&R

TAXES: Valuation $ Not on Assessors Roll - added to common elements No Plat/Lot Tax $ Acct #

RESTRICTIONS:

EASEMENTS: See Schedule B El Exhibit A Chicago Policy See our commitment dtd 7/98

OTHER: Subj to the terms & Conditions of the Goat Island South Condominium & by-laws @ amended rec'd 1/12/88 rec'd 1/20/88 3:30 B115 P138-310

Remarks:

The Newport Tax assessor added Development Unit #1 and Individual Unit Parcels ~~tax~~ to the Common Elements of the Goat Island South Condo in 1995.

He was told by atty. William Cochran that the development rights expired 12/31/94

My review of the Condominium Documents leads me to believe that the development rights were extended at least to 12/31/99. (See 3rd Amend to first amended & restated Decl...). See also Fourth Amendment to first amended & restated .... @ it Specifically applies to Dev. Unit #1

See also Docket Event Listings (next pg)

# EXHIBIT L

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COMMONWEALTH LAND TITLE INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>IDC PROPERTIES, INC.,<br><br>Defendant and Third-Party Plaintiff,<br><br>v.<br><br>TIMOTHY MORE and EDWARDS ANGELL PALMER & DODGE LLP<br><br>Third-Party Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 01-400T |

**THIRD-PARTY DEFENDANT**
**EDWARDS ANGELL PALMER & DODGE LLP'S**
**ANSWERS TO IDC PROPERTIES, INC.'S INTERROGATORIES**

Third-party defendant Edwards Angell Palmer & Dodge LLP answers IDC Properties, Inc.'s interrogatories as follows:

INTERROGATORY NO. 1

Please describe what actions, if any, you contend IDC and its officers and employees took to procure the title insurance policies issued by the Plaintiff Commonwealth Land Title Insurance Company to IDC.

**ANSWER: In or around late 1997, IDC requested Timothy More ("More") to obtain title insurance on the North Unit. In or around late 1998, IDC requested More to increase the amount of coverage on the North Unit and to add the South and West Units to the policy. Accordingly, during the period from December 1997 through February**

**1999, at IDC's direction, More undertook actions to obtain title insurance from Commonwealth on behalf of IDC.**

INTERROGATORY NO. 2

Please state the dates upon which you provided legal services to IDC, Thomas Roos or any entities you knew to be affiliates of IDC, or entities which you knew Thomas Roos to be an officer, director or shareholder of, during the period 1997 to present.

**ANSWER**: **Services were performed for the persons or entities listed during the periods indicated. Services were performed for one or more matters for the persons or entities, and services were often sporadic and not continuous on a month-to-month basis:**

| | |
|---|---|
| **IDC, Inc.** | **January 1997 – June 2005** |
| **Thomas R. Roos** | **January 1997 – December 2005** |
| **IDC Properties, Inc.** | **February 2000 – February 2006** |
| **Goat Island Condominium Assoc.** | **May 2000 – May 2002** |
| **IDC Marina, Inc.** | **January 2000 – May 2006** |

INTERROGATORY NO. 3

Please identify by full name, address, name of employer, business address, and relationship (if any) to you, each person to whom you expect to call as an expert witness at trial and state as to each such person, the subject manner on each such expert is expected to testify; the substance of the facts to which each such expert is expected to testify; the substance of the opinions to which each such expert is expected to testify; a summary of the grounds of each opinion to which each such expert is expected to testify and identify all documents and/or information provided to, received from, or considered by the expert.

**ANSWER**: **Interrogatory No. 3 is premature. Edwards Angell Palmer & Dodge will disclose the experts it intends to call at trial, if any, pursuant to Federal Rule 26(a)(2)(C).**

EDWARDS ANGELL PALMER & DODGE LLP

By: [signature]
Deming E. Sherman

STATE OF RHODE ISLAND
PROVIDENCE, SC.

Subscribed and sworn to before me this 13th day of February, 2007.

Elizabeth M. Kula
Notary Public

My Commission Expires July 14, 2009

**CERTIFICATION**

I hereby certify that on the 14th day of February, 2007, a copy of the within Answers to Interrogatories was mailed to the following counsel of record:

Stephen F. Gordon, Esq.
Peter J. Haley, Esq.
Gordon Haley LLP
101 Federal Street
Boston, MA 02110

W. Mark Russo, Esq.
Christopher M. Mulhearn, Esq.
Ferrucci Russo P.C.
55 Pine Street, 4th Floor
Providence, RI 02903-2841

Steven E. Snow, Esq.
Robert K. Taylor, Esq.
Partridge, Snow & Hahn LLP
180 South Main Street
Providence, RI 02903

# EXHIBIT M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COMMONWEALTH LAND TITLE INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>IDC PROPERTIES, INC.,<br><br>Defendant and Third-Party Plaintiff,<br><br>v.<br><br>TIMOTHY MORE and EDWARDS ANGELL PALMER & DODGE LLP<br><br>Third-Party Defendants. | ) | C.A. No. 01-400T |

**THIRD-PARTY DEFENDANT TIMOTHY MORE'S**
**<u>ANSWERS TO IDC PROPERTIES, INC.'S INTERROGATORIES</u>**

Third-party defendant Timothy More answers IDC Properties, Inc.'s interrogatories as follows:

<u>INTERROGATORY NO. 1</u>

Please describe what actions, if any, you contend IDC and its officers and employees took to procure the title insurance policies issued by the Plaintiff Commonwealth Land Title Insurance Company to IDC.

