# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| COMMONWEALTH LAND TITLE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>IDC PROPERTIES, INC.,<br><br>Defendant. | C.A. No. 01-400-T |

## PLAINTIFF'S PRETRIAL MEMORANDUM

## I. INTRODUCTION

This case involves a $12 million title insurance policy (the "Policy") originally issued by Commonwealth to IDC Properties, Inc. ("IDC") in January 1998. The Policy allegedly insures IDC's fee simple interest in certain parcels of land on Goat Island in Newport, as well as IDC's right to develop those parcels. IDC induced Commonwealth to issue the Policy by concealing, *inter alia*, threats of imminent title litigation by an association of residential condominium owners on Goat Island; indeed, IDC signed a tolling agreement just eight days before the Policy date in order to forestall the filing of a complaint. When the condominium owners did file suit against IDC in 1999, they prevailed. The Rhode Island Supreme Court subsequently affirmed the judgment against IDC, but on different reasoning.

Commonwealth is seeking a declaration that IDC's failure to disclose threats of imminent title litigation relieves Commonwealth of any obligation to indemnify IDC for its loss. IDC has never submitted a proof of claim as required by the Policy, but has asserted that the value of its loss exceeds the $12 million Policy limit.

## II. PARTIES

The parties and their trial counsel in this case are:

(a) Commonwealth Land Title Insurance Co.

Steven E. Snow, Esq.
Robert K. Taylor, Esq.
Partridge, Snow & Hahn LLP
180 South Main Street
Providence, RI 02903

(b) IDC Properties, Inc. [1]

## III. FACTUAL BACKGROUND

On January 13, 1988, IDC's predecessor, Globe Manufacturing, recorded a declaration of condominium for Goat Island South ("GIS Condominium"), approximately 23 acres on Goat Island, Newport, Rhode Island. Globe recorded an amended and restated declaration on March 3, 1988 (the "Master Declaration"). *America Condominium Association Inc. v. IDC, Inc.*, 844 A.2d 117, 120 (R.I. 2004) ("*America Condominium I*"). The Master Declaration divided Goat Island South into six parcels, of which five were designated Master Units. The Master Units comprised the airspace above and all buildings or improvements located on the land. The land underlying each Master Unit was designated a master limited common element. *America Condominium Association, Inc. v. IDC, Inc.*, 870 A.2d 434, 436 (R.I. 2005) ("*America Condominium II*").

Three of the Master Units – Capella South Condominium, America Condominium and Harbor Houses Condominium – were existing residential complexes. *America Condominium II,* 870 A.2d at 436. Two other units – the West Development Unit and the South Development Unit – were undeveloped. A third undeveloped parcel was known as the Reserved

[1] On August 8, 2007, IDC's counsel filed an emergency motion to withdraw, citing newly discovered irreconcilable differences with their client. On September 13, 2007, the Court granted the motion. No new counsel have entered an appearance for IDC at this time. Pursuant to LR Gen 205(a)(3) a corporation may not appear *pro se.*

Area (later, the North Development Unit). The Master Declaration reserved to the Declarant the right through December 31, 1994 to develop the West Development Unit and South Development Unit. *America Condominium II*, 870 A.2d at 436. The Master Declaration further reserved to the declarant the right to convert the Reserved Area into a Master Unit, and if so converted, the right to develop the Master Unit through December 31, 1994. *Id*.[2]

To govern the newly created condominium, Globe created the Goat Island South Condominium Association ("Master Association"). America Condominium and the two other residential condominiums each had sub-condominium associations. The Members of the Master Association included every individual unit owner and the owner of each undeveloped master unit (which ownership was claimed by Globe). The Master Declaration provided that individual unit owners would be represented on the Master Association by the executive boards of the residential sub-condominium associations. These executive boards were initially appointed and controlled by Globe. *America Condominium I*, 844 A.2d at 121-122.

By early 1994, neither Globe nor its successor in interest, Island Development Corporation, Inc. ("IDC, Inc."), had exercised their rights to develop the West, South, or North Development Units. *America Condominium I*, 844 A.2d at 122. Faced with the impending expiration of those rights at the end of 1994, IDC, Inc. organized a special meeting of the Master Association at which a five year extension of the declarant's development rights for the Reserved Area/North Development Unit was approved. This extension was reflected in a Third Amendment to the Master Declaration. *Id*. at 123.

IDC, Inc. transferred its interests in the GIS Condominium to IDC on October 19, 1994. *America Condominium I*, 844 A.2d at 122 and n. 9. IDC retained the law firm of Edwards

---

[2] More specifically, the declarant with regard to the Reserved Area reserved "the right to withdraw real estate, the right to convert the area to a 'Master Unit,' and the right to construct improvements on the unit, if it were created." *America Condominium II*, 870 A.2d at 439.

