**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

COMMONWEALTH LAND TITLE
INSURANCE COMPANY,
Plaintiff

v.

IDC PROPERTIES, INC.,
Defendant.

C.A. No. 01-400-T

**DEFENDANT'S PRETRIAL MEMORANDUM**

## I. INTRODUCTION

In January of 1998 Plaintiff, Commonwealth Land Title Insurance Company, issued a $12 million dollar title insurance policy (policy) to Defendant, IDC Properties, Inc.[1] The policy in question insured title to certain parcels – designated as condominiums – located on Goat Island, known as the North, South, and West Units, as well as the development/improvement rights on those parcels. In this declaratory judgment action, Commonwealth seeks a declaration that it is not required to cover losses subsequently sustained by IDC, and related to the title and development rights insured under the policy, on the grounds that IDC failed to disclose that the title and rights insured under the policy were subject to potential litigation from individual condominium unit owners. In response, IDC asserts that it made known to Commonwealth the potential for litigation over the validity of the amendments creating the North Unit and the

[1] The original policy was issued in January 1998 in the amount of $7 million dollars and covered both the North Unit and the right to construct improvements on that land. Subsequently, in December 1998, the policy limit was increased to $12 million with additional coverage of South and West Units.

applicable development/improvement rights; and, therefore, Commonwealth's suit for declaratory relief has no basis.

## II. PARTIES

**a.** IDC Properties, Inc.

Thomas C. Angelone, Esq.
Hodosh, Spinella, & Angelone, PC
One Turks Head Place, Suite 810
Providence, RI 02903

**b.** Commonwealth Land Title Insurance Co.

Stephen E. Snow, Esq.
Robert K. Taylor, Esq.
Partridge, Snow & Hahn LLP
180 South Main Street
Providence, RI 02903

## III. FACTUAL BACKGROUND

On January 13, 1988, Globe Manufacturing Co. ("Globe"), recorded a declaration of condominium that it designated as the Goat Island South-A Waterfront Condominium. *America Condominium Association, Inc. et al v. IDC, Inc.*, 870 A.2d 434, 120 (R.I. 2005) (America Condominium II). Included within the 23 acre condominium area were six defined parcels. *Id.* Three parcels consisted of existing residential complexes: America Condominium ("America"), Capella South Condominium ("Capella South"), and Harbor House Condominium ("Harbor House"). *Id.* The three other parcels were vacant, and were classified as the Individual Unit, later designated the West Development Unit ("West Unit"), Development Unit #1, later designated the South Developmental Unit ("South Unit"), and Developmental Unit #2, later designated the Reserved Area or North Developmental Unit ("North Unit"). *Id.*

On March 3, 1988, Globe and the Goat Island South Condominium Association amended and restated the original Condominium Declaration ("Declaration"). *Id.* The amended Declaration reserved certain developmental rights for the Declarant of the condominiums. These developmental rights included the right to convert the land underlying America, Capella South, Harbor House, the West Unit, and South Unit into master limited common elements with development rights in the airspace above these master units. *America Condominium Association, Inc. et al v. IDC, Inc.*, 844 A.2d 117, 120. (R.I. 2004) (America Condominium I). The declaration also reserved the Declarant's right to convert the North Unit into a master common element with development rights to further convert that unit to a limited master common element with a new associated master unit owning the above airspace, or to completely withdraw the North Unit from the condominium. *Id.*

Globe then sold its interests in IDC, Inc who in turn transferred its interest to IDC Properties, Inc. ("IDC") on October 19, 1994. *America Condominium I*, 844 A.2d at 122 n.9. At the date of that conveyance, neither Globe nor IDC had exercised any of their reserved developmental rights. By the terms of the amended Declaration, those rights were to expire on December 31, 1994. *Id.* at 121.

