UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| COMMONWEALTH LAND TITLE INSURANCE COMPANY,<br>Plaintiff<br><br>v.<br><br>IDC PROPERTIES, INC.,<br>Defendant. | C.A. No. 01-400-T |

**DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION TO AMEND PLEADINGS**

For the reasons set forth in Defendant's memorandum attached hereto, Defendant hereby objects to Plaintiff's post-trial motion to amend its pleadings pursuant to Rule 15(b) of the Federal Rules of Civil Procedure.

IDC PROPERTIES, INC.

By its Attorneys,

HODOSH, SPINELLA, & ANGELONE, PC

/s/ Thomas C. Angelone
Thomas C. Angelone, Esq. (#1373)
One Turks Head Place, Suite 810
Providence, Rhode Island 02903
(401) 274-0200
FAX: (401) 274-7538
angelonelaw@aol.com

**CERTIFICATION**

I hereby certify that on this 15th day of November, 2007, this document was filed electronically and is available for reviewing and downloading to the ECF registered counsel of record.

Commonwealth Land Title Insurance Company

c/o Stephen E. Snow, Esq. and Robert Taylor, Esq.
Partridge, Snow, & Hahn, LLP
180 South Main Street
Providence, RI 02903
ses@psh.com

/s/ Thomas C. Angelone

#7509

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

COMMONWEALTH LAND TITLE INSURANCE COMPANY,
Plaintiff

v.

IDC PROPERTIES, INC.,
Defendant.

C.A. No. 01-400-T

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS OBJECTION TO PLAINTIFF'S MOTION TO AMEND PLEADINGS**

## I. INTRODUCTION

In January of 1998 Plaintiff, Commonwealth Land Title Insurance Company (Commonwealth), issued a $7 million dollar title insurance policy (policy) to Defendant, IDC Properties, Inc. (IDC) (later, said policy was increased to $12 million). The policy in question insured title to certain parcels of land located on Goat Island (and contained in the Goat Island South – A Waterfront Condominium), known as the North, South, and West Units, as well as the development rights and improvement rights on the North Unit.[1] In this declaratory judgment action Commonwealth seeks a declaration that it is not required to cover potential losses sustained by IDC, and related to the title and development rights insured under the policy, on the grounds that IDC failed to disclose that the development rights were subject to "threats of

---

[1] The original policy was issued in January 1998 in the amount of $7 million dollars and covered three separate parcels: "Parcel 1," so-called, covered title to the North Unit in fee simple; "Parcel 2," so-called, covered the special declarant's (IDC's) rights under the 5th amendment to the master condominium declaration to develop the North Unit; and "Parcel 3," so-called, covered IDC's right as owner to construct improvements on the North Unit. Subsequently, in December 1998, the policy limit was increased to $12 million to include coverage for titles to the South and West Units delineated as "Parcel 4 and Parcel 5."

litigation" from individual condominium unit owners prior to the issuance of the policy. In response, IDC asserts that because it made known to Commonwealth the potential for litigation over the validity of the 5th amendment to the declaration which extended the time frame in which IDC could exercise its development rights, and because no challenge to the title to the North, South, and West Units had ever been threatened prior to the issuance of the policy, Commonwealth's claims should fail on the merits. A bench trial was begun on November 6, 2007, and closing arguments were heard on November 8.

## II. FACTS RELEVANT TO RULE 15(b) MOTION

During closing arguments, Commonwealth contended that it had proven by a fair preponderance of the evidence that, prior to the issuance of the policy, IDC was aware of, but failed to disclose, threats of litigation challenging each parcel covered under the policy – i.e. IDC's title to the North, South, and West Units as well as IDC's right to develop the North Unit as extended by the 5th amendment to the declaration. Therefore, Commonwealth argued, coverage of the titles to the North, South, and West Units as well as coverage for the 5th amendment development rights should be excluded under sections 3(a) and 3(b) of the policy. IDC countered that Commonwealth had not plead a claim asserting that coverage for the titles to the North, South, and West Units was excluded from the policy under sections 3(a) and 3(b),[2]

---

[2] In its complaint Commonwealth avers, in relevant part:

"**COUNT I**

"* * *

"14. IDC's knowledge of adverse claims and the other facts set forth in paragraph 11 of this Complaint, combined with Insurer's lack of knowledge thereof and IDC's failure to notify Insurer of such facts prior to the issuance of the Owner's Title Insurance Policy results in an exclusion from coverage of any

and, in any event, no evidence was introduced showing that a challenge to IDC's titles to the North, South, and West Units had ever been threatened prior to the issuance of the policy.

