UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

COMMONWEALTH LAND TITLE
INSURANCE COMPANY,
              Plaintiff,

v.                                           C.A. No. 01-400T

IDC PROPERTIES, INC.,
              Defendant.

## MEMORANDUM AND ORDER

ERNEST C. TORRES, Senior U.S. District Judge.

### Introduction

Commonwealth Land Title Insurance Company ("Commonwealth") brought this declaratory judgment action seeking a declaration that an owner's title insurance policy (the "Policy") issued to IDC Properties, Inc. ("IDC") affords no coverage for IDC's loss of development rights in the Goat Island Condominium in Newport, Rhode Island, because IDC failed to disclose that condominium owners had threatened litigation contesting IDC's claimed right to develop a portion of the property known as the North Unit. IDC has filed a counterclaim seeking a declaration that the Policy does cover the loss of IDC's development rights and its title. IDC also seeks

damages for what it asserts was Commonwealth's bad faith refusal to honor the Policy.[1]

Based on the evidence presented during a three-day bench trial; and, for the reasons hereinafter stated, this Court finds that the Policy would not have been issued if IDC had disclosed the threatened litigation and that, therefore, judgment should enter in favor of Commonwealth on both its claim and IDC's counterclaim.

## Declarations and Amendments

Many of the relevant background facts are set forth in two decisions by the Rhode Island Supreme Court determining IDC's development rights in the subject property and an April 3, 2007 Memorandum and Order, in this case, denying Commonwealth's motion to sever claims against two third-party defendants.[2]  See Am. Condo. Ass'n, Inc. v. IDC, Inc., 844 A.2d 117, 120-26 (R.I. 2004) ("American Condominium I") and Am. Condo. Ass'n, Inc. v. IDC, Inc., 870 A.2d 434 (R.I. 2005) ("American Condominium II"); see also, Commonwealth Land Title Ins. Co. v. IDC Properties, Inc., 482 F. Supp. 2d 203, 204-06 (D.R.I. 2007).  The remaining facts were established by the evidence presented at trial.

In January 1988, IDC's predecessor, Globe Manufacturing Co., owned 23 acres of land on Goat Island which it planned to develop as a condominium called "Goat Island South - A Waterfront

---

[1] Previously, IDC's bad faith claim was severed and stayed.

[2] The third party claims, since, have been dismissed.

Condominium" (the "Condominium") and it recorded a condominium declaration (the "Original Declaration") dividing the property into six parcels.

In March of 1988, a First Amended and Restated Declaration of Condominium (the "Master Declaration") was recorded. At that time, residential buildings had been constructed on three of the parcels (the America, Harbor House, and Cappella Units) and three parcels remained undeveloped (the West and South Units and a parcel called the "Reserved Area"). The airspace and all buildings and improvements located on each parcel except the Reserved Area were designated as "Master Units" and the land in each of those units was designated as a Master Limited Common Element.

Section 2 of the Master Declaration purportedly gave the Declarant the right to alter Master Units by "construct[ing] additional buildings and other improvements . . . so long as Declarant owns the Master Units so changed or altered," §2.3(a), and it gave to an Owner or Sub-Association of a Master Unit, the right, "at any time," to construct buildings or other improvements within the boundaries of such Master Unit. §2.3(b). See Pl.'s Ex. 3. The Master Declaration required that the Declarant's right to alter be reflected in an amendment adopted pursuant to Section 10.1.

Section 10.1(a) of the Master Declaration provided that, except as otherwise provided in the Master Declaration or the Rhode

Island Condominium Act (the "Condominium Act"), an amendment changing any Master Unit had to be approved by "all Owners and Sub-Association Board Members" of that Unit and that other kinds of amendments could be made with "at least sixty-seven (67%) in voting interest of all Master Unit Owners and Sub-Association Members." §10.1(a). The Condominium Act provided that "no amendment may create or increase special declarant rights, increase the number of units, change the boundaries of any unit, the allocated interests of an unit, or the uses to which any unit is restricted, in the absence of unanimous consent of the unit owners." R.I. Gen. Laws §34-36.1-2.17(d). American Condominium I, 844 A.2d at 128-29.