**<u>ANSWER</u>: In or around late 1997, IDC asked if it would be possible to obtain additional title insurance and requested me on IDC's behalf to obtain title insurance on the North Unit, if possible. In or around late 1998, IDC asked if it would be possible to obtain even more title insurance and requested me on IDC's behalf to increase the amount of coverage on the North Unit and to add the South and West Units to the policy,**

**if possible. Accordingly, during the period from December 1997 through February 1999, at IDC's direction, I undertook actions to obtain title insurance from Commonwealth on behalf of IDC.**

INTERROGATORY NO. 2

Please state the dates upon which you provided legal services to IDC, Thomas Roos or any entities you knew to be affiliates of IDC, or entities which you knew Thomas Roos to be an officer, director or shareholder of, during the period 1997 to present.

**ANSWER: Services were performed by me (and others within Edwards Angell Palmer & Dodge LLP (formerly Edwards & Angell, LLP)) as a partner in Edwards & Angell prior to December 31, 2000, and after December 31, 2001 as a solo practitioner, for the persons or entities listed during the periods indicated. Services were performed for one or more matters for the persons or entities, and services were often sporadic and not continuous on a month-to-month basis:**

| | |
|---|---|
| **IDC, Inc.** | **January 1997 – June 2005** |
| **IDC Properties, Inc.** | **February 2000 – February 2006** |
| **Goat Island Condominium Assoc.** | **May 2000 – May 2002** |
| **IDC Marina, Inc.** | **January 2000 – December 2000** |

INTERROGATORY NO. 3

Please identify by full name, address, name of employer, business address, and relationship (if any) to you, each person to whom you expect to call as an expert witness at trial and state as to each such person, the subject manner on each such expert is expected to testify; the substance of the facts to which each such expert is expected to testify; the substance of the opinions to which each such expert is expected to testify; a summary of the grounds of each opinion to which each such expert is expected to testify and identify all documents and/or information provided to, received from, or considered by the expert.

**ANSWER: Interrogatory No. 3 is premature. I will disclose the experts I intend to call at trial, if any, pursuant to Federal Rule 26(a)(2)(C).**

Timothy T. More

STATE OF RHODE ISLAND

PROVIDENCE, SC.

Subscribed and sworn to before me this 13th day of February, 2007.

Notary Public

My Commission Expires 11/30/99

**CERTIFICATION**

I hereby certify that on the 14th day of February, 2007, a copy of the within Answers to Interrogatories was mailed to the following counsel of record:

Stephen F. Gordon, Esq.
Peter J. Haley, Esq.
Gordon Haley LLP
101 Federal Street
Boston, MA 02110

W. Mark Russo, Esq.
Christopher M. Mulhearn, Esq.
Ferrucci Russo P.C.
55 Pine Street, 4th Floor
Providence, RI 02903-2841

Steven E. Snow, Esq.
Robert K. Taylor, Esq.
Partridge, Snow & Hahn LLP
180 South Main Street
Providence, RI 02903

# EXHIBIT N

**TOLLING AGREEMENT**

(or, in the event of termination of this Agreement as provided in section ___ hereof, before such termination)

Upon the exchange of mutual consideration, receipt of which is hereby acknowledged, the parties agree that:

1. In the event that the condominium unit owners' association of (i) Goat Island South - A Waterfront Condominium, (ii) the America Condominium, (iii) the Capella South Condominium and/or (iv) the Harbor Houses Condominium (collectively, the "Associations"), being associations of unit owners for condominiums located on Goat Island, in the City of Newport, State of Rhode Island (collectively, the "Condominiums"), and/or any individual unit owner who is a member of any of the Associations, shall file on or before June 30, 1998 (or such further date as provided herein), an action, suit, proceeding at law or in equity, or otherwise assert any claim against (i) IDC Properties, Inc., (ii) IDC, Inc., (iii) Island Development Corp., (iv) Globe Manufacturing Co. and/or (v) Thomas R. Roos (collectively the "Declarants") in any way relating to or arising from (i) any of the documents, including amendments, pursuant to which the Condominiums were created and/or are governed, maintained and organized, (ii) the procedure by which the Associations have and/or will adopt amendments to the Condominiums' respective declarations and by-laws, (iii) the Declarants' special declarant rights and special development rights, (iv) the allocation of common element expenses in the Condominiums, (v) allegations previously communicated in writing as to the condition of the Condominiums and any construction, repair and improvements relating to the Condominiums, or (vi) the parties' respective interpretation of the Rhode Island Condominium Act, such action, suit, proceeding at law or in equity and/or claim

| Post-it® Fax Note 7671 | Date 12/18 | # of pages ▸ 3 |
|---|---|---|
| To Chip Rogers | From | |
| Co./Dept. | Co. | |
| Phone # | Phone # | |
| Fax # 401-276-6611 | Fax # | |

18649-1

EAPD 0002221

shall be deemed to have been commenced, filed and served, for purposes of statute of limitations, laches, waiver, estoppel or similar defenses, on December 1, 1997.