& Angell (now Edwards Angell Palmer & Dodge) ("EAPD") to represent it in connection with matters relating to the GIS Condominium. (12/20/02 Deposition of Timothy More ("More Depo. Vol. I") at 13-14). Timothy More was one of the EAPD attorneys advising IDC. *Id*.[3]

More questioned whether the Third Amendment validly extended IDC's right to develop the Reserved Area because it was not approved by unanimous consent of all the unit owners. On December 2, 1994, More wrote to Attorney Stanley Kanter, who had represented IDC's' predecessor in interest:

> [Chicago Title Insurance Company] and I believe that the extension of the declarant's rights under the Master Declaration to December 31, 1999 cannot be done without the unanimous consent of all the unit owners within the Master Condominium.

(Complaint Ex. F) (emphasis added). More sent a copy of his letter to the president of IDC, Thomas Roos. On December 5, 1994, Attorney Kanter replied that he had discussed the matter at length with Roos:

> We advised that both the Master Declaration and the Statute could be subject to varying interpretations as to the consent that would be required to extend the Development Rights time period, which could easily subject the Declarant or the Master Association to litigation by Unit Owners dissatisfied with any vote to extend such time period. The parties noted that, if the path to unanimous consent was required, it would be highly unlikely that the Declarant could obtain the consent of all of the approximately eighty-five Unit Owners and that, therefore, as above, an aggressive posture was appropriate. . . .

(Complaint Ex. G).

Following the exchange with Attorney Kanter, IDC recorded a Fifth Amendment to the Master Declaration on December 29, 1994. The Fifth Amendment among other things extended the declarant's right to develop the West Development Unit and the Reserved Area/North Development Unit until 2015. *America Condominium I* at 123-124. IDC also

[3] More left EAPD in December, 2000. (1/7/03 Deposition of Timothy More ("More Depo. Vol. II") at 65).

recorded a Sixth Amendment to the Master Declaration on December 29, 1994. The Sixth Amendment purported to convert the air space over the Reserved Area into a sixth Master Unit known as the North Development Unit. *America Condominium I*, 844 A.2d at 125. The amendments were unanimously approved by the owner of the undeveloped master units (IDC) and members of the IDC-controlled executive boards of the residential condominiums, but not by the individual unit owners. *America Condominium I*, 844 A.2d at 122-125. Certain individual unit owners objected, but to no avail. *Id*. at 124-125.

By late 1997, IDC was planning the construction of a commercial function center on the North Development Unit. Individual unit owners in the residential condominiums challenged IDC's right to build, and asserted that the amendments to the Master Declaration creating those rights were null and void.

On or about November 17, 1997, More prepared a memorandum to File discussing IDC's' development rights. The memorandum asserted that "[i]t is clear that under the Master Declaration and the Condominium Act that the Master Unit Owners, and not the sub-condominium owners, were the proper parties to vote on the amendment." (Complaint Ex. B). The memorandum did not disclose the explicit threats of litigation made by the individual unit owners.

More sent his November 17, 1997 memorandum to Chicago Title Insurance Company, which had issued a policy covering certain of IDC's development rights in 1994, and asked Chicago Title for additional coverage for the North Development Unit. Chicago Title declined to insure the north Development Unit, and questioned the validity of the amendments to the Master Declaration extending IDC's development rights. More did not inform Commonwealth that Chicago Title declined to offer coverage.

On or about December 4, 1997, More wrote a letter to Commonwealth's Rhode Island State Counsel Michael Mellion asking for a $5 million owners' title insurance policy insuring both the fee title to the North Development Unit and the right to construct improvements on that unit. (Complaint Ex. A).

On December 10, 1997, the individual unit owners' lawyer wrote More demanding that IDC sign a Tolling Agreement to forestall the filing of litigation that "otherwise would be inevitable." (December 10, 1997 letter to More). IDC agreed to sign. The Tolling Agreement was signed on January 5, 1998, and established a tolling date of December 1, 1997. The Tolling Agreement covered all claims arising out of the GIS Condominium documents, and included a representation that the signatories had secured the consent of any insurer affected by the agreement. More did not secure Commonwealth's consent before entering into the Tolling Agreement. He did not send a copy of the Tolling Agreement to Commonwealth. He did not discuss the Tolling Agreement with Commonwealth.

On December 12, 1997, Commonwealth issued a quote of $5,000 for $5 million of coverage. Thereafter Commonwealth's title examiner examined public records of the City of Newport to identify any liens, claims or defects of record. Mellion also reviewed and discussed More's November 17, 1997 memorandum with More.