IDC and the Goat Island South Condominium Association then held several meetings at which amendments were adopted extending the development rights. At these meetings, IDC and the Association adopted the amendments using the voting procedures found within the Declaration. On April 27, 1994, a special meeting of the Goat Island South Condominium Association convened. At that meeting, the association adopted the Third Amendment to the Declaration ("Third Amendment"). *America Condominium I*, 844 A.2d at 122. That Amendment extended the period to exercise the Declarant's developmental rights contained in

the Declaration until December 31, 1999. *Id.* at 123. On November 15, 1994, another meeting of the Goat Island South Condominium Association convened and adopted the Fourth Amendment to the Declaration ("Fourth Amendment"). The Fourth Amendment extended development rights in the South Unit until December 31, 1999. At a meeting held on December 29, 1994, a Fifth Amendment to the Declaration ("Fifth Amendment") was adopted extending the Declarant's development rights to December 31, 2015, and IDC also exercised their rights to withdraw the North Unit from the condominium by the exercise of a Sixth Amendment to the Declaration ("Sixth Amendment").

Thereafter, Timothy More, IDC's counsel, requested title insurance from Commonwealth Title ("Commonwealth") on behalf of IDC pursuant to a letter dated December 4, 1997, addressed to Commonwealth's agent, Michael Mellion ("Mellion"). The letter enclosed a memorandum dated November 17, 1997, which discussed the issues surrounding the creation of the North Development Unit and the potential challenges to the amendment creating that unit. The memorandum states that "one may question whether the vote of the subassociations is invalid," but also indicates that, among other things, "[i]n the absence of fraud, a court should find that the one year statute of limitations and/or laches bars any attack on the 1994 amendment." (Mmo. From More to Mellion dated November 17, 1997). More informed Mellion that he had also applied for title insurance with Chicago Title and that Chicago was "having concerns about issuing title insurance on the North Development Unit. (Dep. More, p. 17, l. 19-20).

On December 15, 1997 Chicago Title declined to extend a policy to IDC, and More later told Mellion that Chicago Title had declined to provide title insurance. (Dep. More p. 19, l. 5). More also told Mellion that there was a dispute between IDC and the Condominium Association,

(Dep. More p. 20, 1.21), and that there were "serious disagreements" with the Condominium Association over the validity of the amendments creating extending development rights under the Declaration. (Dep. More, p. 64,1.22). In addition, Mellion had documents authored by his own title examiner which stated that "No MLC [Municipal Lien Certificate] is possible. The city has locus located within the common areas until development occurs, the city will not distinguish as a separate plat and lot." The title examiner's notes went on to state that "[t]he Newport tax assessor added Development Unit # 1 and Individual Unit parcels to the Common Elements of the Goat Island South Condo in 1995. He was told by atty. William Cochran that the development rights expired on 12/31/94. My view of the Condominium Documents leads me to believe that the development rights were extended at least to 12/31/99."

More answered every question asked of him by Mellion and produced any documents that were requested (Dep. Mellion p. 20). Those documents included the Declaration and Amendments. Commonwealth had no contact with Tom Roos, IDC's sole shareholder, or anyone from IDC Properties during the negotiations for the insurance policy. (Dep. Mellion, p 11 l. 16 p.12, l. 2).

Disputes between IDC and the Goat Island South Sub-condo associations led to the signing of tolling agreement in January of 1998 preserving all claims individual condo unit owners may have had against IDC. Soon thereafter on January 13, 1998, Commonwealth issued a policy covering IDC's rights in the North Unit. IDC then commenced building the Newport Regatta Club on the North Unit. In December of 1998, More requested additional title insurance to cover the value of the Newport Regatta Club and the South and West Units. Commonwealth complied and added insurance coverage in accordance with that request in February of 1999.