Realizing that its pleadings are deficient, Commonwealth has moved this Court pursuant to Rule 15(b) to allow it to amend its pleadings to conform to the proof that it asserts it admitted into evidence showing that IDC was aware of, but failed to disclose, a threat of litigation challenging not only IDC's 5th amendment development rights, but also challenging the titles of the North, South, and West units. However, because the record is devoid of any such evidence, Commonwealth's motion to amend its pleadings to include such a claim should be denied.

## III. ARGUMENT

Rule 15(b) of the Federal Rules of Civil Procedure allows a party to amend its pleadings post-trial to conform to the evidence introduced at the trial "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties." Fed. R. Civ. P. 15(b).[3] Here,

---

and all claims by IDC related to the loss, expiration or extinguishment of its development rights at the Goat Island Condominium.

"**COUNT II**

"* * *

"16. IDC's actions created, suffered, assumed or constituted an agreement to create defects, liens, encumbrances, and adverse claims resulting in an exclusion from coverage of any and all claims by IDC related to the loss, expiration, or extinguishment of its development rights at the Goat Island Condominium."

[3] Rule 15(b) of the Federal Rules of Civil Procedure provides:

> "**(b) Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any

IDC did not expressly consent to the trial of the claim that coverage of the titles to the North, South, and West Units was excluded under the policy. As such, the issue presented by Commonwealth's Rule 15(b) motion is whether IDC impliedly consented to a trial of that issue by allowing proof of that claim to be introduced into evidence without objection.

"'Consent to the trial of an issue may be implied if, during the trial, a party acquiesces in the introduction of evidence which is relevant only to that issue.'" Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 232 (1st Cir. 2003) (quoting DCPB, Inc. v. City of Lebanon, 957 F.2d 913, 917 (1st Cir 1992)). Thus, when a party has failed to plead a claim properly, but has introduced evidence without objection to support that claim at trial, an amendment under Rule 15(b) may be allowed so that the pleadings may reflect the proof adduced at trial. This is so because, even in the absence of express consent, when a party allows such evidence to be presented without objection, that party impliedly consents to trial of such claim. See id. However, to succeed in its motion, the party seeking to amend its pleadings must show that it has produced enough evidence at trial to support the claim that it seeks to add. See Madeja v. Olympic Packers, LLC, 310 F.3d 628, 636-37 (9th Cir. 2002) (Rule 15(b) motion properly denied when the evidence adduced at trial only inferentially supported the claim sought to be added); United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co., 81 F.3d 240, 245-46

---

time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the objecting party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

(D.C. Cir 1996) (district court improperly allowed an amendment to add claims of unjust enrichment when there was no evidence in the record to support that claim); Vermont Plastics, Inc. v. Brine, Inc., 79 F.3d 272, 279-81 (2d Cir. 1996) (failure to show proof of privity of contract, when such privity is required by state law to sustain a breach of warranty claim, required denial of Rule 15(b) motion to amend to add breach of warranty claim).

Thus, when a party has produced no evidence to support the claim it seeks to add, an amendment to add that claim is improper. Moreover, if the evidence adduced at trial relates to some other claim already in the case, such evidence may not be relied upon to support an amendment to the pleadings under Rule 15(b) on the basis of implied consent. See Kenda, 329 F.3d at 231-232 (district court properly denied motion to amend under Rule 15(b) when none of the evidence admitted at trial went solely to the claim sought to be added); United States v. Davis, 261 F.3d 1, 59 (1st Cir. 2001) (Where evidence regarding transport of waste was directly relevant to a pled claim of transporter liability as well as an unpled claim of arranger liability, court found no error in the district court's conclusion that non-moving party did not consent to being tried on the arranger liability claim when it failed to object to the admission of that evidence). For, a party cannot be said to have impliedly consented to trial of a new issue when the evidence introduced at trial relates to a claim already in the case. See DCPB, Inc. v. City of Lebanon, 957 F.2d 913, 917 (1st Cir 1992) ("[S]ince the evidence relevant to the plaintiff's supposedly insinuated tort theory was equally relevant to the breach-of-contract theory actually pleaded and tried, the City cannot be said to have impliedly consented to trying the tort theory."); Modern Elec., 81 F.3d at 247 ("By itself, the introduction of evidence relevant to both pled and unplead issues 'cannot serve to give a party fair notice that new issues are entering the case,' . . . nor does it 'imply consent to trial of the unpled issues, absent some obvious attempt to raise

them."); Galindo v. Stoody Co., 793 F.2d 1502, 1513 (9th Cir. 1986) ("It is not enough that an issue may be 'inferentially suggested by incidental evidence in the record;' the record must indicate that the parties understood that the evidence was aimed at an unpleaded issue").