Section 6 of the Master Declaration purported to create Special Development Rights in the Declarant. It gave the Declarant the right "before 12/31/94" to convert the Reserved Area into a Master Unit "owned by the Declarant" or to withdraw it from the Condominium by recording an amendment "without the consent of any Owner." In addition, Section 10.2 reserved to the Declarant the "unrestricted right, without the consent of the Owners or Sub-Association board members or the Master Executive Board, to construct . . . Master Units or units which Declarant continues to own."

By the end of 1994, the Reserved Area had not been converted and nothing had yet been built on it or on the West Unit. However, between April 27, 1994 and December 29, 1994, IDC had purported to

4

adopt three amendments to the Master Declaration (i.e. the Third, Fourth, and Fifth Amendments).   The Third, Fourth, and Fifth Amendments were approved by more than 67% of the Master Unit Owners, but not by all of the individual unit owners.   The Third Amendment, adopted on 4/29/94, purported to extend IDC's time to withdraw or convert and develop the Reserved Area from December 31, 1994 to December 31, 1999.   The Fourth Amendment, adopted on 11/15/94, purported to extend IDC's right to develop the West Unit from December 31, 1994 to December 31, 1999.   The Fifth Amendment, adopted on 12/29/1994, further extended IDC's time to develop the West Unit and the Reserved Parcel to December 31, 2015.   It also gave any Master Unit Owner, including IDC, the right under Section 2.3(b) "notwithstanding any provision in Article 6," to construct buildings and improvements on any Master Unit it owned "at any time."   The Sixth Amendment, which IDC unilaterally adopted on 12/29/94, purported to exercise IDC's "Development Rights" by converting the Reserved Area into the North Development Unit.

Before the Third Amendment was adopted, Thomas Roos, IDC's president, was advised by counsel to IDC's predecessor that the purported extension of time for exercising development rights could be questioned on the ground that all individual condominium owners had not consented but that, since it was deemed unlikely that unanimous consent could be obtained, a decision was made to assume an "aggressive posture."   Pl.'s Ex. 11.

Issuance of the Policy

On October 21, 1994, after the Third Amendment had been adopted, IDC obtained a $10,000,000 title insurance policy from Chicago Title Insurance Company ("Chicago Title") covering IDC's title and development rights in the West and South Units as well as individual condominium units still owned by IDC. It is unclear why the Chicago Title policy did not cover the Reserved parcel but both Chicago Title and Timothy More, IDC's counsel, recognized that the Third Amendment's purported extension of IDC's time to exercise its development rights might be invalid because it had not approved by all individual unit owners.

Sometime in 1997, associations representing the America and Harbor House condominium owners (the "Associations") challenged IDC's claimed right to develop the undeveloped parcels, primarily on the ground that the purported extension of time to exercise those development rights was invalid. In September of that year, the first of several meetings were held involving More, Roos, various individual owners, and attorney Matthew Medeiros who had been hired by the Associations.

After one of those meetings, Roos argued to More that, under Section 2.3 of the Declaration, IDC's right to develop any Master Unit that it owned was not subject to any time limit.  Pl.'s Ex. 13.  However, while More agreed with Roos that IDC should have the right to develop any Master Unit that it owned, he expressed

6

concern "that a court might hold that the endless right of a Declarant (albeit as an Owner) to develop three Master Units improperly circumvents (a) the [Condominium] Act's requirement that the special Declarant's right to complete improvements have a stated time limit and/or (b) the time limit on the Declarant's rights to construct improvements set forth in Section 6 of the Declaration".   More mentioned that the one-year statute of limitations for challenging amendments adopted by an association could bar any suit by the individual unit owners but he pointed out that Medeiros probably would argue that the amendments were not properly adopted.  Pl.'s Ex. 14.

Meanwhile, More was attempting to persuade Chicago Title or Commonwealth to issue a policy covering title to and development rights in the North Unit.  Pl.'s Ex. 19.   In furtherance of that effort, More sent to Commonwealth copies of the Master Declaration, Amendments 1-6, the earlier Chicago Title policy, and a memorandum dated November 17, 1997, stating two theories on which IDC's claim to development rights in North Unit was based.