2. This Tolling Agreement shall be binding on the successors, representatives, employees, heirs and assigns of the parties hereto.

3. Nothing herein shall be deemed to waive any other right [or any defense] which any party hereto may have nor be deemed an admission or assertion of liability by any party hereto.

4. Each signatory hereto warrants and represents that he is unconditionally authorized to execute this Tolling Agreement on behalf of his respective entity, that he fully understands and approves the terms of this Tolling Agreement, and that he has received the consent of any insurer or other person whose rights might be affected thereby.

IDC PROPERTIES, INC.

By:____________________

IDC, INC.

By:____________________

ISLAND DEVELOPMENT CORP.

By:____________________

IN WITNESS WHEREOF the undersigned have executed this Agreement as of the _ day of December, 1997

GLOBE MANUFACTURING CO.

By:______________________________

______________________________
THOMAS R. ROOS, Individually

GOAT ISLAND SOUTH CONDOMINIUM
ASSOCIATION, INC.

By:______________________________

AMERICA CONDOMINIUM
ASSOCIATION, INC.

By:______________________________

CAPELLA SOUTH CONDOMINIUM
ASSOCIATION, INC.

By:______________________________

HARBOR HOUSES CONDOMINIUM
ASSOCIATION, INC.

By:______________________________

1. Page 1, ~~Section 1, Line 7~~ "~~shall~~ be filed on or before June 30th, 1998 or such earlier date as provided herein) ..."

2. Page 1, Section ~~1, Line 16~~ "(v) allegations previously communicated to the Declarants in writing as to the condition of the condominiums..."

3. "This agreement may be terminated by either party at any time upon 15 days prior written notice in which case any action filed by the Condominiums after the termination of this agreement shall be deemed to have been filed on the date the action was actually filed."

4. "The parties further agree that no legal action covered by this agreement shall be filed so long as this agreement remains in effect."

5. Eliminate Globe Manufacturing Co. as a signatory of the agreement.

N any individual unit owner

# EXHIBIT O

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

COMMONWEALTH LAND TITLE INSURANCE COMPANY, Plaintiff

VS. C.A. NO. 01-400T(RWL)

IDC PROPERTIES, INC., Defendant

* * * * * * * * * * * * * * * * *

VOLUME II

CONTINUED DEPOSITION OF TIMOTHY T. MORE, ESQUIRE, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Partridge, Snow & Hahn, 180 South Main Street, Providence, Rhode Island, on January 7, 2003, at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF........ PARTRIDGE, SNOW & HAHN
BY: Robert K. Taylor, Esquire

FOR THE DEFENDANT........ BLISH & CAVANAGH
BY: Thomas E. Romano, Esquire

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

Q. And did you ever request that Commonwealth provide a defense in that case?

A. No.

Q. At some point in time after the litigation was filed by the individual condominium owners, did you become aware that Commonwealth was contesting its potential liability under the title insurance policy issued to IDC?

A. Yes.

Q. How did you become aware of that?

A. I presume either from a call from Bill Landry or Chip Rogers.

Q. And what do you recall about the conversation in which you were informed of Commonwealth's position?

A. I had two. One was that it seemed like a strange lawsuit because of the fact that the title insurance was predominantly related to the title to the North Development Unit, which I didn't think there was any question as to; and, secondly, that since the case hadn't -- since nobody had ever decided that the title was defective, it seemed to me it was a premature lawsuit; and, thirdly, that I couldn't see what basis

Commonwealth had for saying it hadn't issued a valid title policy; and somewhere in the course of the discussions or being informed on what Commonwealth's lawsuit was about, I understood that Commonwealth -- or Michael Mellion in particular -- was alleging that somehow he had been misinformed as to the state of the facts, law, or whatever by me in particular, since I had had the communications with Michael, and I was both surprised and disappointed because I've had such a good relationship with Michael over many years.

Q. After you learned of Commonwealth's declaratory judgment suit, did you have any discussions with anyone inside Edwards & Angell about the circumstances alleged in the Commonwealth lawsuit?

A. I can't remember whether Commonwealth filed a lawsuit before or after I left Edwards & Angell, but I can't recall any discussions with anybody at E & A.

Q. Well, at any point in time have you had any discussions with anyone from Edwards & Angell about the circumstances alleged in Commonwealth's lawsuit?