In reliance upon the information provided by More, as well as its own investigation of publicly recorded documents, Commonwealth issued an Owner's Title Insurance Policy, Policy Number 228716 (the "Policy"), to IDC. The policy limit was $7 million.[4] The Policy insured fee simple title to the North Development Unit and certain rights to improve that Unit. In the transmittal letter to More, Commonwealth's Mellion noted that he was unable to

[4] More's December 4, 1997 letter had requested $5 million of coverage. IDC asked to have the policy limits increased to $7 million in January 1998.

obtain any tax, water or sewer information on the land because, according to the City of Newport, it would continue to be located in the common areas of the GIS Condominium and not distinguished as a separate lot until development occurred. (February 2, 1998 letter). More did not contradict this statement in any way.

IDC constructed a function center, known as the Newport Regatta Club, on the North Development Unit in 1998. *America Condominium I*, 844 A.2d at 125. On December 3, 1998, More wrote Commonwealth and requested an increase in the Policy amount to $12 million, as well as additions to the property description to include the South Development Unit (also known as the "Independent Unit") and the West Development Unit. More again did not disclose the adverse claims of the individual unit owners or the existence of the Tolling Agreement. (More Depo. Vol. II at 120). On or about March 1, 1999, Commonwealth amended the Policy to increase the amount of coverage and to add the two additional development units.

The condominium owners filed suit against IDC on May 29, 1999. Among the issues raised in the suit was "the status of IDC's 'title' to the units it owns." IDC Original Counterclaim, ¶ 5; *see also America Condominium I* , 844 A.2d at 125 (condominium owners' complaint "contended that when defendants failed to exercise their development rights on or before December 31, 1994, their reserved interest in the undeveloped units ceased to exist, thus implying that fee simple title then vested in plaintiffs"). IDC notified Commonwealth of the suit by letter dated October 21, 1999. IDC did not demand that Commonwealth provide a defense.

The condominium associations moved in January 2000 for partial summary judgment in their favor. In June 2001, the Superior Court entered an order declaring that the amendments which purported to extend IDC' development rights "lacked the unanimous consent of the unit owners, and thus were not adopted in accordance with R.I.G.L. § 34-36.1-2.17 and are

void ab initio and have been recorded ultra vires." The order also declared that IDC's development rights on Goat Island "have expired." *Id*.

Both sides appealed. On appeal, the plaintiffs contended "that the partial judgment, as entered, did not accurately reflect the decision of the court because it did not state that fee simple title was now vested in plaintiffs." *America Condominium I*, 844 A.2d at 126. The Rhode Island Supreme Court eventually issued two opinions. The first opinion held that title to the North Development Unit/Reserved Area belonged to the individual unit owners. *America Condominium I*, 844 A.2d at 133. IDC petitioned successfully for reargument, and the Rhode Island Supreme Court issued a second opinion in April, 2005. The second opinion concluded that IDC had never validly created certain development units on Goat Island, including the North Development Unit, and that those areas are common elements of the GIS Condominium. *America Condominium II*, 870 A.2d at 442.

## IV. CLAIMS AND DEFENSES

### A. Commonwealth's Claims.

Commonwealth's complaint seeks a declaration that there is no coverage under the Policy for any loss related to IDC's title and development rights on Goat Island. Commonwealth's right to relief is based on four theories, each alleged in a separate count of the Complaint.

Count I of the Complaint alleges that IDC was aware of adverse claims and defects in the title and development rights insured by the Policy that were not disclosed to Commonwealth either orally or in writing prior to the issuance of the Policy. Policy Exclusion No. 3(b) provides that "defects, liens, encumbrances, adverse claims, or other matters" that are "not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to

the date the insured claimant became an insured under this policy," are excluded from coverage. Commonwealth asserts that IDC's failure to disclose adverse claims and defects relating to its title and development rights results in an exclusion from coverage of all claims related to such interests.

Count II of the Complaint alleges that all claims related to the loss, expiration or extinction of IDC's title and development rights on Goat Island are excluded from coverage because they arise from defects "created, suffered, assumed or agreed to" by IDC. Policy Exclusion No. 3(a) excludes from coverage "defects, liens, encumbrances, adverse claims or other matters" that are "created, suffered, assumed or agreed to by the insured claimant." IDC created the defect resulting in the loss by knowingly recording purported extensions of its development rights that had not been approved by the individual unit owners.

Count III of the Complaint alleges that IDC concealed or misrepresented material facts at the time it applied for the Policy, and that had Commonwealth known of those facts, it would not have issued the Policy. IDC failed to disclose, *inter alia*, (1) the adverse claims and threats of litigation by individual unit owners at Goat Island; (2) the negotiation and execution of the Tolling Agreement just days before the Policy was issued; (3) Chicago Title's decision to decline to offer coverage; (4) Attorney More's knowledge that it was not at all "clear" that the Master Unit Owners were the proper parties to vote on extending the development rights in 1994; and (5) Attorney More's concerns, omitted from the memorandum he prepared for Commonwealth, about the validity of IDC's assertion that it had the unfettered right to develop the undeveloped units as the owner of those units.