On May 29, 1999, the condominium associations of America Condominium, Capella South Condominium, and Harbor House Condominium, (collectively the "Condominium Associations" or "individual unit owners") commenced an action against IDC Properties, Inc. On June 13, 2001 the Rhode Island Superior Court in and for the County of Newport (the "Superior Court") entered a judgment on the parties' cross motions for partial summary judgment determining that the Third, Fourth and Fifth Amendments to the Declaration establishing the Goat Island South – a Waterfront Condominium were null and void by reason, amongst other things, of the failure to solicit the votes of the individual condominium unit owners. The Superior Court entered an Order declaring the amendments null and void, declaring IDC's "right to develop Goat Island" as "expired" and declaring that the Master Association was without right to act in behalf of the "unit owners." Both IDC and the Condominium Associations then pursued cross appeals to the Rhode Island Supreme Court seeking to determine the status of the title to the South, West and North Units. *America Condominium I.*, 844 A.2d at 117. On March 23, 2004, the Rhode Island Supreme Court issued a 51 page opinion in the State Court Litigation making new determinations about the ownership of the Property. The opinion included a 22 page dissent, (Flanders, J.). *Id.*

The Supreme Court subsequently granted the Defendant's petition for re-argument and, on April 8, 2005, issued its opinion in *America Condominium II.* In *America Condominium I* the Supreme Court affirmed the Superior Court's findings that the Third, Fourth and Fifth Amendments were null and void. Notably, there was never any challenge to the validity of the Sixth Amendment creating the North Unit. *See America Condominium I*, 844 A.2d at 124 n.12. The Supreme Court went on to determine in *America Condominium I*, however, that title to the West, South and North Units, had, as a result of the failure of the Third, Fourth and Fifth

Amendments, then vested in "the individual unit owners in fee simple." Id., at 133. In *America Condominium II*, the Supreme Court reconsidered and withdrew this finding. In *America Condominium II*, the Supreme Court looked more closely at the creation of the South, West and North Units and paid particularly close attention to the assertion of IDC, that, regardless of the status of its development rights, it remained the owner of the Master Units, which consisted of the airspace over and above the land underlying the South, West and North Units. The Supreme Court concluded that a Unit is not simply created by describing a parcel of real estate, and designating it as a unit (or a master unit) in declaration of a condominium. There must also be compliance with the [Rhode Island Condominium] Act. *America Condominium II*, 870 A.2d at 442.

The Supreme Court, in *America Condominium II*, determined, quite apart from the dispute over development rights, that the original creation of the West and South Units was not in compliance with the Rhode Island Condominium Act and accordingly, "because the South and West Units were never validly created units within the meaning of the Act, they were, and remain, common elements." 870 A.2d at 440. The Supreme Court reached the same conclusion with respect to the North Unit. *Id.* ("Consequently, these portions of the condominium always were, and remain common elements.")

Commonwealth filed their complaint August 24, 2001 after the commencement of the Condominium Associations' suit. To this date, IDC has not asserted a claim against the Commonwealth policy.

## IV. CLAIMS AND DEFENSES

### a. Commonwealth's Claims

Commonwealth seeks a declaration from this Court that it is not required to cover losses related to IDC's title and development rights on Goat Island. Commonwealth's complaint asserts four separate counts each serving as a different basis for the relief sought.

Count I of the complaint alleges that coverage is excepted under Policy Exclusion No. 3(b) which states that "[d]efects, liens, encumbrances, adverse claims or other matters: * * * not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant, and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy," are excluded from coverage.

Count II of the complaint alleges that coverage is excluded under Policy Exclusion No. 3(a) which states that "[d]efects, liens, encumbrances, adverse claims or other matters: * * * created, suffered, assumed or agreed to by the insured claimant" are excluded from the coverage of the policy.

Count III of the complaint alleges that the policy is void on the grounds that IDC made fraudulent misrepresentations when it allegedly did not disclose to Commonwealth the existence of, among other things, adverse claims against IDC.

Count IV of the complaint alleges that no coverage exists under the policy for losses sustained by IDC as a result of IDC's inability to develop Goat Island because such losses were a known loss, and therefore uninsurable.

**b. IDC's Affirmative defenses**

IDC raises the defenses of waiver/estoppel and ripeness.