As noted, Commonwealth has moved this Court to allow it to amend its complaint to add a new claim that coverage for the titles to the North, South, and West Units should be excluded under the policy. To support its motion, Commonwealth asserts that it has introduced evidence which allegedly shows that IDC knew of threats of litigation challenging the titles to the North, South, and West Units prior to the issuance of the policy but failed to disclose that information to Commonwealth. However, the record reflects that no such evidence was ever produced. Indeed, the evidence introduced at trial, and now relied upon by Commonwealth to support its motion to amend, relates directly to the plead claim that coverage for the 5th amendment development rights should be excluded on the basis of alleged known but undisclosed threats of litigation challenging those rights. Thus, because such evidence cannot be said to go solely to the additional and unplead claim that coverage for the titles to the North, South, and West Units should also be excluded under the policy, this Court should hold that Defendant did not impliedly consent to a trial on that claim.

**A. Commonwealth has presented no evidence that IDC, prior to the issuance of the policy, was aware of any threats of litigation challenging its title to the North, South, and West Units. Moreover, all of the evidence introduced at trial, and now relied upon by Commonwealth, relates directly to threats of litigation challenging IDC's 5th amendment development rights, and therefore cannot support Commonwealth's post-trial motion to amend.**

Timothy More, who represented IDC in its efforts to obtain title insurance from Commonwealth, testified at trial as to what his knowledge was regarding threats of litigation levied upon IDC prior to the issuance of the policy. More testified that he was aware that the

individual unit owners were disputing that IDC had validly extended its right to develop the North, South, and West Units when it adopted of the 5th amendment to the declaration. However, nowhere in More's testimony is there any admission that More had knowledge that a suit challenging the validity of the 6th amendment (which created title to the North Unit), or the titles to the South and West Units (which were created by the 1988 declaration) was being threatened. Indeed, More affirmatively testified that the validity of the sixth amendment was virtually unquestioned prior to the Rhode Island Supreme Court's decision in America Condominium Association, Inc. et al v. IDC, Inc., 870 A.2d 434 (R.I. 2005) (America II). And, in this regard, More's testimony is corroborated by footnote 12 of The Rhode Island Supreme Court's 2004 decision wherein the Court confirmed: "The plaintiffs do not challenge the validity of the Sixth Amendment to the master declaration, conceding that the master declaration granted the declarant the right to make such a conversion on or before December 31, 1994." America Condominium Association, Inc. et al v. IDC, Inc., 844 A.2d 117, 125 n12 (R.I. 2004) (America I).[4] Further, the America I complaint fails to even mention the sixth amendment in any of its averments.[5]

---

[4] Plaintiff asserts that despite the language of footnote 12 of America Condominium Association, Inc. et al v. IDC, Inc., 844 A.2d 117, 125 n12 (R.I. 2004) (America I), footnote 13 of that same opinion is evidence that title to the North, South, and West Units was being challenged – even if the 6th amendment was specifically unchallenged. Defendant does not dispute that title to the North, South, and West Units was being challenged in 1999 when the complaint in America I was filed, or in 2004 when the Supreme Court rendered its opinion. However, footnote 13 sheds no light on the issue of whether such challenges were threatened prior to the issuance of the title insurance policy. Footnote 13 states that the plaintiffs in America I were alleging that because IDC's development rights had run out, its ownership interest in the undeveloped North, West, and South Units was thereby divested. However, there is no evidence in this case that such a threat was ever levied prior to the issuance of the policy. Rather, the evidence bears out that the only relevant threat made prior to the issuance of the policy was that the 5th amendment to the declaration was invalidly adopted and, therefore, that IDC's right to develop (as opposed to improve) its property had run out in 1994.