The first theory was that the Fifth Amendment extending the time for exercising those rights until 2015 was adopted by unanimous consent of the Master Unit Owners and that consent of the Sub-condominium Owners was not required.   However, More's memo failed to mention that one of the Executive Board Members (entitled to vote) objected to amending the declaration or extending the

development rights and, thereafter, abstained from what he deemed an illegal proceeding. American Condominium I, 844 A.2d at 124-25. More's memo also stated that, even if the Amendment were invalid, the one-year statute of limitations probably barred any challenge to it.

The second theory was that, under sections 2.3(a), 2.3(b) and 10.2(a) of the Master Declaration, IDC, in its capacity as owner of the previously converted North Unit had the right to develop it at any time. Pl.'s Ex. 16.

On December 10, 1997, while the request to Commonwealth was pending, IDC entered into a tolling agreement with the Associations representing the individual condominium owners ("the Tolling Agreement") which provided that any suit filed on or before June 30, 1998 would be deemed filed on December 1, 1997, so that the parties could participate in mediation "in an attempt to avoid the litigation that would otherwise be inevitable." Pl.'s Ex. 20.

On December 12, 1997, Commonwealth offered to issue a $5,000,000 policy insuring IDC's title to and development in the North Unit for a premium of one dollar per thousand dollars of coverage, plus the cost of a title examination and some miscellaneous fees. Pl.'s Ex. 21. Three days later, Chicago Title, formally, rejected IDC's application for coverage of its development rights in the North Unit.

In its rejection memo, Chicago Title disagreed with the

8

statements in More's November 17, 1997 memorandum that the Fifth Amendment did not require approval by individual condominium owners and it expressed the opinion that IDC's "development rights for the creation of any Units" had expired on December 31, 1994.  Chicago Title also stated that it was aware of "threatened litigation" regarding the operation of the Master Condominium and was concerned "that there is a substantial risk that the sub-condominium unit owners may allege that there was fraud in the manner in which [the Fifth Amendment] was created." Pl.'s Ex. 22.

On January 13, 1998, Commonwealth issued the Policy in question; and, shortly thereafter, IDC began constructing a function center known as the Regatta Club on the North Unit.  On February 7, 1999, at IDC's request, the Policy limit was increased to $12,000,000 and endorsements were added providing coverage for IDC's title to the South and West Units.

At no time did IDC disclose to Commonwealth that individual condominium owners had threatened a suit challenging IDC's development rights or that there was a tolling agreement extending the time for bringing such a suit.  Nor did IDC ever provide Commonwealth with a copy of Chicago Title's rejection memo.[3]

<u>The Ensuing Litigation</u>

On May 29, 1999, the Associations sued IDC in the Rhode Island

---

[3] More testified that he did tell Michael Mellion, then Commonwealth's Rhode Island counsel, that Chicago Title had declined coverage, an assertion that Mellion disputes.

9

Superior Court seeking a declaration that IDC's development rights had expired on December 31, 1994 and that IDC no longer owned the North Unit on which the Regatta Club had been constructed or any other undeveloped Master Units.   Pl.'s Ex. 36, 12-13.   In June 2001, the Superior Court determined that IDC's development rights expired on December 31, 1994 because the amendments purporting to extend the time for exercising them were not unanimously approved by individual unit owners.   Accordingly, judgment was entered in favor of the Associations.

IDC appealed to the Rhode Island Supreme Court and, while that appeal was pending, Commonwealth brought this declaratory judgment action.   Commonwealth's prayer for relief seeks a declaration that any losses resulting from "the annulment of IDC's purported extensions of its development rights . . . are excluded from coverage under [the Policy]", but the complaint makes it clear that Commonwealth's case is based on IDC's alleged failure to disclose the Associations' threat of suit, the existence of the Tolling Agreement, and the fact that Chicago Title had declined coverage, see Complaint ¶11(e),(g), and that, if those facts had been disclosed, Commonwealth "would not have issued the Owner's Title Insurance Policy to IDC".   Complaint ¶19.   Because IDC's development rights had not been fully adjudicated, this case was stayed pending resolution of IDC's appeal from the Superior Court judgment.