Count IV seeks a declaration that any loss suffered by IDC arising from an inability to develop Goat Island is not covered by the Policy under the known loss doctrine. The

known loss doctrine is a basic precept of insurance law that prohibits an insured from shifting a known loss to the insurer.

**B. IDC's Affirmative Defenses.**

IDC has asserted two affirmative defenses to Commonwealth's claim: waiver or estoppel, and ripeness.

**C. IDC's Counterclaim.**

Count I alleges that by failing to make payment under the Policy after the Rhode Island Supreme Court issued America Condominium II, Commonwealth acted in bad faith. Count II seeks a declaration that Commonwealth is obligated to make payment under the Policy.

## V. FACTUAL AND LEGAL ISSUES

Commonwealth anticipates that the following factual and legal issues will need to be resolved in order to adjudicate the case.

1. Whether IDC failed to disclose adverse claims or defects so that Policy Exclusion 3(b) would apply.

2. Whether Commonwealth had knowledge of adverse claims or defects affecting IDC's title and development rights prior to issuing the Policy.

3. Whether IDC "created, suffered, assumed or agreed to" the defect in its title so that Policy Exclusion 3(a) would apply.

4. Whether IDC misrepresented material facts to Commonwealth in its application for title insurance for Goat Island South.

5. Whether IDC was facing a known loss at the time that it applied for the Policy.

6. Whether Commonwealth waived or is estopped from asserting its claims.

## VI. ARGUMENTS

### A. Count I – Knowledge of Adverse Claims.

Policy Exclusion No. 3 provides that "defects, liens, encumbrances, adverse claims, or other matters" that are "not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy," are excluded from coverage. *See* Exclusion 3(b).[5] IDC's knowledge of adverse claims and other material information regarding the title and development rights insured by the Policy, and its failure to inform Commonwealth of that information, results in an exclusion from coverage of all claims related to loss, expiration or extinction of IDC's title or development rights on Goat Island.

IDC plainly knew of explicit, existing adverse claims against the title sought to be insured at the time it applied for the Policy in December, 1997. IDC's president, Thomas Roos, and its attorney, Timothy More, had attended meetings with litigation counsel for the individual condominium unit owners at which the validity of the North Development Unit and the extension of IDC's development rights were challenged. A November 12, 1997 memorandum presented to

---

[5] The Policy provides that:

> The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damages, costs, attorneys' fees or expenses which arise by reason of:
>
> * * *
>
> 3. Defects, liens, encumbrances, adverse claims or other matters:
> (a) created, suffered, assumed or agreed to by the insured claimant;
> (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
> (c) resulting in no loss or damage to the insured claimant;
> (d) attaching or created subsequent to Date of Policy; or
> (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

"[C]ourts interpreting the standard policy language of exclusion 3 have interpreted the subsections as disjunctive." *National Credit Union Admininstration v. Ticor Title*, 873 F. Supp. 718 (D. Mass. 1995)

Roos by the unit owners at a meeting explicitly declared that the amendments to the Master Declaration on which IDC premised its right to build were "null and void" and "illegal." More concluded on the basis of these discussions that "there was definitely the potential for litigation." Furthermore, More privately told his client, Roos, that he was concerned that a court might view IDC's development of the North Development Unit as an "illegal circumvention" of the Rhode Island Condominium Act.

In fact, Attorney More was reviewing a tolling agreement covering the individual unit owners' claims at the very time that Commonwealth was conducting its title examination. On December 10, 1997, the unit owners' lawyer wrote More demanding that IDC sign a Tolling Agreement retroactive to December 1 to forestall the filing of litigation that "otherwise would be inevitable." The Tolling Agreement broadly covered all claims arising out of the GIS Condominium documents. More did not send the Tolling Agreement to Commonwealth, and testified that he had no recollection of discussing it with Commonwealth's state counsel, Michael Mellion.

IDC also knew of defects in the rights that it sought to insure that were not disclosed to Commonwealth. For example, the November 17, 1997 memorandum that More provided to Commonwealth asserted that it was "clear" that an extension of the development rights did not require the approval of individual unit owners. More's memorandum did not disclose his own doubts about this position, or that both counsel for the individual unit owners and Chicago Title strongly disagreed, as did Attorney Kanter in his December 5, 1994 letter to More. Indeed, More had researched the issue and not found any case law that went either way. The November 17, 1997 memorandum given to Commonwealth also asserted without qualification that IDC had unfettered development rights as the owner of the North Development

Unit. In contrast, More privately advised his client of his concern that a court "would view the construction of improvements by the Declarant, albeit as a [Master Unit] Owner, as an illegal circumvention" of the R.I. Condominium Act and the Master Declaration. More was not forthcoming about this concern in his written submission to or conversations with Commonwealth.