**c. IDC's Counterclaim**

IDC asserts as a counterclaim that Commonwealth's declaratory judgment action constitutes a bad faith failure to pay in violation of R.I.G.L. 1956 § 9-1-33.

## V. FACTUAL AND LEGAL ISSUES

This case presents the following factual and legal issues:

1. Whether IDC was aware that suit against it was imminent challenging the Third, Fourth, and Fifth Amendments.
2. Whether the Sixth Amendment was ever challenged.
3. Whether IDC disclosed the potential for litigation over the validity of the Third, Fourth, and Fifth Amendments.
4. Whether Policy Exclusion 3(b) applies given Commonwealth's knowledge of the potential for challenge to the validity of the voting procedures used to extend development right to the North, South, and West Units.
5. Whether Policy Exclusion 3(a) applies given that the risk associated with insuring the development rights of the North, South, and West units was made known to Commonwealth prior to issuance of the policy.
6. Whether IDC made fraudulent and material misrepresentations that induced Commonwealth to issue the policy.
7. Whether the Known Loss doctrine applies in this case.
8. Whether Commonwealth waived or is estopped from asserting that it had no knowledge of the challenges to the amendments.

## VI. ARGUMENTS

### a. COUNT I – Exclusion 3(b) in the policy

Policy exclusion 3(b) reads: "[d]efects, liens, encumbrances, adverse claims or other matters: * * * not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant, and not disclosed in writing to the Company by the insured

claimant prior to the date the insured claimant became an insured under this policy" are excluded from coverage. Commonwealth argues that because IDC allegedly failed to disclose its knowledge of explicit threats of litigation made by the individual unit owners regarding the validity of the amendments to the Declaration prior to the issuance of the policy, coverage for "all claims related to loss, expiration or extinction of IDC's title or development rights on Goat Island" is excluded under exclusion 3(b). Significantly, Commonwealth bears the burden of proving this claim. *American Title Insurance Company v. East West Financial*, 16 F.3d 449, 455 (1st Cir. 1994) (citing *Pickering v. American Employees Ins. Co.*, 109 R.I. 143, 282 A.2d 584, 587 (1971). Thus, to succeed, Commonwealth must prove (1) that IDC knew of the individual unit owners' challenge to the validity of the amendments; (2) that IDC failed to disclose that information to Commonwealth in writing; and (3) that Commonwealth had no independent knowledge of the substance of these challenges. Commonwealth cannot carry this burden, however, because it clearly had notice of the risk of litigation from the individual unit owners. Indeed, prior to the issuance of the policy in 1998, IDC notified Commonwealth in writing of the potential for litigation over the validity of the amendments.

On December 4, 1997, Timothy More wrote a letter, dated December 4, 1997, to Commonwealth's agent, Michael Mellion, requesting title insurance on the North Unit and the development/improvement rights therein. Enclosed with the letter was a memorandum that discussed the legal issues surrounding the passing of the amendment that created the North Unit and that extended IDC's right to develop and/or improve the unit beyond December 31, 1994. In that memorandum, More first notes the validity of the vote adopting the amendment, but then details his argument as to the validity of the amendment and his belief that, even if the amendment was invalid, the one-year statute of limitations on challenges to the validity of an

amendment to a Declaration adopted by an association had run, thus precluding the bringing of any action on that ground. Through various phone conversations, More further appraised Mellion of the "serious disagreements" between IDC and the individual unit owners regarding the validity of the amendments.[2]

In addition, More informed Mellion that he had applied for title insurance with Chicago Title and that Chicago had some serious concerns about issuing title insurance on the North Development Unit. Later, More reported to Mellion that Chicago Title had declined to provide title insurance. Further, Mellion had documents authored by his own title examiner which stated that a Municipal Lien Certificate could not be issued on the property because, until development

---

[2] It should be noted that, up until the time that the policy was issued, IDC had only received disagreements from the individual unit owners regarding the amendment adoption procedure, and the potential for litigation on those grounds. Thus, IDC correctly made known to Commonwealth that (1) there were serious disagreements with the unit owners regarding the validity of the amendments to the Declaration; and (2) IDC's argument for the validity of the amendments together with its assurance that the statute of limitations on challenging such amendments had run.