Commonwealth argues, however, that the America I complaint, when viewed in conjunction with a tolling agreement signed by Tom Roos, president of IDC (Plaintiff's Exhibit 24), is evidence that suit was threatened challenging the titles to the North, South, and West Units because it constitutes the individual unit owners' effort to assert those claims preserved by the tolling agreement. In other words, according to Plaintiff, because the complaint alleged that IDC should have been divested of its ownership interest in the North, South, and West Units on the basis that its development rights ran out in 1994, and because the tolling agreement can be read broadly enough to encompass such a claim, the complaint is therefore evidence that that claim was threatened prior to the issuance of the policy. This argument is untenable.

First, the tolling agreement is ambiguous with regard to the particular claims that IDC agreed could be tolled. Although it is true that the tolling agreement provides, among other things, that IDC agreed to allow any claim asserted against IDC "in any way relating to or arising from (i) any of the documents, including amendments, pursuant to which the Condominiums were created and/or are governed, maintained and organized . . ." to be tolled, the agreement also explicitly defines the term "Condominiums." And, while that definition includes the "(i) Goat Island South – A Waterfront Condominium, (ii) the America Condominium, (iii) the Capella South Condominium and/or (iv) the Harbor Houses Condominium," it makes no specific reference to the North, South, or West Units. Significantly, although the Goat Island South Condominium is comprised of certain parcels of land (or, more specifically, master units) including the North, South, and West Units, those units are not condominiums – they are master units within the Goat Island South Condominium. Thus, when read in light of the given

---

[5] It should be noted that Defendant objected to the introduction of the Complaint into evidence, and, after Plaintiff had rested, moved to strike the complaint from evidence.

definition of "Condominiums," section (i) of the tolling agreement is unclear as to whether it protects any claims at all challenging title to the North, South, and West Units individually.

Second, and more importantly, even if the tolling agreement can be read broadly enough to encompass a challenge to the titles to the North, South, and West Units, the agreement is not evidence that IDC was made aware that such a challenge was being threatened at the time that the agreement was signed. In other words, simply because the agreement preserved a particular claim prior to the issuance of the policy does not in any way shed light on whether that claim was actually threatened at that time. Similarly, that a claim to the ownership interest to those units was eventually asserted in 1999 in America I, well after the policy had been issued, does not constitute proof that that challenge was threatened prior to the issuance of the policy. Accordingly, Plaintiff's reliance on the America I complaint and the tolling agreement as proof that prior to the issuance of the policy IDC was made aware of, but failed to disclose, threats of litigation challenging the titles to the North, South, and West Units is misplaced.

Further, the tolling agreement is directly related to Commonwealth's claim regarding the exclusion of coverage of IDC's development rights and, therefore, cannot be used to support the argument that Defendant impliedly consented to trial of an additional and unplead claim asserting that coverage of IDC's titles to the North, South, and West Units should also be excluded from the policy. See Kenda, 329 F.3d at 231-232; DCPB, 957 F.2d at 917.

In Kenda, the United States Court of Appeals for the First Circuit held that under Rule 15(b) "'[c]onsent to the trial of an issue may be implied if, during the trial, a party acquiesces in the introduction of evidence which is relevant only to that issue[,]'" and that "'the introduction of evidence directly relevant to a pleaded issue cannot be the basis for a founded claim that the opposing party should have realized that a new issue was infiltrating the case." (Emphasis

added) 329 F.3d at 232 (quoting DCPB, 957 F.2d at 917). In Kenda, the plaintiff sought to amend its pleadings one week after the jury had delivered its verdict to add a claim that it believed was supported by the evidence presented at the trial but was not plead in the complaint. The Court held that because the plaintiff had produced no evidence that went solely to that additional claim, the defendants had not impliedly consented to the inclusion of that claim, and the motion to amend was therefore properly denied. Id.

Here, Plaintiff's complaint cites the tolling agreement as proof that IDC knew that the 5th amendment to the declaration was facing potential attack. Indeed, paragraph 11 subsection (g) of Commonwealth's complaint specifically references the tolling agreement in conjunction with litigation over IDC's development rights.[6] Significantly, IDC produced the tolling agreement at trial to support its claim that coverage for IDC's development rights was excluded under the policy. Thus, the tolling agreement cannot be said to go solely to the additional claim now sought to be added by Commonwealth post-trial – namely, that coverage of titles to the North,

---

[6] Paragraph 11, subsection (g) of Plaintiff's complaint reads:

> "11. The insurer's investigation of this matter has revealed that, prior to the effective dates of the Owners' Title Insurance Policy issued by Insurer, IDC had knowledge of the following material facts:
>
> "* * *
>
> "(g) While IDC and Attorney More were seeking to obtain title insurance from Insurer, IDC and Attorney More were aware of plans by the three condominium associations at Goat Island Condominium to file legal challenges to IDC's development rights. In fact, to forestall the filing of litigation until Insurer issued an Owner's Title Insurance Policy, Mr. More negotiated a "Tolling Agreement" with the condominium associations in December, 1997. This Tolling Agreement both delayed the filing of the Litigation and waived certain statute of limitations, laches, waiver, estoppel and similar defenses. Moreover, this Tolling Agreement was executed by IDC on January 5, 1998 – eight days before Insurer issued the original Owner's Title Insurance Policy to IDC."