In American Condominium I, the Rhode Island Supreme Court held that: (1) the amendments extending the time for IDC to exercise its development rights were void ab initio because they were not unanimously approved by the individual unit owners; (2) IDC's development rights expired on December 31, 1994, and (3) title to the North, South, and West Units had vested in the Association members.  Consequently, the Superior Court judgment was affirmed. American Condominium I, 844 A.2d at 130-33.  After re-argument, the Rhode Island Supreme Court issued a second opinion in American Condominium II.  That opinion, again, affirmed the Superior Court judgment, but, this time, on the ground that the North, South, and West Units "never were validly created" because there were no structural components located on them when they purportedly were created; and, therefore, they did not comply with the "substantial completion" requirement of the Condominium Act.  American Condominium II also reiterated that all three parcels were owned by the unit owners as "common elements."  American Condominium II , 870 A.2d at 442.

After American Condominium II was decided, IDC amended its counterclaim by referring to the decision in American Condominium II that "the original creation of the North, South, and West Units was not in compliance with the Rhode Island Condominium Act and those Units never came into existence and IDC, and its predecessors, never held title to the Units at any time."

11

At the close of the evidence, IDC argued that, even if this Court should decide in Commonwealth's favor, relief should be limited to a declaration that there is no coverage for the loss of IDC's development rights and the declaration should not exclude coverage for IDC's loss of title because Commonwealth's prayer seeks a declaration only with respect to losses from "the annulment of IDC's purported extensions of its <u>development</u> rights." [Emphasis added]. Commonwealth argued that, since its complaint alleges that the Policy would not have been issued if IDC had made the required disclosures, it is broad enough to warrant a declaration that there is no coverage for IDC's title. Nevertheless, out of an abundance of caution, Commonwealth moved to amend its complaint, pursuant to Fed. R. Civ. P. 15(b), in order to specifically request a declaration to that effect.

## **Analysis**

### I. The Policy

The Policy insures IDC against any loss of (1) IDC's title to the North, South, and West Units; (2) IDC's right, as "Special Declarant," to construct improvements on the North Unit until December 31, 2015; and (3) IDC's right, as "an Owner,"[4] to construct buildings and other improvements on the North Unit. However, the Policy excludes from coverage any loss or damage which

---

[4] "Owner" is defined in the Master Declaration as "the Declarant or other person or persons owning a Master Unit, which Master Unit is not a Sub-Condominium." Section 1.27

12

arise by reason of:

> 3. Defects, liens, encumbrances, adverse claims or other matters . . . (b) not known to the Company, nor recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy. Policy at 1, Pl.'s Ex.1.

Since Commonwealth alleges that it would not have issued the Policy if IDC had made the disclosures at issue, the threshold question is whether IDC's failure to make those disclosures entitles Commonwealth to a declaration that there is no coverage because the Policy is void. If the Policy is void, there is no need to determine whether the exclusion applies or, if it does, the extent to which it negates coverage.

II. <u>The Failure to Disclose</u>

Generally, a material misrepresentation or omission in an application for insurance makes the policy voidable. Ostrager & Newman, <u>Handbook on Insurance Coverage Disputes</u>, §3.01[a] (13th ed. 2006). Under Rhode Island law, the misrepresentation or omission need not be made with fraudulent intent. <u>Evora v. Henry</u>, 559 A.2d 1038, 1040 (R.I. 1989)("[A] material misrepresentation in an insurance application makes voidable, without a concomitant demonstration of fraud, an insurance contract that is issued upon the application."); <u>Guardian Life Ins. Co. of Am. v. Alfred Tillinghast</u>, 512 A.2d 855, 859 (R.I. 1986) (holding that "a material misrepresentation, even though innocently made, is a basis

13

for rescinding a contract" and does not require a showing of
fraud); <u>Carpenter v. Am. Ins. Co.</u>, 5 F.Cas. 105 (C.C.R.I. 1839)
("[A] false representation of a material fact is, according to well
settled principles, sufficient to avoid a policy of insurance
underwritten on the faith thereof, whether the false representation
be by mistake or by design.").