The claims asserted by the individual unit owners and covered by the Tolling Agreement were not publicly recorded, or disclosed to Commonwealth in writing, and are therefore excluded from coverage under the Policy. *Kirwan v. Chicago Title Insurance Co.*, 612 N.W.2d 515 (Neb. App. 2000). In *Kirwan*, the title commitment had an effective date of April l; the plaintiffs were notified of an adverse claim on or about April 9; and the plaintiffs were sued on May 16, the same date that the title policy became effective. The appeals court affirmed judgment in favor of the insurer, holding that "the policy clearly excludes from coverage those claims which the insureds had knowledge about, but failed to disclose in writing to the insurer." *Kirwan*, 612 N.W.2d at 524. The court quoted with approval the lower court's reasoning:

> The rationale of title insurance is a coverage of risks ascertainable by both parties from the public records and not otherwise ascertainable by the proposed insured and the insurer. Permitting an insured to obtain coverage for something he or she knew about, but which was unknown and unknowable to the insurer, upsets the actuarial basis and justification for title insurance. Common sense supports the application of an exclusion to such situations.

*Id*. at 525. The logic of *Kirwan* applies equally to this case.

Under Rhode Island law, the courts generally apply the same rules when construing insurance policies as they do when construing contracts. *Employer Mutual Casualty Co. v. Pires*, 723 A.2d 295, 298 (R.I. 1999); *Martinelli v. Travelers Insurance Companies,* 687 A.2d 443, 445 (R.I. 1996). The policy language controls, unless it is ambiguous. *Id*. To determine whether a policy is ambiguous, the court reads the policy in its entirety, giving each

word its plain, ordinary, and usual meaning. *See id.* "If the policy terms are ambiguous or capable of more than one reasonable meaning, then we will strictly construe the policy in favor of the insured and against the insurer. However, we will not engage in mental gymnastics, nor will we stretch the language in a policy to read ambiguity into it where none is present." *Employer Mutual Casualty Co.*, 723 A.2d at 298 (citing *Mallane v. Holyoke Mutual Insurance Company in Salem*, 658 A.2d 18, 20 (R.I. 1995)). The plain language of the Policy clearly excludes coverage for adverse claims that are known to the insured but not disclosed in writing.

**B. <u>Count II – Creation of Defects.</u>**

Count II of the Complaint alleges that all claims related to the loss, expiration or extinction of IDC's title or development rights on Goat Island are excluded from coverage because they arise from "defects, liens, encumbrances, adverse claims or other matters" that are "created, suffered, assumed or agreed to by the insured claimant." *See* Exclusion 3(a). The First Circuit interpreted the same exclusion in *American Title Insurance Co. v. East West Financial*

> Although Rhode Island courts have not interpreted this clause, courts in other jurisdictions have generally held that "the insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances."

16 F.3d 449, 455 (1st Cir. 1994) (quoting *Brown v. Saint Paul Title Ins. Corp.*, 634 F.2d 1103, 1107-08 n. 8 (8th Cir. 1980). "To come within this exclusion, the defect must have been created by the insured claimant and not by some other force." *Resolution Trust Corp. v. Ford Mall Associates*, 819 F. Supp. 826, 840 (Minn. 1991) (citing *Foremost Construction Co. v. Killam,* 399 S.W.2d 593, 596 (Mo. Ct. App. 1966). "Moreover, the application of exclusionary clauses such as the one at issue here often turns on notions of equity. To the extent that an insured has breached an obligation or would derive a windfall profit from recovery against its insurer, courts

are more inclined to find that the insured created, suffered, assumed or agreed to the defect, lien or encumbrance." *American Savings and Loan Association v. Lawyers Title Insurance Corporation*, 793 F.2d 780, 784 (6th Cir. 1986).

IDC, as the owner of the undeveloped Master Units and the entity controlling the boards of the residential condominiums, controlled the procedure by which the Master Declaration was amended in 1994. IDC was advised by counsel that an extension of its development rights could be invalidated unless the individual unit owners approved, but opted not to take such a vote because it feared that the individual unit owners would not approve an extension. IDC's scheme to circumvent the requirements of the Rhode Island Condominium Act was both intentional and inequitable, so that the exclusion for defects "created, suffered, assumed or agreed to" by the insured should apply. *American Title Ins. Co. v. East West Financial*, 16 F.3d at 455. The defect was clearly "created by the insured claimant and not by some other force." *Resolution Trust Corp. v. Ford Mall Assoc.*, 819 F. Supp. at 840.