Commonwealth takes issue with the fact that although IDC signed a tolling agreement with the individual unit owners, it did not provide Commonwealth with a copy of this agreement. However, even assuming that IDC did not disclose the agreement and its contents to Commonwealth – a point that IDC does not concede – this fact is irrelevant because the tolling agreement by its terms was meaningless.

R.I.G.L. 1956 § 34-36.1-2.17(b) reads: "[n]o action to challenge the validity of an amendment adopted by the association pursuant to this section may be brought more than one year after the amendment is recorded." Here, the tolling agreement signed by IDC and the individual unit owners stated that the parties agreed that any action filed would be dated retroactive to December 1, 1997. However, it is undisputed that the amendments in issue in this case were filed in 1994. Thus, assuming arguendo that the tolling agreement was valid in the first place, it was nonetheless meaningless at the time it was signed because any action filed on December 1, 1997 challenging the validity of the amendments in question would have been well beyond the one-year statute of limitations for making such challenges. Indeed, the Rhode Island Supreme Court decisions in *America I* and *America II* in no way hinged on the validity or application of the tolling agreements between IDC and the individual unit owners. IDC had no obligation to disclose an agreement that it considered to be legally meaningless.

occurred there, the city considered the property part of the common elements of the condominium – thus calling into question the validity of the amendment creating the North Unit.

Clearly, then, Commonwealth was well informed of the risk that litigation could arise regarding the validity of the amendments to the Declaration. Indeed, Commonwealth, at the very least, knew (1) that the individual unit owners seriously disagreed with IDC's arguments regarding the validity of the amendments; (2) that IDC believed that the amendments were valid and that any challenges to the validity of those amendments was barred by the statute of limitations; and (3) that Chicago Title had denied coverage of the North Unit. Commonwealth has cited no authority that would have required IDC to disclose any more than what was disclosed in this case.[3] As such, the terms of 3(b) are inapplicable.

Commonwealth's citation to *Kirwan v. Chicago Title Insurance Co.*, 612 N.W.2d 515 (Neb. App. 2000), is misplaced; *Kirwan* is factually distinguishable. In *Kirwan*, the insured never gave any indication to the insurer of the known potential that its title could be challenged on the grounds that title had been vested in another party. Therefore, the court correctly found that the loss resulting from a challenge on that basis was excluded from the policy's coverage. Here, it is undisputed that IDC notified Commonwealth of the potential for challenges to the validity of the amendments creating the North Unit and creating the rights to develop/improve

---

[3] Furthermore, at the very least, Commonwealth is liable under the policy for losses related to defects in the title to the North Unit. That title was created by the Sixth Amendment, and that amendment was never challenged by the individual unit owners. By definition, then, IDC had no duty to disclose the threat of litigation over the validity of the Sixth Amendment, because such threat did not exist. Thus, IDC's losses resulting from defects in that title cannot be excepted from coverage under exclusions 3(a) and 3(b). Similarly, IDC cannot be said to have made a fraudulent misrepresentation or have shifted a known loss to Commonwealth by not disclosing the "threats of litigation" regarding the validity of the Sixth Amendment, because such threats were neither asserted nor pursued. As such, IDC's losses related to defects in the title to the North Unit are clearly covered by the policy.

upon it. Indeed, Commonwealth was well informed as to the circumstances surrounding the passing of those amendments – i.e. that they had not been approved by the unanimous vote of all of the individual unit owners. Moreover, Commonwealth was on notice that, but for the amendments to the Declaration in question, IDC's development rights and its right to create the North Unit otherwise would have run out on December 31, 1994. Thus, unlike in *Kirwan*, Commonwealth insured IDC's interests knowing full well that those interests hinged solely on the validity of the amendments that created them, and that such validity was susceptible to challenge. Accordingly, under the plain language of 3(b), coverage for the individual unit owners claims was not excluded because the potential for challenges to the validity of the amendments was disclosed to Commonwealth.