South, and West units is excluded under the policy as well. And, under Kenda, the tolling agreement therefore cannot be relied upon as evidence that Defendant impliedly consented to trial of that additional claim. See 329 F.3d at 232; see also Grand Light & Supply Co. v. Honeywell, Inc., 771 F.2d 672, 680 (2d Cir. 1985) ("The purpose of Rule 15(b) is to allow the pleadings to conform to issues actually tried, not to extend the pleadings to introduce issues inferentially suggested by incidental evidence in the record.").

Commonwealth also points to two other portions of the record that it asserts constitute proof that threats of litigation challenging the title to the North, South, and West Units were known to IDC prior to the issuance of the policy: (1) a certain sequence of correspondence to and from More, Roos, and Stanley Kanter; and (2) Michael Mellion's testimony that had he known of the "threats of litigation" he would not have issued the policy at all. However, even a cursory look at these pieces of evidence reveals that they fall woefully short of proving that IDC was made aware that its title to the North, South, and West Units was ever being challenged prior to the issuance of the policy. Moreover, this evidence relates directly to Commonwealth's plead claim of exclusion of coverage for IDC's 5th amendment development rights, and therefore cannot support the contention that Defendant consented to a trial on the unplead claim of exclusion of coverage for the titles to the North, South, and West Units.

**1. Correspondence between Stanley Kanter, Tim More, and Tom Roos**

The correspondence between Kanter, More, and Roos does not constitute evidence that IDC was aware that a challenge to title to the North, South, and West Units was ever threatened prior to the issuance of the policy. Plaintiff first points to Exhibit 10, a letter from More to Kanter regarding the 3rd amendment to the declaration which attempted to extend development rights beyond December 31, 1994. However, Exhibit 10 deals only with More's concern over

the validity of the voting procedures used to adopt the 3rd amendment. Exhibit 10 makes no mention of any threats of litigation with respect to title to the North, South, and West Units, or, for that matter, with respect to any of the amendments to the declaration at all. As such, it cannot constitute evidence that IDC had knowledge of threats challenging title to the North, South, and West Units prior to the issuance of the policy.

Plaintiff also cites Exhibit 11, Kanter's response to Exhibit 10, as evidence of IDC's knowledge of threats challenging its title to the North, South, and West Units. Once again, Exhibit 11 makes no mention of any threats of litigation with regard to the validity of the title to the North, South, or West Units. It is merely Kanter's response to More's concerns that the 3rd amendment may have failed to extend IDC's development rights beyond December 31, 1994. That Kanter and More were discussing the possibility that the 3rd amendment may have been invalidly adopted, and therefore may have failed to extend IDC's rights to develop its property, is not evidence that IDC was aware of threats of litigation challenging its title to that property.[7]

---

[7] Plaintiff in its closing argument argued that certain language in the third full paragraph of that document constitutes evidence that a challenge to title, and not just its 5th amendment development rights, was known to IDC prior to the issuance of the policy. The statement relied on by Plaintiff reads: "all acknowledged that it was not feasible for the Declarant to exercise the Development Rights on or before December 31, 1994 as it had not yet formed any concrete development plans for either the Reserved Area or Development Unit #1." Plaintiff contends that Kanter's reference to "concrete development plans" is proof that both More and Kanter were aware that, with regard to the North Unit, the requirement of "substantial completion" (as espoused by the Rhode Island Supreme Court in America II in 2005) had to be met for title to be effective. However, any fair reading of the statement shows that it was meant only to deal with the fact that because IDC had not even begun any concrete development plans for the units as of the date of the letter, December 5, 1994, it was not feasible that it could exercise its development rights before December 31, 1994 and would therefore need an extension. The statement clearly does not evince Kanter's and More's recognition that a threat of litigation had been made contending that the North Unit could not be validly created in the absence of "substantial completion" – i.e. before a building was built on that property.