A misrepresentation is considered material if it "induces the
insurer to insure the applicant." <u>Evora</u>, 599 A.2d at 1040 (citing
cases). Thus, in determining whether a misrepresentation is
material, the critical inquiry is whether the misrepresentation
caused the insurer to issue a policy that the insurer, otherwise,
would have refused to issue. In this connection, a failure to
disclose material facts is treated in the same way as an
affirmative misrepresentation. Ostrager & Newman, <u>Handbook on
Insurance Coverage Disputes</u>, §3.01[b](citing cases); <u>see, e.g.</u>,
<u>Methodist Med. Ctr. of Ill. v. Am. Med. Secu. Inc.</u>, 38 F.3d 316,
320 (7th Cir. 1994)("[F]ailure to disclose material information on
application for insurance may constitute a misrepresentation when
the omission prevents the insurer from adequately assessing the
risk involved."). In any event, an insurer denying coverage on the
ground of misrepresentation bears the burden of proving that there
was a misrepresentation or omission and that it was material to the
insurer's decision to issue the policy. <u>Paul Revere Life Ins. Co.
v. Fish</u>, 910 F. Supp. 58, 63 (D.R.I. 1996)(holding that insurer

14

must prove that the insured made a false statement materially affecting acceptance of risk by insurer).

Here, the evidence clearly shows that in applying for the Policy, IDC knowingly failed to disclose that the individual unit owners had threatened a suit challenging IDC's claimed development rights; that IDC had entered into a tolling agreement with them; and that Chicago Title had cited the threat of suit as one of its reasons for declining to provide coverage.  The evidence further shows that, had those facts been disclosed, Commonwealth would not have issued the Policy.

It is undisputed that Roos and More participated in meetings with individual condominium unit owners and their counsel at which the unit owners' challenge to IDC's development rights in the North Unit as well their threat to initiate litigation were specifically discussed.  Moreover, it is clear that Roos and More recognized the possibility that such a challenge might succeed, as evidenced by More's October 9, 1997 memo to Roos and the decision to enter into the Tolling Agreement in an apparent effort to either settle or delay the litigation until after the insurance had been obtained.

It is equally clear that IDC failed to disclose the threat of litigation or the Tolling Agreement to Commonwealth even though those facts bore directly on the nature of the risk that Commonwealth was being asked to insure.  On the contrary, the November 17, 1997 memorandum that More provided to Commonwealth

15

advanced two theories supporting IDC's claim of development rights but did not mention either the unit owners' challenge or IDC's own assessment that the time for exercising its rights, as declarant, could not be extended without the unanimous consent of all individual unit owners, an assessment that was inconsistent with one of the theories set forth in the memorandum.

The evidence also shows that Commonwealth was unaware of the unit owners' threat of suit; the Tolling Agreement or the fact that the threat of suit was one of the reasons cited by Chicago Title for refusing to issue a policy. None of these facts were matters of public record and IDC did not disclose them.

Finally, the evidence shows that, had those facts been disclosed, Commonwealth would not have issued the Policy. Michael Mellion, who made the decision to issue the Policy, testified that Commonwealth would not have issued the Policy if those facts had been known. He explained that, because the Policy required Commonwealth to defend against any claims challenging IDC's insured interests; and, because the policy premium of approximately $5,000 would have covered only a fraction of the cost of defending against litigation brought by the individual unit owners, Commonwealth would have declined to issue the Policy since it was not interested in "buying a lawsuit." That appears to be the decision that Chicago Title made in declining to issue a policy after learning of the threatened litigation.