**C. <u>Count III – Fraudulent Concealment.</u>**

Rhode Island follows the rule that a material misrepresentation by the insured to the insurer voids the policy. *Carpenter v. American Ins. Co*., 5 Cas. 105 (R.I. 1839) ("A misrepresentation of a material fact, whether it be made through mistake or design, avoids a policy of insurance underwritten on the faith thereof."). A fraudulent misrepresentation occurs when one party makes a false representation intending thereby to induce the claimant to rely thereon and the claimant justifiably relies thereon to his or her harm. *Bjartmarz v. Pinnacle Real Estate Tax Services,* 771 A.2d 124, 127 (R.I. 2001); *Rhode Island Depositors Economic Protection Corp. v. Duguay,* 715 A.2d 1278, 1280 (R.I. 1998). An unintentional material misrepresentation will also void an insurance policy. *Guardian Life Insurance Co. of America v. Tillinghast*, 512 A.2d 855, 859 (R.I. 1986) ("a material misrepresentation, even though

innocently made, is a basis for rescinding a contract."); *Evora v. Henry,* 559 A.2d 1038, 1040 (R.I. 1989) ("We have previously examined the effect of a misstatement of fact in an application for insurance. The theory clearly evinced by these cases is that a material misrepresentation in an insurance application makes voidable, without a concomitant demonstration of fraud, an insurance contract that is issued upon the application.").

In the insurance context, a material misrepresentation is one that induces the insurer to issue a policy. *Evora v. Henry*, 559 A.2d at 1040 ("We believe that a number of jurisdictions have adequately defined material misrepresentation. Many courts have adopted the view that a material representation in an insurance application is any representation that induces the insurer to insure the applicant."). The misrepresentation need not be an affirmative statement, either written or oral. It can be "`any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts.'" *Travelers v. Spidell*, 682 A.2d 471, 473 n. 1 (R.I. 1996) (quoting *Halpert*, 107 R.I. at 413, 267 A.2d at 734). *See also Nash v. Trustees of Boston University*, 776 F. Supp. 73, 83 (D.R.I. 1990), *aff'd*, 946 F.2d 960 (1st Cir. 1991) (misrepresentation occurs "when half truths are uttered that are misleading;" if the maker "knows or believes that the matter is not as he represents it to be" or "knows or believes [it] to be materially misleading because of his failure to state additional or qualifying matter"; or "when the fraud is grounded in either affirmative acts or concealment.").[6]

[6] *See also* Restatement (Second) of Contracts § 161 (1981), which states that nondisclosure of a fact is equal to an assertion of fact if a person "knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing."

Numerous court decisions apply these principles to title insurance. For example, in *Parker v. Title & Trust Company*, 233 F.2d 505 (9th Cir. 1956), the insurance company brought an action seeking cancellation of certain title policies on the grounds that Parker had obtained the policies through fraudulent concealment of facts material to the risk assumed – namely, that title to one of two parcels insured was in the United States. Parker argued that the lower court judgment against him should be reversed because, even if he had knowledge of the defect, he had no obligation to disclose the defect to the title company. The Ninth Circuit disagreed and upheld the lower court, finding that "[t]he fraud here . . . consisted in the implied representation that Parker knew of no reason why a title policy should not be issued." *Parker,* 233 F.2d at 512. The court further observed,

> whatever may be the rule respecting the right of a contracting party to remain silent concerning material facts known to him and which he knows are unknown to the other party, yet if he undertakes to make some statement respecting the matter, he cannot indulge in half-truths.

*Parker*, 233 F.2d at 510. *See also Pioneer Nat'l Title Ins. Co. v. Lucas*, 155 N.J. Super. 332, 382 A. 2d 933 (1978) ("An insurance contract, including one of title insurance, requires the highest degree of good faith and fair dealing between the parties. It requires the insured to advise the insurer of such matters that he knows might influence the insurer in entering into or declining the risk, at least where such facts are not of record and are not discoverable therefrom by the insurer."); *Weir v. City Title Ins. Co.*, 125 N.J. Super. 23 308 A.2d 357 (1973) (considering changed circumstances between time of application and issuance of policy, "it was the obligation of [insured] and his attorney to forthwith bring the matter to the attention of and make full disclosure to [insurer]. The defect was manifestly material to the risk that [insured] sought to have [insurer] undertake, and fair dealing demanded no less."); *Lawyers Title v. D.S.C. of Newark*, 544 So.2d 1070 (Fla. App. 4th Dist. 1989) ("the courts have been loathe to impose

liability on a title insurer for a condition of which the insured had actual, express knowledge"); *Rosenblatt v. Louisville Title Co.*, 218 Ky. 714, 292 S.W. 333 (1927) (failure to disclose possible defect in deed renders policy unenforceable); *Vaughan v. U.S. Title Guaranty & Indemnity Co.*, 137 App. Div. 623 (NY App. Div. 1910) (the insurer, "upon issuing the title insurance, naturally assumed that the [insured]'s deed was genuine, and the concealment of facts within the [insured]'s knowledge, tending to show that it was not, was as fraudulent as affirmative misstatements.").