**b. COUNT II – 3(a) exclusion**

Policy exclusion 3(a) reads: "[d]efects, liens, encumbrances, adverse claims or other matters: * * * created, suffered, assumed or agreed to by the insured claimaint" are excluded from the coverage of the policy. Commonwealth seeks to invoke this exclusion to avoid coverage under the policy on the grounds that because IDC controlled the procedure by which the amendments in question were passed, and because such procedure was ultimately determined to be invalid, IDC intentionally created a defect in its own title. This argument holds no water.

Although Rhode Island courts have not yet interpreted clauses such as 3(a), "other jurisdictions have generally held that 'the insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances.'" *American Title*, 16 F.3d at 455 (1st Cir. 1994) (quoting *Brown v. Saint Paul Title Ins. Corp.*, 634 F.2d 1103, 1107-08 n.8 (8th Cir. 1980). "But the terms of a title

insurance policy are subject to the same rules of construction applicable to insurance policies in general, * * * and any provisions limiting liability or excluding matters from coverage will be strictly construed against the insurer and in favor of the insured." (Internal citations omitted) *Brown*, 634 F.2d at 1107 (citing *Lawyers Title Insurance Corp. v. Research Loan & Investment Corp.*, 361 F.2d 764, 768 (8th Cir. 1966) and *Minnesota Title Insurance & Trust Co. v. Drexel*, 70 F. 194, 198 (8th Cir. 1895)). Moreover, "[w]here an insurance company seeks to deny coverage under a policy exclusion, it carries the burden of proving that the exclusion applies." *Pickering v. American Employers Ins. Co.*, 109 R.I. 143, 282 A.2d 584, 587 (1971).

Commonwealth's assertion that IDC is not covered under the policy for defects arising from the passage of the amendments to the Declaration due to IDC's "intentional" involvement in that process, is ill-founded considering Commonwealth's knowledge, prior to the issuance of the policy, of (1) the facts surrounding the passage of the amendments including that the individual unit owners had not unanimously voted to approve the amendments; (2) the potential for challenge to the validity of the voting procedures employed to adopt the amendments; and (3) that, but for the passage of the amendments, IDC's right to create the North Unit and extend its development rights would have run out in 1994.

In 1998 – approximately four years after IDC's right to create the North Unit and to develop the North, South, and West Units had run out under the master declaration – Commonwealth issued the policy in question covering title to the North Unit and the rights to develop and/or improve it. Thus, when it issued the policy, Commonwealth clearly knew that IDC's rights to create that unit and those rights hinged on the validity of the passage of the amendments in question. In essence, then, Commonwealth now seeks to invoke 3(a) in an effort to avoid coverage of a risk about which Commonwealth was fully aware, and, indeed, for which

the policy was originally sought. However, 3(a) should not be read so restrictively as to allow Commonwealth to avoid coverage of a risk that it knew about when it issued the policy. For, "courts will not narrowly construe the terms of a policy so as to deprive the insured of the protection he reasonably expected and, where a claim is arguably within the policy's coverage, the insurer has the burden of proving that the claim is excluded from coverage." *Brown*, 634 F.2d at 1107 (citing *First National Bank of Minneapolis v. Fidelity National Title Insurance Co.*, 572 F.2d 155, 161 (8th Cir. 1978); *Ranger Insurance Co. v. Mercantile Trust Co.*, 363 F.Supp. 795, 800-01 (E.D.Mo.1973); *Foremost Construction Co. v. Killam*, 399 S.W.2d 593, 596 (Mo.App.1966)). Indeed, to do so would be inequitable and would give a windfall to Commonwealth. *See American Savings and Loan Association v. Lawyers Title Insurance Corporation*, 793 F.2d 780, 784 (6th Cir. 1986) ("the application of exclusionary clauses . . . often turns on notions of equity.").