It should also be noted that More was asked by Plaintiff whether, prior to the issuance of the policy, he thought it was possible that the titles to the North, South, and West Units were

Finally, Plaintiff points to Exhibits 12, 13, and 14 – which consist of correspondence between Roos and his lawyers (including More) – as proof of the existence of known threats of litigation challenging IDC's title to the North, South, and West Units. However, none of these Exhibits even discusses a challenge to the titles to those units. The correspondence deals primarily with the validity of the amendments extending the special declarant's development rights, and the potential that a court may misunderstand the difference between the owner's rights as special declarant to develop its master units, and the owner's rights as an owner to make improvements on its property. Thus, Exhibits 12, 13, and 14 do not constitute proof that IDC was aware of any challenges to its titles to the North, South, or West Units prior to the issuance of the policy.

Moreover, because Exhibits 10-14 all relate to the claim that IDC's development rights should be excluded from coverage under exclusions 3(a) and 3(b) of the policy, they cannot, under Kenda, support Commonwealth's claim that Defendant impliedly consented to trial on the additional and unplead claim that coverage of IDC's titles to the North, South, and West Units should also be excluded from the policy. See Kenda Corp., 329 F.3d at 231-232.

---

defective because the requirement of "substantial completion" had not been met. More, a veritable expert in condominium law, responded that he had not thought of that possibility because he could not in his "wildest dreams" have anticipated the Rhode Island Supreme Court's reasoning with respect to the requirement of "substantial completion." Thus, Plaintiff's contention that Exhibits 10-14 somehow evince that More was concerned with a challenge to the titles to the North, South, and West Unit on the basis of "substantial completion" is not only based on precarious inferences and unfounded assumptions, but is also in direct contradiction to More's testimony at trial.

**2. Mellion's testimony does not prove that a challenge to title to the North, South, and West Units had been threatened but not disclosed prior to the issuance of the policy.**

At trial Mellion testified that had he known of the "threats of litigation" known to IDC at the time IDC requested title insurance, he would have refrained from issuing the policy because he did not want to "buy a lawsuit." While at first glance this statement may appear to illustrate Mellion's belief that threats had been made challenging the title to the North, South, and West Units as well as the 5th amendment development rights, the record does not bear this out. At no point during Mellion's testimony did he ever describe the nature of the threats of litigation that were made known to IDC but undisclosed to Commonwealth. In other words, although Mellion testified that had he known of the "threats of litigation" in this case he would not have issued the policy, he never testified as to what his understanding was as to what claims those threats encompassed. In this regard, Mellion's statement should be considered overbroad and not particularly credible. For, it is self-serving for Mellion, in 2007, to state that he would not have issued a policy in 1997 that covered five very separate insurable interests merely because the validity of one of those interests was under an alleged threat of challenge.

As noted above, the policy in question covered 5 separate Parcels: (1) title to the North Unit; (2) the right of IDC as the special declarant to develop the North Unit under the 5th amendment to the declaration; (3) the right of IDC as the owner of the North Unit to improve that property; (4) title to the West Unit; and (5) title to the South Unit. Significantly, however, the record indicates that the only alleged threats ever made to IDC prior to the issuance of the policy related solely to Parcel 2 – i.e. threats challenging the validity of IDC's attempt, through the adoption of the 5th amendment, to extend the time frame to develop its master units. Thus, Mellion's testimony that had he known of the "threats of litigation," he would not have issued

the entire policy – i.e. coverage for all five Parcels – seems suspect given that the only "threats" made prior to the policy related only to Parcel 2 (the 5th amendment development rights) and not at all to the titles to the North, South, and West Units. Surely, to avoid "buying a lawsuit" Mellion could have refused to cover the 5th amendment development rights but still insured the titles to the North, South, and West Units. For, prior to the issuance of the policy, those titles appeared virtually defect-free; thus, Mellion's testimony that he would not have covered title to those units in the face of a lawsuit that in no way called those titles into question seems suspicious. Because Mellion had the authority to issue the policy in any form he felt appropriate, it is much more likely that Mellion would have, at the very least, issued the policy with respect to the titles to the North, South, and West Units, but declined to cover the 5th amendment development rights.