16

IDC makes three arguments in support of its contention that information regarding the individual unit owners' threat of litigation was not material.  First, it argues that, although More recognized the possibility that a court might find in favor of the individual unit owners with respect to the validity of the Fifth Amendment, it was his opinion that the Fifth Amendment was validly adopted and that the one-year statute of limitations barred any challenge.  Even if one accepts that characterization of More's opinion, IDC's argument misses the point. Despite any opinion that More may have had, the threat of litigation was real and it directly related to a risk covered by the Policy.  Furthermore, the threat of litigation, alone, was material to Commonwealth's decision because Commonwealth did not want to "buy a lawsuit" even if it had a good chance of prevailing.

Second, IDC argues that the undisclosed information was not material because Commonwealth was aware that the amendments may not have been properly adopted.  IDC points out that the notes taken by Mellion in reviewing the Third Amendment show his recognition that unanimous consent by the individual unit owners may have been required.  That argument is not persuasive either because it fails to distinguish between recognition of a possibility that the amendments might not have been properly adopted and knowledge that litigation challenging their validity actually had been threatened. That distinction is especially important here because any concern

about the manner in which the amendments were adopted were diminished by the fact that Mellion was unaware that IDC had entered into a tolling agreement and the fact that he agreed with More's opinion that the one-year statute of limitations probably barred any challenge.

IDC also makes a rather tortured argument that the suit threatened by the individual unit owners challenged only the validity of the Third, Fourth and Fifth Amendments which purported to extend IDC's time to exercise the development rights conferred on it, as Declarant, and not the Sixth Amendment which converted the Reserved Area into the North Unit.  According to IDC, since conversion did not require the consent of individual unit owners, the Sixth Amendment gave IDC, as Owner of the North Unit, the right to develop it "at any time," thereby rendering the individual unit owners' threat of suit immaterial. This argument has several flaws.

First, it rests on the debatable premise that the individual unit owners were challenging only the validity of the Third, Fourth and Fifth Amendments.  More testified that counsel for the Associations "raised a question as to the validity of the Sixth Amendment."  Moreover, the complaint subsequently prepared by Medeiros specifically asserted that IDC "no longer has any ownership interest in . . . the Undeveloped Master Units." Pl.'s Ex. 36 ¶ 54 (emphasis added).

Even if the individual unit owners' challenge was limited to

18

the validity of the Third, Fourth, and Fifth Amendments, the Policy that IDC applied for provides coverage for "the <u>Special Declarant's Right</u>, through the Termination Date as defined in the <u>Fifth Amendment</u> . . . to construct improvements on the North Development Unit" (emphasis added). Thus, a challenge to the validity of the Fifth Amendment would have triggered Commonwealth's duty to defend and the prospect of such a challenge would have caused Commonwealth to decline to issue the Policy in order to avoid "buying a lawsuit." Having failed to disclose material facts that would have caused Commonwealth to decline to issue the Policy, IDC cannot, now, maintain that the Policy affords coverage for selected risks that Commonwealth might have insured against even if the disclosures had been made.

Finally, there is a serious question as to whether the Sixth Amendment supported IDC's claim of development rights after December 31, 1994. IDC contends that there was no time limit on its right, as the <u>Owner</u> of a Master Unit, to develop the unit. IDC relies on Section 2.3(b) of the Master Declaration, which gives the Owner of a Master Unit the right to construct buildings and improvements "at any time." However, it is not clear whether those words refer only to an owner's right to change the interior design of his Master Unit or whether they also refer to his right to construct buildings and improvements. Presumably, that is why the Fifth Amendment, which clearly was challenged by the individual

unit owners, specified that any Master Unit Owner, including IDC, would have the right to develop its Master Unit "at any time."

In any event, as already noted, More's October 9, 1997 memo to Roos expressed concern that IDC's development rights, even as an Owner, could be found to be subject to time limitations contained in both the Master Declaration and the Condominium Act.

In short, this Court finds that IDC failed to disclose information that was material to Commonwealth's decision and that, if such information had been disclosed, Commonwealth would not have issued the Policy.