It is the insured's duty to disclose information material to the risk, regardless of whether the title insurance company requests it. *See, e.g., Collins v. Pioneer Title Ins. Co.*, 629 F.2d 429 (6th Cir. 1980). In *Collins*, the plaintiff secured an option to purchase a tract of land. Before the option expired, the owners of the land entered into a second sales contract with another buyer for the same piece of land, subject to the option expiring. Collins purported to exercise his option the day after it expired, and proceeded to closing knowing that the party to the second sales contract intended to seek specific performance. Collins, acting through his attorney, also obtained title insurance on the land. After the policy issued, Collins put the insurance company on notice of the specific performance claim, and the insurance company denied coverage under the policy.

Ruling in favor of the title insurance company, the court held that Collins' lawyer's failure to disclose the specific performance claim voided the policy, notwithstanding the fact the insured had not made an actual false statement:

> While Collins did not make a false statement on an insurance application, Collins through his agent, Ables, failed to disclose Chalupsky's claim to Pioneer. The insured's duty "to make a fair disclosure of the facts" means that he or she must disclose information which is material to the risk involved. Whether

> information not disclosed is material is a question of law for the court.

629 F.2d at 434 (citations omitted).[7]

IDC did not fully disclose, and misrepresented by omission, several material facts including: (1) explicit threats of imminent litigation by the residential subcondominium owners; (2) the execution of the Tolling Agreement on January 5, 1998, just days before the Policy was issued on January 13; (3) Chicago Title's decision to decline to offer coverage; (4) Attorney More's knowledge that it was not "clear" that the 1994 votes to extend development rights could properly exclude individual unit owners; and (5) More's concerns, omitted from the memorandum he prepared for Commonwealth, about the validity of IDC's assertion that it had the unfettered right to build on the undeveloped units as Owner. Commonwealth would not have issued the Policy to IDC had it been aware of these facts.

**D. <u>Count IV – Known Loss Doctrine.</u>**

Any loss suffered by IDC arising from an inability to develop Goat Island is not covered by the Policy under the known loss doctrine. The known loss doctrine is a basic precept of insurance law that prohibits an insured from shifting a known loss to the insurer. As described by the Massachusetts Supreme Judicial Court:

> [T]he basic purpose of insurance is to protect against fortuitous events and not against known certainties. Parties wager against the occurrence or nonoccurrence of a specified event; the carrier

---

[7] The court also held that the fact that Collins dealt with the insurance company through his lawyer was of no import:

> [H]e knew that Pioneer was not informed of Chalupsky's [the party to the second sales contract] claim. He admitted that he had received a copy of [his attorney's] Preliminary Report on Title and an owner's binder from Pioneer, neither of which mentioned Chalupsky's claim. Furthermore, he knew the importance of the Chalupsky claim to the risk assumed by Pioneer. * * * We simply do not believe that Collins . . . expected that Pioneer would insure the title without exception for Chalupsky's claim, then being litigated, if it knew all the facts.

*Id.* at 434.

> insurers against a risk, not a certainty. *Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 29 (1st Cir. 1981). It follows from this general principle that an insured cannot insure against the consequences of an event which has already begun. *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 63 (3d Cir. 1982). Once the risk is eliminated, the contract for insurance no longer exists. *Bartholomew v. Appalachian Ins. Co. supra.* Courts have found that the insurable risk is eliminated in the instance where an insured knows, when it purchases a policy, that there is a substantial probability that it will suffer or has already suffered a loss. At that point, the risk ceases to be contingent and becomes a probable or known loss. When the insured has evidence of a probable loss when it purchases the policy, the loss is uninsurable under that policy. *See Outboard Marine Corp. v. Liberty Mut. Ins. Co., supra.* This rule has been recognized in Massachusetts and by leading authorities on the subject of insurance. *See Bettigole v. American Employers Ins. Co.,* 30 Mass.App.Ct. 272, 274, 567 N.E. 2d 1259 (1991); Couch, Insurance §§ 1.5, 2:7 (rev. 2d ed. 1984); R. Keeton & A. Widiss, Insurance Law § 4 (1988).

*SCA Services, Inc. v. Transportation Insurance Co.*, 419 Mass. 528, 532-33, 646 N.E.2d 394 (1995) (emphasis added). *See also Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 29 (1st Cir. 1981) ("The concept of insurance is that the parties, in effect, wager against the occurrence or non-occurrence of a specified event; the carrier insures against a risk, not a certainty.").

The Rhode Island Supreme Court applied the known loss doctrine in *Insurance Company of North America v. Kayser-Roth Company*, 770 A.2d 403 (R.I. 2001). In *Kayser-Roth*, the defendant was sued by an insurer that had issued comprehensive liability policies in 1982 and 1983. The insurer contended that at the time the policies were issued, Kayser-Roth knew that contamination at a site owned by one of its former subsidiaries would almost certainly give rise to a loss. Therefore, the insurer argued, the known loss doctrine precluded coverage for environmental clean up costs. Kayser-Roth argued that it first became aware of its potential liability to the Government for clean-up costs in 1984, when it received notice from the EPA that it was a potentially responsible party.