**c. COUNT III – Fraudulent Misrepresentation**

Commonwealth argues that IDC did not fully disclose certain material facts, and that such alleged failure constituted a fraudulent misrepresentation that voided the policy. The Rhode Island Supreme Court has adopted the view that that a material representation in an insurance application is any representation that induces the insurer to insure the applicant. *Evora v. Hery*, 559 A.2d 1038, 1040 (R.I. 1989). Commonwealth contends that IDC's alleged failure to disclose (1) explicit threats of litigation made by the individual unit owners; (2) the execution of the Tolling Agreement; (3) Chicago Title's decision to offer coverage; (4) More's "knowledge that it was not 'clear' that the 1994 votes to extend development rights could properly exclude individual unit owners;" (5) More's concerns that the amendments were potentially invalid, were all omissions that constituted material misrepresentations. These arguments are without merit;

IDC disclosed all the information necessary for Commonwealth to assess the risk in issuing title insurance in light of the potential challenges to the amendments.

Commonwealth was fully informed as to the process by which the amendments were adopted, and More's concern that that process could be challenged. More's memorandum partially entitled "title issues" sets forth a detailed argument for the validity to the amendments, but also states that "one may question whether the vote of the subassociations is invalid." It is therefore disingenuous for Commonwealth to assert that More did not express his concern about the possible invalidity of the adoption process. Essentially, what Commonwealth suggests is that More – the person representing an applicant for title insurance – had the duty to supply Commonwealth with the counterargument to his argument for the validity of the amendments, and that the failure to "disclose" that legal argument was a material omission voiding the contract. More had no such duty. He appropriately appraised Commonwealth (1) that he sought title insurance for a title and its corresponding development rights; (2) that such title and corresponding development rights were created by certain amendments to the master declaration; (3) that those amendments had not been approved by the unanimous vote of the individual unit owners; (4) what his arguments were for the validity of the voting procedures employed to adopt those amendments; (5) that Chicago title had denied coverage for the North Unit which was created by those amendments; and (6) that the individual unit owners did not agree that the amendments were properly adopted. Commonwealth has cited no authority that required More and IDC to adequately appraise Commonwealth as to the arguments that could be, or could have been, made for the invalidity of the amendments. As such, Commonwealth cannot prove that IDC committed fraudulent misrepresentations that voided the policy.

**d. COUNT IV – Known Loss Doctrine**

The known loss doctrine does not release Commonwealth from its obligation to insure IDC's losses in Goat Island. IDC did not know before the policy took effect that the Rhode Island Supreme Court would declare the amendments to the Declaration void *ab initio* or could IDC have been substantially certain that it would lose its property rights in the contested units. Parties to an insurance contract wager against the occurrence or nonoccurrence of a specific risk but not a known certainty. *SCA Services Inc. v. Transportation Ins. Co.*, 419 Mass 528, 532, 646 N.E.2d 394, 397 (Mass. 1995) (*quoting Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 29 (1[st] cir. 1981)). From this general principle courts created the known loss doctrine which provides "that an insured cannot insure against the consequences of an event which has already begun." *SCA Services Inc. v. Transportation Ins. Co.*, 419 Mass 528, 532, 646 N.E.2d 394, 397 (Mass. 1995) (quoting *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 63 (3d Cir. 1982). Under this doctrine, an insurable risk terminates when an insured knows when it purchases a policy that there is a substantial probability that it will suffer or has already suffered a loss. *SCA Services Inc. v. Transportation Ins. Co.*, 419 Mass 528, 532-33, 646 N.E.2d 394, 397 (Mass. 1995) (citing *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 63 (3d Cir.1982). The loss suffered by IDC was a result of the inherent defects in the Declaration as interpreted by the Rhode Island Supreme Court in 2004 and 2005. Commonwealth should not be allowed to deny coverage under the known lose doctrine by claiming that IDC could somehow divine the outcomes America I and II in 1997 and1998.