Moreover, Mellion testified unequivocally that after conducting his own independent analysis, he concluded that he was in agreement with More that the 5th amendment was valid and would withstand challenge. Thus, Mellion's statement that he did not want to "buy a lawsuit" essentially meant that he did not want to defend against what he ultimately considered would be a losing case for any challenger. In other words, Mellion's statement can be understood to mean that, despite his belief in the validity of the 5th amendment, he did not want to have to spend any money defending that validity. Taken in context then, Mellion's statement that he would have refused to issue any policy at all seems overbroad. Had he known of the threats of litigation over the 5th amendment, Mellion would have been well within his authority to except from the policy any expenses for defending any litigation challenging the 5th amendment. Thus, Mellion's testimony in 2007, after title has been divested by the Rhode Island Supreme Court, that he

would have refused to issue the entire policy had he known of a threat of litigation that related only to one small portion of that policy appears somewhat convenient.

### B. Plaintiff's amendment would unduly prejudice Defendant and therefore should not be granted.

The First Circuit has held that "[i]t is axiomatic that amendments which unfairly prejudice a litigant should not be granted." DCPB, 957 F.2d at 917 (citing Lynch v. Dukakis, 719 F.2d 504, 509 (1st Cir. 1983); Scully Signal Co. v. Electronics Corp. of Am., 570 F.2d 355, 362 (1st Cir. 1977), *cert. denied*, 486 U.S. 945, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978)).[8] Moreover, the Court has held that "prejudice is an almost inevitable concomitant in situations where . . . the late amendment attempts to superimpose a new (untried) theory on evidence introduced for other purposes." DCPB, 957 F.2d at 917. Here, Commonwealth is attempting to superimpose a new and untried claim that coverage for titles to the North, South, and West Units should be excluded from the policy. However, to support this attempt Commonwealth is relying on evidence introduced to support its plead (and tried) claim of exclusion of coverage for IDC's 5th amendment development rights. Unfair prejudice to IDC's case, therefore, is "an almost inevitable concomitant" to Commonwealth's motion to amend. See id. Further, "in weighing prejudice, an important factor is whether the movant has shown any justification for its delay in moving to amend." DCPB, 957 F.2d at 917. Here, Commonwealth can cite to no reason for its delay in amending its pleadings to add an additional claim for exclusion of coverage for the titles

[8] It is important to note that even if Defendant would not be prejudiced by the amendment in this case, Plaintiff's motion should be denied on the basis that Defendant did not consent (either expressly or impliedly) to a trial on the issue sought to be added. See supra Part III.A. For, "[A] finding that the nonmoving party would not be prejudiced by an untimely amendment does not compel a determination that the amendment is appropriate." United States v. Davis, 261 F.3d 1, 59 (1st Cir. 2001); see also Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 232 (1st Cir. 2003) ("prejudice, or lack thereof, is only one issue to be weighed in considering whether an amendment is appropriate.").

to the North, South, and West units on the basis of alleged known but undisclosed threats of litigation challenging those titles. As such, this Court should deny Plaintiff's motion to amend to add this new claim on the basis that Defendant did not consent (either expressly or impliedly) to a trial on that issue, and that the amendment would unfairly prejudice Defendant.

## IV. Conclusion

Commonwealth has failed to prove that IDC was aware of any threats of litigation regarding the titles to the North, South, and West Units. Indeed, all of the evidence that Commonwealth has produced relates directly to its claim that coverage for IDC's 5th development rights should be excluded under the policy exclusion 3(a) and 3(b). As such, this Court should deny Commonwealth's motion to amend its pleadings to add a claim that coverage for the titles to the North, South, and West Units should also be excluded under those exclusions because Commonwealth has not shown that Defendant impliedly consented to a trial on that additional claim, and Defendant would be unfairly prejudiced by such an amendment.

IDC PROPERTIES, INC.

By its Attorneys,

HODOSH, SPINELLA, & ANGELONE, PC

/s/ Thomas C. Angelone
Thomas C. Angelone, Esq. (#1373)
One Turks Head Place, Suite 810
Providence, Rhode Island 02903
(401) 274-0200
FAX: (401) 274-7538
angelonelaw@aol.com

**CERTIFICATION**

I hereby certify that on this 15th day of November, 2007, this document was filed electronically and is available for reviewing and downloading to the ECF registered counsel of record.

Commonwealth Land Title Insurance Company
c/o Stephen E. Snow, Esq and Robert Taylor, Esq.
Partridge, Snow, & Hahn, LLP
180 South Main Street
Providence, RI 02903
ses@psh.com

/s/ Thomas C. Angelone

#7502