## III.   The Motion to Amend

It is unnecessary for Commonwealth to amend its complaint to specifically request a declaration that the Policy affords no coverage for IDC's title, because the absence of coverage for IDC's title follows from the finding that Commonwealth would not have issued the Policy if IDC had made the required disclosures. However, since the motion to amend has been made, it is granted pursuant to Fed. R. Civ. P. 15(b)[5] which provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend

---

[5] Fed. R. Civ. P. 15(b) was amended effective on December 1, 2007 but, the amendment made no substantive changes to the Rule.

does not affect the result of the trial of these issues.
If evidence is objected to at the trial on the ground
that it is not within the issues made by the pleadings,
the court may allow the pleadings to be amended and shall
do so freely when the presentation of the merits of the
action will be subserved thereby and the objecting party
fails to satisfy the court that the admission of such
evidence would prejudice the party in maintaining the
party's action or defense upon the merits.

In deciding whether to allow pleadings to be amended to
conform to the evidence, the relevant questions are whether the
parties expressly or impliedly agreed to try the issues raised by
the amendment and whether the opposing party would be "unduly
prejudiced." See Campana v. Ellen, 755 F.2d 212, 215 (1st Cir.
1985) ("Such late pleading amendments may be allowed . . . to the
extent that the party opposing the amendment will not be unduly
prejudiced.").

Generally, motions to amend the pleadings to conform to the
evidence should be granted "so long as the opposing party has not
been prejudiced in presenting his case." Brandon v. Holt, 469 U.S.
464, 471 n. 19 (1985) (internal quotes omitted). Prejudice, in
this context, refers to whether the opposing party "'had a fair
opportunity to defend and whether he could offer any additional
evidence if the case were to be retried on a different theory.'" In
re Rauh, 119 F.3d 46, 52 (1st Cir. 1997)(quoting Browning Debenture
Holders' Committee v. DASA Corp., 560 F.2d 1078, 1086 (2d Cir.
1977)). Conversely, "courts have refused to grant such motions if
amendment would prejudice one of the parties, such as by requiring

the presentation of additional evidence." <u>Scully Signal Co. v.
Elec. Corp. of America</u>, 570 F.2d 355 (1st Cir. 1977) <u>cert. denied</u>,
463 U.S. 945 (1978). A "claim of surprise that is not borne out by
the facts or an objection to a mere technical addition to the
theory of the claim for relief" is not sufficient to avert a motion
to amend. Miller & Wright, § 1495 at 58; <u>see</u> <u>Stevens v. F/V Bonnie
Doon</u>, 731 F.2d 1433 (9th Cir. 1984)(denying defendant's motion to
limit the damages to the sum set forth in the pleadings).

Here, the issue with respect to coverage of IDC's title is
whether Commonwealth would have issued the Policy if the required
disclosures had been made. IDC was on notice that this was an
issue in the case because the issue was raised by the allegation in
Commonwealth's complaint that it would not have issued the Policy.
Complaint ¶19. Furthermore, IDC's pretrial memorandum recognized
that "Commonwealth seeks a declaration that it is not required to
cover losses subsequently sustained by IDC, and related to the
<u>title</u> and development rights insured under the policy". Def.'s
Pretrial Mem. 1 (emphasis added).

In addition, IDC had ample opportunity to present evidence on
this issue. Indeed, during trial, IDC's counsel vigorously cross-
examined Mellion in an attempt to show that the undisclosed
information would not have influenced Commonwealth's decision to
issue the Policy.

Consequently, this is not a case in which, at trial, IDC,

unexpectedly, was confronted with a claim entirely different from the claims raised by the pleadings and was deprived of a fair opportunity to challenge the evidence presented in support of that claim. Commonwealth's complaint specifically alleged that the Policy was void and IDC had every opportunity to present evidence to the contrary.

### Conclusion

For all the foregoing reasons, the Clerk is directed to enter judgment in favor of Commonwealth on its complaint for declaratory relief declaring that Commonwealth Owner's Title Insurance Policy No. 228716 issued to IDC is null and void and that Commonwealth is not liable to IDC for any loss, damage, costs, attorney fees or expenses sustained or incurred by IDC as a result of Commonwealth's denial of coverage. The Clerk also is directed to enter judgment in favor of Commonwealth on IDC's counterclaims.

IT IS SO ORDERED.


Ernest C. Torres
Sr. United States District Judge

Date: December 21, 2007

23