The Rhode Island Supreme Court summarized the known loss doctrine as follows:

> The known loss doctrine is applied when the insured has knowledge, before the inception of an insurance policy, that the insured has suffered the threat of an immediate economic loss, as a result of some event, and that the reality of that loss occurring is a certainty. *See generally* 3 Eric Mills Holmes, *Holmes's Appleman on Insurance 2d* § 16.4 at 290 (1998) (the known loss doctrine "applies only where the insured is aware of a threat of loss so immediate that it might be stated that the loss was already in progress and such was known at the time of application or issuance of the policy since this doctrine is designed to prevent fraud when coverage is sought to be misused to insure a certainty rather than a fortuity").

*Kayser-Roth*, 770 A.2d at 415. The Court agreed with the company that the risk of liability for remedial costs did not become imminent until after the Kayser-Roth received notice from the EPA in 1984:

> Before the EPA action, the only claim ever brought against Kayser-Roth was brought by a single landowner seeking compensation for property damage. Kayser-Roth successfully defended that claim. Accordingly, although Kayser-Roth was aware that it potentially could be subjected to suits for property damage, it did not know, and had no reason to know, at least until 1984, that it could be subjected to a suit from the government for cleanup costs. Therefore, First State's known loss defense was properly denied.

*Kayser-Roth*, 770 A.2d at 416.

The known loss doctrine precludes coverage of IDC's loss of development rights on Goat Island. Unlike the insured in *Kayser-Roth*, IDC had received notice of the claims of the individual unit owners <u>before</u> it applied for the Policy; indeed, the individual unit owners would have filed suit challenging IDC's title but for the Tolling Agreement negotiated in December 1997. Because IDC had knowledge of the defects in its title, the risk of claims based on such defects was no longer an insurable risk. The loss was already in progress; it was merely a matter of time before it occurred.

**E. <u>IDC's Waiver And Estoppel Defenses.</u>**

In the context of insurance claims, waiver is the voluntary and intentional relinquishment of a known right. *Alan Corp. v. International Surplus Lines Insurance Co.*, 22 F.3d 339 (1st Cir. 1994); *Pacheco v. Nationwide Mutual Insurance Co.*, 114 R.I. 575, 577-578 (R.I. 1975). Equitable estoppel requires some reasonable, good-faith reliance by the insured upon some act, conduct or inaction of the insurer, to the detriment of the insured. *Id.* "Insurance contracts cannot be created by estoppel. That doctrine cannot be invoked . . . to create a primary liability of the insurer for which all elements of a binding contract are necessary." 16B J.A. Appleman and J. Appleman, *Insurance Law* §9090 (1981); *see also Nieves v. Intercontinental Life Ins. Co.*, 964 F.2d 60, 66 (1st Cir. 1992) (holding that, under Puerto Rico law, an insurance policy cannot be extended by waiver or estoppel). Similarly, "[i]t is well established that, whatever the scope of waiver in insurance law, 'it does not extend to the broadening of coverage, so as to make the policy cover a risk not within its terms.'" *Alan Corp.*, 22 F.3d at 343 (quoting *Palumbo v. Metropolitan Life Ins. Co.*, 293 Mass. 35, 199 N.E. 335, 336 (1935)).

There are no facts in this case that would establish either waiver or estoppel. IDC failed to disclose material information that would have put Commonwealth on notice of the true magnitude of its exposure. *See Warren v. Confederation Life Association*, 401 F.2d 487, 490 (1st Cir. 1968) ("Even so we could not accept plaintiff's contention that because the company knew to some extent that the applicant was not in first class health it waived the provision in its entirety. The company cannot be regarded as waiving what it does not know.").

**VII. <u>PENDING MATTERS</u>**

There are no matters pending at this time.

## VIII. ESTIMATED TIME OF TRIAL

Commonwealth estimates that one and one half days will be required to present its evidence.

## IX. WITNESSES

Commonwealth's witness list is being filed separately.

## X. EXHIBITS

Commonwealth's Exhibit List is being filed separately. Commonwealth reserves the right to use exhibits identified by IDC. Commonwealth further reserves the right to use unlisted exhibits for impeachment purposes.

COMMONWEALTH LAND TITLE
INSURANCE COMPANY

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

Steven E. Snow (#1774)
Robert K. Taylor (#6514)
180 South Main Street
Providence, RI 02903-7120
(401) 861-8200
(401) 861-8210 FAX
ses@psh.com
rkt@psh.com

DATED: September 17, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing PLAINTIFF'S PRETRIAL MEMORANDUM was sent by prepaid first class mail on the 17th day of September, 2007 to the following:

IDC Properties, Inc.
c/o Richard J. Land, Esq.
Registered Agent for Service
123 Dyer Street
Providence, RI 02903

/s/ Robert K. Taylor

672811_3/6052-3