IDC, further, cannot be shown to have had a certainty that it would lose possession of the North Unit, and, thus, the known loss doctrine is inapplicable to this case. *Insurance Company of North America v. Kayser Roth Corp.*, 770 A.2d 403, 415 (R.I. 2003). After agreeing to the initial insurance contract, IDC invested substantial amounts of capital into the North Unit by creating

the Newport Regatta Club; this was not the conduct of a company with knowledge that it could later be divested of its property rights. IDC also relied on advice from Timothy More who stated that the applicable statute of limitations period had run. IDC had previously exercised the Sixth Amendment pursuant to the Declaration and the Condominium Associations never challenged the validity of the Sixth Amendment. IDC could not have had knowledge in 1997 or 1998 that the Supreme Court would strike down the Sixth Amendment, which removed the North Unit from the condominium area, some 8 years later in *America Condominium* II. As such, the known loss doctrine is inapplicable to this case.

**e. IDC's AFFIRMATIVE DEFENSES – Waiver, Estoppel, and Ripeness**

The doctrines of waiver and estoppel are generally applicable to insurance contracts. The principle that no one shall be permitted to deny that he intended the natural consequences of his act when he has induced others to rely upon them is as applicable to insurance companies as it is to individuals. *Globe Mut. Life Ins. Co. of New York v. Wolff*, 95 U.S. 326, 330 (1877). Further, equitable estoppel requires reasonable, good-faith reliance by the insured upon the actions, conduct or inaction of the insurer, to the detriment of the insured. *Alan Corp. v. International Surplus Lines Insurance Co.*, 22 F.3d 339 (1st Cir. 1994).

Here, the facts in this case establish both waiver and estoppel. Commonwealth and its agent Mellion had knowledge of the possible litigation over the condo amendments when they issued the insurance policies. Further, IDC relied on Commonwealth because it began construction of the Newport Regatta Club after the issuance of the insurance policies. Commonwealth must now be estopped from denying that insurance coverage.

IDC also contends that this case is not ripe because IDC has yet to make a claim against these policies.

**f. IDC's COUNTERCLAIM – Insurer's bad faith refusal to pay a claim made under any insurance policy**

IDC contends that Commonwealth acted in bad faith when it commenced this declaratory judgment before this court. R.I. Gen. Laws § 9-1-33 provides in pertinent part that "an insured *** may bring an action against the insurer *** when it is alleged the insurer wrongfully and in bad faith refused to pay or settle a claim *** or otherwise wrongfully and in bad faith refused to timely perform its obligations under the contract of insurance." R.I. Gen. Laws § 9-1-33 (2006). Here, Commonwealth filed this action even though they previously had knowledge, through defendant's disclosure, of IDC's dispute with the Condominium Associations. Commonwealth therefore filed this action in bad faith and violated § 9-1-33.

## VII. PENDING MATTERS

No matters are pending at this time.

## VIII. ESTIMATED TIME OF TRIAL

IDC estimates that one and one-half days will be required to present its evidence.

## IX. WITNESSES

IDC's witness list is being filed separately.

## X. EXHIBITS

IDC's Exhibit List is being filed separately. IDC reserves the right to use exhibits identified by Commonwealth. IDC further reserves the right to use unlisted exhibits for impeachment purposes.

IDC PROPERTIES, INC.

By its Attorneys,

HODOSH, SPINELLA, & ANGELONE, PC

/s/ Thomas C. Angelone
Thomas C. Angelone, Esq. (#1373)
One Turks Head Place, Suite 810
Providence, Rhode Island 02903
(401) 274-0200
FAX: (401) 274-7538
angelonelaw@aol.com

## CERTIFICATION

I hereby certify that on this 23rd day of October, 2007, this document was filed electronically and is available for reviewing and downloading to the ECF registered counsel of record.

Commonwealth Land Title Insurance Company
c/o Stephen E. Snow, Esq.
Partridge, Snow, & Hahn, LLP
180 South Main Street
Providence, RI 02903
ses@psh.com

/s/ Thomas C. Angelone

#7209